IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AT SAN ANTONIO


UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                              No. SA:13-CR-00655-XR-5

MARCIANO MILLAN VASQUEZ,
                              San Antonio, TX
                    Defendant.   July 14, 2016


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
VOLUME 8
BEFORE THE HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

APPEARANCES


APPEARING FOR THE PLAINTIFF:

     Mr. Russell DeWitt Leachman
     Assistant United States Attorney
     601 N.W. Loop 410, Suite 600
     San Antonio, Texas  78216-5512
     210-384-7150
     russell.leachman@usdoj.gov

     Mr. Michael Christopher Galdo
     Assistant United States Attorney
     816 Congress, Suite 1000
     Austin, Texas 78701
     512-916-5858
     michael.galdo@usdoj.gov


APPEARING FOR THE DEFENDANT:

     Mr. Jaime Efrain Cavazos
     Attorney at Law
     110 West Nueva
     San Antonio, Texas 78204
     210-224-4848
     jcavazos_law@hotmail.com

ALSO PRESENT:

    Ms. Sonia Hart and Ms. Iris Farias
    Court-Appointed Interpreters

COURT REPORTER:

    Kristin M. Anderson, CSR, RPR, FCRR
    Former United States Court Reporter
    Bexar County Courthouse
    225th District Court
    100 Dolorosa, 2nd Floor
    San Antonio, Texas 78205
    210-335-2465
    kristin.anderson@bexar.org

Proceedings reported by stenotype, transcript produced by
computer-aided transcription.

INDEX

PLAINTIFF'S WITNESSES                                    Page

  Jorge De Leon-NAVARRO

    Redirect Examination by Mr. Galdo          1643

  Christopher Benavides

    Direct Examination by Mr. Leachman         1652

  Kelvin Culp

    Direct Examination by Mr. Leachman         1662

    Cross-Examination by Mr. Cavazos           1673

    Redirect Examination by Mr. Leachman       1674

    Recross-Examination by Mr. Cavazos         1675

  Cary Owens

    Direct Examination by Mr. Leachman         1675

    Cross-Examination by Mr. Cavazos           1680

Adolfo Efren Tavira-ALVERADO

    Direct Examination by Mr. Leachman            1685

    Cross-Examination by Mr. Cavazos             1787

    Redirect Examination by Mr. Leachman         1806

    Recross-Examination by Mr. Cavazos           1812

  Denise Stone

    Direct Examination by Mr. Leachman            1815

    Cross-Examination by Mr. Cavazos             1835

    Redirect Examination  by Mr. Leachman        1842


DEFENDANT'S WITNESSES

  None



                         EXHIBITS


| PLAINTIFF'S EXHIBITS | | IDENTIFIED | OFFERED | RECEIVED |
|---|---|---|---|---|
| 26 | Photograph | 1650 | 1650 | 1650 |
| 34 | Photograph | 1650 | 1650 | 1650 |
| 70 | Photograph | 1651 | 1651 | 1651 |
| 71 | Photograph | 1651 | 1651 | 1651 |
| 72 | Photograph | 1651 | 1651 | 1651 |
| 73 | Photograph | 1651 | 1651 | 1651 |
| 74 | Photograph | 1651 | 1651 | 1651 |
| 75 | Photograph | 1651 | 1651 | 1651 |

| 76  | Photograph | 1651 | 1651 | 1651 |
|-----|------------|------|------|------|
| 77  | Photograph | 1651 | 1651 | 1651 |
| 78  | Photograph | 1651 | 1651 | 1651 |
| 79  | Photograph | 1651 | 1651 | 1651 |
| 80  | Photograph | 1651 | 1651 | 1651 |
| 81  | Photograph | 1651 | 1651 | 1651 |
| 82  | Photograph | 1651 | 1651 | 1651 |
| 85  | Photograph | 1653 | 1654 | 1654 |
| 86  | Photograph | 1653 | 1654 | 1654 |
| 87  | Photograph | 1653 | 1654 | 1654 |
| 88  | Photograph | 1653 | 1654 | 1654 |
| 89  | Photograph | 1653 | 1654 | 1654 |
| 90  | Photograph | 1653 | 1654 | 1654 |
| 91  | Photograph | 1653 | 1654 | 1654 |
| 92  | Photograph | 1653 | 1654 | 1654 |
| 93  | Photograph | 1653 | 1654 | 1654 |
| 93A | Document   | 1654 | 1655 | 1655 |
| 94  | Photograph | 1653 | 1654 | 1654 |
| 95  | Photograph | 1653 | 1654 | 1654 |
| 96  | Photograph | 1653 | 1654 | 1654 |
| 97  | Photograph | 1668 | 1668 | 1668 |
| 98  | Chart      | 1736 | 1737 | 1737 |
| 99  | Chart      | 1736 | 1737 | 1737 |
| 241 | Map        | 1761 | 1761 | 1761 |
| 242 | Map        | 1761 | 1761 | 1761 |

| 242A | Map | 1761 | 1761 | 1761 |
| 242B | Map | 1761 | 1761 | 1761 |
| 242C | Map | 1761 | 1761 | 1761 |
| 242D | Map | 1761 | 1761 | 1761 |
| 243 | Map | 1751 | 1751 | 1751 |
| 243A | Map | 1751 | 1751 | 1751 |
| 243B | Map | 1751 | 1751 | 1751 |
| 247 | Documents | 1650 | 1650 | 1651 |
| 253 | Document | 1682 | 1680 | 1680 |
| 254 | | | 1680 | 1680 |
| 255 | Photograph | 1677 | 1677 | 1677 |
| 256 | Photograph | 1677 | 1677 | 1677 |
| 257 | Photograph | 1677 | 1677 | 1677 |
| 258 | Photograph | 1677 | 1677 | 1677 |
| 278 | | | 1648 | 1649 |
| 284 | Photo | 1784 | | |
| 285 | Photo | 1784 | 1785 | 1785 |
| 286 | Photo | 1784 | 1785 | 1785 |
| 287 | Photo | 1784 | 1785 | 1785 |
| 289 | Document | 1825 | 1825 | 1826 |
| 290 | Document | 1825 | 1826 | 1826 |

DEFENDANT'S EXHIBITS     IDENTIFIED OFFERED  RECEIVED

  None

1           (Judge enters courtroom.)

2           THE COURT:  Yes?

3           MR. CAVAZOS:  Yes, Your Honor.  May we approach?

4           THE COURT:  No one is here.

5           MR. CAVAZOS:  Oh, that's right.  No one is here.  I

6    visited with two people last night, and I've made a decision

7    that I do not intend to use Lucero Ivon Vasquez as a witness,

8    and that's the person being held through the writ.  So, as far

9    as the defense goes, we have no issue with the Court excusing

10   her.  We're not intending to use her in our case or the

11   rebuttal or anything.

12          THE COURT:  What's the Government --

13          MR. LEACHMAN:  She's not our witness, Judge.  We

14   issued a subpoena for her.  We'd ask that she be held until the

15   completion of trial and we make a determination as to whether

16   if we want her as the trial progresses.

17          THE COURT:  Okay.  She, I believe, has been

18   transported from Del Rio back to San Antonio is the last I

19   heard, is that -- Anybody?

20      Yes?

21          COURTROOM DEPUTY:  She's been appointed an attorney.

22          THE COURT:  And she's been appointed an attorney, so

23   she'll remain under the writ for now, and -- and we'll decide

24   when to release that writ.

25      Anything else we need to take up?

1    MR. CAVAZOS:  Yes, Your Honor.  There's some exhibits

2    that Mr. Leachman and I have concurred on that we want to make

3    you aware of to kind of speed things up.

4         THE COURT:  Okay.  Are these Government or defendant

5    exhibits?

6         MR. CAVAZOS:  Government.

7         MR. LEACHMAN:  So, Your Honor, on the 1A exhibits, I

8    failed to offer, but I think Jose Luis Rodriguez identified

9    Exhibits 26 and 34, and we're going to move for their

10   admission, and we can do this in front of jury without

11   objection.

12        MR. CAVAZOS:  That's correct.  I'm not -- I don't

13   intend to --

14        THE COURT:  Okay.

15        MR. CAVAZOS:  -- object to those.

16        THE COURT:  Well, if you're going to wait and do this

17   in front of the jury, let's just bring them in.

18        MR. CAVAZOS:  Oh, okay.

19        MR. LEACHMAN:  But there's several others that we --

20        THE COURT:  But they're all without objection?

21        MR. CAVAZOS:  Yes, Your Honor.

22        MR. LEACHMAN:  Yes, Your Honor.

23        THE COURT:  Okay.

24        MR. CAVAZOS:  The other matter that I want to bring

25   to the Court's attention, Your Honor, is he is on my witness

1  list, and it is the lawyer that represented Mr. Millan Vasquez

2  in that Mexican trial.  I know Your Honor has made a ruling on

3  that.  The Government and I have an agreement on that, and it's

4  not a stipulation.  Okay.  But it's an agreement, but I can --

5            THE COURT:  They're not going to object to you

6  tendering the evidence?

7            MR. CAVAZOS:  They're going to object to the

8  contents, and its validity, et cetera, so, basically --

9            THE COURT:  Hold on.  They are or are not?

10           MR. LEACHMAN:  We are not.  He's going to move --

11 he's going to seek to admit evidence that the -- that exhibit

12 saying that he was acquitted of the other charge.  We're not

13 going to object to that coming in, but we are definitely

14 contesting matters that are raised in it.

15           THE COURT:  Right.

16           MR. CAVAZOS:  Correct.  And what I intend to do with

17 this witness, Your Honor, is have him explain the process, the

18 trial, I guess if you will, the processes that were involved,

19 the procedures that were involved, the conclusions of -- of the

20 judge.  There was an appeal that is also part of the exhibits,

21 the defense exhibits, that he also handled as well.  And I

22 wanted to explain that.

23      In addition to that, Your Honor, my last submission, I

24 think it's Exhibit 10A or 10 -- it is -- and it was filed -- it

25 was preceded with a notice of intent to use a foreign document.

1    And what it is, Your Honor, is it's this same lawyer, at my

2    request, did what is called a -- or, basically, the equivalent

3    of a habeas -- habeas through a federal judge in Mexico wherein

4    that judge commanded the law enforcement authorities in that

5    district, or that territory, to answer him as to whether there

6    was any pending charges or any investigations involving the

7    defendant.  And -- and what I want this -- this witness to do

8    is explain that process, explain the procedures that he did,

9    explain the agencies that were notified, and then give a

10   summary of what it was that the court was able to provide.

11             THE COURT:  And is there objection to that testimony?

12             MR. LEACHMAN:  Absolutely, Your Honor.  We -- we

13   don't believe that any of that is relevant for the purposes of

14   this proceeding.  If -- if the Court's even inclined to

15   entertain it --

16             THE COURT:  I already made a --

17             MR. LEACHMAN:  -- I believe it's already been

18   addressed by a prior order.

19             THE COURT:  Right.  I already made a ruling.  That's

20   exactly what I was going to say.  So, you know, pursuant to

21   your agreement, you know, motions in limine rulings are

22   pretrial evidentiary not even -- they're not final evidentiary

23   rulings, so I made a ruling on the -- on the motion in limine

24   to the first part.  The Government now is not going to object,

25   so, if the Government doesn't object, then it comes in.

1       But, as to the second part, the Government still objects.

2   I've already ruled on that.  So, before the witness testifies

3   on that, approach the bench, we offer your explanations, and

4   I'll make a final ruling at that point.

5           MR. CAVAZOS:  Will Your Honor give me an opportunity

6   to make a proffer for the record?

7           THE COURT:  Well, yeah, if I exclude it, which I'm

8   likely to do to be quite honest with you because I've already

9   looked at this law pretty closely, but I'm subject to seeing

10  what -- you know, how this is playing out and see how this

11  progresses.  But assuming I believe I'm still correct on the

12  law, and I exclude it before the jury, you'll be allowed to

13  present, outside the presence of the jury, the evidence for the

14  limited purposes of perfecting an appeal.

15          MR. CAVAZOS:  Thank you, Judge.

16          THE COURT:  Anything else?

17          MR. LEACHMAN:  No, I think we can take it up at the

18  time, Judge.  I don't think he's allowed to get behind the

19  judgment either.  I mean he can put the documents in.

20          THE COURT:  Behind the judgment?

21          MR. LEACHMAN:  Well, I mean what he was trying to --

22          THE COURT:  There was no judgment on that habeas.  It

23  was just --

24          MR. LEACHMAN:  No, I understand that.  I'm talking

25  about the prior matter, Your Honor.  The acquittal on the one

1    Mexican --

2         THE COURT:  Well, I thought you were not objecting to

3    that?

4         MR. LEACHMAN:  I'm not objecting to the document

5    coming in, and that's what the agreement says.  But, just like

6    in any case, you can -- you can prove up a judgment, that

7    doesn't mean you get to -- to get behind the judgment, and so,

8    you know, the documents speak for themselves.  I don't think he

9    gets to put the guy on to say, "I was involved in this, and

10   this is how it really went."  But --

11        THE COURT:  Well, no.  I didn't understand

12   Mr. Cavazos saying that.  I understood Mr. Cavazos saying he

13   was going to put up the lawyer to say, this is the process.

14   That's -- that's what I heard, not -- not -- I mean so there's

15   a difference between explaining to the jury the process and --

16   and offering his -- his own independent thoughts on -- on what

17   was going on behind the scenes.

18        I thought he was just going to say, you know, my client

19   was picked up on such-and-such date in Mexico.  There's not

20   jury trials.  There's proceedings just before the bench.  The

21   judge hears testimony only through affidavits.  The judge read

22   all the affidavits.  This was his conclusion.  Someone appealed

23   that.  And -- and, on appeal, it was either affirmed or over --

24   or overturned.  That's what I thought he was going to testify

25   to.

```
 1              MR. LEACHMAN:  Maybe I misunderstood.

 2              MR. CAVAZOS:  If that's -- if that's the limit of

 3    what I'm allowed to do, I'll hold it to that.

 4              THE COURT:  That's what I thought you were intending,

 5    and that's what you are limited to.

 6              MR. CAVAZOS:  Very well.

 7              THE COURT:  Okay.  Can we bring in the jury?

 8              MR. CAVAZOS:  And the jury can have access to that

 9    document, and they can make --

10              THE COURT:  Right.  I mean --

11              MR. CAVAZOS:  -- the conclusions they wish?

12              THE COURT:  -- the Government is not objecting to the

13    introduction of the documents, so the documents in their

14    English translation go to the jury for its consideration of

15    whatever worth they think it's entitled to.

16              MR. CAVAZOS:  Fair enough.

17              THE COURT:  Anything else?

18              MR. LEACHMAN:  No.

19              MR. CAVAZOS:  I think not, Your Honor.

20              THE COURT:  Let's bring in the jury.

21              MR. CAVAZOS:  Oh, Your Honor.  One other matter --

22              THE COURT:  Oh, one second.

23              MR. CAVAZOS:  -- one other matter.

24         I thought at the end of testimony yesterday that this

25    witness was excused and done.  That was my understanding.
```

1        THE COURT:  I thought -- Karl is not here.  I thought

2   you were still taking him -- or who -- who had him?

3        MR. LEACHMAN:  He had just passed him --

4        THE COURT:  Right.

5        MR. LEACHMAN:  -- you asked Mr. Galdo if he had any

6   redirect --

7        THE COURT:  There we go.  Right.

8        MR. LEACHMAN:  -- he said it would be --

9        THE COURT:  Extensive.  And that's correct.

10        MR. GALDO:  It may not be as -- as -- I do have a

11   couple --  a few questions for Mr. De Leon.

12        THE COURT:  Okay.

13        COURT SECURITY OFFICER:  All rise for the jury.

14              (Jury enters courtroom.)

15        THE COURT:  Please be seated.

16     Good morning, ladies and gentlemen.

17     And, Mr. Galdo?

18        MR. GALDO:  Thank you, Your Honor.

19                   JORGE DE LEON-NAVARRO,

20   having been previously duly sworn, testified under oath as

21   follows:

22                   REDIRECT EXAMINATION

23   BY MR. GALDO:

24   Q. Good morning, Mr. De Leon.

25   A. Good morning.

1    Q. You understand you're still under oath?

2    A. Yes.

3    Q. So I'm going to talk to you about a couple of different

4    timeline issues that defense counsel was asking you about

5    yesterday.   Okay?

6    A. Yes.

7    Q. The first is about what you told law enforcement.   The

8    first -- when you first were arrested, you told law enforcement

9    you had been kidnapped; right?

10   A. Yes.

11   Q. And then they started interviewing you, then you asked for a

12   lawyer?

13   A. Correct.

14   Q. And then, once you had a lawyer, that lawyer had to do

15   things like get discovery, which is the evidence from about

16   your case, and go over that with you; correct?

17   A. Yes.

18   Q. And then he entered into negotiations with our office about

19   a plea?

20   A. Yes.

21   Q. And then, during that process, we sat down and had a

22   conversation; correct?

23   A. Yes.

24   Q. And the first time that you sat down with us to discuss the

25   details of when you were kidnapped, you told us you had

1    witnessed horrific murders; right?

2           MR. CAVAZOS:  Leading, Your Honor.

3           THE COURT:  That's sustained.

4    BY MR. GALDO:

5    Q. Sir, when you sat down with us to have a conversation in

6    detail, without going into exactly what you say -- what you

7    said, were you able -- did you recount what you saw?

8    A. Yes.

9    Q. I also want to talk to you about the timeline when you were

10   kidnapped.  And I wrote down some dates on a piece of paper,

11   and the last date on here, if you can see the screen, the

12   bottom of the screen --

13   A. Yes.

14   Q. -- and you can read my handwriting, 3/1/31, March 1st, 2013;

15   do you see that at the bottom?

16   A. Yes.

17   Q. And that's the date that we were talking to defense

18   counsel --

19           MR. CAVAZOS:  Your Honor, I'm -- I'm going to object

20   with the presentation of that timeline.  This witness has been

21   direct and cross-examined on dates, and he testified repeatedly

22   that he did not know.

23           THE COURT:  Just make an objection.  What's the

24   objection?

25           MR. CAVAZOS:  It's leading.

1    THE COURT:  That's overruled.

2  BY MR. GALDO:

3  Q. So this is just a series of dates in February and March;

4  correct?

5  A. Yes.

6  Q. And February has 28 days?

7  A. Yes.

8  Q. And you were asked about when you were released and defense

9  counsel asked if it was March 1st, and you said March 1st;

10  right?

11  A. Yes.

12  Q. And then there were also questions about -- repeated

13  questions about the text you sent on the February 23rd, which

14  is in evidence, about the Abascals (*phonetic*) that you saw

15  killed and burned; right?

16  A. Yes.

17  Q. And where did that take place?

18  A. The junkyards.

19  Q. Then there was defense counsel asked you a lot of

20  questions --

21    THE COURT:  Let's just ask a question.

22  BY MR. GALDO:

23  Q. -- about what location -- questions about the location.  And

24  what was the first place that you saw the killings?

25    MR. CAVAZOS:  Your Honor, these questions have all

1  been asked and answered.

2          THE COURT:  That's overruled.

3          THE WITNESS:  The orange house.

4  BY MR. GALDO:

5  Q. And actually, before I write that down, you said you -- how

6  many days did you say you were kidnapped for?

7  A. Yes.

8  Q. How many days?

9          THE COURT:  That was asked and answered.

10      Next question.

11  BY MR. GALDO:

12  Q. You testified it was 13 days.  And so if we count, one, two,

13  three, four, five, six, seven, eight, nine, ten, eleven,

14  twelve, thirteen.  That's 13 days; right?

15  A. Yes.

16  Q. So the -- so the orange house was the first location.  And

17  you then went to another location to witness a killing; right?

18  A. Santa Nella (*phonetic*).

19  Q. And then where did you go back to see the third?

20  A. The orange house.

21  Q. And then after the orange house?

22  A. The house with two stories.

23  Q. And I don't want to get into the details again.  But what

24  was -- what was the type -- what occurred there?  Just in the

25  broadest sense.

1  A. Where the little girl and her parents died.

2  Q. And then, after that, you talked about going to the

3  junkyards; right?

4  A. Junkyards.

5  Q. And then after the junkyards --

6  A. Again, to the junkyards.

7  Q. Another junkyard.  And where was the final location?

8  A. The river.

9  Q. And did you know how close the river incident was to the day

10  you were released?

11  A. The last day.  That one.

12  Q. Do you remember exactly what days these events occurred on?

13  A. I don't recall exactly.

14  Q. So, as best you can recall, what's now on the screen

15  accurately depict your memory within a date range of what

16  occurred?

17  A. Yes.

18          MR. GALDO:  Your Honor, Government offers

19  Exhibit 278.

20          MR. CAVAZOS:  I'm going to object, Your Honor.  It

21  does not speak for his testimony.  It's not an accurate

22  reflection.

23          THE COURT:  Your response?

24          MR. GALDO:  Your Honor, the witness just said it did.

25          MR. CAVAZOS:  It provides no specificity, Your Honor,

1   and --
2          THE COURT:  It doesn't require specificity.  It's a
3   summary.  It's admitted.
4          MR. GALDO:  I'm going to simply write on the top,
5   Jorge De Leon.
6   BY MR. GALDO:
7   Q. Mr. De Leon, did -- during the time period of your
8   kidnapping, did anyone with the Zeta organization visit your
9   family in Acuna?
10         MR. CAVAZOS:  Objection, Your Honor.  There's been no
11  foundation laid that he has any personal knowledge of that.  He
12  was in custody -- or allegedly in custody.
13         THE COURT:  That's sustained.  You need to establish
14  a foundation.
15  BY MR. GALDO:
16  Q. Do you know of any visits to your family?
17  A. Chano spoke with my family.
18  Q. And, Mr. De Leon, you were asked about your family
19  yesterday, and when I asked you why it was so hard to identify
20  the defendant, you said there was fears for your family.  Do
21  you still have significant fear of the defendant and your
22  family being harmed?
23  A. Yes.
24         MR. GALDO:  I'm going to pass the witness,
25  Your Honor.

1        THE COURT:  Any questions?

2        MR. CAVAZOS:  No questions, Your Honor.

3        THE COURT:  Any further need for this witness?

4        MR. GALDO:  No, Your Honor.  May he be excused?

5        MR. CAVAZOS:  Yes, he may.

6        THE COURT:  He's excused.

7            (Witness excused from witness stand.)

8        THE COURT:  Your next witness or housekeeping?

9        MR. LEACHMAN:  Yes, Your Honor.  We have a few

10  housekeeping matters to take up quickly with the -- with the

11  Court.

12      Exhibits 20 -- 1A-26, and 1A-34 are photographs of

13  individuals identified on a chart but not in individual photos,

14  and we're going to move those into evidence without objection.

15        THE COURT:  Okay.  Give me the numbers again.

16        MR. LEACHMAN:  1A-26A and 1A-34.

17        MR. CAVAZOS:  That's correct, Your Honor.  No

18  objection.

19        THE COURT:  1A-26 is admitted.  1A-34 is admitted.

20        MR. LEACHMAN:  I'm also moving in Government's

21  Exhibit No. 247 which is a series of government documents

22  related to crossing histories.

23        THE COURT:  Any objection?

24        MR. CAVAZOS:  One second, Judge.  Let me refer to my

25  notes.

1    247?

2           MR. LEACHMAN:  Correct.

3           MR. CAVAZOS:  No, Your Honor.  No objection.

4           THE COURT:  247 is admitted.

5           MR. LEACHMAN:  We're also moving, Your Honor, for the

6    admission of Government's Exhibits 70 through 82 inclusive

7    which are photos related to the particular marijuana seizure.

8           THE COURT:  Any objections to --

9           MR. CAVAZOS:  No, Your Honor, no objections to 70

10   through 82.

11          THE COURT:  70 through 82 are admitted.

12          MR. LEACHMAN:  And, with that, we're ready to call

13   our next witness.

14          THE COURT:  Your next witness.

15          MR. LEACHMAN:  We do have, I guess, one other just --

16   I don't know if the court reporter can help us with this or

17   not, but the transcript is no longer --

18          THE COURT:  And it's because Karl is realtime, and

19   Kristin is not.

20          MR. LEACHMAN:  Okay.  And, with that, then,

21   Your Honor, the Government would call Chris Benavides.

22          COURTROOM DEPUTY:  Raise your right hand.

23              (Witness sworn.)

24          COURTROOM DEPUTY:  Thank you.  Have a seat.

25          MR. LEACHMAN:  May I proceed, Your Honor?

1    THE COURT:  Yes.

2             CHRISTOPHER BENAVIDES,

3    being first duly sworn, testified under oath as follows:

4             DIRECT EXAMINATION

5    BY MR. LEACHMAN:

6    Q. Please state your full name for the record.

7    A. Full name is Christopher Benavides.

8    Q. And, Mr. Benavides, how are you currently employed?

9    A. I'm currently employed as a Special Agent with the Bureau of

10   Alcohol, Tobacco, and Firearms here in San Antonio.

11   Q. And, as an ATF agent, what are your duties and

12   responsibilities?

13   A. I'm a -- I'm investigating firearms, explosives, and

14   arson-related federal offenses.

15   Q. Okay.  And, as part of those duties and responsibilities,

16   when -- when other law enforcement agencies, state and federal,

17   including DEA, FBI, people like that, make seizures of weapons,

18   are you often called in to process those?

19   A. That is correct, that we do.

20   Q. And, as such, are you a person who's familiar with the

21   various types of weapons and -- and their capabilities and

22   things of that a nature?

23   A. Yes, sir, I am.

24             MR. LEACHMAN:  May I approach the -- the witness,

25   Your Honor?

1    THE COURT:  Yes.

2  BY MR. LEACHMAN:

3  Q. Agent, I'm going to show you some photographs that have been

4  previously marked as Government's Exhibits 85, 86, 87, 88, 89,

5  90, 91, 92, 93, 94, 95, and 96 --

6  A. Yes, sir.

7  Q. -- and ask you, if you'll take a look at those, and when

8  you're done, I'll have a few questions about that.

9    Do you recognize what's depicted in that photograph?

10  A. Yes, sir, I do.

11  Q. And were you -- in regards to what we just talked about

12  earlier, were you called out in July of 2011 in connection with

13  a significant gun seizure here in the San Antonio area to -- to

14  look at and -- and have -- have your agency process those

15  weapons?

16  A. I was not actually called out, but I am familiar with the --

17  with this particular recovery.

18  Q. Okay.  And so other ATF agents were also involved in that

19  particular process; is that correct?

20  A. Correct.  Our office was contacted immediately on this

21  seizure, and we did have two agents that did go out and help

22  process.

23  Q. Okay.  And then, when the guns came back to the ATF, that's

24  when you became familiar with the firearms that are described

25  therein; is that correct?

1    A. Yes, sir.  That is correct.

2    Q. And you have also been involved in processing firearms that

3    were -- were seized in connection with -- with, for example,

4    the La Trusa (*phonetic*) case; is that correct?

5    A. Yes, sir, that is correct.

6    Q. And, in that case, did -- was there similar types and -- and

7    kinds of firearms seized related to that investigation also?

8    A. Yes, sir.  These are particularly AK-47 type variant rifles

9    as well as 223 caliber assault rifles as well.

10            MR. LEACHMAN:  Your Honor, the Government would move

11   for the admission of Government's 85 through 96.

12            MR. CAVAZOS:  No, objection, Your Honor.

13            THE COURT:  85 through 96 are admitted.

14   BY MR. LEACHMAN:

15   Q. Okay.  And so -- so the jury can see what we're talking

16   about here, let me show you what's marked as Government's

17   Exhibit No. 93 and 94.  And I'm going to show you what I'm

18   going to mark as Government's Exhibit No. 93-A, which is not --

19   it's not on the exhibit list, Your Honor, but I've shown it

20   previously to defense counsel.

21        And may I approach the witness?

22            THE COURT:  Yes.

23   BY MR. LEACHMAN:

24   Q. And I'm going to show you what's been marked as Government's

25   Exhibit No. 93A, and does that represent an inventory of the

1  firearms that are depicted in the photograph that -- that

2  you're now looking at?

3  A. Yes, sir, it is.

4         MR. LEACHMAN:  Move for the admission of Government's

5  Exhibit 93A.

6         MR. CAVAZOS:  No objection, Your Honor.

7         THE COURT:  93A is admitted.

8  BY MR. LEACHMAN:

9  Q. And, Agent Beach, in connection with this particular load of

10  firearms, I want to -- or Benavides.  Agent Beach is another

11  ATF agent; is that right?

12  A. Yes, sir, it is.

13  Q. Okay.  I apologize.

14      If we look at that list, does that -- does that tell you

15  the various types of firearms that are depicted in -- in the

16  photos and that were seized back in July of 2011?

17  A. Yes, sir, it gives a description of the manufacturer and the

18  make as well as the model and the type of caliber that -- with

19  that particular rifle.

20  Q. Okay.  And I'm not sure if the jury is familiar with the

21  various types of firearms, so I would like you to briefly tell

22  me a little bit about the characteristics of some of those.

23  Okay.  And, first, let me ask you this, and we go -- if you go

24  and look at Exhibit 93A, for example, the first one is a

25  DPMS A15, 223.  What does that tell you about that firearm?

1  A. That tells me that's a civilian type of assault rifle,

2  similar to a M-16, which is military-style rifle.  Most of the

3  time it's used for -- for protection or for killing.  It uses a

4  223 caliber rifle round, and it's semiautomatic.

5  Q. Okay.  And then if we look at just the second one on the

6  same list.  It's a Saiga AK variant 7.62 by 39.  What -- what

7  is that?

8  A. It's a -- also an assault rifle also used mostly by Soviet

9  or Eastern block countries, Romania, Russia.  It's also used in

10 Korea, and it's a different type of caliber.  It's mostly used

11 for military.  It's not our military.  It's foreign military.

12 And it uses a different type of caliber, which is a 7.62 by 39

13 millimeter round.

14 Q. Is that a high-power cartridge?

15 A. Both of those are, a 223, as well as the 7.62 are high

16 velocity rounds in order to penetrate kevlar as well as body

17 armor.

18 Q. Okay.  And if we went through it -- and I'm not going to do

19 it.  We've been at this too long to do that.  But if we went

20 through this whole list, most of the weapons that we're talking

21 about are either a variant of an AK-47 or an AR-15; is that

22 correct?

23 A. That is correct.

24 Q. And an AK-47 is the primary -- is that the primary military

25 weapon used by Eastern block countries across the world?

1  A. It is, and also the most available to get in multiple

2  countries as well.

3  Q. So it's the most used small arm in military activities in

4  the world?

5  A. Based on my training and experience, it is.

6  Q. And -- and is the ARV-15 basically the civilian variant of

7  the M-16 which is the second most common small arm used by

8  armies across the world?

9  A. Yes, sir, it is.

10  Q. Okay.  And are both of these weapons capable of using high

11  capacity magazines?

12  A. Yes, they -- they do.  They can accept high capacity

13  magazines.

14  Q. Okay.  And I guess I should just quickly -- there are few

15  types of other guns on here, like, a mini 14.  What's that?

16  A. It's a -- also purchased as a ranch rifle, and it's a wooden

17  stock, but it also carries as 762 caliber 39, and it's bolt

18  action sometimes.

19  Q. Okay.  And then also there's some -- there's some weapons on

20  here that are shotguns as well; is that correct?

21  A. There were some shotguns, yes.

22  Q. And what's the difference between a shotgun and a rifle?

23  A. It has to do with the -- the barrel.  On the rifle, it has,

24  inside the barrel, a rifling round.  It actually spins when it

25  comes out.  And, as far as a shotgun, it's what you call a

1   smooth bore.  In other words, it uses a slug or different type

2   of round that shoots straight out the barrel.

3   Q. And a shotgun can have multiple projectiles?

4   A. It can.  It also can have a high capacity magazine go with a

5   shotgun as well.

6   Q. Okay.  And so, like, in Government's Exhibit 92, if we look

7   kind of at the -- down -- down here at the lower right-hand

8   corner of that photo, what -- what is that item right there?

9   A. In -- in layman terms, it's basically called a high capacity

10  magazine or a drum, a drum type of round that can hold -- that

11  one I can't tell.  It can hold anywhere from 50 to 100 rounds

12  depending on what type of ammunition is going inside of it.

13  Q. And does that allow you to shoot continuously without having

14  to reload?

15  A. Correct.  It doesn't -- it's not fully -- it doesn't make

16  the firearm fully automatic, but what it makes is the

17  individual not having to continuously reload in order to have

18  multiple rounds come out of the rifle.

19  Q. Okay.  And are all of these, or at least the AK variants and

20  AR-15s that are depicted in the various photos in Government's

21  Exhibit 92 through 94 and on 93A, are the -- are the vast

22  majority of those able to accept high capacity magazines?

23  A. Yes.  And, actually, most of them are sold with high

24  capacity magazines when you purchase them.

25  Q. And -- and define, for the ladies and gentlemen of the jury,

1  what a high capacity magazine is.

2  A. It's -- it's considered ten or more on a -- on a magazine.

3  And when I say magazine, or some people call it a clip, and

4  that's what attaches to the -- the rifle or the pistol.

5  Because you can have a high capacity magazine for a pistol as

6  well as a -- a long gun which is what these are.

7  Q. Okay.  And are some of these, even these AK and AR variants,

8  like I'm looking at Exhibit 93, and I'm looking at the -- the

9  guns that are situated vertically --

10  A. Yes, sir.

11  Q. -- along the right side, are those actually pistol versions

12  of those two types of firearms?

13  A. That's correct.  It still shoots the same type of caliber

14  that we've been discussing, a 762, it just doesn't have a

15  telescopic or a folding stock, but it is considered a pistol

16  because it's meant to be fired from your hand as opposed to

17  having it put against your shoulder.  So those are considered

18  pistols.

19  Q. And let me show you what's been previously introduced into

20  evidence as Government's Exhibit No. 104, which -- which is

21  some -- another firearm load that was seized in connection with

22  this case and ask -- and these -- and these are full auto

23  weapons.  Can you -- can you tell us what the difference is

24  between a full auto weapon and what you've just been

25  describing?

1    A. Yes, sir.  If you look -- if you recall the other

2    photograph, they look very similar as far as the appearance on

3    there.  The difference has to do with a configuration on the

4    way the -- the trigger system is set up.  On a fully -- on a

5    fully automatic firearm, or these rifles, when you pull the

6    trigger back, it continuously rifles the round through the

7    chamber.  It's just one hold, and it continuously does it.  On

8    the other you saw which was semiautomatic, it takes one trigger

9    pull for every single time.  So as fast as you want to pull it,

10   the round will come out versus these one hold continually will

11   empty out the magazines.

12              THE COURT:  Agent, you might want to just slow down

13   just a tad bit.

14              THE WITNESS:  Yes, Your Honor.

15              MR. LEACHMAN:  Yeah.  Sorry, Your Honor.  I'm not

16   helping.  I'm pushing this along.

17   BY MR. LEACHMAN:

18   Q. And -- and is the full auto application typically a

19   military-type application?

20   A. That -- that is correct.

21   Q. And is -- it is possible for a civilian to own these kinds

22   of weapons?

23   A. It is, as long as they're licensed with the Bureau of

24   Alcohol, Tobacco and have paid a -- a fee in order to -- to

25   possess it, as well as have a background check, it is lawful.

1    Q. And -- and there's a whole separate -- there's a whole

2    separate process for a full auto weapon than there would be for

3    a semi-auto weapon; is that correct?

4    A. That is correct.

5    Q. Okay.

6            MR. LEACHMAN:  I'll pass the witness.

7            THE COURT:  Any questions?

8            MR. CAVAZOS:  No questions.

9            THE COURT:  You may step down, Agent.  Thank you.

10           THE WITNESS:  Thank you, Your Honor.  Thank you,

11   jury.

12           THE COURT:  And your next?

13           MR. LEACHMAN:  The United States would call

14   Agent Kelvin Culp.

15       May -- may this witness be excused, Your Honor?

16           THE COURT:  Any further need for this witness?

17           MR. CAVAZOS:  No, Your Honor.

18           THE COURT:  He's excused.

19               (Witness excused from the witness stand.)

20           COURTROOM DEPUTY:  Could you raise your right hand.

21               (Witness sworn.)

22           COURTROOM DEPUTY:  Thank you.  Have a seat.

23                       KELVIN CULP,

24   being first duly sworn, testified under oath as follows:

25

1          DIRECT EXAMINATION

2     BY MR. LEACHMAN:

3     Q. Please state your name for the record, sir.

4     A. Kelvin Culp.

5     Q. And how are you employed, sir?

6     A. For the Drug Enforcement Administration.

7     Q. And where are you currently assigned?

8     A. Here in San Antonio.

9     Q. And how long have you been so assigned?

10    A. Been here since 2001.

11    Q. And what is your current position?

12    A. Investigator Special Agent.

13    Q. And did you have that same position and were you working in

14    that capacity back on July 7th of 2011?

15    A. I was.

16    Q. And in connection with your duties as a DEA agent, were you

17    involved in an investigation of a narcotics and -- and

18    gun-trafficking ring?

19    A. Yes, sir, I was.

20    Q. And, as part of your involvement in that, did you learn on

21    July 7th of 2011 of a potential gun load that was being

22    transported from the interior of the United States to the

23    border of Mexico?

24    A. Yes, sir.  That's correct.

25    Q. And how was it that you learned about that?

1   A. I was told by the case agent that they had information that

2   a load may be picked up in Houston and taken across the border.

3   Q. Okay.  And was that a lengthy investigation that had been

4   ongoing for --

5   A. Quite a while.

6   Q. -- for a long period of time?

7   A. Yes, sir.

8   Q. Okay.  And, in connection with that, did you learn that

9   there might be a particular vehicle involved in the

10  transportation of these weapons?

11  A. Yes.

12  Q. And did you and others take steps in order to interdict that

13  vehicle before it made it to Mexico?

14  A. We did.  We established surveillance.

15  Q. And did agents obtain eyes on the vehicle that was believed

16  to be involved with this particular activity?

17  A. Yes, we did.

18  Q. And -- and where was that?

19  A. It was on the other side of Seguin on I-10.

20  Q. Okay.  And, as a result of that, was a traffic stop

21  initiated at the vehicle?

22  A. Yes, by the Guadalupe County Sheriff's Office.

23  Q. And what kind of vehicle was it?

24  A. I recall it being, like, a black Ford pickup with a trailer.

25  Q. Okay.  And so I'm going to show you what's marked as

1  Government's Exhibit 86 and ask you is that the license plate

2  of the vehicle that was involved?

3  A. Yes, sir.

4  Q. And Government's Exhibit No. 85, is that the trailer you

5  just described?

6  A. It is.

7  Q. And did you have reason to believe that -- that there was

8  something hidden within the contents of that trailer?

9  A. Yes, sir.  We received information that they might be hiding

10  guns inside the hidden compartment or concealed compartment

11  inside of the Sheetrock there.

12  Q. Okay.  And so, once the traffic stop was initiated, what

13  happened?

14  A. The deputy made contact with the driver, said he appeared

15  nervous.  He received consent to search the truck and the

16  trailer.

17  Q. Okay.  And, ultimately, did -- did you search the truck and

18  the trailer?

19  A. Yes, sir, we did.

20  Q. And, as part of that, did you remove the -- the --- I guess

21  these sheets of plywood and -- and the Sheetrock that -- that

22  were on -- on the top of the trailer?

23  A. Yes, sir.

24  Q. I'm showing you Government's Exhibit No. 88, is that what

25  was contained within the interior of the Sheetrock on that

1 trailer?

2 A. Yes, sir, it is.

3 Q. And just for the benefits of the -- of the jury, there's

4 photographs of boxes here on the top.  Do you see that?

5 A. I do.

6 Q. And what is that?

7 A. That would be ammunition.

8 Q. Okay.  And we can also tell that -- I don't know if you can

9 tell, but I can from here.  But that it says it's 5.56.  Is

10 that the caliber of ammunition that it is?

11 A. It is.

12 Q. And is that the kind of ammunition that's used for an AR-15?

13 A. It is.

14 Q. And so did you continue to -- to look at and inventory --

15 well, let me ask you this, too.

16     Do you see these things up here?  And I'm looking at

17 Government's Exhibit No. 87, do you see these things up here?

18 A. I do.

19 Q. Are those -- are those tuna can type containers that are

20 actually sealed up hermetically, and everything, that contain

21 other ammunition for 7.62 by 39 weapons?

22 A. Yes, sir.

23 Q. And then did you ultimately extract everything that was

24 contained within the trailer that's depicted on Government's 87

25 and 88?

1   A. Yes, sir, we did.

2   Q. And I'm going to show you Government's Exhibit 93, 94, 95,

3   96, and ask you, are those the guns that were subsequently

4   taken out and inventoried by you and others?

5   A. They were.  I believe the count is 67 guns.

6   Q. Okay.  And actually we have in evidence a document,

7   Government's Exhibit 93A, that -- that sets forth the type

8   and -- of weapons each of those are; is that correct?

9   A. That's correct.

10  Q. And all of these are firearms; right?

11  A. They are firearms.

12  Q. And then you also found, since it's in here, 89 to 91 photos

13  of tools that were in there, what was the significance of that?

14  A. Well, it either could have been used as just, you know,

15  cover, or it could have been used to drill actually the

16  Sheetrock to make the holes.

17  Q. Okay.  And also maybe it looks like a construction crew --

18  A. Yes, sir.

19  Q. -- carrying it around --

20  A. Exactly.

21  Q. -- like a normal thing for a person  --

22  A. Right.

23  Q. -- that would be doing a Sheetrocking job?

24  A. Right.

25  Q. Okay.  All right.  And then after this seizure took place --

1    MR. LEACHMAN:  Did you get squared up?

2    MR. GALDO:  I have the disk.

3    BY MR. LEACHMAN:

4    Q. All right.  After this seizure was effected -- first, let me

5    ask you.  Was this seizure tied back to an individual named

6    Adolfo Efren Tavira?

7    A. Yes, sir.

8    Q. And did agents, subsequent to that, have an opportunity to

9    speak to Mr. Tavira?

10    A. Yes, sir.

11    Q. And, based upon those conversations, did they learn that --

12    that this was a gun seizure that was one of -- of other gun

13    seizures?

14    A. Yes, sir.

15    Q. And did the DEA do some investigation, based on that, to

16    look at crossing histories related to the trailer that was

17    depicted in Government's Exhibit, I think, 85, if I remember

18    right, 85, to determine whether or not you could find some

19    prior crossings of that trailer?

20    A. Yes, sir.  It's my understanding that, through law

21    enforcement databases, they did find other crossings with that

22    same trailer.

23    MR. LEACHMAN:  May I approach the witness?

24    Your Honor?

25    THE COURT:  Yes.

1668

1   BY MR. LEACHMAN:

2   Q. I'm going to show you what's been marked as Government's

3   Exhibit No. 97.  Have you had the opportunity to review that?

4   A. I have.

5   Q. And I'm going to see if we can get this thing to work.  But

6   the following -- does this fairly and accurately depict that

7   trailer on a -- on a previous occasion?

8   A. It does.

9           MR. LEACHMAN:  I move for the admission of

10  Government's Exhibit 97.

11          MR. CAVAZOS:  No objection, Judge.

12          THE COURT:  97 is admitted.

13  BY MR. LEACHMAN:

14  Q. Okay.  And while they're working on that to see if they can

15  get this to play, this is -- let's -- let's make sure the jury

16  knows what it is.  So is this a video taken at POE?

17  A. Yes.

18  Q. And is it a southbound video of a truck and trailer that's

19  going out of the United States into Mexico?

20  A. That's correct.

21  Q. And are you familiar with -- with southbound operations at

22  the port?

23  A. I know, from time to time -- they have cameras set up, and,

24  from time to time, they have different operations set up, yes.

25  Q. Okay.  But it's not the same deal as, like, people -- I mean

1    the port coming into the United States is a full-time, 24-hour,

2    7-day a week thing; right?

3    A. Yes, sir.

4    Q. And what is your understanding as far as the outgoing

5    operation?

6    A. Well, I know they have cameras set up, whether they have

7    them 24/7 is not the same as the inbound, and sometimes they do

8    subsequent operations to check outbound.

9    Q. And -- and, in fact, something that sort of varies depending

10   on what's going on?

11   A. Correct.

12   Q. Okay.  So let me ask about that.  So is there multiple

13   camera views of -- of this southbound operation showing people

14   exiting the United States?

15   A. There are.  I believe it's on Camera 4.  If you check

16   Camera 4, it will show the outbound with a similar shot of

17   the --

18   Q. Okay.

19   A. -- one on screen --

20   Q. Just so the jury understands, while you're directing to

21   Camera 4, does Camera 1 sort of show, like, the vehicle coming

22   head on?

23   A. So Camera 1 would be the front of the vehicle; Camera 2 may

24   be a side angle of the driver; and, Camera 4 would be the rear

25   end of the trailer going outbound.

1  Q. Okay.  So it's the one that -- that allows you to best see

2  basically the -- the trailer --

3  A. Correct.

4  Q. -- as it's leaving is --

5  A. Correct.

6  Q. -- that correct?

7          MR. LEACHMAN:  If you make No. 4 play --

8      This is why I hate it.

9          THE WITNESS:  If you'd like, I can see if I can

10  assist with it?

11          MR. LEACHMAN:  Well, I think the problem is the feed

12  not the -- not the computer --

13          THE WITNESS:  Okay.

14          MR. LEACHMAN:  -- at this point, but I'm not -- I'm

15  not --

16          THE WITNESS:  There's one or two underneath there,

17  under 4?

18          MR. LEACHMAN:  Yes.

19          THE WITNESS:  Okay.  I've got the video.  Do I need

20  to hit a function to load it in here?

21          MR. LEACHMAN:  I think there's some sort of a switch

22  over here that has to be --

23      Does it work on this -- on a -- on a laptop?

24          THE WITNESS:  Yes.

25          MR. LEACHMAN:  Okay.  And, yeah, let's just--

1    I mean is that acceptable, Your Honor?

2         THE COURT:  Yes.

3         MR. LEACHMAN:  Okay.  Let's do this.  Let's take it

4  up here --

5    Your Honor, may I have permission for the witness to stand

6  down here kind of in front of the jury to assist --

7         THE COURT:  Let's just play it from the witness

8  stand.

9         MR. LEACHMAN:  Is it going to show on the Elmo?

10 Okay.  Well, let's try that.

11        THE WITNESS:  There we go.

12             (Video playing.)

13        THE WITNESS:  Right there.  I think if you let it

14 play a bit and pause it as it moves forward, you'll catch

15 the -- the back end, and I believe a paper tag in the back.

16 And right there.

17 BY MR. LEACHMAN:

18 Q. Okay.  And, on that, you can see the same stripe that's on

19 this -- this exhibit --

20 A. Yes, sir.

21 Q. -- is that right?

22 A. Yes, sir.

23 Q. Okay.  And --

24 A. Same blue tarp.

25 Q. -- the other thing that's important is that -- that's fine.

1          MR. LEACHMAN:  Well, let me just ask Agent Culp about

2     that.

3     BY MR. LEACHMAN:

4     Q. In one of the other views, it's basically from the booth

5     where you're seeing the person that drive --

6     A. Correct.

7     Q. -- that drove up --

8     A. Correct.

9     Q. -- is that correct?

10         And the person that drives up and pays the person in the

11    booth, is that the same person, Raymundo Rivera, who was

12    arrested on July 7th in -- in possession of the vehicle and all

13    these guns?

14    A. Yes, sir.

15    Q. Okay.  And see if you can make that play real quick, if

16    you're able to.

17    A. Let's try Camera 2.  There we are.

18                    (Video playing.)

19    BY MR. LEACHMAN:

20    Q. Okay.  And is that the same guy?

21    A. Yes, sir.

22         MR. LEACHMAN:  Okay.  And that's fine,

23    Ranger Sanchez.  Thank you for that.

24    BY MR. LEACHMAN:

25    Q. Okay.  And so the bottom line is that you didn't know about

1673

1    this particular load going through --

2    A. Did not.

3    Q. -- when you did the seizure on July 7th; is that correct?

4    A. That's correct.

5    Q. And that's something that you learned through the target

6    Tavira to be able to go back and to find this prior load --

7    A. Correct.

8    Q. -- is that correct?

9    A. That's correct.

10            MR. LEACHMAN:  Okay.  Pass the witness.

11            THE COURT:  Any questions?

12            MR. CAVAZOS:  Yes, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. CAVAZOS:

15   Q. Good morning, sir.

16   A. Good morning.

17   Q. Were you involved in the actual search at the takedown scene

18   of the trailer and the truck?

19   A. Yes.

20   Q. Okay.  Did you find any physical evidence linking that gun

21   load to the defendant in this case?

22   A. Define physical evidence, what -- what do you mean?

23   Q. Fingerprints?  Receipts?  Phone records?  Anything?

24   A. No.  They obviously weren't fingerprinted there on the

25   scene, so no.

1  Q. Did you find any documentation on the driver that you've

2  just identified that would link him and that load to the

3  defendant?

4  A. I did not.

5           MR. CAVAZOS:  That's all I have, Your Honor.

6           THE COURT:  Anything based on those questions?

7           MR. LEACHMAN:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9  BY MR. LEACHMAN:

10  Q. Firearms themselves are physical evidence; are they not?

11  A. They are.

12  Q. Ammo is physical evidence; isn't it?

13  A. It is.

14  Q. Magazines, are they physical evidence?

15  A. They are.

16  Q. And when -- when we -- when we talk about the seizures of

17  physical evidence in the United States relating back to drug

18  cartels in Mexico, do you often find physical evidence related

19  to the Plaza boss in -- in a foreign country when you make a

20  seizure here in the United States?

21  A. No, sir.

22  Q. Is it typical for DEA investigators to tie that back through

23  the testimony of witnesses?

24  A. Yes, sir.

25           MR. LEACHMAN:  Pass the witness.

```
 1            THE COURT:  Anything based on that?
 2                      RECROSS-EXAMINATION
 3  BY MR. CAVAZOS:
 4  Q. So, basically, you're -- you're relying on the word of those
 5  that are taken down to connect the dots; correct?
 6  A. Through multiple interviews and witnesses, yes.
 7  Q. Thank you.
 8            MR. CAVAZOS:  No further questions.
 9            THE COURT:  And you may step down.  Thank you.
10            THE WITNESS:  Okay.  Thank you.
11               (Witness excused from the witness stand.)
12            MR. LEACHMAN:  United States calls Agent Cary Owens.
13            OCOURTROOM DEPUTY:  Would you raise your right hand.
14               (Witness sworn.)
15            COURTROOM DEPUTY:  Thank you.
16                      CARY OWENS,
17  being first duly sworn, testified under oath as follows:
18                    DIRECT EXAMINATION
19  BY MR. LEACHMAN:
20  Q. Please state your name for the record.
21  A. Cary Owens.
22  Q. And how are you employed, sir?
23  A. I'm a Special Agent with the Drug Enforcement
24  Administration.
25  Q. And for how long?
```

1   A. Approximately ten years.

2   Q. And where are you currently assigned?

3   A. Lubbock, Texas.

4   Q. And what was your previous area of assignment?

5   A. Eagle Pass, Texas.

6   Q. And how long were you in Eagle Pass?

7   A. Approximately seven years.

8   Q. And from when to when?

9   A. From June of 2006 through February of 2013.

10  Q. Okay.  And in your connection -- or strike that.

11      In connection with your duties as a DEA Agent in the

12  Eagle Pass sector for DEA, were you involved in the

13  investigation of a cocaine seizure on August 12th, 2011?

14  A. Yes, sir.

15  Q. And, briefly, tell the ladies and gentlemen of the jury, as

16  a DEA Agent, were you called to a particular location in

17  reference to a seizure?

18  A. Yes, sir.  I was called out to a border patrol station.  It

19  was a checkpoint case.  Border patrol on August 12th of 2011

20  had a vehicle in primary.  The canine alerted to that vehicle.

21  They moved that vehicle to secondary, after a search of the

22  vehicle, located 100 -- or a 100 bricks of cocaine.  And, at

23  that time, we were notified and called out to the station.

24          MR. LEACHMAN:  May I approach the witness,

25  Your Honor?

1           THE COURT:  You may.

2   BY MR. LEACHMAN:

3   Q. I'm going to show you what's been previously marked as

4   Government's Exhibits No. 255, 256, 257, and 258 and ask you if

5   you recognize those photographs?

6   A. Yes, sir.

7   Q. And what -- what -- what do those photographs depict?

8   A. The cocaine that was seized on October 12th, 2011.

9   Q. And do they fairly and accurately show what that cocaine and

10  the items around that seizure looked like?

11  A. Yes, sir.

12          MR. LEACHMAN:  Move for the admission of Government's

13  255 through 258 inclusive.

14          MR. CAVAZOS:  No objection.

15          THE COURT:  255, 256, 257, and 258 are admitted.

16  BY MR. LEACHMAN:

17  Q. This is August 12th, 2011; is that correct?

18  A. Yes.  Sorry, August -- August 12th, 2011, yes, sir.

19  Q. Okay.  And, so the jury can see, this first photo, is

20  this -- is this a photo taken at the POE or at the -- strike

21  that, the checkpoint?

22  A. Yes, sir.  They have a back scanner van that does imaging,

23  X-ray imaging of vehicles.

24  Q. Okay.  And, in the bed of this truck, is there some -- is

25  there an item in there?

1    A. Yes, sir.  It's a roll of carpet.

2    Q. Okay.  And -- and can you see something, it appears

3    something is within the inside of the roll of carpet there?

4    A. Yes, sir, individual bricks located inside the carpet.

5    Q. Okay.  And now I'm going to show you 256, is that what that

6    roll of carpet -- that's been cut open?

7    A. Yes, sir.

8    Q. And there's some cardboard, or something looking like that,

9    inside that; is that correct?

10   A. Yes, sir.  That's the cardboard that the roll of carpet is

11   spun onto.

12   Q. Okay.  And then, inside 257, there is -- what is that inside

13   that?  I guess it's the carpet, the cardboard carpet roll?

14   A. It's 100 bricks of cocaine.

15   Q. Okay.  And 258, is that one of those bricks that's -- that's

16   busted open?

17   A. Yes, sir.  I had to stamp and pop on it.

18   Q. Okay.  And -- and do you-all take samples of this and send

19   it off to the lab basically?

20   A. Yes, sir, the whole -- the whole shipment is sent to the

21   lab.

22   Q. Okay.  And you mentioned that there is a stamp on there that

23   it says, pop-up.  What does -- what does that signify?

24   A. Pop-ups usually are going to stay, or any stamp on cocaine

25   is going to be -- representing the origin of the narcotic,

1    where it came from.  It also means which cartel it belongs to,

2    purity level.  It can also basically be --

3    Q. Is it an identifying --

4    A. -- to see if the drug had been tampered with or --

5    Q. I'm sorry.  Go ahead.

6    A. If the narcotic had been tampered with or if it's been

7    opened and -- and messed with.  If, say, someone breaks that

8    cocaine brick open and takes part of it, they're not going to

9    have the press or the stamp to re-stamp that brick.  Each stamp

10   is almost like a fingerprint to that narcotic.

11   Q. So is it sort of a form of quality control for the drug

12   cartels?

13   A. Yes.

14   Q. And does it -- does it tell the end recipient of this brick

15   of cocaine whether it's been tampered with en route?

16   A. Yes, sir.

17   Q. And is that important because of what they call stepping on

18   drugs?

19   A. Yes, sir.  It's going to take down the purity level if

20   someone steps on their products.

21   Q. Okay.  And, ultimately, this was approximately 100 kilos of

22   cocaine; is that correct?

23   A. Yes, sir.

24   Q. And the net weight was?

25   A. 100 or --

```
 1   Q. 98 --
 2   A. 98 kilograms.
 3   Q. -- .13 kilos?
 4   A. Yes, sir.
 5           MR. LEACHMAN:  Your Honor, at this time, I'd move for
 6   the admission of Government Exhibits 253 and 254.
 7           MR. CAVAZOS:  No objection, Judge.
 8           THE COURT:  253 and 254 are admitted.
 9   BY MR. LEACHMAN:
10   Q. And so showing this is -- this is the DEA lab report that
11   shows the -- the amount of cocaine that was -- the net amount
12   of cocaine exclusive of all packaging and everything else at
13   the lab.  It's 98.13, it's a little less than 100 kilos of
14   cocaine; is that correct?
15   A. Yes, sir.
16   Q. And -- and is that a significant cocaine seizure?
17   A. Yes, sir.
18   Q. Anywhere anytime?
19   A. Anywhere in the United States or anywhere.
20           MR. LEACHMAN:  I'll pass the witness.
21           THE COURT:  Any questions.
22           MR. CAVAZOS:  Yes, Your Honor.
23                       CROSS-EXAMINATION
24   BY MR. CAVAZOS:
25   Q. You've been involved in quite a few drug seizures while you
```

1  were there in the Eagle Pass area; correct?

2  A. Yes, sir.

3  Q. Did you run across that -- that stamp that was just

4  identified in -- in the exhibit on more than one occasion?

5  A. That was the first time I ran across that stamp, sir.

6  Q. And you were there from 2006 to 2013?

7  A. Yes, sir.

8  Q. Okay.  And if there was a large cocaine seizure, such as

9  this one, would your office be involved?

10  A. Not necessarily, sir.

11  Q. Okay.

12  A. Anything caught at the port of entry, which usually is the

13  method of the -- the methods cartels use to cross cocaine,

14  whereas marijuana is more of cash drop form, and they will

15  backpack marijuana across the rivers.  So it's usually -- we

16  see a lot more marijuana done on the border, whereas cocaine

17  they're going to try to disguise that with other loads, hide

18  it.  So, unless it's caught at the checkpoint, we don't respond

19  to it.  If it's caught at the port of entry, ICE, customs,

20  responds to that.

21  Q. How many cases would you say you responded in that

22  seven-year period that -- where cocaine was involved in?

23  A. Myself responded out on duties calls, possibly ten.

24  Q. Ten.  And you never saw this stamp previously?

25  A. No, sir.

1    Q. Okay.

2              MR. CAVAZOS:  Nothing further.

3              THE COURT:  Anything based on that?

4              MR. LEACHMAN:  No further questions of this witness,

5    Your Honor.

6              THE COURT:  May he be excused?

7              MR. LEACHMAN:  Yes, please.

8              MR. CAVAZOS:  Yes.

9              THE COURT:  Agent Owens, you're excused.

10                  (Witness excused from the witness stand.)

11             THE WITNESS:  Thank you, sir.

12             THE COURT:  Your next witness?

13             MR. LEACHMAN:  May I have just a moment, Your Honor?

14             THE COURT:  (Nods head.)

15             MR. LEACHMAN:  Your Honor, the United States would

16   call Adolfo Efren Tavira.  Before I do that, may I publish the

17   Exhibit 253 to the jury?

18             THE COURT:  Yes.

19             MR. LEACHMAN:  Stipulation of facts:

20   August 16th, 2011, cocaine seizure.  Comes now the

21   United States of America by and through its United States

22   Attorney for the Western District of Texas and

23   Marciano -- Marciano Millan Vasquez, Defendant in the

24   above-entitled numbered cause, by and through his attorney, and

25   file this stipulation of facts, and all parties represent to

1  the Court that the following facts are stipulated and are not

2  at issue.

3      1) That Dr. Aaron Tesfai is a forensic chemist with the

4  DEA South Central Laboratory, and, as such, is an expert in the

5  field of forensic chemistry.

6      2) That if Dr. Aaron Tesfai were present to testify, he

7  would testify that based upon his analysis conducted on

8  October 12th, 2011, the substance seized in relation to the

9  above-captioned case on August 16th, 2011, is in fact cocaine

10  hydrochloride.

11      3) That the amounts of cocaine seized in this case under

12  Lab No. 6219983 and case No. MD-110108 consisted of a net

13  weight of 93 -- 98.13 kilograms of cocaine.  The purity of the

14  cocaine was 75.1 percent.  The net aggregate weight of the pure

15  cocaine is 73.69 kilograms.

16      That the substances are in fact --

17      4) That the substances in fact are cocaine hydrochloride,

18  also known as cocaine, and that there is no dispute among the

19  parties as to the chain of evidence in this case.

20      5) That the Government may -- may introduce the official

21  chemist's report, his curriculum vitae, the drugs tested, the

22  stipulation, and photographs of the substances into evidence

23  for the purposes of making the record complete.

24      Signed and agreed to the 5th day of July, 2016.

25      Signed by myself on behalf of the United States,

1  Mr. Cavazos for Mr. Millan Vasquez, and by the defendant

2  himself. And attached is the curriculum vitae of the witness.

3       And, with that, Your Honor, the Government's next witness

4  is Adolfo Efren Tavira. This will be a lengthy witness, so

5  this would be an appropriate time for a break.

6            THE COURT: The jury needs a break. Is it clear for

7  the jury to -- we're going to give the jury a break. Is it --

8            COURT SECURITY OFFICER: Oh, okay. Just a minute.

9            MR. LEACHMAN: I'm sorry. I should have said that

10  earlier.

11            COURT SECURITY OFFICER: All rise for the jury.

12                 (Jury leaves courtroom.)

13                 (Recess.)

14            COURT SECURITY OFFICER: All rise for the jury.

15                 (Jury enters courtroom.)

16            THE COURT: Please be seated.

17            COURTROOM DEPUTY: Could you raise your right hand,

18  please.

19                 (Witness sworn.)

20            COURTROOM DEPUTY: Thank you.

21            THE INTERPRETER: May the interpreter instruct the

22  witness, Your Honor.

23            THE COURT: Yes.

24                 (Interpreter speaking to the witness. )

25            MR. LEACHMAN: Thank you. May I proceed, Your Honor?

1        THE COURT:  Yes.

2                ADOLFO EFREN TAVIRA-ALVERADO,

3   being first duly sworn, testified under oath as follows:

4                    DIRECT EXAMINATION

5   BY MR. LEACHMAN:

6   Q. Please state your full name for the record.

7   A. Adolfo Efren Tavira-Alvarado.

8   Q. How old are you, sir?

9   A. I am 46 years old.

10  Q. And where did you grow up?

11  A. I was born in Piedras Negras, Coahuila, Mexico.

12  Q. And did you spend most of your life there?

13  A. Yes.  Most of my life, yes.

14  Q. Did you live in the United States for a period of time?

15  A. Yes, I lived in Austin, Texas, for two years.

16  Q. And when approximately was that?

17  A. From the year 2000 to 2002 about.

18  Q. I'm sorry?

19  A. About.

20  Q. Thank you.

21      And how far did you get in school, sir?

22  A. Until the 12th grade.

23  Q. And did you graduate from -- from secondary school?

24  A. Yes.

25  Q. Any college?

1    A. Yes.

2    Q. Did you graduate from college?

3    A. Yes.

4    Q. And what -- what kind of degree did you obtain?

5    A. Mining mechanic.  I'm a technician in that.

6    Q. Okay.  And what kind of jobs have you held since -- since

7    finishing school?

8    A. I did not finish -- well, once I finished --

9              INTERPRETER:  Interpreter correction.

10             THE WITNESS:  Once I finished schooling, I did not

11   work in a job within my profession.  After, I worked in

12   Televisa.

13   BY MR. LEACHMAN:

14   Q. And what -- what kind of job did you have for Televisa?

15   A. The last job that I had was administrator of production or

16   production manager.

17   Q. And did you work your way up to that position?

18   A. Yes.

19   Q. And what other kinds of positions did you hold prior to

20   that?

21   A. I was in the programming department, and then I was promoted

22   to cameraman in the production department.  And then I was in

23   the lead department.

24   Q. Okay.  And when did you -- when did you quit working for the

25   news?

1    A. In -- in 2000, in the year 2000.

2    Q. Okay.  Are you married, sir?

3    A. No.

4    Q. Do you have children?

5    A. Yes.

6    Q. I don't want to know their names, but how many children and

7    what are their range of ages?

8    A. The oldest is 24 years old.  The next one is 21, 18, and 12.

9    Q. And did you become involved in -- in the trafficking of

10   narcotics?

11   A. That's true.

12   Q. And did you become involved doing that with the Zeta Drug

13   Cartel?

14   A. Yes.

15   Q. And are you currently incarcerated for those activities?

16   A. That's true.

17            MR. LEACHMAN:  Your Honor, may I approach the

18   witness?

19            THE COURT:  Yes.

20   BY MR. LEACHMAN:

21   Q. Mr. Tavira, I want to show you some -- some documents.

22   First, let me ask you, did you have three separate cases that

23   you were charged in here in the United States?

24   A. Uh-huh.

25   Q. You need to answer a yes or no, please.

1  A. Yes.

2  Q. Okay.  And let me show you what's been marked as

3  Government's Exhibit No. 279.

4      Do you see that document?

5  A. Yes.

6  Q. And that document is in English, and you're -- you're

7  speaking Spanish, so we understand that.  But did your lawyer

8  show you this document --

9  A. Uh-hum.  Yes.

10  Q. -- and is this a charge that you had here in San Antonio, in

11  Judge Rodriguez' court, that related to a weapon violation?

12  A. That's true.

13  Q. Okay.  And let me show you what's been marked as

14  Government's Exhibit No. 280 and ask if you recognize that

15  document?

16  A. Yes.

17  Q. Okay.  And is this a -- first let me let -- let you see the

18  back here.

19      Does that document have your signature on it?

20  A. Yes.

21  Q. And does it have your lawyer's signature on it?

22  A. Yes, that also.

23  Q. And that -- and does it have my signature on it?

24  A. Yes.

25  Q. Okay.  And is the case number on -- on Government's Exhibit

1  No. 280 different than the case number on Government's

2  Exhibit 279?

3  A. Yes.

4  Q. Okay.  And so one is a 2011 case number, and one is a 2013

5  case number; is that correct?

6  A. That's true.

7  Q. Okay.  And, in addition to that, I want to show you what's

8  been marked as Government's Exhibit No. 281 and ask you if you

9  recognize that document?

10  A. Yes.

11  Q. And is that -- is that also a plea agreement?

12  A. Yes.

13  Q. Sorry.  And does it also have your signature on it?

14  A. That's true.

15  Q. And your lawyer's signature?

16  A. Uh-hum.  Yes.

17  Q. And does this case relate to a case that was transferred to

18  San Antonio from the Eastern District of Texas up in Sherman?

19  A. Yes.

20  Q. Okay.  And regarding these three charges that you have,

21  first let me ask you, did you plead guilty to the last two

22  charges that we just talked about?

23  A. Yes.

24  Q. And the -- the last two charges we -- we talked about, the

25  2013 case here in Judge Rodriguez' court and also the 2012 case

1    from -- from the Eastern District of Texas, are those the two

2    cases you plead guilty to?

3    A. That's true.

4    Q. Okay.  And you did not plead guilty to the -- the first

5    charge that we talked about which was the 2011 charge; is that

6    correct?

7    A. Yes.

8    Q. And this -- just for the -- was this a smaller case, this

9    2011 case involving the -- a gun charge related to a weapons

10   case?

11   A. That's true.

12   Q. And was this a ten -- a ten-year felony that you could have

13   been sentenced up to ten years in prison?

14   A. Yes.

15   Q. Now, the other two cases that we talked about in -- in

16   Government's 280 and 281, were those both cases where your

17   punishment range was ten years to life in prison?

18   A. That's true.

19   Q. Okay.  So were you required to plead in the two bigger cases

20   instead of the third case?

21   A. Yes.

22   Q. Okay.  And did you do that?

23   A. Yes.

24   Q. And when you did that, did the -- did the smaller case get

25   dismissed?

1   A. Yes.

2   Q. And were you sentenced on those two cases?

3   A. Yes.

4   Q. And how -- and what sentence did you get on each of those

5   two cases that we've been talking about?

6   A. 30 years.

7   Q. 30 years in prison?

8   A. Yes.

9   Q. And are you currently serving that sentence?

10  A. Yes.

11  Q. And I'll show you Government's Exhibit No. 282 and ask if

12  you recognize that document?

13  A. Yes.

14  Q. Okay.  And -- and is that a cooperation agreement that you

15  entered into with the Government after pleading guilty --

16  really before pleading guilty to those other two cases?

17  A. That's true.

18  Q. And I want to show you also a document that's marked as

19  Government's Exhibit No. 283 and ask you if you recognize that

20  document?

21  A. Yes.

22  Q. Okay.  And does it have -- I guess it has your lawyer's

23  signature and -- and another AUSA's signature; is that --

24  A. And mine also.

25  Q. Okay.  And is this a proffer letter that you received so

1  that you could tell us about everything you've done with --

2  without your own words basically being used to enhance your

3  sentence?

4  A. That's true.

5  Q. Now, I want to -- let me ask you just a few more questions

6  related to your -- to your background.

7      Prior to your arrest in connection with all of these

8  charges, did you have any other criminal history prior to that

9  time?

10 A. No, none.

11 Q. Okay.  Are you a United States Citizen?

12 A. No.

13 Q. And are your family United States Citizens?

14 A. Yes.

15 Q. Are some are and some aren't?

16 A. Yes.

17 Q. Okay.  In our plea we ask that, but have you asked, in

18 connection with your cooperation, to -- to seek some

19 immigration help for your family members who you believe would

20 be at risk for your cooperation?

21 A. Yes.

22 Q. And have you received some help in that regard?

23 A. Yes.

24 Q. Okay.  I want to back up a minute and just talk about the --

25 the day you were arrested.  Okay?

1    A. Yes.

2    Q. All right.  Do you recall the day that you were arrested?

3    A. Yes.

4    Q. What -- what day was it?

5    A. It was in April of 2013.

6    Q. April 19th of 2013?

7    A. Yes, 18.  18, 19.

8    Q. And how was it that you were arrested?

9    A. That day I was at a ranch.  We were working to crossover a

10   shipment of marijuana.

11   Q. Okay.

12   A. And when we were on the U.S. side, the immigration arrived.

13   Q. Okay.  And then -- and -- and was it the following day that

14   you -- that you arrived at the port?

15   A. I don't understand --

16   Q. Okay.

17   A. -- the question.

18   Q. Were -- were you caught there, or were you caught at the

19   Port of Entry?

20   A. No.  No, at that time, they did not capture me.

21   Q. Okay.  And so -- and -- and was that the day before you were

22   actually arrested?

23   A. The day before?

24   Q. I'm asking you, sir.  Let me ask it this way.

25        Okay.  You were just talking about a marijuana load that

1  you were working on prior to your arrest; correct?

2  A. Yes.

3          MR. LEACHMAN:  May I approach the witness,

4  Your Honor?

5          THE COURT:  Yes.

6  BY MR. LEACHMAN:

7  Q. I'm going to show you some documents that are already

8  admitted into evidence as Government's Exhibits 71 through 82.

9  Take a look at these real quick.  Okay.  Do you recognize the

10  things that are depicted in those photos?

11  A. Yes.

12  Q. Okay.  And is that the load of marijuana you were testifying

13  about?

14  A. That is.

15  Q. And was that on April 18th of 2013?

16  A. Yes.

17  Q. Okay.  And while we're -- while we're here, let's just go

18  ahead and cover that.

19      How much marijuana was that approximately that you were

20  trying to get into the U.S. on that day?

21          (Defendant speaking in Spanish with no translation.)

22  BY MR. LEACHMAN:

23  Q. Was it about 100 kilos or 200 -- 200 pounds.

24  A. It was.  I think, at that time, if I -- it was about

25  100 kilos.

1  Q. Okay.

2  A. 200 pounds.

3  Q. Okay.  So a 100 kilos would be 220 pounds, and I'm -- I'm

4  referring to Government's Exhibit No. 281 that shows that

5  that's 218.17 pounds; is that right?

6  A. Yes.

7  Q. And I'm showing you Government's 80, is that the kind of

8  bags that the marijuana was being transported in?

9  A. Yes.

10  Q. And there were -- there were a couple of guys that were

11  arrested in connection with that -- that load.  And do you know

12  who they were?

13  A. Yes.

14  Q. And -- and who were they?

15  A. The one with glasses, he is -- I know him as Mandito.

16  Q. Okay.  And how about the other guy, did you know him?

17  A. That one I do not recognize.  Not that one, no.  But the

18  first one, yes.

19  Q. Okay.  And were these guys -- what -- what were these

20  guys -- what were they supposed to do?

21  A. The first one was going to pick up the marijuana on that

22  side.

23  Q. On the U.S. side?

24  A. Yes, on the U.S. side.

25  Q. Okay.  And so in the course of -- of working on -- on this

1   load, did you end up on the U.S. side also?

2   A. Yes.

3   Q. And -- and where -- where approximately was this ranch where

4   this marijuana -- marijuana load was being crossed?

5   A. This ranch on the Mexican side is in a place called

6   San Vicente, San Vicente Ranch.

7   Q. And where is that located in relationship to -- I'm showing

8   you a map which is Government's 228 on the screen.  Here's

9   Piedras.  Here's Del Rio.  Which -- which way would it be?

10   A. It was -- no, it is from Piedras Negras to Laredo.

11   Q. So is it farther south than is being shown on this map?

12   A. Yes.

13   Q. Okay.  And is this a ranch that you were familiar with?

14   A. Yes.

15   Q. And is it a ranch that you had used to cross marijuana on

16   other occasions?

17   A. Yes.

18   Q. Did you use this ranch for any other purposes?

19   A. No, it's only for that.

20   Q. Would -- would people hide at this ranch when the military

21   was in the Piedras Negras area?

22   A. Yes.  It was a place we would could go when the military

23   would arrive to Guerrero.  And, since the ranch was right on

24   the edge of the river, and it's very easy to cross over by foot

25   or on a horse, and we would hide out there waiting while the

1    military would leave again.

2    Q. Okay.  So back to -- back to April 18th of 2013.  Were you

3    meeting the -- these folks that we were just talking about over

4    there to -- to pick up this -- this load of marijuana that was

5    being crossed?

6    A. Yes.

7    Q. Okay.  And were -- were they coming from inside the

8    United States to the border to -- to pick it up?

9    A. Yes.

10   Q. Okay.  And were -- were you there to -- to signal them when

11   they were close to -- to the load to come on and get it?

12   A. Yes, it was the first time that I would cross with a

13   shipment.  I would always stay on the Mexican side.  But, on

14   this occasion -- the place was very secure.  We didn't have

15   anyone to help us, so I crossed over, and I was trusting.  I

16   was feeling, you know, that it was okay, and so I crossed over

17   and got my phone.

18   Q. Okay.

19   A. And I was in charge of mentioning the exact place to arrive

20   when we came with the shipment.

21   Q. Okay.

22   A. There was someone up on a hill who was there to let us know.

23   They were the lookout to let us know when the truck would be

24   arriving.

25   Q. Okay.  And did a vehicle arrive?

1   A. No.  They told -- no, they told me it was a vehicle that

2   Mandito was coming in, but it was not.  It was immigration.

3   Q. So did you --

4   A. And it was at night.  We -- we left -- we -- we got out of

5   our hiding places and made some kind of gestures to them, but,

6   no, it was the immigration.

7   Q. So did you signal the immigration to come to you for the

8   marijuana?

9   A. Yes, well, that's how it happened.

10   Q. Okay.  But they didn't apprehend you at that time; is that

11   correct?

12   A. No.

13   Q. And how was it that you avoided apprehension at that moment?

14   A. Yes.

15   Q. How?  How did you get away?

16   A. Well, it was a very dark night.  That's what happened.  The

17   ones who came out to the edge of the road, those are the ones

18   that they caught, and I stayed behind.  I was separated from

19   them.  So all I did, since I was dressed in all black, I just

20   stayed crouched down.  And one from the immigration came

21   walking by about two meters from me, and then he went back.

22   Q. And so did you -- what did you do then?

23   A. And so then, afterwards, I didn't hear anything, and they

24   left.  I continued walking, and I was lost because it was very

25   late at night until I was guided by the noise of the river.  So

1  then, after that, I went to the river.

2  Q. And did you cross back to Mexico?

3  A. Yes, I crossed to Mexico to the ranch.

4  Q. Okay.  And then what did you do?

5  A. And then I gathered up my things.  I took a telephone is

6  all.  I changed clothes.  That's all.  But I didn't allow

7  anyone to see me.

8  Q. Okay.  And then what did you do?

9  A. And, after that, I called someone, someone I trust.

10  Q. Okay.

11  A. And, at that time, well, I had already been going through a

12  period of time where I no longer wanted to be there in

13  Piedras Negras.

14  Q. Okay.

15  A. And -- and the reason is that I did not want to continue

16  working for the cartel anymore either.

17  Q. So what did you do?

18  A. So I took advantage of that situation.  Where these people

19  were on -- or at the ranch were trustworthy people for them, so

20  I didn't allow them to see me then anymore.  So I walked.  I

21  walked to another place where I knew -- that I knew of there,

22  that same ranch.

23  Q. And what were you trying to do?  Why were you being

24  secretive and all of that?

25  A. Well, what happened was I was trying to find an alibi.  I

1    just couldn't escape and just leave the cartel.  And if I just

2    left, just like that, I just couldn't stay in Mexico.  And,

3    besides, my whole family was there.

4    Q. Okay.

5    A. I could not escape in that manner and put my family in

6    danger, you see.  So what I said to myself was -- or what I did

7    was, this is the perfect occasion, the people in immigration

8    then saw that -- the people at the ranch --

9              THE INTERPRETER:  Correction.  Interpreter

10   correction.

11             THE WITNESS:  The people at the ranch saw that

12   immigration came, and they would give testimony then that

13   immigration caught me.

14   BY MR. LEACHMAN:

15   Q. So what did you do?

16   A. So I thought about that afterwards.  So I arrived afterwards

17   to Piedras Negras, and I talked about it to my family, and it

18   was something very difficult.  And I said to them:  I don't

19   want anyone to know.  I'm not going to say goodbye to anyone.

20   Q. So what did you do?

21   A. Just my sister, I told her, "I don't want anyone to see me.

22   I don't want to say goodbye to my mom, nor my dad.  Nobody."

23   So I asked my sister to call the -- to call the City of Austin

24   to look for an attorney because I was going to turn myself in.

25   Q. Okay.  And did you do that?

1  A. Yes.

2  Q. And where did you turn yourself in?

3  A. In the City of Eagle Pass.

4  Q. Okay.  I want to back up just a minute and talk to you about

5  this -- this load of dope.  We've already talked about what is

6  Government's Exhibit 80 and 81 and ask you who was the owner of

7  that dope?

8  A. In that -- in that -- in that shipment, there were three

9  partners, one was the Vecino, one was Chano, and the other one

10 was myself.

11 Q. Is the person that you know as Chano in the courtroom here

12 today?

13 A. Yes.

14 Q. Would you point him out and describe an article of clothing

15 that he's wearing?

16 A. He's the person right next to the person with white hair.

17 He has glasses.

18         MR. LEACHMAN:  Your Honor, may the record reflect

19 that the witness has identified the defendant?

20         THE COURT:  So noted.

21 BY MR. LEACHMAN:

22 Q. Okay.  I want to get back to -- to that in a minute.

23         But I want -- I want to back up with you for a minute and

24 talk about how you got involved in drug trafficking.

25         How did you first get involved with drug trafficking?

1  A. Like I told you before, I worked at Telvista, and I worked

2  in the news department.  Unfortunately, the people I studied

3  with, the people that I knew in Piedras Negras, they worked for

4  a person called Miguel, and he worked for the de Sinaloa

5  Cartel.

6  Q. And did Miguel have a nickname?

7  A. Yes.  Well, that's how they would call him, Miguelito.

8  Otherwise I don't know.

9  Q. And how did Miguelito get you involved in drug trafficking?

10 A. When they would do something, since I was in the news, I

11 would remove that news so that their names, their -- about them

12 would not appear in the news.

13 Q. Okay.  So when -- when these folks would be involved in

14 illegal activities in Piedras, they would come to you as a

15 newsman, and you would scrub the stories so they wouldn't

16 appear in it; is that what you're saying?

17 A. Yes, that's the way it was.  I also I was in charge of

18 speaking with the other media --

19 Q. Okay.

20 A. -- communication agencies.

21 Q. And so they would ask you to get that -- get the news

22 scrubbed from other outlets besides just your own; is that

23 correct?  And were you able --

24 A. Yes, that's true.

25 Q. -- to do that for them?

1    A. Yes, I was doing that.

2    Q. And explain to me how -- would -- would you get paid for

3    doing that?

4    A. Well, yes.  Yes.  Yes, they would pay me, and the others,

5    too.  At first I would do it only because they were my friends.

6    Q. Okay.

7    A. I knew them, right?

8    Q. So -- I'm sorry to interrupt you.

9    A. Then afterwards --

10   Q. Go ahead.  Finish.

11   A. But then, afterwards, so whenever or wherever they would see

12   me, they would call me.  They would talk to me and give me

13   money and some money for the boss.

14   Q. And, when you talked about your friends, who were you

15   talking about?

16   A. I'm speaking of Beto Canas and others who worked with Mares,

17   Armando Mares.

18   Q. So I'm showing Government's Exhibit IA-20.  Can you see that

19   person in there?

20   A. Yes.

21   Q. Is that Beto Canas?

22   A. Yes, that's Beto Canas.

23   Q. And who else did you just say?

24   A. Ricardo Guerra also.

25   Q. Okay.  And does Ricardo Guerra have a nickname?

1    A. El Diente.

2    Q. I'm going to show you what's marked Government's Exhibit

3    No. IA-56.  Who's that?

4    A. He's the one, El Diente.

5    Q. Okay.  And then you also mentioned another person.  I can't

6    remember who it was.  I think it was Mando Mares?

7    A. Mando Mares, yes, correct.

8    Q. Is he a person that is deceased?

9    A. It's been a long time since I've seen him.  I don't know if

10   he's already dead.

11   Q. Okay.

12   A. That's probably --

13   Q. Okay.  So, in any event, people like Diente and -- and

14   Beto Canas are your friends.  How are they paying you for help

15   to scrub the news for them?

16   A. They would give me money.  And later -- well, I knew them,

17   and they were traffickers, and that way I also knew people who

18   wanted to work with them.  And so what I did was -- well, the

19   first thing I started doing was introducing them.

20   Q. And you're talking about people that helped them move drugs

21   or move money or things like that?

22   A. Yes --

23   Q. Okay.

24   A. -- things that do --

25   Q. And would you put --

1  A. -- things like that --

2  Q. -- would you get paid for introducing them to these people?

3  A. No.  At first, no.  First of all, it was just -- they would

4  make their own arrangements.  But I was always thinking that I

5  was going to receive something, right?

6  Q. Okay.

7  A. And that's how it happened.  These people whom I introduced

8  them to, they worked out really well, speaking about drug

9  trafficking, and they liked how these people worked.  And the

10 first time they told me that they were going to buy a certain

11 amount of drugs.  Let's say -- let's say they're going to buy

12 5 kilos, and I was going to obtain the earnings of 1 kilo when

13 it was sold in the United States.  If it was sold for $10,000,

14 they were going to give me $1,000.

15 Q. Okay.  And so you had a little stake in whatever was being

16 delivered through the --

17 A. Yes.

18 Q. -- transporters that you would recruit; is that right?

19 A. That's how I started --

20 Q. Okay.

21 A. -- yes.

22 Q. And did you come -- subsequently become more involved with

23 drug trafficking?

24 A. That's true.

25 Q. Okay.  How did you become more involved?

1  A. Well, I started obtaining money, and I also started earning

2  the trust of the people bringing the drugs.

3  Q. Okay.

4  A. And I knew more people in the U.S. that would buy drugs, so

5  I started buying my own merchandise, and that's how.

6  Q. Okay.  And -- and, in the beginning, who were you -- who

7  were you buying this merchandise from?

8  A. Well, there was Miguel there, like I say, in Piedras Negras

9  with the Sinaloa Cartel.  But other people would arrive.  They

10  were from Cuernavaca.

11  Q. Okay.  Were they -- were they part of a cartel?

12      What time frame are we talking about?

13  A. We're talking, more or less, from '96 to 2000.

14  Q. This predates the Zetas; right?

15  A. Yes, a lot --

16  Q. Okay.

17  A. -- a lot, a lot of time before.

18  Q. And so these folks that would come from Cuernavaca, did

19  they -- were they associated with a different cartel?

20  A. Truthfully, no, not yet.  At that time, the cartels didn't

21  exist, or they weren't as strong.

22  Q. Okay.

23  A. Each one could buy the merchandise one wanted -- one wanted

24  and bring it to Mexico or wherever.

25  Q. Okay.  So what did you do with your contacts of these folks

1  from Cuernavaca and the other people like Diente and Beto and

2  others who were there in the Piedras Negras area?

3  A. Well, after these people from Cuernavaca, well, they would

4  bring the cocaine from Peru, from Columbia.  And now I knew

5  these people.  So I presented -- or introduced these people who

6  had the cocaine to them.  I introduced them to Ricardo Guerra,

7  Celso, El Buda, the other people who have already passed away.

8  Q. Okay.  And what happened when you introduced them to each

9  other?

10  A. Well, they started working.

11  Q. Okay.  And so does that mean Diente and the guys from

12  Cuernavaca are now moving cocaine together?

13  A. At this time, with them, not -- no, not --

14  Q. Okay.  So tell us --

15  A. -- anymore.

16  Q. -- how it worked then.

17  A. Like I tell you, or like I say, they would come with me,

18  these people who had the cocaine, I would receive it in

19  Piedras Negras, and so what I would do is I would get the

20  cocaine and give it to them, deliver it to them.  They would

21  pay me, and I would pay the people in Cuernavaca, and they

22  would return to their state.

23  Q. Okay.  So give -- give us an example of how that transaction

24  would work, and, specifically, how would you get paid in that

25  transaction?  How much were these drugs costing?  Things like

1   that.

2   A. Well, at that time, the kilo they would bring from over

3   there was $8,000.

4   Q. Okay.

5   A. And then I could sell it in Piedras Negras for 10,000 or

6   $9,000, and that's how I got my earnings.

7   Q. Okay.  And so who would buy from you at the 9 or $10,000

8   kilo rate?

9   A. Who would buy it from me?

10  Q. Yes, sir.

11  A. Beto Canas, almost everyone that I knew at that time who

12  sold, Celso, people who had --

13  Q. Were they -- did they have any --

14  A. -- it at their homes?

15  Q. Sorry.  I'm sorry that I interrupted you.

16         THE COURT:  She finished.

17         THE WITNESS:  Who had it from their homes.

18  BY MR. LEACHMAN:

19  Q. I'm showing you Government's 187.  Is that Celso?

20  A. That's him.

21  Q. Okay.  Was there also a person, another person named Lagos?

22  A. Juan Lagos was there.  Julio Santoscoy was there.  There

23  were more, more, more people.

24  Q. Okay.  And -- and so -- and, again, what time frame are we

25  talking about at this point?

1  A. I want to say it was between the years '96 and 2000.

2  Q. Okay.  And what kinds of quantities of cocaine are we

3  talking about that is being bought and purchased during that

4  time frame?

5  A. At that time, it wasn't all the people that are at this

6  time, right?  And the people who would arrive, they didn't come

7  with large shipments, right?  These people would come by bus

8  from Cuernavaca, for example.  They would hide it on their

9  bodies, for example, tied to their bodies.  Sometimes they

10 would bring 4 or 5 kilos.

11 Q. Okay.

12 A. So that's how I would sell it one kilo to each person.  We

13 started small.

14 Q. Okay.  And so the whole load of the folks from Cuernavaca

15 would be 4 or 5 kilos, and you would sell one to Diente and one

16 to --

17 A. Uh-hum.

18 Q. -- Juan Lagos and one to Celso, and stuff like that?

19 A. Yes.

20 Q. Okay.  And -- and that continued for -- for a few years?

21 A. Yes, it was a few.  It wasn't a short duration.  It was,

22 let's say, a maximum of two years.

23 Q. Okay.  And, during that two years, how much cocaine did you

24 receive and -- and sell to these folks we've just been talking

25 about?

1   A. About 500 to 600 kilos.

2   Q. Okay.  And did the circumstances change somewhere around

3   2000?

4   A. Yes, it changed because the federal police was at that time,

5   and they started looking for me there in Piedras Negras.

6   Q. Okay.  So how did that change this business arrangement?

7   A. So what I did was get out of that.  I got out of the

8   Telvista, the news department.  I quit --

9   Q. Okay.

10   A. -- at Telvista.

11   Q. And so I guess I -- I didn't ask this before.  But up till

12   2000, you're doing this on the side, and you still had your job

13   with the TV station; is that right?

14   A. Uh-huh.  Yes.  Yes.

15   Q. So I guess it would be pretty easy to catch a TV person?

16   A. Of course.

17   Q. Okay.  So you -- you left the TV business.  What -- what did

18   you do then?

19   A. There was someone who worked for the federal police, and he

20   didn't want to come to any arrangement with me, in other words,

21   for me to pay him so that I could continue working.

22   Q. Okay.  So what happened with that?

23   A. And so what I did was, well, since there was no arrangement,

24   he was going to catch me.  So what I did was to leave

25   everything, and I decided to come to the United States.

1  Q. And this was in -- in 2000?

2  A. Yes, it was in 2000.

3  Q. And I think you testified earlier that you lived in the U.S.

4  for two or three years; is that right?

5  A. Yes.

6  Q. And did you stay in Austin during that time?

7  A. Yes.

8  Q. And did you have anything to do with the drug business while

9  you were in Austin?

10  A. No, I came with the firm thinking that I was going to leave

11  all that behind and change my life.

12  Q. Okay.

13  A. I worked at a paint shop.  I worked for two years there.

14  Q. Okay.

15  A. But the same.  During that time that I left, all these

16  people, Julio Santoscoy and Diente, they all started -- they

17  started to grow, to grow and grow, talking -- we're talking

18  about the drug business, right?

19  Q. Okay.

20  A. So when they knew that I was in Austin, they started

21  searching me out for the same thing to take care of shipments,

22  to take money.

23  Q. Okay.  And when we talk about that they sought you out, in

24  Austin; is that right?

25  A. Yes.

1  Q. And.  To be clear, when you're in Austin, are you legally in

2  Austin, or are you illegally in Austin?

3  A. I did not enter illegally.  I did have a visa and a permit.

4  But then time went by, and it expired.  The visa expired.

5  Q. So you didn't extend your visa?

6  A. Yes.  Uh-huh.

7  Q. Okay.  And so they reach out to you in Austin, and are they

8  wanting you to help them in Austin, or are they wanting you to

9  help them back in Mexico?

10 A. They wanted me to help them in Austin.

11 Q. And what did they want you to do?

12 A. What I just mentioned, to receive merchandise, to take care

13 of it, to receive money, too, and to send it to them in Mexico.

14 Q. Okay.  And did you do that?

15 A. Frankly, I did not do it.  What happens is that my brother,

16 my older brother lives there, and he's someone who does not do

17 anything of what I did or was doing or had been doing, and I

18 didn't want to do anything to put him in danger or prejudice

19 the situation for him.

20 Q. Doesn't approve of the drug business?

21 A. No, not at all.  Very different.

22 Q. This is for the whole time you're in Austin?

23 A. Yes.

24 Q. Why did you leave Austin?

25 A. Because these people, these people who were looking for

1713

```
 1   me --
 2   Q. You're talking about the federal police in Mexico?
 3   A. Yes.
 4   Q. Okay.
 5   A. And they moved him.  He left.  And everyone was working so
 6   hard, and they invited me to return and work with them.
 7   Q. Okay.  And so did you return?
 8   A. Yes, I returned.
 9   Q. And did you work with them?
10   A. Yes, I started working with them.
11   Q. And what -- what year was this?
12   A. In 2003.
13   Q. And -- and when we say them, I want to know who all of the
14   people were that were part of this, that are part of them.
15   A. Oh, well, they are a lot of people.
16   Q. We've got a little time.  Tell me about them.
17   A. All these people, like, say, Celso, El Buda, El Diente,
18   Julio Santoscoy.  Let's see.  Who else was there?
19   Q. Let me show you what's marked as Government's
20   Exhibit 1A-15 --
21   A. Yes, Cheke.  Cheke was there, too.
22   Q. Okay.  Was there -- was there a person named Indalesio?
23   A. That, too.  Indalesio was there, too.
24   Q. You talked earlier about Armando Mares.  Was he still there?
25   A. Yes, Armando Mares.  They were all there.
```

1   Q. And did he have a brother that was involved?

2   A. Yes.

3   Q. And who was that?

4   A. Checo Mares.

5   Q. And -- and, again, these are all people in 2003 when you --

6   that are in The Plaza working when you go back and are going to

7   get into the drug business with them; is that right?

8   A. Yes.

9   Q. Okay.  And we've -- we've talked about a number of people

10  and -- and showed you photos of those folks.  Julio Santoscoy,

11  where is he?

12  A. I think he's in prison.

13  Q. In the United States; right?

14  A. Yes, here in the United States.

15  Q. Okay.  Indalesio Soberanes, where is he?

16  A. He died.  Oh, he died.

17  Q. And Armando Mares?

18  A. Mando Mares -- Mando Mares, I'm not sure if he's dead.

19  Q. How about Checo Mares?

20  A. Checo Mares, he did die also.

21  Q. Okay.  All right.  So, in 2003, you get back into the drug

22  business.  Tell us what -- what you did, and what you were

23  going to do.

24  A. Well, when I returned, all those people that I had helped

25  out before, now they had the opportunity to help me.  In other

1  words, I had an open account for whatever I wanted.

2  Q. And let's talk about that a minute.  When you say you had an

3  open account, does that mean they would front you drugs?

4  A. Yes.  Yes.

5  Q. Okay.  And did all of those people that we've just talked

6  about front you drugs?

7  A. Yes, some had drugs.  Well, most of them did have drugs,

8  yes.  At that time, Indalesio was the big guy, the biggest guy.

9  Q. Okay.  And so did you work with him?

10  A. Yes.

11  Q. And -- and so walk us through the kinds of transactions that

12  you're dealing with when you went back to Mexico in 2003.  And

13  I want you to take me up to -- well, let me ask you this.

14     Were the Zetas in The Plaza in Piedras Negras when you

15  returned?

16  A. No, they didn't -- or they hadn't arrived yet.

17  Q. And -- and when approximately did they arrive?

18  A. It wasn't until next year in about 2004 when they arrived.

19  Q. Okay.  So I want to separate those two.  And I want you to

20  first tell me about the drug trafficking activity you're doing

21  between 2003 and the time that the Zetas arrive in Piedras.

22  A. Okay.  Well, Indalesio, since I knew him from before, and so

23  one time I arrived with him and I said, "You know what?  I have

24  enough to buy about two kilos."  And so he said, "Okay.  Here

25  are your two kilos.  And, here, I will give you two more kilos

1  that are mine so you can take them also."

2  Q. So you're the transporter for his -- he wants you to sell

3  two for him?

4  A. Uh-hum.  Yes.  Uh-huh.

5  Q. Okay.  And then what happens?

6  A. Well, yes, I would take those two kilos, I would cross the

7  bridge, and I would come over and sell them.  And then I would

8  return with the money.  Another way I could make money was that

9  I knew some federal agents, the highway federal agents.

10 Q. There in Piedras Negras?

11 A. Yes, there in Piedras Negras.  They were Jorge Cuellar.

12 Q. Okay.

13 A. And sometimes there would be shipments in the -- on the way,

14 and they would confiscate them.  They would confiscate the

15 cocaine, or they would pay them with cocaine, and they would

16 give them to me, and I would sell them.

17 Q. Okay.  And so would you -- how would you get paid on a deal

18 like that?

19 A. The same.  The same manner, the minimum usually of what I

20 would earn would be about a thousand dollars.

21 Q. Per kilo?

22 A. Yes.

23 Q. Okay.  So for that -- that year or so, from 2003 till the

24 Zetas show up, how many kilos of cocaine did you move during

25 that time frame?

1    A. The same, about 300 or more.

2    Q. I want your best estimate.  Do you think it's more than 300

3    or not?

4    A. Yes, approximately, some 400.

5    Q. Three to four hundred.

6        Okay.  And is this just you moving this?  This doesn't

7    count the dope that's being moved by Buda or Cheke or Santoscoy

8    or Diante or any of them?

9    A. No, it's just me.

10   Q. Okay.  And that -- did that continue up until the point that

11   the Zetas came to The Plaza?

12   A. Yes.  During that time when the Zetas arrive, you could

13   work --

14            THE INTERPRETER:  Interpreter correction.

15            THE WITNESS:  During this time, before the Zetas

16   arrived, you could work.  You could pay the agents, and you

17   could work very easily.

18            THE COURT:  You missed the federal -- or you missed

19   the authorities.

20            THE INTERPRETER:  The authorities.

21            THE WITNESS:  You could pay the authorities.

22            MR. LEACHMAN:  Okay.

23   BY MR. LEACHMAN:

24   Q. And when the Zetas arrived, did everything change?

25   A. Yes, that's true.  When the Zetas arrived, you had to report

1  everything to them, everything that would arrive into

2  Piedras Negras.

3  Q. And so how is it that -- and did you and all of these people

4  we've been talking about so far, did they end up joining with

5  the Zetas?

6  A. Yes, because if you did not -- if you did not report with

7  them, they were going to kill you.  They arrived and took over

8  The Plaza.  That's what we call it.

9  Q. Okay.  And so how did the -- how did they affect the

10  takeover of The Plaza, or how did everyone end up going to work

11  with them?

12  A. Well, most decided to join them.

13  Q. Well, let's -- first let's started with you.  Did you -- did

14  you have some contact with the Zetas when they first came to

15  The Plaza?

16  A. Yes, I had to present myself with them.  There was a person,

17  a cousin, a cousin to Indalesio.  His name was Raul,

18  Raul Soberanis.  When the Zetas arrived, he was the one that

19  worked closely with them, with the Zetas.

20  Q. Okay.  And is that Raul Parra Soberanis?

21  A. Yes.  Raul Parra Soberanis, yes.

22  Q. And when you were summoned to talk to the Zetas, who was the

23  first Zeta that you talked to when you -- when they arrived on

24  The Plaza?

25  A. Well, let's see.  Raul contacted me, and he said -- he told

1   me, "I need you to report to them, you yourself."

2   Q. Okay.

3   A. You get there on your own because if they have to go pick

4   you up, that's not going to go well for you.

5   Q. So did you do that?

6   A. Yes.  You could call it that he made the arrangements for my

7   introduction.  And so I remember that I went to speak with

8   someone.  I remember it was 10.

9   Q. And when you say 10, you mean Z-10; right?

10  A. Yes, Zeta-10.

11  Q. I'm showing you Government's Exhibit No. 1A-37.  Is -- is

12  that Z-10?

13  A. That's him, yes.

14  Q. And do you know what else they called him besides Z-10?

15  A. Mellado --

16  Q. Okay.

17  A. -- Comandante Mellado.

18  Q. And so when you went and met with Comandante Mellado, what

19  happened?

20  A. I went to where they were.  And, frankly, I didn't think

21  that they were so organized like that, and I went to a place

22  they call it a quinta.  It's called Villa de Fuente, the place.

23  And, when I arrived, it was a whole army.

24  Q. How many people were there?

25  A. (Defendant speaking in Spanish.  No translation.)

1  Q. Approximately?

2  A. Well, no.  Frankly, well, there were about approximately

3  between 80 and 100 people.

4  Q. And were these people armed?

5  A. All armed.

6  Q. And so did you have a meeting with Mellado?

7  A. Yes.  So what I did was I arrived with Raul, and he

8  introduced me to him.

9  Q. Okay.  And how did that go?

10  A. I arrived, and I told them who I was, and then he told me --

11  and he said, "That's a good thing that you came -- to come by

12  on your own."  They already knew who I was, what I could do.

13  And that at that time he said, "Everything you want to move,

14  anything you want to bring into Piedras Negras or that you want

15  to buy, you have to report it to us."

16  Q. Okay.

17  A. If you don't have the wherewithal with what to work with, we

18  do have it.  So you cannot work without reporting to us.

19  Q. Okay.  So and this is -- at the beginning, there's two ways

20  to deal with it, one, you -- you tell them about drugs you're

21  going to move and -- and pay for permission --

22  A. Yes.

23  Q. -- right?

24      Or the other is source it directly from the Zetas?

25  A. Yes, that's the way --

1   Q. Okay.

2   A. -- it is.

3   Q. And when you had this meeting with him, were there other --

4   other drug movers present, or were you the only one there?

5   A. No, each one would arrive at their own time.  At that time,

6   like I say, the only one with me was Raul Parra Soberanis.  I

7   also remember that Miguel Uribe was there.  At that time, he

8   worked with Raul Parra, and there was -- they were the ones

9   that got me into a truck.  I couldn't go in my own truck.  I

10   had to go in their truck.

11   Q. Okay.  And so did anything else important happen at this

12   meeting?

13   A. No, the most important thing is that I presented myself with

14   them, and that was it.

15   Q. So did you proceed to get to work with them after that?

16   A. The next step, yes.

17   Q. Okay.  And what was the next step?

18   A. Well, we couldn't do things like we did them before because

19   they were there, right?  So what I decided to do is to work

20   with someone -- or for someone who'd be in contact with them.

21   I didn't want to be talking to them or any of that.

22   Q. Okay.  So you basically took on a boss that would be between

23   you and the -- and the leadership of the Zetas?

24   A. Uh-hum.  Yes.

25   Q. And who was that person?

1  A. The first person was Jorge Cuellar.

2  Q. Okay.  And is this the same guy that you talked about before

3  who was a federal policeman?

4  A. Yes.

5  Q. Okay.  And so tell us about that.  Did you move drugs with

6  Jorge Cuellar?

7  A. Yes.  I didn't want to have any problems.  Before I had some

8  clients, I left that.  And then all I dedicated myself to doing

9  is just transporting.

10  Q. Okay.  And how long did that continue?

11  A. It was in about 2004, 2005, and 2006 approximately.  But

12  also -- well, I didn't only work for him.

13  Q. Who else?

14  A. I also worked for other people who would ask me for help.

15  Q. Who were they?

16  A. Some were Beto Canas and Cheke.  Afterwards, Jorge Cuellar

17  had problems in the corporation where he worked.

18  Q. What do you mean by, the corporation where he worked?

19  A. Well, he was the highway patrolman --

20  Q. Okay.

21  A. -- the federal agent.

22  Q. So what happened to him?

23  A. There was an internal department there in the agency at the

24  highway federal patrol that started investigating into him.

25  Q. And what happened to him?

1  A. So he asked for time off.  He asked for leave time.  He

2  wanted to retire from the corporation.

3  Q. And did he do that?

4  A. That's how he did it, yes.

5  Q. And did he go into full-time drug work at that point?

6  A. No.  No, he separated himself completely at that time.

7  Q. So he didn't do any more drug business after that?

8  A. During the investigation and during the time that -- that

9  they could arrange for everything, he was stable.  He wasn't

10  doing anything.

11  Q. Okay.  Did you do any additional drug dealing with

12  Jorge Cuellar?

13  A. After that time, no.

14  Q. Okay.

15  A. So, like I say, I started working with Cheke.

16  Q. Okay.  And -- and with Beto Canas?

17  A. Yes, with Beto Canas.

18  Q. And what time frame are we talking about now?

19  A. We're talking now around 2007.

20  Q. And how long did you work with -- with Cheke?

21  A. With Cheke, I worked approximately -- to about the beginning

22  of the year 2010.

23  Q. Before I -- before I leave Jorge Cuellar, I want to make

24  sure I -- I know how much -- it looked like you worked for --

25  for him in 2004 and 2005; is that right?

1    A. Yes.

2    Q. Or was it all the way through 2006?

3    A. No, to about the middle of 2006.

4    Q. And how much -- how much dope did you move with

5    Jorge Cuellar?

6    A. Jorge Cuellar, he would move quantities of 5 kilos.

7    Q. And how frequently would he do that?

8    A. Each -- he would do it about each month, but it's just that

9    when the Zetas arrived, he no longer worked like he worked

10   before.

11   Q. Okay.  So, during the whole time that you worked with

12   Jorge Cuellar, how much dope did you move with him?

13   A. At that time, with Jorge Cuellar, about 500 kilos

14   approximately.

15   Q. And your -- your job was to recruit and to supervise the

16   transporters; is that right?

17   A. Yes.

18   Q. And how would you do that?

19   A. Well, I got a car.  I would create a secret compartment, and

20   then I would look for somebody whose personalty would match

21   that of the car.

22   Q. Okay.  And what do you mean by that?

23   A. For example, if I had a truck, I would place someone who

24   looked like a cowboy or a rancher.

25   Q. Okay.  And then would you send those folks to the U.S. to

1  the destination for the -- for the dope?

2  A. Yes.

3  Q. And would you coordinate on phones the delivery and the pick

4  up of the money and things like that?

5  A. The -- the business that moved in this manner, I

6  controlled -- I gave -- I would give a telephone to the driver,

7  and I would give him expense money and the truck for him to

8  come here to the United States.  Obviously, I would deliver the

9  truck to him already loaded, right?

10  Q. Okay.

11  A. He would cross over on the bridge.  He would cross the

12  checkpoint.  Every time he would do that, he would send me a

13  code, and I would get another telephone, and I would dial and

14  call the owner of the shipment.

15  Q. Okay.  And would you switch these telephones all the time?

16  A. Yes.

17  Q. And why would you do that?

18  A. Supposedly, it was for security.

19  Q. Okay.  And what kind of security?

20  A. Because, on occasion, they would grab the telephones.  They

21  could get them.

22  Q. Okay.  So were you careful not to send telephones with a

23  bunch of information about you or other members of the cartel

24  into the U.S. where it could be obtained?

25  A. Let's see.  I didn't understand really all that, the

1  question.  Could you repeat it one time?

2  Q. Yeah.  It wasn't very well -- very well said.

3      Were you worried about -- information about yourself or

4  other drug dealers reaching the hands of U.S. Law Enforcement?

5  A. Yes.  There are two things that I needed to do, take care of

6  my worker, and the person to whom they were going to deliver.

7  Why?  Because if they are watching the person who was going to

8  deliver, I was thinking, well, if he called directly to my

9  worker, they would make the connection with him.  So what I

10 would do is with one telephone, that was for the worker, the

11 other telephone was the -- the other telephone was for the one

12 who was going to receive the delivery, and the other one was

13 for the owner of the shipment in Mexico.

14 Q. Okay.  And so you -- you keep the information separate --

15 A. Yes.

16 Q. -- from those persons so they can't share information or

17 don't have information about other members of -- of the

18 organization if they get caught?

19 A. Yes.  And the people who are going to receive the shipment

20 in the United States should not -- are not supposed to see the

21 person driving, the person who would arrive at a certain place

22 with a certain shipment let's say.  If that person arrived to

23 San Antonio, that person would leave the car parked -- or the

24 vehicle parked in a certain place, and they would leave the

25 keys either on the tire or at the gas tank there inside.

1  Q. And -- and is that so that they don't know who each other

2  are so they can't testify against each other?

3  A. That's true.

4  Q. Okay.  So I want to move back to -- back to -- I think you

5  said 2006, 2007ish when you start working with Cheke and Buda.

6  Did you perform the same function for those two persons that

7  you've just described?

8  A. Yes.

9  Q. Okay.  And was -- was Ezequiel Rodriguez, the guy in 1A-15,

10 was he a high-level person in the cartel?

11 A. At that time -- at that time, he was one who -- well, we're

12 talking about 2007 --

13 Q. Okay.

14 A. -- he was one who was more like Beto Canas and Cheke.  But

15 there were more, but I only worked with those two because I

16 knew them from before.

17 Q. Okay.  Who was the -- who was in charge of The Plaza in

18 Piedras in 2006, 2007?

19 A. At that time, I remember that Mellado was there, yes.

20 Q. When does Cien come into the picture?

21 A. Cien enters in around 2008, about a year later.  Yes.

22 Q. Okay.  And let me -- let me direct your attention back to --

23 to Chano, who you've identified earlier.  Okay.  When did you

24 first meet Chano?

25 A. Well, as Ezequiel Rodriguez started working directly with

1  Cien, the Zeta Cien.

2  Q. Okay.

3  A. And Ezequiel Rodriguez had a car wash there --

4  Q. Where was this car wash --

5  A. -- in the City of Piedras Negras.

6             THE REPORTER:  What was the question?

7             MR. LEACHMAN:  I'm sorry.

8  BY MR. LEACHMAN:

9  Q. Where was the car wash?

10 A. Manuel Perez Trevino Bypass, yes, a bypass.

11 Q. And what was the significance of this car wash?

12 A. It's the biggest one in Piedras Negras --

13 Q. Okay.

14 A. -- in the whole area, it's the biggest car wash.  So, behind

15 the car wash, they would arrive there.  Cien would arrive to do

16 business with Cheke.

17 Q. Okay.  And so were you at the -- did you go to this car

18 wash?

19 A. Yes.  Well, we worked.  Well, I worked with him.

20 Q. And the first time you encountered Chano, was it at that car

21 wash?

22 A. Yes.  On one occasion, yes, it was at that car wash.  Cien

23 would do his negotiations with Cheke.  Cien would leave in one

24 truck.  Daniel Menera would arrive then.  It was his business

25 to deliver the drugs.

1  Q. So Danny was delivering the drugs for Cien?

2  A. Yes.  At that time, Danny Menera would work for Cheke -- no.

3  Excuse me.  I'm sorry, for Cien.

4  Q. Okay.  And so Danny Menera is working to Cien delivering

5  kilos.  What was -- what was Chano doing the first time you saw

6  him?

7  A. And Chano would work with him.  He was always there.  He was

8  his -- well, he was always together with Danny Menera.

9  Q. And so, on this first occasion when you saw them, were --

10 were they delivering kilos of cocaine?

11 A. Yes.

12 Q. And -- and did you see how much kilos of cocaine it was?

13 A. Yes, they would always hand over 50 to 100 --

14 Q. And --

15 A. -- kilos of cocaine.

16 Q. -- did they deliver a load of cocaine on that occasion?

17 A. Yes.

18 Q. And tell us how it happened.  Did they show up in a vehicle?

19 A. Well, yes, they arrived in their truck, and we were at the

20 business.

21 Q. Okay.  And -- and was the -- where was the cocaine?

22 A. They would bring it , the cocaine, in a truck.  They would

23 always arrive in these big suitcases.

24 Q. Okay.  And how did the cocaine get from their truck to you?

25 A. Chano would unload it, and myself and him and another person

1  who worked with Cheke, and he would open it, and we would count

2  the squares, then I would grab it, and I would load it up into

3  my truck.

4  Q. Okay.  And when you say, count the squares, what is a

5  square?

6  A. One square is one kilo.

7  Q. Okay.  And what was the purpose for counting the squares?

8  A. That was the business that was being done.  Cien would tell

9  Cheke, "I'm going to leave 100 kilos with you."

10  Q. Okay.  And so were you or Cheke, or you on behalf of Cheke,

11  checking to make sure --

12  A. Yes.

13  Q. -- that the amount of kilos they were delivering was what

14  was stated?

15  A. Yes, that's true.

16  Q. And were they watching, and by they I mean Chano and Danny,

17  to make sure that they would -- they had a proper count of what

18  they were supposed to deliver to you at the same time?

19  A. Yes.

20  Q. Okay.  And is -- is this event that you're describing, did

21  that play out numerous times when you were working for Cheke?

22  A. Yes.  That's how we worked the whole time.  When we didn't

23  deliver there at the -- well, we almost always would get

24  delivery there at the car wash.

25  Q. How many times do you believe you received trucks there at

1  the car wash?

2  A. It's hard to remember how many times we did it.  It was our

3  job.  Frankly, it was -- it was one or two times a month, and

4  the quantities were 50 or 100.

5  Q. And for how many years did that continue?

6  A. Up to 2010 it was.

7  Q. So from 2007 to 2010?

8  A. Yes.

9  Q. So if that's -- if that's four years, that would be

10  48 months; right?

11  A. Uh-hum.  Yes.

12  Q. And if -- if it was an average of 1.5 times for 48 months,

13  that's -- that would be 82 times?

14  A. Well, approximately.

15  Q. Okay.  Well, let me ask you this.  Is that -- is that in the

16  range?  Does that seem approximately like the amount of times

17  that you received cocaine deliveries there at the car wash from

18  Chano?

19  A. It's just that, you see, that what happens also is that we

20  didn't work the whole year.  It's not all the time, right?

21  Q. Okay.

22  A. That's why it's hard to know exactly how many times.

23  Q. Right.  Sometimes a business is really hopping, and

24  sometimes there's no business at all.  Is that -- is that true?

25  A. That's the way it is.

1  Q. Okay.  But let me ask you this.  But what I understood you

2  to say is, if you took that into account, on average, you were

3  getting cocaine between one and two times per month --

4  A. Uh-hum.

5  Q. -- is that right?

6  A. Yes.

7  Q. Okay.  And so if -- if we had somewhere in the neighborhood

8  of 80 times that these deliveries of -- are made, how much

9  cocaine does that amount to over those four years, from 2007 to

10 2010, approximately?

11 A. Oh, my goodness.  It would be between 1,000 -- 1,500 and

12 2,000 kilos.

13 Q. Well, let me -- let me just -- and I want to know what the

14 right number is, whatever it is.  But let me -- let me suggest

15 this to you.  If there was 80 times, and if it was a minimum of

16 50 kilos per time, that's 4,000 kilos right there using the

17 minimum.

18 A. Yes, but, like I say, that's what I have and as far as what

19 I did, right?  Like I say, we weren't working the whole year or

20 every week.

21 Q. Okay.  So what you're saying is it's really less than 1.5

22 times a month.  It's probably more like one time a month or

23 something?

24         THE COURT:  He's already given you an estimate.  Move

25 on to another question.

1      Counsel?

2           MR. LEACHMAN:  I'm sorry?

3           THE COURT:  He's already given you an estimate.  Move

4    on to another question.

5           MR. LEACHMAN:  Okay.

6    BY MR. LEACHMAN:

7    Q. Apart from the times that you met Chano there to receive

8    drug deliveries, did you also have occasions to meet him at the

9    car wash for other purposes?

10   A. All the time, whenever I would see Chano, it was for the

11   work.  On occasion, it was to deliver.  Other times he was

12   there to receive his money that he would get from the

13   transactions.

14   Q. And how frequently would you meet him to receive -- or to --

15   regarding the money for these transactions?

16   A. Almost always it was -- well, sometimes once a month when we

17   would deliver.  On other occasions, I was not present because

18   Cheke was the one who would hand over the money.

19   Q. Okay.  But if -- if we're talking about the number of times

20   that you've seen --

21   A. Uh-hum.

22   Q. -- Chano before, how many times have -- have you met with

23   him during the course of your dealings with the Zetas

24   approximately?

25   A. No.  Well, him, I met him at Daniel's side.

1  Q. I don't care who's he with.

2      I mean how many times were you personally in the presence

3  of this defendant?

4  A. Well, no -- well, no, the whole time.  We all worked the

5  same thing.

6  Q. Okay.  Hundreds of times?

7  A. Hundreds of times, well, yes.

8  Q. Okay.  Did you have occasion also to move drugs directly

9  with Chano?

10 A. Yes, the last time that he delivered to me and Vecino was a

11 ton of marijuana.

12 Q. Okay.  And was the marijuana we talked about earlier this

13 morning, the 100 kilos that was seized in the United States,

14 was it part of that 1,000 kilos of marijuana?

15 A. Yes, it was a part of that.

16 Q. Did you move other amounts of marijuana with Chano besides

17 that thousand kilos you just described?

18 A. No.

19 Q. Marijuana --

20 A. Marijuana, no --

21 Q. Okay.  Did you move other drugs with Chano besides the

22 marijuana?

23 A. Like -- just like I just mentioned, that he would deliver to

24 me and Cheke when he worked with Daniel.  But directly that he

25 would deliver to me, it was that ton.

 1   Q. Okay.  Do you remember earlier in your testimony you talked

 2   about how, when you would move loads at the beginning, that you

 3   and Indalesio would have cocaine in -- in the same load and --

 4   and move -- move it into the United States and then share

 5   the -- the proceeds?

 6   A. Yes.

 7   Q. Is that something that is common that -- that the Zetas

 8   would also do that more than one person who was part of the

 9   Zeta hierarchy would put loads together in order to move them

10   into the United States?

11   A. Yes.

12            MR. LEACHMAN:  May I approach the witness,

13   Your Honor?

14            THE COURT:  Yes.

15   BY MR. LEACHMAN:

16   Q. Mr. Tavira, I'm going to show you two documents that are

17   marked Government's Exhibit No. 98 and Government's Exhibit

18   No. 99.

19                 (Change of interpreter.)

20            THE INTERPRETER:  May the interpreter hear the

21   question again, please?

22            MR. LEACHMAN:  Sure.

23   BY MR. LEACHMAN:

24   Q. Mr. Tavira, I'm going to show you what's been previously

25   marked as Government's Exhibits 98 and 99.

1    A. Yes.

2    Q. And, in that regard, have you and I --

3              THE COURT:  Maybe I'm misunderstanding the numbers.

4    You said 100; didn't you?  Yeah.

5              MR. LEACHMAN:  98 and 99.

6              THE INTERPRETER:  Interpreter correction.

7         (Interpreter speaking to the witness in Spanish.)

8              THE INTERPRETER:  Thank you, Your Honor.

9    BY MR. LEACHMAN:

10   Q. And, in that regard, have you and I sat down before and

11   talked about various members of the Zetas and drug trafficking

12   activities that they conduct?

13   A. Yes.

14   Q. And did we take about the difference of the organization,

15   say, in the 2005, 2006 time frame and in the later time frame

16   after you were arrested?

17   A. Yes.

18   Q. And do Government's Exhibits No. 98 and No. 99 reflect the

19   organizational structure of the Zetas as you conveyed to -- to

20   us in those meetings?

21   A. Yes, that's right.

22   Q. And -- and for a person that's not familiar with the Zetas,

23   would this help them understand who's who in the Zeta

24   leadership?

25   A. Yes.

1    MR. LEACHMAN:  Move for the admission of Government's

2  Exhibit No. 98 and 99, Your Honor.

3    MR. CAVAZOS:  No objection, Judge.

4    THE COURT:  98 and 99 are admitted.

5  BY MR. LEACHMAN:

6  Q. So I'm going to show you first what's marked as Government's

7  Exhibit No. 98.  And just so the jury can see what we're

8  talking about, this is a chart that relates to people that were

9  involved with the Zetas going back to 2005 and 2006 as far as

10 back then; correct?

11 A. Yes.

12 Q. And, on this chart, it shows -- and -- and just so we're

13 also -- we can understand.  The people that formed the primary

14 portion of this chart on the bottom half, actually a little

15 more than the bottom left quarter, are people that are working

16 within The Plaza in Piedras Negras; is that correct?

17 A. Yes, at that time, it was like that.

18 Q. Okay.  And is that the only plaza that you've ever really

19 worked in?

20 A. Yes.

21 Q. Okay.  And so, for example, on this -- this chart, up here

22 kind of in the middle we have Cien; right?

23 A. Yes.

24 Q. And -- and he's directly under Lazcano who's the big boss of

25 the whole thing back then; is that right?

1  A. Yes.

2  Q. And then, beneath him, is -- is a guy with the nickname

3  Metro Alpha; isn't that right?

4  A. Yes.

5  Q. Okay.  And was he in -- in The Plaza for a portion of the

6  time we've been talking about?

7  A. Yes.

8  Q. Okay.  And was there parts of the times that we've been

9  talking about that he was not in The Plaza as well?

10  A. Who was not there?

11  Q. Metro?

12  A. Yes.

13  Q. Okay.  And then below Metro we have Pepillo Gloria.  Who is

14  that?

15  A. Pepillo Gloria, he was one who worked heavily while he was a

16  Zeta.

17  Q. And what happened to him?

18  A. He was captured in Mexico by the government.  The charges

19  that he has is that he murdered some agents from the

20  United States in the City of Mexico.

21  Q. Okay.  And so did he end up leaving The Plaza there in

22  Piedras?

23  A. Yes.

24  Q. Okay.  And, in that regard, did Cien ultimately get picked

25  up by the government of Mexico also?

1  A. Yes, that, too.

2  Q. And -- and, for example, in your chart up here, in 2006, you

3  have the leaders -- who later became leaders, 40 and 42, kind

4  over here at the top left; is that right?

5  A. Yes.  Yes.

6  Q. And then, later, we have, on -- on the more current chart

7  and that we made together, I guess, back in May of this year,

8  does it show Omar Trevino -- Trevino Morales having more direct

9  control, again, of what basically represents The Plaza,

10  Piedras Negras?

11  A. Yes.

12  Q. And he is, at this point, under 40 who is, at that time, the

13  head of the entire cartel; is that right?

14  A. Yes.

15  Q. And give us just an idea of around when this transition

16  takes place, when 40 and 42 become the head of -- well, 40

17  becomes the head of the cartel, and 42 because becomes the

18  controlling person for the Piedras area.

19          THE INTERPRETER:  May the interpreter please hear

20  that again?

21          MR. LEACHMAN:  Yes, ma'am.

22  BY MR. LEACHMAN:

23  Q. Please tell us when it was, approximately, that 40 became

24  the head of the cartel and 42 had direct control over the

25  Piedras Negras area?

1  A. Well, if I'm not mistaken, I believe that it was around -- I

2  think it was around 2009, 2010 or when I came over here

3  about -- 2013.

4  Q. From that time frame, those guys are in control as we just

5  discussed?

6  A. Yes.

7  Q. Okay.  Now I want to back up a minute, and I want to talk to

8  you.  So you talked about before that you moved -- that between

9  2007 and 2010 that you were moving cocaine with -- with

10  Ezequiel Rodriguez, this guy; right?

11  A. Yes.

12  Q. And did -- did you start helping someone else besides

13  Ezequiel Rodriguez in the 2010, 2011 time frame?

14  A. Yes.

15  Q. And who was that person?

16  A. It was, well, Poncho Cuellar.

17  Q. Okay.  And how long did you work for Poncho Cuellar?

18  A. In 2010 and I think the first part of 2011 --

19  Q. Okay.

20  A. -- also -- also part of 2009.

21  Q. Okay.  And what did you do for Poncho Cuellar?

22  A. The same.  He would deliver the cocaine to me, and I had the

23  people to take the cocaine to wherever he told me to send it.

24  Q. Okay.  And would you coordinate those loads or assist in

25  coordinating those loads into the United States?

1    A. Yes.

2    Q. Okay.  And did -- did -- I'm going to show you

3    Government's 98 again.  And back at this time you had

4    Poncho Cuellar being basically about at the same level as -- as

5    Danny Menera; is that correct?

6    A. Yes.

7    Q. And did -- did Poncho Cuellar, was -- was he one of the more

8    successful movers of cocaine for the Zeta Cartel?

9    A. Yes.

10   Q. And, during that time, from -- from part of 2009 through the

11   first part of 2011, that you worked with Poncho Cuellar, give

12   us an idea of how much drugs you were moving for -- for him and

13   the Zetas during that time frame?

14   A. Well, Poncho Cuellar, like I said, he was the one who was in

15   charge of all of the cocaine movement in Piedras Negras.  At

16   that time, the Zetas were working very strongly, their loads

17   were at least 35 kilos that they would deliver to me.

18          MR. LEACHMAN:  I'm sorry.  I didn't hear that.  Can I

19   get the interpreter to repeat the reply?

20          THE INTERPRETER:  At that time, the loads were at

21   least 35 kilos.

22          MR. LEACHMAN:  Okay.

23   BY MR. LEACHMAN:

24   Q. And same questions as before, how frequently were you

25   getting these loads, and I'm trying to get an idea of the total

1   amount of cocaine you assisted Poncho Cuellar move?

2   A. Well, with Poncho Cuellar, like I said, they were working.

3   They were always working, always.  So then they worked with

4   them -- him I worked about once a week.

5   Q. Okay.

6   A. But, with each shipment, at that time, I had about five

7   pickup trucks, in the tank, we would put in from about 35 to

8   45 kilos in each one of them.

9   Q. And so, if you added all of that up, approximately how many

10  kilos of cocaine do you think you moved with Poncho Cuellar?

11  A. Even though it was less time that I worked -- that I had

12  worked with others, but I think it was about double, about

13  4,000 kilos approximately.

14  Q. Okay.

15          THE COURT:  And, with that, let's go ahead and take a

16  lunch break.

17      Ladies and gentlemen, I've got another criminal matter to

18  attend to during the lunch hour, so follow the instructions of

19  the courtroom security officers.  Again, do dot deliberate

20  about this case, do not get on the smart phone, don't do any

21  independent research, don't talk to one another, loved ones,

22  coworkers, or anything -- anybody else about this case.

23      Is their lunch here?

24          COURTROOM DEPUTY:  She hasn't let me know yet.

25          THE COURT:  I'm not sure if your lunch has arrived

1743

1  yet.  Let's say 12:45.  If for some reason your lunch is

2  running late, we'll move that back, but let's say 12:45 for

3  now.

4       All rise for the jury.

5            COURT SECURITY OFFICER:  All rise.

6                 (Jury leaves courtroom.)

7            THE COURT:  The witness can step down.

8                 (Recess.)

9                 (Jury enters courtroom.)

10           THE COURT:  Please be seated.

11      Mr. Leachman.

12           MR. LEACHMAN:  Thank you, Your Honor.

13  BY MR. LEACHMAN:

14  Q. Before we broke for lunch, Mr. Tavira, we were talking about

15  cocaine movement that you did with the -- the Zeta Cartel; do

16  you recall that?

17  A. Yes.

18  Q. And we had gone through, I believe, all of the activities

19  that you had done with -- with Poncho Cuellar; is that correct?

20  A. Yes.

21  Q. Was there a point in time which you discontinued working

22  with Poncho Cuellar and -- and worked under another person in

23  the Zetas?

24  A. Yes.

25  Q. And who was that?

1  A. I started working directly with Daniel Menera.  But between

2  him -- or in between him, or as an intermediary, was a guy

3  named Vecino.

4  Q. Okay.  So from Poncho you went to Vecino, and then from

5  Vecino to Danny Menera?

6  A. No.  Not like that, no.  What I wanted to say was that

7  Vecino was in the middle between Daniel and myself.  Whatever

8  Danny, or Daniel, wanted me to do or wanted to give

9  instructions for me to do, he would tell Vecino.  Vecino --

10  Vecino would tell me.  And, if I didn't have anything to do

11  with Daniel, I would go through Vecino.

12  Q. Okay.  So the -- the person that's supplying you cocaine is

13  Vecino when ordered to do so by Danny?

14  A. That's the way it is.

15  Q. Okay.  And was that the case back in August of 2011?

16  A. Yes.

17  Q. And did you have a significant cocaine seizure during the

18  month of August 2011?

19  A. I think so, yes.

20          MR. LEACHMAN:  Can I approach the witness,

21  Your Honor?

22          THE COURT:  Yes.

23  BY MR. LEACHMAN:

24  Q. I'm going to show you what's been marked as Government's

25  Exhibit 255, 256, 257, and 258.

1  A. Yes, that's the way it is.  Yes, these are them.

2  Q. Okay.  And do you recognize what's in those photos?

3  A. Yes.

4  Q. And is -- is that a load of cocaine that you were moving

5  back in August of 2011?

6  A. Well, that cocaine was not -- well, it wasn't me -- well,

7  they hadn't given it to me.

8  Q. Okay.

9  A. That cocaine was someone else's.  The one responsible to

10  bring that truck to the United States was someone else.

11  Q. Were you aware of that cocaine when it was being moved?

12  A. Yes, I knew what he was doing also.

13  Q. And did you know the -- the manner, the way that they were

14  moving that particular cocaine?

15  A. That's true.

16  Q. And did you know how it was hidden?

17  A. Yes.

18  Q. And did you tell -- and the way it was hidden was in a roll

19  of carpet; is that correct?

20  A. Yes.

21  Q. And did you tell investigators that you were aware of this

22  load that fell that was in a roll of carpet?

23  A. Yes.

24  Q. And did you tell them that you knew who it came from and

25  what the source of it was?

1  A. Yes.

2  Q. And who did it come from, and what was the source of it?

3  A. The one who worked that one was Daniel Menera, and then in

4  charge of that shipment I know him was Cuco.

5  Q. Was the defendant Chano involved in that load with

6  Danny Menera?

7  A. Well, what I can say, Daniel was the one in charge of that,

8  and -- and Chano worked with him.  I don't know if he had a

9  certain participation in that.

10 Q. Okay.  Was he working with Danny Menera in August of 2011?

11 A. Yes.

12 Q. And that's a good point.  I want to talk to you about -- so

13 I'm showing you your chart, Government's Exhibit No. 99.  Is

14 it -- is it correct that all of the Zetas are helping each

15 other move cocaine and marijuana and other drugs within

16 The Plaza?

17 A. Yes.

18 Q. Okay.  So, for example, let's just say for a minute that --

19 that we've got a load like this of a hundred kilos of cocaine;

20 okay?

21 A. Okay.

22 Q. And let's say that the person that's moving that load of

23 cocaine, let's say it's this guy over here.  Let's say it's

24 Goofy; all right?

25      I'm just giving you an example --

1  A. Yes.

2  Q. -- and he answers to Cuco?

3  A. Yes.

4  Q. And maybe Cuco is working with you or with Vecino --

5  A. Yes.

6  Q. -- right?

7  A. Yes.

8  Q. And so, if all of those drugs are being moved within

9  Piedras Negras, those drugs enjoy the security provided by the

10  whole cartel controlling that area; don't they?

11  A. Yes.

12          MR. CAVAZOS:  Objection to speculation, Your Honor.

13          THE COURT:  One second.

14      How do you know that, sir?

15      Yes, I'm speaking to the witness.

16          THE WITNESS:  That everyone helps each other?

17          THE COURT:  No, the question before or --

18      Let's back up.  Ask a new question -- or ask the question

19  again or rephrase it.

20          MR. LEACHMAN:  Let me break it -- I'll break it down.

21  BY MR. LEACHMAN:

22  Q. Do the Zetas protect the drugs of all of the people that

23  worked for the Zetas like those on -- on Chart 99?

24  A. Yes.

25  Q. Okay.  And so if a person has a load of drugs in Piedras,

```
 1    and it belongs to one particular person on the chart, are --
 2    are all of the other Zetas on the chart helping protect that
 3    load of drugs in Piedras?
 4              MR. CAVAZOS:  Objection, Your Honor.  It calls for
 5    speculation.  It's getting into --
 6              THE COURT:  That's -- that's over --
 7              MR. CAVAZOS:  -- the mind of people that he has no
 8    knowledge of.
 9              THE COURT:  That's overruled.
10              THE WITNESS:  That's true.
11    BY MR. LEACHMAN:
12    Q. And -- and is that because they control the police?
13    A. Yes.
14    Q. And do the police protect the drugs?
15    A. Yes.
16    Q. And -- and the other thing I guess that I want to make sure
17    that the folks understand.  When you're talking about people at
18    the level of Danny Menera or Chano or Celso, people like that,
19    are those folks aware of -- of the whole activities of what the
20    Zetas are being involved in?
21              MR. CAVAZOS:  Objection, speculation, Your Honor, no
22    basis in fact.
23              THE COURT:  That's overruled.
24              THE WITNESS:  Yes, they are aware.  One way or
25    another, they are all together.
```

1  BY MR. LEACHMAN:

2  Q. Okay.  And -- and by way of example, Danny knows how much

3  dope Poncho Cuellar is moving; is that true?

4  A. Yes.

5  Q. And Poncho Cuellar knows how much dope Pio is moving?

6  A. No.

7  Q. Okay.  Why not?  What's the difference there?

8  A. For example, each one has his own people.  For example,

9  Poncho has the people he distributes to.  Poncho -- Danny he

10  has his people he distributes to.  But, in one way or another,

11  there's always communication.

12  Q. And for somebody that's a plaza boss, or -- or even the

13  right-hand of a plaza boss, it's their job -- is it their job

14  to know how much everybody is moving in The Plaza?

15  A. Yes.

16  Q. And is, in fact, that how it's determined how the -- the

17  company gets paid?

18  A. Yes.

19  Q. Okay.  Okay.  So I want to direct your attention now,

20  Mr. Tavira, to -- to some events that occurred back in --

21  around February of 2011.  Okay?

22  A. Yes.

23  Q. Was there a point in time when you got kidnapped or picked

24  up by the cartel?

25  A. Yes.

1  Q. And -- and when was that?

2  A. It was in the month of March, 2012.

3  Q. Okay.  And we've been talking earlier about Poncho Cuellar.

4  At the point that you got picked up, were you still working for

5  Poncho Cuellar?

6  A. No, Poncho Cuellar had already left, was not working any

7  longer with the Zetas.

8  Q. Okay.  And so I want to direct your attention to this --

9  this time that you were picked up.  When -- when did that

10  happen?

11  A. When they kidnapped me?

12  Q. Yes, sir.

13  A. Well, what happens is Poncho Cuellar comes to the

14  United States.  The reason being I don't know exactly.  There

15  are just rumors.

16  Q. Okay.  How long prior to this -- this night that you're

17  picked up has Poncho Cuellar come to the United States?

18  A. About 15 days went by.

19  Q. Okay.  And so where were you the night that you were

20  kidnapped?

21  A. That night I was -- I was in my house.  I just had arrived,

22  and my wife, the one who was my wife at that time was with me,

23  and my two children, the younger ones.  The older ones were not

24  there fortunately.  They were out.  It was a Saturday, and they

25  were out with friends or something like that.

1  Q. And -- and what were you doing there at your house?

2  A. I remember that I was -- well, I was already at home, and I

3  was preparing to go to bed.  I remember that one day before

4  that that Vecino told me that Poncho had come to the

5  United States and that to be very careful that with one phone

6  call there could be a report to him.

7          MR. LEACHMAN:  May I approach the witness,

8  Your Honor?

9          THE COURT:  Yes.

10  BY MR. LEACHMAN:

11  Q. I'm going to show you what's been marked as Government's

12  Exhibit 243, 243A, and 243B.

13  A. Yes.  It is the City of Piedras Negras, yes.

14  Q. And does that show the location of your house?

15  A. Yes, my house is here.

16          MR. LEACHMAN:  Move for the admission of Government's

17  243 to 243A and B.

18          MR. CAVAZOS:  No objection.

19          THE COURT:  243, 243A, and 243B are admitted.

20  BY MR. LEACHMAN:

21  Q. And so, Mr. Tavira, 243 is the location there with the

22  little green dot on it, is that -- is that your home?

23  A. Yes.

24  Q. And just so the folks can sort of see on the map, is that

25  the neighborhood where that home was located?

1  A. Yes.

2  Q. And does that show roughly where it's located within the

3  City of Piedras Negras?

4  A. Yes.

5  Q. Okay.  And so you're at home.  It's at night.  What happens?

6  A. When, as I say, I'm getting ready to go to bed, suddenly I

7  heard that the gate -- I heard the gate and -- because my house

8  has the wall, and then it has the gate door.

9  Q. Okay.  So where -- where is the wall, and where is the gate

10 on this photograph?

11 A. Where it says, Daniel L. Farias, where you're pointing,

12 that's where the gate is.  That's where the gate is, and,

13 further ahead, there, there's a door (*indicating*.)  That door I

14 could open from the inside from my room.

15 Q. So is there a -- is there a doorbell or something out there?

16 A. Yes, there's a finger, so you can call when you do ring the

17 bell.

18 Q. And remotely you can unlock it?

19 A. Yes, and the door opens.  And I saw that they were making

20 lots of noises, very strong, hard noises on the door --

21 Q. How did you see that --

22         THE INTERPRETER:  The interpreter hasn't finished.

23         MR. LEACHMAN:  Sorry.

24         THE WITNESS:  And there were noises on the gate.

25 They were knocking very fast on the gate.

1           MR. LEACHMAN:  Okay.

2    BY MR. LEACHMAN:

3    Q. And how were you able to see that?

4    A. Because I was in my bedroom, and it faces the front.  And I

5    was upstairs.  And so there is a nightstand, and so then you

6    just have to press the button and immediately the door opens.

7    Q. Okay.  What did you see?

8    A. When I saw who it was, they came in with weapons.  They were

9    armed.  And so, you know what I said, I told my wife, "They're

10   coming for me."  "Where are the children?"  When I opened --

11        Well, after they had come in, and I was there, and they

12   were making noises at the front door of my house, and that's

13   always open, or unlocked.  So, when they opened it, they yelled

14   my name out.  And the first one to come in was Gustavo.

15   Q. Okay.  Let me -- let me stop you for just a second and back

16   you up.

17        When you saw them, how many people did you see?

18   A. Quickly, I saw three of them.

19   Q. Okay.  And how are these guys dressed?

20   A. They had some kind of a vest, and one had a scarf like you

21   were looking at death, like, it was a skull.

22   Q. So the mask had a picture of a skull on it?

23   A. Yes.

24   Q. Okay.  And then -- and -- and when they entered the -- the

25   premises, how many people were there?

1  A. Two entered.  First, was Tavo.  That person I know him.  You

2  could say we were friends.  He knew my family, and I knew his,

3  right.  So he entered first.  That's --

4  Q. Let me show you what's marked as Government's Exhibit 1A-46.

5  Do you recognize that person?

6  A. That's him, yes.

7  Q. Okay.

8  A. That's Gustavo.

9  Q. Have you told us who this person is?

10 A. I'm sorry?

11 Q. Did he tell us who this person was?

12 A. Yes.

13 Q. Okay.  And so he comes into the -- to the residence.  What

14 happens then?

15 A. So, when he arrives, he tells me, "Compadre, let's go!

16 Hurry up!"  That's what he says to me.  And he says, "Ma'am,

17 you, get into the closet."  It was a big closet.  And, the

18 little girl, she was coming out of her bedroom, and she -- she

19 saw that he was armed, and she got afraid.  And my other son

20 also came out of his bedroom, and he knew them.  So he got

21 ahold of them, and said, "Get away!  Get in!  Get in!"  And he

22 took my two children and my wife, and he put them behind a

23 door, and he closed the door.  And Chano, in that moment, was

24 coming in behind him, and he was also armed.  And he says,

25 "Let's go!  Let's go!  It's already time to go."  They took me

1  down the stairs quickly.

2  Q. Did you know anyone besides Chano and Tavo?

3  A. So they got me into a truck, but they threw me down to the

4  floor not onto the seat but the floor.  Yes, I did know someone

5  who was driving.

6  Q. And who was that?

7  A. And the one who was driving I did recognize because he told

8  me, he spoke to me and said, "Tavira, what did you do?"  I

9  said, "I didn't do anything.  I haven't done anything.  I'm

10  okay."

11  Q. And then what happened?

12  A. Okay.  So they sped out, the two -- I think there were two

13  of them.  They left.

14  Q. And when you say two of them, do you mean two vehicles?

15  A. Yes, because when they took -- got me into the truck -- I

16  don't know if Chano and Tavo were there, but I do know that the

17  one with the skull scarf on his face, he was there because he

18  had his foot on my back.  He was holding me down.

19  Q. Okay.  And was he armed at the time?

20  A. Who?

21  Q. The person with his foot on your back.

22  A. Yes.

23  Q. And was there a gun being held on you?

24  A. Yes, it was a long weapon, but I don't know if it was an

25  AK-47 or if it was an AR-15.

1756

1  Q. Okay.  And did -- did they take you in the vehicle for a

2  drive?

3  A. No.  Well, they -- yes.  Well, they took me to a place.

4  Q. Okay.  How long -- how far a distance -- how long did it

5  take between the time they put you in the car at your home and

6  you arrived at a place?

7  A. Approximately 15 -- well, 10 to 15 minutes.

8  Q. Okay.  And, while you're driving from your house to that

9  place, do you know who's in the vehicle with you?

10  A. Yes.

11  Q. And who's in the vehicle with you?

12  A. The one who was driving was Daniel's brother.

13  Q. And -- and what is his -- does he go by?

14  A. I know him as Macias.

15  Q. Okay.  And who else was in the vehicle?

16  A. I think it was just him.  Like I say, I was on the floor, I

17  couldn't see, and the one who was watching over me.

18  Q. Okay.  At this point in time, are you bound in any way?

19  A. Up until that moment, no.

20  Q. Okay.  And so was there any conversation between the person

21  that was driving or the person that's holding the gun on you

22  during this 15 minutes that's you're -- you're driven to a new

23  location?

24  A. No, just what I told you that he asked me what had I done.

25  All you could hear were the radios and the motors, the engines,

1  because they were going really fast to the places we were --

2  where we were going.

3  Q. Could you tell what was being said on the radios?

4  A. That they had -- they already had me.  They were bringing

5  me, and they said some code, and that was all.

6  Q. Okay.  And so what happens when you arrive at this place?

7  A. Well, when they get me out of the truck, they put some

8  handcuffs on me.  They -- they take me.  They -- they had ahold

9  of me with my head down where there was a pickup truck.

10  Q. And who put the handcuffs on you?

11  A. Frankly, I don't remember.  I don't remember exactly who --

12  who placed them on me.  When I arrived at the truck, 42,

13  Zeta-42 and Zeta 40 were there.

14  Q. Was Chano there?

15  A. Frankly, I didn't see him anymore.

16  Q. Was Danny there?

17  A. Yes.

18  Q. What happened once you got there?

19  A. When I arrived, that was the first time I saw 40 and 42.

20  Q. Okay.  And where were they?

21  A. 42 was down by me to one side, and 40 was at the wheel at

22  the truck, at the steering wheel.

23  Q. Okay.  And then what happened?

24  A. And then someone arrives and says, "This is the Tavira.  The

25  one who works with Poncho."

1  Q. Who said that?

2  A. It seems like it was 40 or Enano.  So 40 moves to one side

3  and asks me, "Where is Poncho?  And I respond that, "No, I

4  don't know."  That there had been some time that I had not seen

5  him.  And he said, "Well, how come you don't know?  You work

6  with him."  And I told him, "Well, that's what I'm telling you.

7  It's what I'm saying."

8       So, at that time, or at that moment, Daniel arrives.  He

9  arrives, Daniel arrives with the telephone, and he tells

10 Zeta-40, "Commander, will you allow me?"  And he says, "Yes.

11 What's going on?"  Tavira -- so he tells him, "Tavira works for

12 us."

13 Q. When he said us, who did he mean?

14 A. In other words, works for Daniel.  And, on the phone, he had

15 100.  100 was the one who was speaking.

16 Q. And how did you know that?

17 A. Because, at that moment, he gives the phone to Zeta-40, and

18 he takes the call, and then he says, "Oh, all right.  Why

19 hadn't anyone told me?"  And he closes the phone and gives it

20 to Daniel.

21 Q. And did you have any conversation with him at that point?

22 A. With Z-40?

23 Q. Yes.

24 A. What happened then -- yes.  What happened then was -- yes.

25 He says -- he says, "Daniel works for Vecino.  They work

1  together for Cien, for 100."

2  Q. Okay.  And then what happened?

3  A. Yes, and then he tells Daniel, "Well, in a previous

4  occasion, they had given me a load of 100 kilos."  Supposedly

5  all of us who were working in transporting marijuana or

6  cocaine, the company gave each person 100 kilos.  And -- and

7  those 100 kilos, they were not going to pay for them for

8  crossing them to the United States.

9  Q. They weren't going to pay a transportation fee to people

10  like you?

11  A. No, they weren't going to pay.

12  Q. Why not?

13  A. Because, with those 100 kilos, we would be helping the

14  company.

15  Q. So the profits from the -- the movement and sale of that --

16  those loads of cocaine, the money would go directly back to the

17  Zetas to fund other things?

18  A. Yes.  All I was going to do was take those 100 kilos, take

19  them to the United States, deliver them, and not do anything

20  more.

21  Q. Okay.  And -- and were other people required to do the same

22  with 100 kilos?

23  A. That's what I was told that I had to do that.  That's what

24  Vecino told me, and I did it.

25  Q. Okay.

1 A. And so Daniel tells Cuarenta -- he tells the Comandante, "We

2 delivered a 100 kilos to him.  We delivered a 100 kilos from

3 the company to him, and all he has left here are 15.  The rest

4 are in the United States.  That's why I'm telling you that he's

5 working for us."  So then he says, "Why hadn't you told me this

6 before?"

7 Q. Who said that?

8 A. 40.

9 Q. Okay.

10 A. And then he tells Daniel, "Daniel, this Tavira, he worked

11 with Poncho, and he's going to be really hot."  That's what he

12 said.  That's how he said it.  And that's what he told Daniel,

13 "You will be responsible for him, and you'll answer for him.

14 Because if you answer for him at this moment, right now, I'll

15 let him go.  But, whatever he does or may do, you will be the

16 responsible one."  And at that -- at that moment, then Daniel

17 turned to him and -- and said that he would.  That he said,

18 yes, I will respond or answer for him.

19 Q. And that you would then have to work for Daniel?

20 A. Yes, from that time forward, I had to be with him forever.

21 Q. Was 42 part of this conversation also?

22 A. Yes, both of them were there.  Both of them.

23 Q. And were there -- were there sicarios around at this time as

24 well?

25 A. Yes, there were.  Well, they were all there.  When all of

1761

1    this was going on, and I started looking around, there were

2    sicarios everywhere around.

3            MR. LEACHMAN:  May I approach the witness,

4    Your Honor?

5            THE COURT:  Yes.

6    BY MR. LEACHMAN:

7    Q. I'm going to show you what's been marked as Government's

8    Exhibit 241 through 242-D and ask you if you can recognize that

9    these are maps and -- and Google earth type photos of locations

10   and ask you if you can recognize what the location is depicted

11   there?

12   A. Yes, all of them, and the place that is shown here is the

13   place where they took us.

14           MR. LEACHMAN:  Move for the admission of Government's

15   Exhibits 241 through 242D.

16           MR. CAVAZOS:  No objection, Judge.

17           THE COURT:  241, 242, 242A, B, C, and D are all

18   admitted.

19   BY MR. LEACHMAN:

20   Q. And so 241 shows the general location in Piedras Negras

21   where they took you to; is that correct?

22   A. Yes.

23   Q. And 242A, and there where there's that green dot, is that

24   the general area where you were taken?

25   A. Yes.

1  Q. And 242B, is that a little further view of the -- of the

2  location where you were taken?

3  A. Yes.

4  Q. And, 242C, again, zoomed out a little further; is that

5  correct?

6  A. Yes.

7  Q. And, if we look at 242D, does it show that the location is

8  in sort of west -- the west part of Piedras Negras?

9  A. Yes.

10 Q. Okay.  And tell the -- tell us what -- what the -- what it

11 looks like at this location?  Is this -- is there a structure

12 there?  What is this?

13 A. As you can see, it's a large lot, and it has walls all

14 around it.  That's where the highway ends, and that's where you

15 enter on the left side.  There were lots of trucks there and

16 lots of people.

17            THE INTERPRETER:  The interpreter needs a

18 clarification.

19            THE WITNESS:  A street.  This is where the street

20 ends.

21            MR. LEACHMAN:  Okay.

22            THE INTERPRETER:  Interpreter correction.

23 BY MR. LEACHMAN:

24 Q. Okay.  And had you ever been to this location before?

25 A. No.

1  Q. Okay.  And when you -- when you first arrived at that

2  location and -- and were taken out of the vehicle, tell us what

3  you were able to see?

4  A. When they get me out of there, they took me directly to the

5  truck that I just commented to you about.  And when they were

6  on the way taking me to where 40 and 42 were, this other guy

7  was there.  His name is Victor Cruz.  He was also in handcuffs,

8  and he, too, he was a friend of Poncho Cuellar.

9  Q. Were you handcuffed in front of your body or behind your

10  body?

11  A. Behind.

12  Q. Okay.  And is that the same for the other people you saw

13  there?

14  A. Yes.

15  Q. Okay.

16  A. So, when they let me go, then I turned.  And so when I turn

17  around there, I notice also, and it surprised me to see this

18  person because Victor Cruz's wife was there.

19  Q. Okay.

20  A. Until that moment, I didn't have an idea as to what was

21  going on there.  So, when I leave, when I retreat from where

22  the Cuarentas, the 40s are, and that Daniel comes up to me, and

23  says, "Follow me."  And when I'm following behind Daniel, and

24  I'm looking around and turning around and looking, and there

25  are many people, civilians.  In fact, Victor Cruz' children

1  were down on their knees, and Victor Cruz was on his knees to

2  one side of them.

3  Q. How many people are there?  And I mean the civilians not the

4  Cuarentas.

5  A. Truthfully, I don't know how many there are.  There were a

6  lot of -- a lot of people.  More than -- more than 20 people as

7  far as what I could see.

8  Q. And were they all kneeling?

9  A. Yes, and some of them were on top on the -- on the trucks.

10  They were down and also others were down below also.  So I

11  leave.  I get out of -- or move to one side out of that place,

12  and Daniel takes me to a car that he had there.

13  Q. Okay.  Before you do that.  Let me -- let me show you what's

14  been marked as Government Exhibit No. 245.  Do you recognize

15  the persons in that photo?

16  A. Yes.

17  Q. And who is that?

18  A. That is Victor Cruz and his wife.

19  Q. And do you know his wife's name?

20  A. No, frankly, I do not remember.

21  Q. Okay.  And let me show you what's been marked as

22  Government's Exhibit No. 245.  Do you recognize anybody in

23  those photo -- in that photo?

24  A. Yes.

25  Q. And who is that?

1  A. Victor Cruz' sons.

2  Q. Okay.  And there are three -- this is -- is this

3  Victor Cruz?

4  A. Yes.

5  Q. And there are three children in the photo with him?

6  A. Yes.

7  Q. And do you know which two children were with him that night?

8  A. There were two only, but I'm not sure which two -- or which

9  of the three were there -- which of the three were the two that

10  were there.

11  Q. And was there anybody else with them that you knew?

12  A. Rafita's father was there.  Someone -- someone who worked

13  with Poncho.  And his brother was there also, Rafita's brother.

14  Those were the ones I knew.  Even though it was at nighttime, I

15  could still recognize them because they are very tall.

16  Q. Okay.  And how did you know Victor Cruz and -- and his wife?

17  A. I've known Victor Cruz from long time ago, from the time

18  when we were both in middle school.  And he studied, and he was

19  a master of tae kwon do.  He had an academy.  And then, after a

20  while, he started putting up a gym, so I would go to his gym.

21  And, besides, my children studied with his children, and they

22  knew each other.

23  Q. Did they go to the same school?

24  A. One went to the same school here in United States, and the

25  others were in Mexico.  Yes, but they did grow up together.

1  Q. And how did you know his wife?

2  A. His wife, her parents have -- they had businesses there in

3  Piedras Negras, and I met her when they got married.

4  Q. Was -- was there another child with the -- the Cruz Family

5  that was not one of the Cruz children that night?

6  A. Yes.  Also, afterwards -- well, like I say, I didn't know

7  what was going -- what was going to happen there, really what

8  was happening there.  After that happened, after that moment,

9  they put me in a car, and what I really wanted to do was -- all

10  I wanted to do was get out of there.

11  Q. I want -- I want to back up before you get out of there and

12  ask you if, while you were there at this location that you've

13  been describing, did you have some exchange with -- with

14  Mrs. Cruz?

15  A. Yes.  When I was there, they had her also.  She was tied up.

16  They were asking her questions that who else had business with

17  Poncho.  So then when she turns to look at me, and I was

18  looking to see what was going on with her , she told me, "My

19  children!"  She was asking me like that, "And my children!"  I

20  didn't know what was going on with her children until I saw

21  that they were on their knees to one side, one side of

22  Victor Cruz.

23  Q. Okay.  And what did you say to her then?

24  A. I could not say anything to her.  She was over there like at

25  a distance where that screen is, and all she could do was move

1   her lips, "My children."  And I couldn't say anything to her.

2   Q. Was she trying to get you to help her?

3   A. Yes.  Like I say -- like I said, I didn't know what was

4   going on, but, once I was in the car -- I'm sorry.

5       Well, they started to kill, kill everyone who was there.

6   Q. Did Brenda Cruz have anything to do with the Zetas?

7   A. No.

8   Q. Did those children?

9   A. Not them either.

10  Q. And when she spoke to you, were you still handcuffed?

11  A. No, they had already taken the handcuffs off.

12  Q. And did they escort -- where did they escort you to?

13  A. They escorted me to a car that they had there inside, and

14  they put me in the car.  And I told Daniel, "Take me!  Take

15  me!"  And he said, "No.  Wait!  Wait!"  And then, like I say,

16  suddenly, you started hearing shots.  I was there in the car,

17  and the shots, they finished, and I saw that they started

18  moving the people that they had tied up, and they were killing

19  them in cold blood.  And, their bodies, they would grab them

20  and throw them into some pickup trucks, and they started

21  leaving.  And that's when I got out of there also.

22  Q. Did -- did Daniel Menera tell you why you couldn't leave

23  when you asked?

24  A. I think that no one could leave, not until they finished

25  doing what they were going to do.

1  Q. Where -- where were 40 and 42 when this was all going on?

2  A. There at the trucks, and not to say that they were the ones,

3  but they were doing it.  I don't know who else was doing it.

4  Q. Did -- did you see them leave after what you just described

5  happen?

6  A. Yes, they left.  I left, and everyone left quickly.

7  Q. Okay.  And did they leave before you?

8  A. I think I left first because our -- the car was at the

9  entrance.  I left, and everyone left at the same time.

10  Q. Did you see them load the -- the bodies of these people into

11  the trucks?

12  A. Yes.

13  Q. How many trucks did they load these persons' bodies into?

14  A. They were big trucks.  I saw about three our four.

15          THE COURT:  Are you moving to a different subject?

16          MR. LEACHMAN:  I am.

17          THE COURT:  Let's take a break.

18          COURT SECURITY OFFICER:  All rise.

19              (Jury leaves courtroom.)

20              (Recess.)

21          COURT SECURITY OFFICER:  All rise for the judge and

22  jury.

23              (Judge and jury enter courtroom.)

24          THE COURT:  Please be seated.

25          MR. LEACHMAN:  Your Honor, I had one point of

1  clarification that relates to a translation question.

2  BY MR. LEACHMAN:

3  Q. And -- and that is, Mr. Tavira, when you were speaking of

4  the number of persons that you saw at the location that we've

5  just been talking about, how many people did you see there?

6  A. I saw approximately more than 30 people.

7      MR. CAVAZOS:  Your Honor, may we approach for a

8  second?

9      THE COURT:  Come on up.

10      (Sidebar at bench with Judge and counsel as

11  follows:)

12      MR. CAVAZOS:  That is completely different from what

13  he testified earlier.  I thought I heard 20 in his response and

14  maybe 30, but I don't -- I never heard him say more than 30.

15      THE COURT:  He said 20 to 30 people present.  That's

16  what he said earlier.

17      MR. CAVAZOS:  Okay.  Then that's more consistent with

18  what I heard.  Now it's more than 30.

19      THE COURT:  And the question has been asked -- if the

20  objection is asked and answered, that's sustained.

21      Next.

22      MR. CAVAZOS:  That is the objection.

23      MR. LEACHMAN:  I mean I haven't even been able to

24  state the basis for it.

25      Your Honor, during the break, a person came and told us

1770

1    that the translation of that was incorrect.  We asked the

2    translator.  She asked the witness.  And he said, "No.  I told

3    you more than 30 people."

4            MR. CAVAZOS:  I was writing numbers down --

5            THE COURT:  Well, that's what I was writing on the

6    basis of a proper English translation.  So the translator got

7    it wrong, and I'm a little concerned about some of the

8    translations that have taken place, and so now I'm trying to

9    verbally state what corrections I hear, too.

10        Go ahead and ask the question.  Step back.

11                    (Sidebar at bench concluded.)

12   BY MR. LEACHMAN:

13   Q. Mr. Tavira, I'm going to ask that you -- the question one

14   more time.

15        How many people did you see at that vacant area, that

16   you've just been describing, that were the victims or people

17   kneeling at the scene?

18            MR. CAVAZOS:  Objection, Your Honor, asked and

19   answered.

20            THE COURT:  That's overruled.

21            THE WITNESS:  More than 30 people.

22            MR. LEACHMAN:  Thank you.

23   BY MR. LEACHMAN:

24   Q. Now, you -- you talked about the -- the various people that

25   were there and that moved you while you were at -- at that

1  vacant area; correct?

2  A. Yes.

3  Q. Did you, at any point, hear the defendant at that location?

4  A. If I heard him?

5  Q. Talking.

6  A. Well, he was the one -- he was the one who got me out of the

7  truck, the one who was escorting me, and he was to one side of

8  the car where I was.  And even when they gave me back a

9  telephone and a ring of mine that they had taken away from me,

10  and they gave it back to me.

11  Q. And was Chano the person that gave those back to you?

12  A. Yes, he was there.  He was there the whole time from the

13  time they took me.

14        THE COURT:  Okay.  Let -- let me stop you all here

15  because it's becoming difficult, I think, for the translator --

16  me to understand the translations, and the court reporter to

17  take this all down.

18     Sir, you need to completely wait for the lawyers asking

19  you a question before you start answering.  Let -- then start

20  making your response.  Please do it in small segments so I can

21  have the translator translate these things in each small

22  segment rather than you giving a lengthy answer and then her

23  trying to get a lengthy translation in.

24        Do you understand me?

25        THE WITNESS:  Yes.

1           THE COURT:  Okay.  Continue.

2           MR. LEACHMAN:  Okay.

3    BY MR. LEACHMAN:

4    Q. After you left that location, where did you go?

5    A. Well, I went to -- well, I went around with one of the

6    workers that Daniel has, in that car driving around for a

7    while, until he was given the order to go drop me off at my

8    house once again.

9    Q. Do you know who that worker was?

10   A. I know him but just by his nickname.  They call him Orejas.

11   Q. And how long did you ride around with him before they took

12   you home?

13   A. Approximately about one hour.

14   Q. Okay.  And did anything happen once you returned home?

15   A. No, all I wanted was to find my children as to where they

16   were and my wife and speak with them that I was okay.  At that

17   time, I didn't tell my wife anything, not anything, absolutely

18   nothing.  It was just me.

19   Q. Okay.  The folks that you talked about out there that night,

20   the Cruz Family, and -- and the other individuals who you

21   named, have any of those people ever been seen again?

22   A. No, I never saw them again.

23   Q. Did you know a grandson of a person that owned a furniture

24   store there in Eagle Pass and in Piedras?

25   A. Yes.  I learned that one of the boys that was there with the

1 Victor Cruz children was one of -- was him.

2 Q. And has that person ever been seen again?

3 A. No.

4 Q. Okay.  The day after this event happens, did you have

5 contact with -- with members of the Zetas?

6 A. That happened Saturday.  So Sunday went by, and it wasn't

7 until Monday that I saw and got together with El Vecino, and he

8 started -- well, I told him everything that had happened to me,

9 and the people I had seen there.  And he told me, and he

10 confirmed it to me that I was the only one who had been saved.

11 Q. The only person who survived that night that wasn't one of

12 the leaders of the Zetas?

13 A. That's true.  And, at that time, Celso also called to ask me

14 what had happened.  And they all started calling me asking me

15 things, telling me things, asking me what had happened.  And

16 actually nobody -- well, Celso was one of them, their people.

17 To him, I did tell and to El Vecino.  Nobody else.  Nobody else

18 know all about it.

19 Q. Did you have a meeting following these events with -- with

20 Danny Menera?

21 A. Yes.

22 Q. Where was this?

23 A. Yes, it was -- it was only by phone.

24             THE COURT:  Wait a minute.  Let's go to question and

25 answer.

1    MR. LEACHMAN:  Okay.

2  BY MR. LEACHMAN:

3  Q. And -- and when did you have this conversation?

4  A. I think it was that same day, Monday.  The day I spoke with

5  El Vecino.

6  Q. And what did you and Danny discuss?

7  A. Now, what I needed to do was give him everything.

8  Everything that corresponded to Poncho, I needed to give it to

9  him.  I had to tell him what houses we used to work, what cars

10  I had that belonged to Poncho Cuellar.  Everything that I had

11  that had to do with Poncho Cuellar, I had to hand it over to

12  Daniel Menera.

13  Q. And did you do that?

14  A. Yes.

15  Q. And what things did you hand over to Daniel Menera?

16  A. I delivered some trucks to him, bullet-proof car, and two

17  houses.

18  Q. And did it include the house that you've talked about before

19  on Government's Exhibit No. 243?

20    THE INTERPRETER:  Is that No. 23?

21    MR. LEACHMAN:  243.

22    THE WITNESS:  No, I delivered that one to him on

23  another occasion.

24  BY MR. LEACHMAN:

25  Q. So you had to give this house to the Zetas later?

1  A. Yes, later.

2  Q. And was it for the same reason or something else?

3  A. No.  And I want to say something, and I'm not offering

4  apologies for what I did, but it's just that the business that

5  happened that night, I can't overcome it, not up to this date,

6  to the present time.  I cannot, and that's what made me really

7  think things over --

8  Q. Okay.

9          THE INTERPRETER:  Interpreter clarification.

10         OTHER INTERPRETER:  Come to my senses.

11         THE WITNESS:  Come to my senses.

12  BY MR. LEACHMAN:

13  Q. Well, Mr. Tavira, I need to ask you the questions, and you

14  just answer the stuff that I'm asking you.  Okay, sir?

15  A. Okay.

16  Q. Okay.  So I want to take you back, and -- and so you had to

17  go give up everything that related to Poncho Cuellar.  Did you

18  have to show them places or things that related to

19  Poncho Cuellar?

20  A. Yes.

21  Q. What sort of things?

22  A. Like I said before, the houses that we used to load the

23  cars, the houses where we had the kilos of cocaine stored, the

24  cars used to transport the cocaine, and things that I had that

25  belonged to Poncho.

1  Q. Okay.  Did -- did you later have additional conversations

2  with -- with members of the Zetas about what happened that

3  night, and -- and, specifically, what happened to Victor Cruz

4  and his family?

5  A. Like I said, the only one I had it with, the one who called

6  me, Celso, did I say what happened to me that night.

7  Q. Okay.  Did -- did anybody else tell you, I'm not talking

8  about asking you about the events, I'm saying telling you about

9  what happened to those people that night?

10          MR. CAVAZOS:  Objection, hearsay, Your Honor.  It has

11  not defined the who.

12          THE COURT:  Anybody from the conspiracy is what you

13  mean?

14          MR. LEACHMAN:  Yes, sir.

15          THE COURT:  Rephrase your question.

16  BY MR. LEACHMAN:

17  Q. Did any of the Zetas tell you about what happened that

18  night, not you asking -- not asking you, telling you about what

19  happened that night?

20  A. Yes.  When I talked to Daniel and El Vecino, they told me

21  what persons had been murdered that night, who had died that

22  night.

23  Q. Who did they tell you?

24  A. Well, yes, that truthfully it was Victor Cruz' family, the

25  son of Sanchez Garza, the father, the brother, and a friend of

1  Rafita, some workers Poncho had at some ranch, and some friends

2  of Poncho's, she was a teacher at a school in Allende, and her

3  husband.  Yes, people who had nothing to do with the drug

4  trafficking, just people who knew Poncho -- Poncho.

5  Q. And did they tell you why that this happened to people that

6  just knew Poncho?

7  A. Well, no.  Just that they had to take some vengeance, get

8  revenge for something that Poncho had done to them.

9  Q. And did they -- they talk about what Poncho had done to

10  them?

11  A. Well, like I say, it's just that some persons were saying

12  that Poncho worked for the DEA.  Others were saying that he

13  owed them a lot of money.  That's what has been said, but,

14  frankly, he's the only one who knows.

15  Q. Okay.  After these events took place that we've been

16  discussing, when was the next time that you talked to the

17  defendant, Chano?

18  A. With him, at that time, I no longer saw him.  I did not.  I

19  no longer saw him.  I would just hear about him.

20  Q. Let me talk to you a little bit about guns and -- and the

21  Zetas.  Were you required to acquire guns for the Zetas?

22  A. Yes.

23  Q. And -- and did you do that?

24  A. Yes.

25  Q. And how did you go about -- well, strike that.

1        And was everyone that moved dope for the Zetas required to

2   obtain guns for them?

3   A. Yes.

4   Q. And how did you go about obtaining firearms for the Zetas?

5   A. Well, one time I was called during the night, and they took

6   me to where Celso was, and 42 was there.  And $40,000 were

7   given to me.  AK-47s and AR-15s only was I to buy.

8   Q. Okay.

9   A. Cuerno de chivo, those are AK-47s.

10  Q. And when was this?

11  A. That's when I was working directly for Daniel and the --

12  Vecino.  I don't remember exactly.  That was in between 2011

13  and 2012.

14  Q. And were you involved in moving weapons for the Zetas back

15  in the summer of 2011?

16  A. Yes, they gave me that amount of money, and they gave me

17  15 days to get the weapons and deliver them to them.

18  Q. Okay.  And -- and all of these events that we've been

19  talking about, before at the vacant area and the deaths, was

20  that -- what year did that happen?

21  A. The --

22           THE INTERPRETER:  The interpreter needs a

23  clarification as to depths?

24           MR. LEACHMAN:  The deaths, the killings.

25           THE WITNESS:  All the deaths occurred in March of

1    2011, and then all the rest were March 2011 and on until 2012.

2         MR. LEACHMAN:  Okay.

3      May I approach the witness, Your Honor?

4         THE COURT:  Yes.

5    BY MR. LEACHMAN:

6    Q. I'm going to show you what's been marked and entered into

7    evidence already as Government's Exhibit No. 85.  Do you

8    recognize what's in that photo?

9    A. Yes.

10   Q. What is that?

11   A. It's a trailer with sheetrock.  And, in the middle of the

12   sheetrock, it has a compartment, and we would put the weapons

13   there.

14   Q. And so I will show you Government's Exhibit No. 87 and 88.

15   Is that the compartments you're talking about?

16   A. Uh-hum.  Yes, those are them.

17   Q. And who came up with the idea of using this trailer and the

18   construction materials?

19   A. I did.

20   Q. And was this a load of firearms that you were moving for the

21   Zetas?

22   A. Yes.

23   Q. And -- and did it have about 67 guns as part of this load?

24   A. That time, yes.

25   Q. And just looking at Government's Exhibit No. 92 and 93, are

1  those the kinds of guns that you were attempting to acquire for

2  them?

3  A. Yes.

4  Q. Okay.  And where were these guns coming from?

5  A. Those weapons, I would transport them from the City of

6  Austin from Houston.

7  Q. And in this -- in the City of Houston, who was acquiring

8  these weapons for you?

9  A. Well, when I started, I sent my brother-in-law, and then I

10 told El Vecino, because we would coordinate everything with

11 El Vecino, and so I told him, "El Vecino, wherever my

12 brother-in-law goes, I want it to be a safe place."  That it

13 have a place with a roof so that the trailer can arrive and the

14 work that you see there can be done.

15 Q. Okay.

16 A. And I told him, "But I want it to be a safe place because I

17 am sending my brother-in-law."  And El Vecino told me in this

18 manner, "Don't worry.  Those are Chano's brother -- brothers,

19 and Chano's people that are in charge of that."  That's what he

20 told me.

21 Q. And where were Chano's brothers and Chano's people located?

22 A. In -- in Houston.

23 Q. And did you send your brother-in-law to go pick up guns in

24 Houston?

25 A. Yes.

1  Q. And the -- the load of guns that we were just talking about

2  that are in Government's exhibits in the high 80s and low 90s,

3  did those all come from Houston?

4  A. Yes.

5  Q. And were they taken by law enforcement between Houston and

6  San Antonio?

7  A. Yes.

8  Q. Okay.  And the -- the load that -- that -- that's shown in

9  Government's Exhibit 92, was that the first load of guns that

10 you had ever moved for the Zetas?

11 A. It wasn't the first.  I'm not sure if that was the third or

12 the fourth.

13 Q. Okay.  And did the other two or three loads successfully

14 make it back to Mexico?

15 A. All of them.

16 Q. And after you got arrested and talked to law enforcement,

17 did you tell them about those previous loads?

18 A. Yes.

19 Q. When you would purchase these firearms, how would you get

20 the money to buy them?

21 A. Like I said, the first time, it was delivered to me

22 personally by Celso.  The other -- and the other times it was

23 delivered to me, in other words, Danny would send it to me

24 either through El Vecino or Tavo.

25 Q. Is that the same Tavo that -- that was the person that you

1  talked about that -- that came to your house the night that you

2  were kidnapped?

3  A. Yes.

4  Q. And who -- tell -- tell me, who is that -- who is Tavo?  Is

5  he related to any other person that's related to the Zetas?

6  A. No, Tavo is Daniel Menera's brother-in-law.

7  Q. Okay.  That's what I meant.

8      And was he involved in -- in the three or four gun loads

9  that you were just talking to us about?

10  A. Well, he's the one who gave me the money to buy the weapons

11  and have money for expenses also.

12  Q. And when you would -- after you would acquire the weapons

13  and get them into Mexico, what would you do with them?

14  A. Well, I would deliver them to him.

15  Q. To Tavo?

16  A. To Tavo, yes.

17  Q. And anyone else that received the guns besides Tavo?

18  A. No, I don't remember who else I would deliver them to.

19  Q. Did you get them other things besides weapons like ammo,

20  magazines, vests, pistols?

21  A. No.  Frankly, all that I would get for them that they would

22  ask me for would be the weapons.

23  Q. In connection with the trans -- the movement of drugs across

24  the border, did the Zetas use young people in order to do that?

25  A. Yes.

1  Q. And why did they do that?

2  A. Well, I think that they did not have -- well, they didn't

3  know exactly what they were doing and in crossing those things

4  also they weren't paid like other people were paid.

5  Q. So were they cheaper?

6  A. Yes.

7  Q. And did the Zetas know that and talk about that?

8  A. Yes.

9  Q. And, if they got caught, were they in less trouble?

10 A. No.  If they were caught in Mexico or the United States?

11 Q. In the United States.

12 A. Also.

13 Q. I want to talk to you a little bit about the law enforcement

14 in Piedras.  Who controlled the police in Piedras?

15 A. Up to 2012, the Zetas controlled them.

16 Q. Did you know anything about the Zetas control of politicians

17 in the State of in Coahuila?

18 A. Yes, that, too.

19 Q. What did you know about that?

20 A. Some contributions.  Because of the contributions made,

21 exact amount of money, I don't know, but they were delivered to

22 the governor.  And, at that time, Ruben Moreira was there.

23 Q. And were you present on -- on any occasions where that money

24 was delivered?

25 A. I was present at one delivery, but I got out of there.  They

1  were going to do it, and then they told me they did.  They had

2  done so at Beto Canas', at his ranch.

3  Q. And do you know the details of how that money was going to

4  be delivered?

5  A. All they told me was that they had given him a Suburban with

6  a bunch of suitcases filled with money.

7  Q. Was the whole Suburban full of money?

8  A. Yes.  Well, yes, they told me that the Suburban was full of

9  suitcases full of money.  So, other than that, I don't know.

10  Q. Did the Zetas also make payments to some of the military?

11  A. Not the whole military, but, yes, to some.  Yes, certain

12  groups of the military, yes.  To the PFP, they had arrangements

13  with them, too.

14          MR. LEACHMAN:  May I have a moment, Your Honor?

15          THE COURT:  Yes.

16          MR. LEACHMAN:  May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. LEACHMAN:

19  Q. Mr. Tavira, I'm going to show you four exhibits that I've

20  marked as -- for Government's -- for identification purposes as

21  Government's Exhibits 284, 285, 286, and 287.  Do you recognize

22  anything depicted in any of those photographs?

23  A. Yes, I recognize this.  That it's like a pulupos, or hut.

24  We call them pulupos in Mexico.

25  Q. And is that on Government's Exhibits 286 and 287, these two?

1  A. Yes.

2  Q. Do you recognize what's in the other two photos, 284 or 285?

3  A. Yes.  Not this one, but this one here, yes, it was some land

4  or like a ranch that Chano had close to the Rio Bravo

5  (*indicating*).

6  Q. So you've -- you've identified 285 through 287 as part of

7  that; is that correct?

8  A. Yes.

9       MR. LEACHMAN:  Move for the admission of Government's

10  285 through 287, Your Honor.

11       MR. CAVAZOS:  No objection, Judge.

12       THE COURT:  285 is admitted, 286 and 287 are

13  admitted.

14  BY MR. LEACHMAN:

15  Q. So, Mr. Tavira, these are some photographs that -- that the

16  defense has provided to us.  Have you been to the location

17  that -- that you're looking at on Government's Exhibit 287 and

18  286 before?

19  A. Yes, I was there on one occasion.

20  Q. And do you know something about -- and this is what you were

21  talking about, this little pavilion, or I think whatever it was

22  that you called it, but do you know something about how that

23  particular structure got built?

24  A. Yes.  My brother-in-law and I were associated in a

25  construction company, and on one occasion that we were there in

1  the office he told me, he said, "Let's go and drop off some

2  materials because I'm building some --

3            OTHER INTERPRETER:  Horse stalls --

4            THE WITNESS:  -- horse stalls and a pulupa for

5  Chano."

6            MR. LEACHMAN:  Okay.

7  BY MR. LEACHMAN:

8  Q. And is this thing that's depicted in 287, is that a pulupa?

9  A. Yes.

10 Q. And so did your brother-in-law build that?

11 A. Yes, he had been helping him in building things for some

12 time, for a period of time, and I believe that that's one of

13 the things that he helped build because that type of

14 construction, those pulupos, is something that my

15 brother-in-law did.

16 Q. Okay.  And is the structure that -- that's on this little

17 ranchito that you've been talking about, is that Chano's main

18 residence in Mexico?

19 A. No, I think that was just a place to go spend time.  It's a

20 pretty place that's on the side of the river or nearby the

21 river.  And -- and, when I went, they were just then building

22 it.  I don't know what it looks like now.

23 Q. Okay.  The last thing I want to ask you about, Mr. Tavira,

24 is right before you came to the United States -- actually

25 strike that.

1      When you came to the United States and turned yourself in,

2  did you immediately talk to some law enforcement agents?

3  A. Yes.

4  Q. And, at that time, did you tell them who was in control of

5  The Plaza?

6  A. Yes, those were some of the first questions they asked me.

7  Q. And, in April of 2013, who was in control of The Plaza?

8  A. Chano.  Chano was in control of The Plaza.

9  Q. And do you know that in part because the day before you were

10 moving marijuana for Chano?

11 A. Yes.

12         MR. LEACHMAN:  Pass the witness.

13         THE COURT:  Does anybody need a break or press on?

14     Press on.

15     Your cross-examination?

16         MR. CAVAZOS:  Okay.

17                         CROSS-EXAMINATION

18 BY MR. CAVAZOS:

19 Q. Mr. Tavira, just because we were just talking about the

20 ranch.  Let's talk about that for just a second.  Is it a huge

21 ranch?  Many acres?

22 A. No, it's what we call in Mexico a quinta.

23 Q. What does that mean?

24 A. It's a place that's not very large, but it's a place that

25 you visit with your family.  You can have animals there.

1   Q. Did he have animals there at the time?

2   A. Yes.  Yes, they had horses.

3   Q. What else?

4   A. They had their -- I recall -- I saw that they had there

5   some -- they had chickens, and they had sheep, something like

6   that.

7   Q. What's that?  A goat?

8         THE INTERPRETER:  The interpreter didn't hear that.

9   BY MR. CAVAZOS:

10   Q. Is that a goat?

11   A. Yes.

12   Q. Did you see those there as well?

13   A. Yes, I was just telling you that they had that at that time.

14   Q. And was there a house on that piece of property?

15   A. No, just then -- at that time, I saw two trailer homes.

16   Q. Well, you've seen ranches owned by Beto Canas and some of

17   the other guys?

18   A. Oh, yes.

19   Q. Does this ranch compare to that?

20   A. No.  No.  No.  At that time, no, like I told you, he was

21   just building it then.  I don't know how far he built it up.

22   Q. Does it compare in size?

23   A. Well, the quintas, they end up -- they're not real large

24   places, but the ranches are.  Those are large.

25   Q. Okay.  So if you were to compare Mr. Millan's place to

1  Mr. Canas' place, would there be any comparison?

2  A. No.  No, no, not at all.

3  Q. Who would have the bigger place and the nicer place?

4  A. Well, no, Beto Canas.

5  Q. Who else's ranch did you go to that was a member of the

6  Zetas?

7  A. The Garzas, but those ranches, they're family properties

8  they come from, you know.

9  Q. And the ranch that Mr. Millan Vasquez had, that was a humble

10  place; right?

11  A. Yes, but that's not a ranch.  Like I told you, that's

12  something different.

13  Q. Right.  Okay.

14      You talked about law enforcement and politicians and the

15  military being bought by the Zetas or paid for by the Zetas,

16  and you said that a group of the PFP, with respect to the

17  military, was controlled by the Zetas; right?

18  A. Yes.

19  Q. What about the SEMAR?

20          THE INTERPRETER:  The interpreter didn't hear that.

21  BY MR. CAVAZOS:

22  Q. SEMAR?

23  A. SEMAR?

24  Q. SEMAR, de marinas?

25  A. Oh, the marines?

1  Q. Si.  Sorry.  Yes.

2  A. No, I don't think so.  With those, I don't think there was

3  an arrangement.

4  Q. That was the group that the Zetas feared the most as far as

5  the police went; right?

6  A. Yes.  With them, they didn't want to have any confrontation.

7  The ones that they had battle with was with the GATE group.

8  Q. Okay.  And when you were asked about politicians, you spoke

9  directly about a governor that was in office at the time;

10 correct?

11 A. Yes.  Yes.

12 Q. In Piedras Negras, and in your country, are the judges

13 elected or appointed officials?

14 A. The politicians are by voting.  And the judges, those are

15 appointed.

16 Q. Okay.  And you mentioned law enforcement in Piedras, and you

17 said that until 2012 the Zetas controlled them; right?

18 A. Yes.

19 Q. Did they control them after 2012?

20 A. They controlled them since they arrived at Piedras Negras.

21 Q. Okay.  And you left in what year?

22 A. April of 2013.

23 Q. And so they controlled them up until the point that you

24 left; correct?

25 A. Yes.

1  Q. Well, after you left, you turned yourself into U.S. custody;

2  correct?

3  A. Yes.

4  Q. And you signed a cooperation agreement; correct?

5  A. Well, I didn't sign anything.

6  Q. Okay.  Well, let me ask you, was any -- was part of the

7  things that you had to do, if you had to do anything, was to

8  continue to communicate with your Zeta contacts?

9  A. Yes, at all times.

10 Q. Okay.  So, after you came to the United States, you

11 continued to communicate with the Zetas; is that what you're

12 saying, or did I get that wrong?

13 A. Once I came to the United States?

14 Q. Yes.  You stopped communicating with the Zetas?

15 A. Yes.

16 Q. You had no direct or indirect communications with them

17 whatsoever?

18 A. No, I was already in prison.

19 Q. So what was going on, after you left in Piedras, you really

20 had no knowledge of; correct?

21 A. No, not at all.

22 Q. Okay.  You were asked -- or actually, you testified that you

23 provided weapons for the Zetas on three , maybe four,

24 occasions; correct?

25 A. Yes.

1  Q. And that that's all you provided, nothing else; correct?

2  A. Well, perhaps I misinterpret or misspoke or did not

3  communicate well, but that was the fourth time that that truck

4  crossed over that type -- where the weapons were hidden.  On

5  other occasions, I brought them in pickup trucks hidden.  But,

6  when they demanded that I bring more weapons, a higher volume,

7  that's what I had to do to do that.

8  Q. Okay.  I'm going to show you what's been marked as

9  Government's Exhibit 88, can you see it?

10         THE INTERPRETER:  Can the interpreter hear that

11  number again?

12         MR. CAVAZOS:  88.

13         THE WITNESS:  Yes.

14  BY MR. CAVAZOS:

15  Q. Can you see that picture from where you're at?

16  A. Yes, of course.

17  Q. What are these?

18  A. Those are boxes of bullets.

19  Q. Okay.  So you were providing more than just guns for the

20  Zetas.  You were providing them with the ammunition as well;

21  correct?

22  A. Yes, that's right.

23  Q. Okay.  We talked a lot about the March 2011 incident.  I'm

24  going to call it Cuellar incident.  And -- and you said -- you

25  testified that after that you really didn't have contact with

1  Mr. Millan Vasquez; correct?

2  A. That's right.

3  Q. Was that because he was now in the United States?

4  A. Yes, possibly.

5  Q. Okay.  Well, I mean you testified that when you were

6  arranging for a weapons load that Danny talked about Marciano

7  being in Houston and his family being in Houston; right?

8      (Defendant answers in Spanish.)

9  A. Yes --

10  Q. Oh --

11      THE COURT:  One second.

12      MR. CAVAZOS:  Sorry.

13      THE INTERPRETER:  The interpreter is going to ask for

14  a repetition.

15      THE WITNESS:  Specifically, what I commented about is

16  where they were going to arrive to, they said not to worry

17  about it, that Chano's people, his brothers, were in charge of

18  that.  That's how they said it.

19  BY MR. CAVAZOS:

20  Q. But they didn't tell you that, that Marciano himself was

21  going to be there; correct?

22  A. No.  No, they didn't tell me that he would be there but that

23  he would be in charge of that.  So I didn't know if he was in

24  Mexico or the United States.

25  Q. All you know is that after March of 2011, the Cuellar

1  incident, you stopped seeing him around like you have testified

2  that you used to?

3  A. Listen, I can't tell you that I -- I saw him on some

4  occasions on the street, but we were not doing any more deals

5  anything -- or anything.  Because, like I said, at that time,

6  he was already dedicated himself to something else, and I was

7  doing something different.

8  Q. And I'm just going to back up just for a second.  When did

9  you go to the place that he had those -- those animals in and

10 the pulupa at?

11 A. I believe it was in -- perhaps in -- perhaps in 2010, 2010

12 or 2011, I think.

13 Q. Was it before or after the Cuellar incident?

14 A. No.  No, it was before.  Before.

15 Q. I've heard your testimony, and I'm going to ask you this.

16 Do you -- or did you consider yourself a member of the Zetas

17 when you were working for them and with them?

18 A. Well, I did not consider myself a Zeta because the ones that

19 we called Zetas, they're the ones who were armed in pickup

20 trucks, in -- with bulletproof vests.  They were -- they were

21 the ones who were patrolling the city.  They were the ones who

22 were weaponed -- with weapons.  They were the ones that were

23 the Zetas.

24 Q. Were those the same ones that protected you and what you

25 were doing in the drug business?

1  A. Yes, they were dedicated to taking care of The Plaza so that

2  the Contras wouldn't come in.

3  Q. So the people, like yourself, that were moving drugs and

4  involved in that, they weren't necessarily Zetas; correct?

5  A. That's right.

6  Q. And you spoke a lot about your contact with Daniel and with

7  Mr. Vasquez being related to the movement of drugs; right?

8  A. Yes.

9  Q. So, by your definition, Daniel and Mr. Millan Vasquez

10 wouldn't be Zetas either; right?

11 A. At that time that Daniel worked for Cien, for Z-100.  Zeta

12 Cien, he used to -- it used to be that Daniel used to work for

13 Cien.  So, back then, Cien had his people, but Daniel was not a

14 Zeta until Cien was no longer there then that's when Daniel had

15 his people, and then he was armed, and he was a Zeta.  That

16 happened a few months before what happened with Poncho.  And

17 then, after what happened with Poncho, then, from then on, it

18 was pretty well stated, and I considered him then 100 percent

19 Zeta.

20 Q. And that's Daniel that you're speaking of right now;

21 correct?

22 A. Yes.

23 Q. But you would agree with me, even though you don't

24 characterize yourself or define yourself as a Zeta, that the

25 activities that you were involved in with them, the drug

1  dealing, the weapons loads, the money transfers, that was all

2  about the Zetas; was it not?

3  A. Yes.  Yes, unfortunately, that turned you into a Zeta.

4  Q. Okay.  And you were doing that activity in a large way way

5  before March 2011; correct?

6  A. Yes.

7  Q. Okay.  There was -- there were some questions, and there was

8  some testimony about why the people that were associated with

9  Poncho were killed, and you said something to the effect of:

10 Only he knows.  Who were you referring to when you answered

11 that question with a he?

12 A. What I meant to say was that only Poncho knew what he had

13 done to the Zetas that they killed the people -- his -- the

14 people that he knew, his friends.  The thing is that the people

15 who did business with Poncho, like myself, they didn't get

16 killed.  Some of them he let them know to take off.  And the

17 others, the ones that got killed, they were all innocent

18 people.  That was a big difference.  Now, who was more at fault

19 there, them or myself?  Who should have died on that day?

20             MR. CAVAZOS:  Your Honor, I'm going to object to the

21 narrative response.

22             THE COURT:  That's sustained.  Ask a question.

23 BY MR. CAVAZOS:

24 Q. Did you get a phone call from Poncho Cuellar to leave?

25 A. No.  No.

```
 1  Q. Thank you, sir.
 2  A. Okay.
 3  Q. Is there -- who was the person that ordered what you were
 4  describing to the jury that happened in March of 2011, if you
 5  know?
 6  A. Yes, it was known that it was the brothers, Miguel and
 7  Omar Trevino.
 8  Q. And they're known by the numbers what?
 9  A. Zeta 40 and Zeta 42.
10  Q. I'm sorry.  But I'm going to have to kind of take you back
11  to that scene again.  I have to clear up some things.  I
12  apologize, but I have to do that.
13            MR. CAVAZOS:  One second, Judge.
14  BY MR. CAVAZOS:
15  Q. This is Government's 242.  Is this the location where it
16  took place, what you described?
17  A. Yes, sir.
18  Q. Okay.  And -- and this is the road -- is this the road that
19  leads to it?
20  A. No, it's over on this side where it says --
21  Q. Right here?
22  A. -- driver doctor.
23        No, to the right.
24  Q. Oh, right here?
25  A. Yes.  You go all the way there, and that's where the street
```

1 ends.

2 Q. So when you were taken there, where is the entrance that you

3 came in?

4 A. It's -- move it to the front.  Right there, closer, closer.

5 There's a --  a little more.  There's an entrance --

6 Q. Right here?

7 A. -- and there's another one.  Further ahead.  There's another

8 entrance.  Right there.

9 Q. Okay.  But this green symbol, does this mean anything to you

10 in relationship to where the events took place?

11 A. It's all that place.

12 Q. All this area?

13 A. That -- that place is surrounded -- that place is surrounded

14 by a wall.  If you notice, there's a wall fence.

15 Q. Okay.  And, when you were brought to this scene, did you

16 come in through this entrance or this one (*indicating*)?  One or

17 two?

18 A. It has to be that one.

19 Q. One?  This one?

20 A. Yes.

21 Q. Okay.  And this spot, how far into this location did the

22 vehicle that you were in get?  Did you go all the way in?

23 A. Up to right there, where you have -- right there.

24 Q. Right here?

25 A. Further ahead.

1   Q. Okay.

2   A. That's where.

3   Q. Okay.

4   A. That's where everybody was right there from one side to the

5   other.

6   Q. And is this very close to the area where the truck --

7   where -- was it 40 that was there?

8   A. Yes, they were both there.  Yes.

9   Q. Okay.  All right.  And then you talked about following

10  Danny --

11  A. Yes.

12  Q. -- to a vehicle that was going to take you away from this

13  place; right?

14  A. Yes.

15  Q. Correct?

16  A. Yes.

17  Q. Okay.  So what direction, and I'm going to use a point of my

18  pen, what direction did you and Danny walk toward?  This

19  direction?  That direction?

20  A. Where that green point is, in that direction.  That's where

21  we were.

22  Q. So that's where the car that Danny --

23  A. Yes.

24  Q. -- was going take you in was?

25  A. Yes.

1800

1  Q. How far away was that car from the truck where 40 and 42

2  were in?

3  A. They were from where the door is to where we are here.

4  Q. Okay.  What would your estimate, because that lady has to

5  write it down, of the distance that you're estimating?

6  A. Well, it could be about 20 meters or more.

7  Q. It's what you think?

8  A. I think so.

9  Q. Okay.  Fair enough.

10       Now, you were walking away from where 40 and 42 were,

11  walking toward that car; correct?

12  A. Yes.

13  Q. And did you get into the car, and that's where you heard the

14  shots fired?

15  A. Yes, sir.

16  Q. Okay.  And was the car pointing in this direction, or was it

17  pointing in the direction toward where 40 and 42 were?

18  A. No, the trucks were side by side like that.

19  Q. Okay.  I'm going to use the point of my pen, and I'm going

20  to use this green spot, and you tell me which direction I

21  should go, left or right?

22  A. Where the trucks were?

23  Q. Yes.  Where was the vehicle that Danny was going to take you

24  away in in relationship to that?  You said over here; right?

25       Now, my question is, which direction was the vehicle

1801

1  pointing toward?  Was it pointing toward the entrance --
2  A. No.
3  Q. -- of the location, or was it pointing away from it?
4  A. The car that I was in?
5  Q. Yes.
6  A. It was --
7  Q. So was it like this?
8  A. The front of the car was pointing towards the other side of
9  the pen.
10  Q. Like this (indicating)?
11  A. Yes.
12  Q. Okay.  And you were on the passenger's side?  The driver's
13  side?  Front seat?  Back seat?  Where were you?
14  A. I was in the back seat on the -- in the passenger -- I was
15  in the back looking over to where the trucks were.
16  Q. Okay.  You mentioned that it was at night; correct?
17  A. Yes.
18  Q. And you mentioned that it was dark; correct?
19  A. Yes, it was dark.  It was dark.  Just --
20  Q. Were you able to make out details of people's faces from the
21  distance that you were seeing this that you described?
22  A. Yes.
23  Q. And I want to take you back to what you said earlier when
24  you were describing the events and who was there.  You
25  described Mr. Millan Vasquez being in a vehicle separate from

1  the one that took you there; correct?

2  A. Yes.

3  Q. And then you said that you didn't see him there; is that

4  true?

5  A. No.  No, he was there.  He was there.  He got me out of the

6  truck that they brought me in.

7  Q. Okay.  But that's the last time you saw him; right?

8  A. Yes, that's when they grabbed me, and they took me over to

9  the 40, and that's when I spoke with them.

10  Q. So your description of the events do not include

11  Marciano Millan Vasquez committing a violent act that night;

12  correct?

13  A. The truth, the truth, I don't know.  I'm not sure if he did

14  it or if he did not do it.

15  Q. Let me ask it this way.  Did you, with your own see, eyes

16  Marciano Millan Vasquez kill anyone --

17  A. No.

18  Q. -- that night?

19  A. No.

20  Q. Have you, with your own eyes, ever seen

21  Marciano Millan Vasquez kill anyone?

22  A. No.

23  Q. Have you, with your own eyes, ever seen

24  Marciano Millan Vasquez beat anyone?

25  A. That, no, not that either.

1  Q. I got to ask you this question.  And I'm sorry I've got to

2  take you back there to ask.  But, when you were brought to 40

3  and 42, in your mind, something horrible was going to happen to

4  you; right?

5  A. Yes.

6  Q. And but for Daniel having that phone with Cien on the other

7  line and telling 40 and 42 that you worked with them --

8  A. Yes.

9  Q. -- you probably wouldn't be sitting there today according to

10  your testimony; correct?

11  A. That's right.

12  Q. And what Daniel was basically telling Cien is he works with

13  us, he did the 100-kilo freebie that we all -- that we required

14  everybody to do; right?

15  A. Yes.

16  Q. But, before you testified about that, you testified that the

17  Zeta bosses knew everything that was going on in The Plaza

18  because everything had to be reported to them; correct?

19  A. Yes.

20  Q. And -- but you testified that 40 and 42 said:  Why didn't

21  anybody ever tell us this?  We didn't know anything about

22  this --

23         THE COURT:  Just ask a question.

24  BY MR. CAVAZOS:

25  Q. How did they not know what you were doing if they supposedly

1  knew everything?

2  A. Because this is what's happened.  When you work with these

3  people, you always want to be in a good situation with them.  I

4  worked directly for Poncho, but I did favors for Cien.  Those

5  favors, Vecino would ask me to do them, but I would tell him, I

6  don't want them to find out that I'm doing those things.  But

7  these people, besides the fact that they're together, they

8  don't want their people to be working with some others here and

9  there.  So, therefore, I was okay with Poncho through 40 and

10 42, and I was okay with Cien through Daniel and Vecino.  But

11 also -- but the time that passed on, when Poncho stopped

12 working, perhaps that's why they didn't find out, or they

13 hadn't been told yet that I was working with them.

14 Q. Poncho was moving a lot of drugs before he bowed out; right?

15 A. Yes.

16 Q. You testified that he was the biggest cocaine dealer in

17 Piedras Negras?

18 A. There in Piedras Negras, yes.

19 Q. So it would reason that the Zetas would know about his

20 activities; right?

21 A. Yes.

22 Q. And, when he stopped, then you went to work with Danny and

23 Vecino; right?

24 A. Yes.

25 Q. And you testified about moving hundreds almost close to

1    thousands of kilos with them; right?

2    A. Yes.

3    Q. And, still, the 40 and 42, the main Zeta guys, didn't know

4    what you were doing?  How could that be?

5    A. It's like I'm saying, at that time, maybe they didn't know

6    because they had their own problems over there with that war,

7    and I couldn't tell you why they didn't know yet.

8    Q. So maybe your prior testimony that the Zeta leaders knew

9    everything that was going on at The Plaza all the time, we

10   might want to qualify that; correct?

11   A. Well, perhaps, yes, but --

12              THE INTERPRETER:  Your Honor --

13              THE COURT:  Yes?  You're going to switch?

14              MR. CAVAZOS:  Pass the witness.

15              THE COURT:  Do you have any other questions?

16              MR. LEACHMAN:  Yes, Your Honor.

17              THE COURT:  Okay.  Let's go ahead and change

18   translators.

19       Do you have quite a few questions?

20              MR. LEACHMAN:  I'm sorry?

21              THE COURT:  Do you have quite a few questions?

22              MR. LEACHMAN:  Yes, sir.

23              THE COURT:  Let's go ahead and take a break.

24              COURT SECURITY OFFICER:  All rise.

25                    (Jury leaves courtroom.)

1        (Recess.)

2            COURT SECURITY OFFICER:  All rise for the judge and

3    jury.

4                (Judge and jury enter the courtroom.)

5            THE COURT:  Please be seated.

6            MR. LEACHMAN:  Just a moment, Your Honor.  Sorry.

7        May I proceed, Your Honor?

8            THE COURT:  Yes.

9                        REDIRECT EXAMINATION

10   BY MR. LEACHMAN:

11   Q. Mr. Tavira, I want to ask you a few follow-up questions of

12   cross-examination.

13       You were asked a number of questions about whether or not

14   you had seen the defendant Chano after 2011; do you remember

15   those questions?

16   A. Yes.

17   Q. Is it possible he was in the U.S. for some part of that

18   time?

19   A. Yes.

20   Q. Is it also clear that he was in Mexico for part of that

21   time?

22   A. Also.

23   Q. You testified that in April of 2013 that Chano was running

24   The Plaza; is that correct?

25   A. Yes.

1807

1  Q. And can a person run The Plaza from the United States?

2  A. No.

3  Q. You were asked a number of questions regarding whether --

4  what it means to be a Zeta.  Do you remember those questions?

5  A. Yes.

6  Q. Okay.  And you made a distinction, if I understood you

7  correctly, between a person who straps on a bulletproof vest

8  and is armed, and then other persons as to whether they're a

9  Zeta or not; is that correct?

10 A. Yes.

11 Q. And was Danny Menera a person that did those things and was

12 a Zeta?

13 A. Yes.

14 Q. And was Chano a person that did those things and was a Zeta?

15 A. Yes.

16 Q. And I do want to -- to make sure I understand about the

17 other people that you don't consider, you know, a full-fledged

18 Zeta.

19     Do other people that are much lower-level persons, like,

20 people that are transporters for you or other people, do they

21 still work for the company?

22 A. At this moment?

23 Q. Sorry.  No, sir.  No, sir.  I'm talking about back when all

24 of this is going on.

25     So I mean, for example, persons who are -- somebody that

1   was driving a load for you back in 2011, does that person -- is

2   it working for the company?

3   A. Yes.

4   Q. So, even though they may not be what you considered a Zeta,

5   they still work for the Zetas; is that correct?

6   A. Yes.

7   Q. Okay.  Now, you were asked another question that was sort of

8   related to that.  And that was -- you were asked:  Well, if 40

9   and 42 didn't know what you were doing, then they can't know --

10  then they can't know everything that's going on with the

11  company; right?  Do you remember that question?

12  A. Yes.

13  Q. Okay.  And you aren't -- are you testifying, or did you

14  testify, that the leaders of the Zetas necessarily know what

15  every single person that works for the company is doing?

16  A. Yes, they know.

17  Q. They do?

18  A. Yes, they know.

19  Q. Okay.  Is that even possible?  I mean could 40 know where a

20  person is that's driving some small load of marijuana at a

21  given point in time?

22          MR. CAVAZOS:  Objection, Your Honor.  That's been

23  asked and answered.

24          THE COURT:  That's overruled.

25                  (Defendant speaking in Spanish.)

1        THE COURT:  Sir, you're not answering the question.

2        THE WITNESS THROUGH THE INTERPRETER:  The way you

3   follow how this works -- you're going --

4        THE COURT:  One second.  You need to answer just the

5   questions that are posed to you.

6        MR. LEACHMAN:  Try to answer just my question.

7        THE WITNESS:  Okay.  When you're going to move

8   something, a load, you have to let them know, the one who is in

9   charge of that location.

10  BY MR. LEACHMAN:

11  Q. Okay.  And so is there a responsibility to report what

12  they're doing back to the company?

13  A. Yes.  All the time, yes.

14  Q. I want to ask this a different way.

15       Let's say that -- let's say that a person is a -- well,

16  let me ask you this.

17       40 is the top person back at that time for the whole Zeta

18  cartel; right?

19  A. Yes.

20  Q. And let's say William Clay Ford is the head of all of Ford

21  Motor Company --

22  A. Yes.

23  Q. -- can William Clay Ford know about every car transaction

24  that happens at Red McCombs here in San Antonio?

25       MR. CAVAZOS:  I'm going to object to the form of the

1    question, Your Honor.  He's asking about a company that he has

2    no knowledge of as to how they operate in answering the

3    question.

4              THE COURT:  That's overruled.

5              THE WITNESS:  No, I do not understand.

6              MR. LEACHMAN:  Okay.

7              THE INTERPRETER:  I'm sorry.  The interpreter was

8    interrupted with all the objections.

9              MR. LEACHMAN:  I understand.  I'm sorry.  Let me ask

10   it over.

11   BY MR. LEACHMAN:

12   Q. Could the chief executive officer for a large corporation,

13   like Ford Motor Company, know about all of the transactions at

14   its dealerships like Red McCombs here in San Antonio?

15   A. At that moment, I think not --

16             THE COURT:  Stop.  Stop.  You got an answer.  Next

17   question.

18             THE WITNESS:  I think not.

19             MR. LEACHMAN:  Okay.

20   BY MR. LEACHMAN:

21   Q. Okay.  And is the Zeta a big company that has a lot of

22   people involved in it as well?

23   A. Yes.

24   Q. You were asked some questions about who ordered the

25   events -- ordered the killings that occurred in the March 2011

1   Poncho Cuellar incident; do you remember that?

2   A. Yes.

3   Q. At the time that you were taken before 40 and 42, were the

4   Zetas talking amongst themselves about what to do with respect

5   to you?

6   A. Yes.

7   Q. And what -- all of those folks that you talked about were

8   participating in that conversation; is that true?

9   A. Yes.

10  Q. And, in order for that conversation to even take place,

11  somebody had to grab you and take you there; is that true?

12          MR. CAVAZOS:  I'm going to object, Your Honor.

13  There's no basis of a conversation that this witness has any

14  knowledge of.

15          THE COURT:  That's overruled.

16          THE WITNESS:  Yes.

17  BY MR. LEACHMAN:

18  Q. And the persons that abducted you from your home and took

19  you to this event were Tavo and Chano; right?

20  A. Yes.

21  Q. And all of the persons, and it's Chano and Tavo, did they

22  strap on a vest for that occasion?

23  A. I think so.

24  Q. Okay.  If you don't know, that's fine.

25      Did they have weapons for that occasion?

1812

1   A. Yes.

2   Q. Did they bind you or handcuff you for that occasion?

3   A. Yes.

4   Q. Did they direct you where to go for that occasion?

5   A. Yes.

6   Q. Did the other Sicarios that were there and protecting the

7   parameter of that vacant lot in Exhibit 242, were they helping

8   to secure that area so that this event could transpire?

9   A. Yes.

10  Q. And are all of those folks keeping the victims of this event

11  from leaving?

12  A. Yes.

13  Q. So if -- and these people, the Sicarios and Tavo and Chano

14  and Danny, and all of that, they're helping -- they have

15  decided to assist the Zetas in making this event occur; is that

16  correct?

17  A. Yes.

18  Q. And they -- did they assist in allowing the Zetas to take

19  their revenge on Poncho Cuellar for whatever it is that he did?

20  A. Yes.

21            MR. LEACHMAN:  Pass the witness.

22            THE COURT:  Any questions based on those?

23            MR. CAVAZOS:  Yes, Your Honor.

24                     RECROSS-EXAMINATION

25  BY MR. CAVAZOS:

1  Q. You testified that when Tavo entered your home, and you were

2  claiming that Mr. Millan Vasquez was there, that your family

3  was in your home, too?

4         MR. LEACHMAN:  That's beyond the scope of cross,

5  objection.

6         THE COURT:  Yeah, where are you headed with this?

7  Because that's beyond the scope.

8         MR. CAVAZOS:  They just talked about this -- his

9  kidnapping and who was involved.  That's all I'm asking.

10        THE COURT:  But they didn't go back to the house.

11 I'll let a little bit of it go.  Go ahead.

12 BY MR. CAVAZOS:

13 Q. Very simply, they chose not to include your family; correct?

14 A. Yes.

15        MR. CAVAZOS:  Nothing further.

16        MR. LEACHMAN:  Unfortunately, I do have a follow

17 up --

18        THE COURT:  No, that's not going to be necessary.  On

19 that one question?  You may step down, sir.

20        MR. LEACHMAN:  May I approach, Your Honor?

21        THE COURT:  Come on up.

22               (Sidebar at bench between Judge and counsel as

23 follows:)

24        THE COURT:  What's the relevance of them letting the

25 family go?

1    MR. LEACHMAN:  Here's the relevance is that what he

2    will testify to is that Tavo entered the house first.  Tavo hid

3    the children and told them -- and told him to hide the kids

4    because Chano was behind him, and Chano would take his family

5    and kids.

6        THE COURT:  Well, and he implied that the first time

7    around, so you covered that subject.

8        MR. LEACHMAN:  But he didn't talk about Chano did,

9    what he told him about Chano.  That's a direct link.  It's

10   relevant.

11       THE COURT:  It's not necessary.  Let's move on.

12       Do you have another witness, or what are you going to do?

13       MR. LEACHMAN:  One other witness.

14           (Sidebar at bench concluded.)

15       THE COURT:  You may step down stir.

16           (Witness excused from witness stand.)

17       THE COURT:  And your next witness?

18       MR. LEACHMAN:  The United States calls

19   Agent Denise Stone.

20           (Witness sworn.)

21       MR. LEACHMAN:  May I proceed, Your Honor?

22       THE COURT:  Yes.

23               DENISE STONE,

24   being first duly sworn, testified under oath as follows:

25

                        DIRECT EXAMINATION

1   BY MR. LEACHMAN:

2   Q. Please state your full name for the record.

3   A. Denise Stone.

4   Q. And how are you employed, Ms. Stone?

5   A. I'm a Special Agent with the Drug Enforcement

6   Administration.

7   Q. And for how long?

8   A. A little over 24 years.

9   Q. And are you currently assigned to San Antonio?

10  A. Yes, sir.

11  Q. And do you work major -- major drug investigations is your

12  primary function?

13  A. Yes, sir.

14  Q. And have you been one of the agents responsible for the

15  investigations -- some of the investigations that led to -- to

16  the charges that were brought in the case before the Court

17  today?

18  A. Yes, sir.

19  Q. And, specifically, was that case made out of multiple

20  investigations both here, Austin, Eagle Pass, Del Rio, and

21  other places in the United States?

22  A. Yes, sir.

23  Q. Okay.  I want to talk to you a little bit about the -- the

24  way that you conduct these kinds of investigations, and,

1    specifically, how witnesses, including cooperating witnesses,

2    are -- are questioned by law enforcement.  Okay?

3    A. Okay.

4    Q. First question:  Are witnesses ever exposed to other

5    witnesses when you're investigating a drug conspiracy?

6    A. No, sir.

7    Q. Are they always separated from one another?

8    A. Yes, sir.

9    Q. Okay.  Do you -- when you approach a person about their

10   involvement in a drug-trafficking conspiracy, do you make them

11   tell you what their role is, and who they're associated with,

12   or do you provide them with names at the beginning?

13              THE COURT:  One second.

14              MR. CAVAZOS:  Objection, Your Honor.  The questions

15   are leading.

16              THE COURT:  They are leading.

17              MR. LEACHMAN:  I'm just trying to move along,

18   Your Honor.

19   BY MR. LEACHMAN:

20   Q. Tell us how you go about doing -- questioning witnesses.

21   A. Well, normally, when we make an arrest or stop and detain

22   people for questioning, we separate all the parties involved

23   and get each person's individual statement.

24   Q. Okay.  And how did you get -- how does the ball get rolling

25   with the person you're talking to?

1817

1    A. Well, it might be an investigation that we have already

2    ongoing, or it might be something that we see, or we might be

3    referred to.

4    Q. Okay.  And -- and let's take the instance of a -- of a

5    cooperating witness like many of whom who have testified in

6    this trial.  How do you initiate a -- a debrief-type session

7    with a person like that?

8    A. We just sit down with them and let them provide us with the

9    facts as they know it.

10   Q. Okay.  And, as part of that, do you ask them to tell you who

11   their criminal associates are?

12   A. Yes, sir.

13   Q. And, prior to asking them who their criminal associates are,

14   do you frequently know who their criminal associates are?

15   A. Yes, sir.

16   Q. And do you listen to that information?

17   A. Yes, sir.

18   Q. Do you test that information against what you already know?

19   A. Yes, sir.

20   Q. Do you use information from other witnesses that you've

21   talked to to develop a baseline, to know whether or not what

22   they're telling you is consistent with what you've learned

23   elsewhere?

24   A. Yes, sir, from other persons.

25   Q. Do you -- do you do that not only across your own witnesses,

1    but with witness reports from other cases?

2    A. Yes, sir.

3    Q. Do you do that across other agencies as well?

4    A. Yes, sir.

5    Q. In this case, were there multiple agencies contributing to

6    this large Zeta organization that we've been talking about?

7    A. Yes, sir.

8    Q. And do you cross-check the information that they give you

9    against other agencies' information?

10   A. Yes, sir.

11   Q. I want to talk to you specifically about when -- when you're

12   trying to determine whether or not an individual knows a

13   particular target or defendant.  Okay?

14   A. Okay.

15   Q. So let's say that you're trying to find out if a willing

16   witness knows an individual.  How do you go about that?

17   A. We normally present them with a photo lineup that is

18   comprised of six photos that are very similar to each other

19   with the same facial characteristics, same race, same

20   everything.

21   Q. Same amount of facial hair?

22   A. Facial hair --

23   Q. Same type --

24   A. -- hair on the head --

25   Q. -- of hair, if they have it?

1819

1  A. Yes, sir.

2  Q. And is anything about that suggestive to whether or not --

3  to who the person is that you're interested in?

4  A. No.  No, sir.

5  Q. And if the person doesn't know anyone, is that the end of

6  the discussion related to that particular target or -- or

7  potential defendant?

8  A. Sometimes.

9  Q. Okay.  And do you -- do you frequently show them multiple

10 photo arrays to people that you're talking to?

11 A. Yes, sir.

12 Q. And is that the procedure that was used in connection with

13 the investigation in this case?

14 A. Yes, sir.

15 Q. And is that the procedure that was used in talking to the

16 various witnesses who have testified in conjunction with their

17 criminal activities with the defendant?

18 A. Yes, sir.

19 Q. Okay.  I want to show you what's already been introduced

20 into evidence as Government's Exhibit No. 247?

21          MR. LEACHMAN:  Can I approach, Your Honor?

22          THE COURT:  Yes.

23 BY MR. LEACHMAN:

24 Q. Do you recognize that document?

25 A. Yes, sir.

1  Q. And is that some crossing histories for various individuals

2  that are connected with this case?

3  A. Yes, sir.

4  Q. And so would you tell the jurors who -- whose crossing

5  histories that particular document is?

6  A. These pertain to Marciano Millan Vasquez, Severino

7  Abascal Villarreal, Alejandra Vaneli Silva Luna, and

8  Rodolfo Reyes.

9  Q. Okay.  And, first question, with regard to the defendant, he

10 was found here in the United States; correct?

11 A. Yes, sir.

12 Q. Has he ever had a documented crossing, according to the

13 records of the immigration service, into the United States

14 legally?

15 A. The information that we obtained was from June 1st of 2008,

16 to June 14th, 2016, and he has no record of ever crossing.

17 Q. Zero?

18 A. Zero.

19 Q. The -- the other individuals that are listed on that

20 crossing history, have you looked at those -- those documents?

21 A. Yes, sir.

22 Q. Do those -- and, for example, Severino Abascal, did he cross

23 pretty regularly into the United States prior to the date of

24 his demise we heard about?

25 A. Yes, sir.

1821

1  Q. And has there been any crossings of that person since that

2  time?

3  A. No, sir.

4  Q. Same thing for -- well, Vaneli didn't cross much as I

5  recall?

6  A. She never crossed.

7  Q. Okay.  We -- we have heard a lot of testimony about

8  Danny Menera?

9  A. Yes, sir.

10  Q. Is that a person that has been on the DEA's radar for a

11  significant amount of time?

12  A. Yes, sir.

13  Q. And in -- do you receive, and do you look at various

14  intelligence reports that relate to targets such as

15  Danny Menera?

16  A. Yes, sir.

17  Q. And, in connection with those, do you learn various names or

18  monikers that those folks use from various debriefs or source

19  intelligence or things of that -- things of that nature?

20  A. Yes, sir.

21  Q. And what are some of the nicknames that Danny Menera has

22  used as his nickname?

23  A. Danny Chicken.

24  Q. Okay.  And so, when we heard earlier in testimony that when

25  he set up -- when -- when the phone was set up for the

1822

```
1    BlackBerry messenger for Jorge DeLeon, and the person who is
2    the recipient sets that up, Chicken, and Chicken 2, would be
3    consistent with Danny Menera and his associates?
4    A. That's correct.
5              MR. CAVAZOS:  Objection, speculation, Judge.
6              THE COURT:  That's overruled.
7              THE WITNESS:  That's correct.
8    BY MR. LEACHMAN:
9    Q. We've talked -- we've heard a lot of testimony about some of
10   the issues that come up with investigations across an
11   international boundary.  First question:  As -- as a person
12   that's done drug investigations on the border in the
13   United States for over 20 years, is that a significant
14   impediment to your ability to conduct your investigation?
15   A. Yes, sir, it is.
16   Q. Second question:  Does the amount of assistance that you
17   receive from the Government of Mexico, is it different in drug
18   cases than it is in other types of cases?
19   A. Yes, sir.
20   Q. And is it less -- do you get a lessened amount of -- of any
21   assistance from the Government of Mexico in cases involving
22   drugs?
23   A. Yes, sir.
24             MR. CAVAZOS:  Your Honor, may we approach?
25             THE COURT:  Come on up.
```

1          (Sidebar at bench as follows:)

2          MR. CAVAZOS:  That document, I believe was in the

3    discovery.  I have not seen this document before, and neither

4    one of these documents are listed in the document list.

5          THE COURT:  So what is this document then?

6          MR. CAVAZOS:  My understanding, from the way they

7    represented, it relates to a title history to a vehicle that

8    was driven by a person that crossed the international bridge.

9          THE COURT:  And so why are you prejudiced, or why is

10   this --

11         MR. CAVAZOS:  I don't know what -- I don't -- I don't

12   know.  I haven't had an opportunity to determine how it's

13   connected to me or not.

14         THE COURT:  Go ahead.

15         MR. LEACHMAN:  This is a -- this is a vehicle that is

16   listed on Mrs. Vasquez' cross record, and that's all it is.

17         MR. CAVAZOS:  No, I get it.  I know where this is

18   going.  There was a witness that testified about a van being

19   connected to Millan Vasquez's wife, and that's all it was, a

20   van, a van --

21         MR. LEACHMAN:  That's not.

22         MR. CAVAZOS:  -- and I don't know whether trying to

23   connect this to that, but if that is where they're going, I'm

24   objecting to it because they can't --

25         THE COURT:  This is not the van?

1          MR. LEACHMAN:  It is the van.

2          THE COURT:  It is the van.  Okay.

3          MR. CAVAZOS:  Well, how do we know if it's the van?

4          THE COURT:  Because the title documents say it.

5          MR. CAVAZOS:  That it's a van?

6          MR. LEACHMAN:  Yeah.

7          MR. CAVAZOS:  Well, no, no, no.  But the fact that

8    it's a van, how do we know that it's a van that the witness

9    told them about.

10          THE COURT:  One second.

11          MR. LEACHMAN:  The witness testified that it was a

12   blue Dodge Caravan, and --

13          MR. CAVAZOS:  Right.

14          MR. LEACHMAN:  -- and that he built the clavo in that

15   van for -- Millan Vasquez, the defendant, back in 2010.  The

16   crossing records that we got from the daughter shows her

17   crossing include in 2010, and this is the title for that van.

18          MR. CAVAZOS:  Okay.  How many blue vans could there

19   be, Judge?

20          THE COURT:  Well, that's circumstantial evidence

21   which the Government -- the witness -- the jury can take

22   whatever weight it wants to give.  That's a matter of weight

23   for the jury.  It's not a matter of an evidentiary objection.

24          MR. CAVAZOS:  All right.  Well --

25                  (Sidebar at bench concluded.)

1    MR. LEACHMAN:  May I approach the witness,

2    Your Honor?

3             THE COURT:  Yes.

4    BY MR. LEACHMAN:

5    Q. I'm going to show you two documents.  One is marked

6    Government's Exhibit 289 and ask you to look at that document

7    and tell me if that is -- if you recognize that document.

8    A. Yes, sir.

9    Q. And -- and what is it?

10   A. This is the registration to a 2005 Dodge van.

11   Q. And, actually, is this the title history for that van?

12   A. Yes, sir, it is.

13   Q. And I'm showing now Government's Exhibit 290; is that right?

14   A. Yes, sir.

15   Q. And 289, does that show the crossing history for?

16   Lucero Ivon Vasquez?

17   A. Yes, sir.

18             MR. LEACHMAN:  And move for the admission of

19   Government's Exhibit 289.

20             MR. CAVAZOS:  I'll renew my objection, Your Honor.

21             THE COURT:  All right.

22             MR. LEACHMAN:  This is a crossing history.

23             MR. CAVAZOS:  Again, I'll renew my objection,

24   Your Honor.

25             THE COURT:  That's --

1          MR. CAVAZOS:  It was not on the exhibit -- exhibit

2    list.

3          THE COURT:  That is noted and overruled.  289 is

4    admitted.

5    Q. And is Government's Exhibit 290 a certified copy variant of

6    the seal of the State of Texas of the registration for -- and

7    the same --

8    A. Yes, 2005 Dodge van.

9    Q. -- the same 2005 Dodge van with VIN number ending in 10604?

10   A. Yes, sir.

11         MR. LEACHMAN:  Move for the admission of Government's

12   Exhibit No. 290.

13         MR. CAVAZOS:  Again, I would renew my objection,

14   Judge.

15         THE COURT:  Noted and overruled.  290 is admitted.

16         MR. LEACHMAN:  Okay.

17   BY MR. LEACHMAN:

18   Q. Now, Agent Stone, you recall the testimony of I believe it

19   was Mr. Jose Luis Rodriguez when he testified that --

20         MR. CAVAZOS:  Your Honor, we're having difficult with

21   the device.  Sorry, Russ.

22         MR. LEACHMAN:  No, no worries.

23         THE COURT:  I really don't think it's your devices

24   over there.  I think it's her device.

25         THE INTERPRETER:  It's not working.  I'll sit next to

1    him.

2              THE COURT:  Thank you.

3         Go ahead, Mr. Leachman.

4              MR. LEACHMAN:  Thank you, Your Honor.

5    BY MR. LEACHMAN:

6    Q. Okay.  So you heard the testimony I believe yesterday of

7    Jose Luis Rodriguez that he had built a clavo in a blue dodge

8    Caravan for the defendant; do you recall that?

9    A. Yes, sir.

10   Q. And did you learn about that information from -- previously

11   from Mr. Rodriguez?

12   A. Yes, sir.

13   Q. And did you take that information and go and seek the

14   records that are -- well, strike that.

15        Did you seek the records about the crossings of

16   Lucero Ivon Vasquez independently of that?

17   A. Yes, sir.

18   Q. And did you do that, or did you Joel Devet (*phonetic*)?

19   A. Yeah, Joel Devet.  An ICE agent helped me with that.

20   Q. And you were able to obtain the government records of

21   Ms. Vasquez' crossing history back in 2010 when this

22   purportedly -- which Mr. Rodriguez had told you happened; is

23   that correct?

24   A. That's correct.

25   Q. And I want to show you kind of at the bottom of the exhibit,

1828

1  it shows you the VIN number for it which ends in 10604; is that

2  correct?

3  A. That's correct.

4  Q. And so based upon that information, and it also has a

5  license plate up here which ends with, I believe -- strike

6  that, 377; is that correct?

7  A. Yes, sir.

8  Q. Okay.  And then, based on that, did you go and get

9  Government's Exhibit No. 290, which is title document from the

10  Texas Department of Motor Vehicles?

11  A. Yes, sir.

12  Q. And, in -- in that document, first, are you able to confirm

13  that it's the same VIN number ending in 10604?

14  A. Yes.

15  Q. And then does that tell you, in case you're not clear about

16  it, what kind of vehicle it is that we're talking about?

17  A. Yes, sir.

18  Q. And we learn that it's a Dodge -- 2005 Dodge van?

19  A. Yes, sir.

20  Q. And in here -- I'll come back to that in just a second.

21  A. Okay.

22  Q. So then I come back to Government's Exhibit No. 289, and we

23  find that in September of 2010, there's a crossing for

24  Lucero Ivon Vasquez; is that right?

25  A. It's December.

1829

1   Q. What did I say?

2   A. September.

3   Q. I'm sorry.  December, December 9 of 2010; is that right?

4   A. Yes, sir.

5   Q. And it shows that it's an inbound vehicle?

6   A. Yes, sir.

7   Q. And it shows that it's a van?

8   A. Yes, sir.

9   Q. And it shows that it has that same license plate that we

10  just talked about before; is that correct?

11  A. Yes, sir.

12  Q. Okay.  And it also tells you what other persons are in the

13  vehicle at the time; is that correct?

14  A. Yes, sir.

15  Q. And so one of the persons is?

16  Exwin Neovardo Vasquez (*phonetic*); is that right?

17  A. Yes, sir.

18  Q. And do we know that person to be a relative of the

19  defendant?

20  A. Yes, sir.

21  Q. And there's a Laura Irene Herrera who is already in -- also

22  in the vehicle?

23  A. Yes, sir.

24  Q. And then we look, and we see that we've got another crossing

25  for that vehicle in December of 2000 -- 2010, December 10th of

1830

1  2010 for that vehicle as well; is that correct?

2  A. Yes, sir.

3  Q. And it also shows who the various persons are in the vehicle

4  at that time; is that correct?

5  A. That's correct.

6  Q. And here we have Martin Alexis Vasquez as one of the persons

7  in the van with the same license number; is that correct?

8  A. Yes, sir.

9  Q. Oh, here it is.  And, if we look at the document, it tells

10  us it's a passenger vehicle, and what color it is?

11  A. It's blue.

12  Q. It's blue.

13      And is that -- so here you've got a witness that's told

14  you something, and you go follow it up to see if you can prove

15  whether or not it's true or not; right?

16  A. Yes, sir.

17  Q. And a lot of times, it's hard to follow that stuff up, and

18  you can't prove it one way or the other; is that right?

19  A. That's correct.

20  Q. And, in fact, if you would have just gone and looked at the

21  title history, which is Government's Exhibit 290, it's

22  interesting to find that it's never registered to Mr. Vazquez;

23  is it?

24  A. No, sir.

25  Q. And it's not registered to his daughter --

1831

1   A. No.

2   Q. -- or stepdaughter?

3   A. No, sir.

4   Q. It's registered to bunch of random people that just don't

5   fit.  You wouldn't know to connect this title back to this case

6   if you didn't have the crossing history of her in that very

7   vehicle with that license plate; would you?

8   A. That's correct.

9   Q. Some of the testimony we've heard is about the seizures that

10  have -- that have taken place, and we heard about a lot of

11  seizures in this case; right?

12  A. Yes, sir.

13  Q. Do you remember all that?

14      And one of the -- the frequent themes is:  "Is, well, what

15  is there at the seizure that's going to tie back to the person

16  in Mexico that's responsible for the load."  Do you remember

17  hearing testimony about something like that?

18  A. Yes, sir.

19  Q. You've been doing this 20 years.  Are you normally going to

20  find evidence that's going to tie something back to a Plaza

21  boss when you seize something out of either a vehicle or a

22  stash house in the United States?

23  A. No, sir.

24  Q. You do obtain, however, physical evidence sometimes; do you

25  not?

1832

1  A. Yes, sir.

2  Q. And is all of the dope that we've been showing pictures of

3  for the last two weeks, is that physical evidence?

4  A. Yes, sir.

5  Q. Are the phones that are taken off the person physical

6  evidence?

7  A. Yes, sir.

8  Q. And are the tolls that come from the phones, are those

9  physical evidence?

10  A. Yes, sir.

11  Q. And -- and, by the way, when we talk about phone tolls,

12  that's something that's not kept by the government; is that

13  right?

14  A. That's correct.

15  Q. Well, maybe in La La Land, or whatever, but it's kept by --

16  where you acquire it from is from the phone company; right?

17  A. That's correct.

18  Q. And can that -- can those documents be changed?

19  A. No, sir.

20  Q. So when, for example, Lilia Arroyo-Martinez talks about, I

21  got this phone from from the defendant's daughter to talk to

22  the defendant, and the subscriber information comes back and

23  says it indeed was subscribed to the defendant's daughter,

24  that's something that was in stone before it was ever told to

25  you by the witness or before you got the records from the phone

1833

1  company; is that right?

2  A. That's correct.

3  Q. There's been a lot of talk about various people and the

4  sentences that they're looking at and what the sentences they

5  got for various cases.  You heard a lot of that testimony;

6  right?

7  A. Yes, sir.

8  Q. First question:  Most of what we heard about is -- is a

9  statutory range for a punishment for an offense; is that

10  correct?

11  A. That's correct.

12  Q. Okay.  And for -- for big-time dope cases, we're talking

13  more than five keys of coke.  You're talking more than a

14  thousand keys of weed, and we're talking more than 500 grams of

15  meth, all of those are ten to life cases --

16  A. That's --

17  Q. -- is that correct?

18  A. -- that's correct.

19  Q. But that does not necessarily mean that that's what -- that

20  the person is going to get life because they're in one of those

21  cases; does it?

22  A. No, sir.

23  Q. And is their whole system, under our rules, about guidelines

24  and -- and looking at various factors unique to the person that

25  determines what -- what range they would be in?

1  A. Yes, sir.

2          MR. CAVAZOS:  Your Honor, he's leading the witness.

3          THE COURT:  That's sustained.

4  BY MR. LEACHMAN:

5  Q. Can you tell the jury the process by which the -- the range

6  of sentences is developed for a person that's been convicted of

7  a drug offense?

8  A. Well, a lot of -- a lot of what goes into consideration is a

9  person's history, aggravating circumstances, you know, if the

10  person had a gun or resisted arrest or --

11  Q. Are there many factors?

12  A. Yes, sir --

13  Q. Is drug --

14  A. -- many factors.

15  Q. -- is drug quantity one of the factors?

16  A. Yes, sir.

17  Q. Okay.  Back to the issue regarding information obtained

18  from -- from Mexico in connection with your investigations.

19      First question:  Do you -- do U.S. Agents have the ability

20  to go conduct their own investigation in a foreign country?

21  A. No, sir.

22  Q. We just heard the testimony from Mr. Tavira, and that --

23  that is one of the cases that -- that was your investigation

24  that you had been working on before he turned himself in; is

25  that correct?

1   A. Yes, sir.

2   Q. And did you have the opportunity to speak to him the day

3   that he turned himself in or shortly thereafter?

4   A. I don't think it was the same day.

5   Q. Okay.

6   A. Maybe a day or two after.

7   Q. I'm sorry?

8   A. It might be a day or two after.

9   Q. Okay.

10  A. I'm not sure that we got to talk to him the same day.

11  Q. Okay.  Well, let me ask you this.  Did other agents also

12  talk to him on the first day that he turned himself in?

13  A. That's correct.

14  Q. And did he indicate that the defendant was running the Plaza

15  the first day he ever showed up?

16  A. That's correct.

17  Q. And was that before this case was even brought or indicted?

18  A. That's correct.

19          MR. LEACHMAN:  Pass the witness.

20          THE COURT:  Anything?

21          MR. CAVAZOS:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. CAVAZOS:

24  Q. Agent Stone, you were just asked about the range of

25  punishment and whether in fact defendants get those sentences;

1836

1  correct?

2  A. Yes, sir.

3  Q. Isn't it true that when you're interrogating or interviewing

4  and/or debriefing a suspect, that is one of the things that

5  you-all make sure that you mention to them, what their range of

6  punishment is in order to get them to cooperate; is that not

7  true?

8  A. It's normally part of the approximator (*phonetic*).

9  Q. Is that not true?

10 A. That's correct.

11 Q. Now, there's a lot of talk about this van.  So I want to

12 cover that real quick.

13     Did anyone contact the registered owner of the van to

14 determine if there was any relationship between them and

15 Ivon Silva?

16 A. No, sir.

17 Q. So in order for you to tie Jose Luis' -- or Jose Luis

18 Rodriguez' testimony and confirm it that there was a clavo in

19 that van, the VIN number doesn't prove that; does it?

20 A. No, sir.

21 Q. The border crossings don't prove that; does it?

22 A. No, sir.

23 Q. Okay.  Now, looking at the border crossings, does -- do

24 those records help you determine whether at any time that

25 particular vehicle was thoroughly examined at the port of entry

1  or at a checkpoint?

2  A. I don't know.  I'd have to see them again.  I don't have

3  them up here.

4  Q. Okay.  I believe there --

5  A. No, these are -- these are people crossings not --

6  Q. Okay.

7  A. -- car crossings.

8       MR. CAVAZOS:  May I -- may I approach the witness,

9  Your Honor?

10       THE COURT:  You may.

11  BY MR. CAVAZOS:

12  Q. There's several pages, so take your time.  Let me know when

13  you're ready.

14  A. Okay.  In this -- this report says if it was inspected or

15  not.

16  Q. Right.  Was it?

17  A. This one says it was inspected.

18  Q. Okay.  And was a clavo found?

19  A. It doesn't say if a clavo was found or not.

20  Q. Take a good look.

21  A. It just says negative.

22  Q. Okay.  Are there any others?

23  A. Personal search, no.  This one says seven-point inspection,

24  negative.

25  Q. Okay.  Keep going.

1838

1  A. This one says:  Negative -- seven-point inspection,

2  negative.  And this one says seven-point -- well, this is the

3  same one.  It repeats as to each person in the vehicle.

4  Q. Oh, I see.

5  A. Inbound, it looks like it was searched twice.

6  Q. Twice.  And, based on those records, no clavos were found;

7  correct?

8  A. It doesn't mention a clavo in the report.

9  Q. Okay.  Well, do you know of this vehicle being seized at a

10 port of entry for having a false compartment?

11 A. I'm not aware of that.

12 Q. Okay.  Did you investigate that to determine if this vehicle

13 has ever been seized?

14 A. No, somebody else would have.  I didn't.

15 Q. Was it done in this case, do you know?

16 A. I don't know.

17 Q. You don't know.  Okay.  So the crossing records don't help

18 us, the VIN numbers --

19            THE COURT:  Is that a question?

20            MR. CAVAZOS:  I'm getting there.

21 BY MR. CAVAZOS:

22 Q. -- don't help us.  The only thing that we have is --

23            MR. LEACHMAN:  Your Honor, I object to him

24 testifying.

25            THE COURT:  That is testifying.  That's why I'm

1839

1  asking the question.

2           MR. CAVAZOS:  Let me ask the question.

3  BY MR. CAVAZOS:

4  Q. Isn't it true that all that we have here is Jose Luis

5  Rodriguez' word that he put a clavo in there?  We don't have

6  any confirmation that that clavo is in that vehicle; correct?

7  A. I guess not.

8  Q. Okay.  You testified just recently that -- that dope is

9  physical evidence; correct?

10  A. Yes, sir.

11  Q. Okay.  But the dope itself doesn't link itself to another

12  person unless there's some other evidence to do that; correct?

13  A. Well, it might if the person had it on 'em.

14  Q. Right.  Well, if they had it on them, that would be an

15  obvious.  Let's say -- let's assume, for argument sake, that

16  the person doesn't have it on them.  You would need some

17  evidence to link the two of them; correct?

18  A. That's correct.

19  Q. Okay.  And in this case we don't have any physical evidence

20  linking any of the dope seizures that have been testified to

21  here to this defendant; correct?

22  A. I wouldn't agree with you.

23  Q. Okay.  Was there any physical evidence associated directly

24  with the dope, other than testimony or words of witnesses, that

25  linked the dope to this defendant?

1840

1  A. Well, when you look at the big picture, I would say so.

2  Q. Okay.

3  A. Some of them are.

4  Q. Okay.

5  A. You have to look at many things.

6  Q. All right.  Well, let me ask you this.  With respect to

7  Lilia Martinez, wasn't it true that she told you-all when she

8  was debriefed that her son had a relationship with?

9  Ivon Vasquez?

10 A. She never -- I never talked to her about that.  I don't know

11 what she said.

12 Q. Did you read her reports?

13 A. Not those reports, no.

14 Q. Okay.  So, if she did, you wouldn't know?

15 A. If she did, I wouldn't know that.

16 Q. Okay.  When you're debriefing -- let me -- let's scratch

17 that.

18     Do you get involved in assisting the prosecutors in

19 determining sentence reductions for cooperators?

20 A. We have a say in it.

21 Q. Okay.  And would you agree with me that your opinion is

22 valued in that area; correct?  Because you're the ones that

23 interview these people, you're the ones getting information

24 from them; correct?

25 A. That's correct.

1  Q. And you give information for things you don't know, and you

2  don't give information for things that you do know as they're

3  debriefing; correct?

4  A. I don't think I understand your question.

5  Q. Okay.  Let me ask it this way.  It was -- it was a poorly

6  worded question.

7       Is information for -- from a cooperator that you don't

8  know important to you?  In other words, if he tells you

9  something that you didn't know before?

10 A. It's all important.

11 Q. Okay.  So, if he gives you information that you already

12 know, is that as equally important as information that you

13 don't know about someone that you're trying to get?

14 A. Yeah, because it's building their credibility.

15 Q. Okay.  So it's equal?

16 A. It's all important.

17 Q. Isn't it true that most of your takes -- or arrests and that

18 are the product of cooperators' debriefs and information that

19 you learned from them; correct?

20 A. Correct.

21 Q. Okay.  So you have to rely on that word -- on their word a

22 lot of times in what you do; correct?

23 A. Somewhat.

24          MR. CAVAZOS:  Pass the witness.

25          THE COURT:  Anything?

1842

1    　　　　MR. LEACHMAN:  Yes, Your Honor.

2    　　　　　　　REDIRECT EXAMINATION

3    BY MR. LEACHMAN:

4    Q. Do you ever rely just upon what they tell you?

5    A. No, sir.

6    Q. Do you -- do you -- we talked at length before, I mean is

7    this a whole process by which you test and corroborate the

8    things they have to tell you?

9    A. Yes, sir.

10   Q. And, in this case, is the information that witness after

11   witness gave you corroborated by information that other

12   witnesses independently gave you?

13   A. Yes, sir.

14   Q. Is 11 cooperating witnesses, like in this case, an

15   extraordinary amount of evidence in an investigation like

16   this -- in this case --

17   A. Yes, sir.

18   　　　　MR. CAVAZOS:  Objection, Your Honor.  That calls for

19   bolstering.

20   　　　　THE COURT:  Sustained.

21   BY MR. LEACHMAN:

22   Q. You were asked a question about evidence of linking the

23   defendant back to the -- the dope.  Do you remember that

24   question?

25   A. Yes, sir.

1843

```
 1  Q. And, in -- in many cases, is the evidence that you have to
 2  link the person back to the dope the testimony of other persons
 3  intrinsic or part of that transaction?
 4  A. Yes, sir.
 5  Q. And is that the case in each one of these discreet seizures
 6  that we've talked about, and there's been more than 20 of them
 7  over the course of the past two weeks?
 8  A. Yes, sir.
 9          MR. CAVAZOS:  Objection bolstering, Your Honor.
10          THE COURT:  Sustained.
11  BY MR. LEACHMAN:
12  Q. You've got the -- in evidence, the phone from
13  Lilia Martinez; correct?
14  A. Yes, sir.
15  Q. Did that phone have this defendant's name in it?
16  A. Yes, sir.
17  Q. And that was in there when it was -- when it was seized --
18          MR. CAVAZOS:  Objection, Your Honor.  That was not in
19  evidence.
20          THE COURT:  That's overruled.
21  BY MR. LEACHMAN:
22  Q. Was that -- was that name in that -- that -- the phone data
23  that was extracted?  Was it there on the day that it was seized
24  from her person?
25  A. That's correct.
```

1  Q. And was that a long time before anyone ever talked to her

2  about this defendant or this case or anything else?

3  A. Yes, sir.

4  Q. Okay.  And same thing about the phone subscriber

5  information, that phone was in this defendant's name; correct?

6  A. It was in his daughter's name.

7  Q. I mean in his -- it's in his -- in his daughter's name?

8  A. Stepdaughter's name.

9  Q. And it was in that name long before anybody talked to her

10  about this case; is that correct?

11  A. That's correct.

12  Q. But she -- did she tell you that the source of -- of the

13  phone that she was given in order to -- to conduct their drug

14  transactions?

15  A. Yes, sir.

16  Q. And when you went back and you checked it, did -- did the

17  things that she told you, was it borne out by the evidence that

18  you investigated after this -- after she told us that?

19          MR. CAVAZOS:  Bolstering, Your Honor.

20          THE COURT:  That's overruled.

21          THE WITNESS:  Yes, sir.

22  BY MR. LEACHMAN:

23  Q. Regarding the Government's Exhibit No. 289 and 290 I think

24  it is, which is the title to the vehicle, is -- is this

25  vehicle, was it salvaged back on 2014?

1   A. Yes, sir.

2   Q. So it isn't likely you could go and, at this point, talk to

3   somebody about whether or not -- whether or not the clavo is

4   still around or not; is it?

5   A. That's -- that's correct.

6   Q. You -- you were asked a number of questions about whether or

7   not the vehicle was inspected?

8   A. Yes, sir.

9   Q. Have you -- you probably don't do this.  I don't know.  But

10  have you been in and out of an international port of entry in a

11  vehicle recently?

12  A. Yes, sir.

13  Q. Does a seven-point inspection mean that they tore the

14  vehicle apart in order to determine whether or not it might

15  have a clavo?

16  A. No, sir.

17  Q. And -- and, by the way, have you seized vehicles that had

18  clavos in them that had multiple passes in and out of the port

19  of entry before it was ever discovered?

20           THE COURT:  One second.

21           MR. CAVAZOS:  That's leading, Your Honor.

22           THE COURT:  That's overruled.

23           THE WITNESS:  Yes, sir.

24           MR. LEACHMAN:  Okay.

25  BY MR. LEACHMAN:

```
 1  Q. That's kind of -- is that the point, to have -- to have a
 2  secret compartment that won't be found?
 3  A. That's correct.
 4  Q. The hallmark of a good one?
 5  A. Yes, sir.
 6  Q. And you were asked about, well, all we have is -- is --
 7          THE COURT:  Just ask a question.
 8  BY MR. LEACHMAN:
 9  Q. -- where to look about whether or not this van has anything
10  to do with Mr. Millan Vasquez; do you remember that?
11  A. Yes, sir.
12  Q. And we do know some things for sure; right?
13  A. Yes, sir.
14  Q. Do we know whether or not Lucero Ivon Vasquez was in that
15  van?
16  A. Yes, sir.
17  Q. Because the records show it --
18  A. Yes, sir.
19  Q. -- correct?
20      And that's something that can't change over time; is that
21  correct?
22  A. That's correct.
23  Q. And we know that she's in this van in 2010; don't we?
24  A. That's correct.
25  Q. And we know that the witness said that that's when he made
```

1 this van for this defendant?

2 A. That's correct.

3 Q. And we know that she's in a van that's blue; don't we?

4 A. That's correct.

5 Q. And we know the witness, before we ever even got these

6 records, told us that the van that he built for the defendant

7 was blue; didn't he?

8 A. That's correct.

9 Q. And we know that the van was a Dodge Caravan; don't we?

10 A. Yes, sir.

11 Q. And we know the witness testified --

12        MR. CAVAZOS:  Your Honor, these questions have been

13 asked and answered.

14        THE COURT:  They have.

15 BY MR. LEACHMAN:

16 Q. The point being, and -- and there's other factors about the

17 model and everything else, that was exactly what the witness

18 testified to?

19 A. That's correct.

20        MR. CAVAZOS:  That's bolstering, Your Honor.  I'm

21 sorry.

22        THE COURT:  That's sustained.

23 BY MR. LEACHMAN:

24 Q. Is that the way you test and corroborate witnesses like

25 Jose Luis Rodriguez to determine whether or not there is truth

1  to what he's telling you?

2  A. Yes, sir.

3       MR. LEACHMAN:  Pass the witness.

4       THE COURT:  Anything?

5       MR. CAVAZOS:  Nothing further.

6       THE COURT:  And you may step down.

7            (Witness excused from the witness stand.)

8       THE COURT:  Are there any further witnesses from the

9  Government?

10      MR. LEACHMAN:  The United States rests, Your Honor.

11      THE COURT:  The Government's rests.

12      Ladies and gentlemen, we're going to call it quits for

13 today.  We're not yet done though.  We still have more work to

14 do, so the same rules still apply even though the case will now

15 shift to the defendant presenting testimony.  The same rules

16 still apply that I gave you earlier:  One, no outside research;

17 two, do not discuss this case amongst yourselves yet here.

18 We're not at deliberation stage yet.  Three, do not talk with

19 your loved ones, family, friends, coworkers, anyone else about

20 this case, also no independent research.  Your job remains to

21 go home safely, return at 8:30, and we'll see you tomorrow.

22      COURT SECURITY OFFICER:  All rise.

23            (Jury leaves courtroom.)

24      THE COURT:  Please be seated.

25      MR. LEACHMAN:  Your Honor, may I approach the witness

1    stand just to retrieve an exhibit?

2              THE COURT:  Yeah.

3         Are there going to be any motions made now, or do you want

4    to wait until the morning, or how do you want to proceed on

5    that?

6              MR. CAVAZOS:  I want to wait till the morning,

7    Your Honor.

8              THE COURT:  Okay.  That's fine then.  For you-all,

9    we'll try to bring in the jury somewhere around the 8:30.  For

10   you-all, be here at 8:15 so I can hear any motions and rule on

11   those before any return of the jury.

12             MR. CAVAZOS:  Your Honor, I'm going to have two

13   witnesses available tomorrow morning.  All the other witnesses

14   will be available to me on Monday.  That's the earliest I could

15   have them here.

16             THE COURT:  Okay.

17             MR. CAVAZOS:  I don't anticipate lengthy testimony

18   from them.  I imagine we can deal with them pretty quickly.

19             THE COURT:  So when you say pretty quickly, are you

20   talking about perhaps even having closing arguments on Monday?

21             MR. CAVAZOS:  I've got five witnesses coming in on

22   Monday, and they're all Spanish speakers.  So I don't know.

23             MR. LEACHMAN:  Who are your witnesses tomorrow?

24             MR. CAVAZOS:  Tomorrow it will be -- hang on a

25   second.  Let me make sure I get the names right.  Alma Danielle

1    Trevinis and Luisetta DeLuna (*both phonetic*).

2              MR. GALDO:  Are these character witnesses?

3              MR. CAVAZOS:  Yes.  They'll be basically providing

4    character evidence and the basis of knowledge of the client

5    where they've met him, where they've seen him --

6              THE COURT:  So then what you're telling is we're

7    probably going to be recessing around lunch or before lunch

8    tomorrow?

9              MR. CAVAZOS:  I would -- I would imagine.

10             THE COURT:  Okay.  Then, for tomorrow, let's plan on

11   this then.  So 8:15 you be back for any motions I need to hear.

12   We hear from the two Friday witnesses, Ms. Salinas and

13   Ms. De Luna, and then we'll stick around as long as we need to

14   consider jury charge, and then -- then we'll close for the

15   weekend.  We come back Monday.  We have potentially five

16   witnesses for the defendant.  I'm not binding you to this.  Is

17   the defendant going to testify or not?  I'm trying to figure

18   out the jury charge.

19             MR. CAVAZOS:  At -- at this point, no, Your Honor.

20             THE COURT:  Okay.  I'll continue just to keep that

21   highlighted in the draft charge.  So tomorrow I'll provide

22   you-all copies somewhere after we break with these witnesses

23   with the draft version of the charge, and then we can -- we'll

24   see how lunch works out and whether we come back and just have

25   an informal charge conference and work through those issues, we

1  recess for the weekend, we come back Monday, have those five

2  witnesses.  I guess my preference is to have -- how much

3  closing argument time does the Government want?

4          MR. LEACHMAN:  Can we have an hour and 30 minutes?

5          THE COURT:  How much does defendant think he needs?

6          MR. CAVAZOS:  I'll take the same amount of time as

7  the Government, Your Honor.  I'd like to have more if it.

8          THE COURT:  Okay.  The reason I'm asking for that is

9  this case was long.  I'll give you each an hour and a half.

10  I'm trying to figure out whether we do that Monday or Tuesday.

11  What's your thoughts on this, I mean do we -- do we have the

12  Government open on Monday afternoon with -- with its closing

13  argument, and then come back Tuesday, defendant, and then you

14  have their final, or do we do this in one haul?  What's your

15  thoughts?

16          MR. LEACHMAN:  I think it should all be together,

17  Your Honor.

18          MR. CAVAZOS:  I -- I agree with that, Judge.  And,

19  furthermore, I'm -- I'm just, you know, wondering how far along

20  we're going to get Friday on that jury charge.

21          THE COURT:  Okay.

22          MR. CAVAZOS:  The other thing that might expedite

23  that is I'm going to make a request that the actual criminal

24  history of the testifying witnesses be included in the charge.

25  You know, witness so-and-so testified, and he has a conviction

1    for this and this and this.

2         THE COURT:  We'll see.  I'm not -- I mean --

3         MR. LEACHMAN:  Do you have a case?

4         MR. CAVAZOS:  I've -- I've seen it in every other

5    trial I've done, Judge.

6         MR. LEACHMAN:  He'll instruct them about criminal

7    history.  There's a pattern charge for that.

8         MR. CAVAZOS:  Yes.

9         THE COURT:  Yeah, there's a pattern charge, and it --

10   and so I mean it does just generally call for what, so a

11   generic description they've been convicted of previous drug

12   crimes, or something like that.  But I'll tell you, my draft

13   right now is working on 37 pages I believe.  I mean I'm not

14   going to read a book to these people.

15        MR. CAVAZOS:  I gotcha.

16        THE COURT:  And so we'll take that up on -- tomorrow.

17   I'm just trying to figure out the --

18        MR. CAVAZOS:  I would like, at the very least, if

19   they have previous drug-trafficking crimes.  Okay?

20        THE COURT:  Okay.  We'll go -- one step at a time,

21   guys.  What I'm trying to figure out is just, big picture, what

22   are we doing?  So we will do an informal jury charge tomorrow.

23        MR. CAVAZOS:  Okay.

24        THE COURT:  Monday we will hear from five witnesses

25   for the defendant.  It appears to me that we will recess early

1    on Monday.  We will come back on Tuesday for closing arguments.

2    I'm giving you each an hour and a half, and so I'm anticipating

3    the closing arguments will be completed by -- by the lunch

4    break.  So we will have the Government opening, you're going

5    to?  Reserve how much time.

6            MR. LEACHMAN:  We'll open -- 30 minutes to open, and

7    an hour to close close.

8            THE COURT:  Okay.  So 30 minutes for opening, an hour

9    for final.  And so, within that, that will take us through

10   lunch, with a break, and so whether or not we'll have final

11   after break, and then my -- my reading of the jury charge will

12   take place prior to closing arguments.  So the jury will

13   actually have in their hand the jury charge that I will read to

14   them, and they can read along, the hard copy.  That's the big

15   game plan.  We'll fight about little details tomorrow.

16           MR. CAVAZOS:  Fair enough.

17           MR. LEACHMAN:  Thank you for that.

18           THE COURT:  8:15.  See you tomorrow.

19           COURT SECURITY OFFICER:  All rise.

20            (Whereupon said jury trial proceedings, Volume 6,

21   concluded at 5:03 p.m.)

22

23

24

25

C E R T I F I C A T E


        I, Kristin M. Anderson, a Registered Professional Reporter, Federal Certified Realtime Reporter, and former Official Court Reporter for the U.S. District Court, Western District of Texas do hereby certify:

        That the foregoing is a true and correct transcript of the proceedings transcribed from my stenographic notes in the above-entitled matter;

    That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

        WITNESS my hand on this 26th day of September, 2017.




    _/s/ Kristin M Anderson_____
    Kristin M. Anderson, CSR, RPR, RPR
    Former United States Court Reporter
    Bexar County Courthouse, 2nd Floor
    100 Dolorosa, 225th District Court
    San Antonio, Texas 78205