```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,     )
          Plaintiff,               )
 4                                 ) No. SA:13-CR-655-XR-5
          vs.                      )
 5                                 ) San Antonio, Texas
     MARCIANO MILLAN VASQUEZ,      ) July 13, 2016
 6        Defendant.               )
     ----------------------------
 7
                            VOLUME 7
 8
                     TRANSCRIPT OF JURY TRIAL
 9           BEFORE THE HONORABLE XAVIER RODRIGUEZ
                   UNITED STATES DISTRICT JUDGE
10
     A P P E A R A N C E S :
11
     FOR THE PLAINTIFF:
12
     United States Attorney's Office
13   Russell D. Leachman, Esquire
     Michael C. Galdo, Esquire
14   601 N.W. Loop 410, Suite 600
     San Antonio, Texas 78216
15
     FOR THE DEFENDANT:
16
     Jaime Cavazos, Esquire
17   Attorney at Law
     110 West Nueva
18   San Antonio, Texas 78204

19   COURT REPORTER:

20   Karl H. Myers, CSR, RMR, CRR
     Official Court Reporter
21   655 E. Cesar Chavez Blvd., Rm. 315
     San Antonio, Texas 78206
22   Telephone:  (210) 244-5037
     Email:   karlcsr@yahoo.com
23
     Proceedings reported by stenotype, transcript produced by
24   computer-aided transcription.

25
```

```
1                          INDEX

2                 VOLUME 7 - JULY 13, 2016

3                     WITNESS INDEX

4    JOSE LUIS RODRIGUEZ:

5    Cross examination by Mr. Cavazos ---------------- 1386
     Redirect examination by Mr. Leachman ------------ 1427
6    Recross examination by Mr. Cavazos -------------- 1451
     Redirect examination by Mr. Leachman ------------ 1458
7    Recross examination by Mr. Cavazos -------------- 1461

8    JAIME ABASCAL REYNA:

9    Direct examination by Mr. Leachman -------------- 1468

10   MONSERRATO SANCHEZ:

11   Direct examination by Mr. Galdo ----------------- 1473
     Cross examination by Mr. Cavazos ---------------- 1479
12
     ALEJANDRO MASCORRO:
13
     Direct examination by Mr. Galdo ----------------- 1480
14
     JASON TIMS:
15
     Direct examination by Mr. Galdo ----------------- 1481
16   Cross examination by Mr. Cavazos ---------------- 1483

17   ORLANDO VARA:

18   Direct examination by Mr. Galdo ----------------- 1485
     Cross examination by Mr. Cavazos ---------------- 1489
19   Redirect examination by Mr. Galdo --------------- 1490

20   ERICK TARANGO:

21   Direct examination by Mr. Galdo ----------------- 1490
     Voir dire examination by Mr. Cavazos ------------ 1494
22   Continued direct examination by Mr. Galdo ------- 1495
     Recross examination by Mr. Cavazos -------------- 1499
23   Redirect examination by Mr. Galdo --------------- 1501

24

25
```

1   ANTHONY LIVINGSTONE:

2   Direct examination by Mr. Galdo ----------------- 1502
    Cross examination by Mr. Cavazos --------------- 1515
3   Redirect examination by Mr. Galdo -------------- 1526
    Recross examination by Mr. Cavazos ------------- 1533

4
    JAMES BEARD:

5
    Direct examination by Mr. Galdo ----------------- 1534
6   Cross examination by Mr. Cavazos --------------- 1541

7   JORGE DE LEON-NAVARRO:

8   Direct examination by Mr. Galdo ----------------- 1545
    Cross examination by Mr. Cavazos --------------- 1597

9
                     EXHIBIT INDEX

10

11  Government's Exhibit 101 was admitted on Page 1497.
    Government's Exhibit 103 was admitted on Page 1497.
12  Government's Exhibit 104 was admitted on Page 1497.
    Government's Exhibit 105 was admitted on Page 1497.
13  Government's Exhibit 106 was admitted on Page 1495.
    Government's Exhibit 107 was admitted on Page 1495.
14  Government's Exhibit 109 was admitted on Page 1495.
    Government's Exhibit 110 was admitted on Page 1538.
15  Government's Exhibit 111 was admitted on Page 1538.
    Government's Exhibits 112-116 were admitted on Page 1504.
16  Government's Exhibit 117 was admitted on Page 1539.
    Government's Exhibit 118 was admitted on Page 1487.
17  Government's Exhibit 119 was admitted on Page 1487.
    Government's Exhibit 120 was admitted on Page 1487.
18  Government's Exhibit 121 was admitted on Page 1477.
    Government's Exhibit 122 was admitted on Page 1477.
19  Government's Exhibit 123 was admitted on Page 1510.
    Government's Exhibit 123-A was admitted on Page 1510.
20  Government's Exhibit 124 was admitted on Page 1537.
    Government's Exhibit 125 was admitted on Page 1538.
21  Government's Exhibit 126 was admitted on Page 1538.
    Government's Exhibit 128 was admitted on Page 1539.
22  Government's Exhibit 129 was admitted on Page 1539.
    Government's Exhibit 130 was admitted on Page 1539.

23

24

25

```
1              (July 13, 2016, defendant present.)

2              (Jury not present.)

3              THE COURT:  Good morning.  Thank you.  Please be

4     seated.

5              I was provided two documents from the defendant

6     today, a proposed limiting instruction and an amended witness

7     list.  Let's take up the limiting instruction first.  I mean,

8     I guess two questions.

9              One is, does the government oppose this or have any

10    modifications?  And, two, at what point would this be

11    introduced?

12             Mr. Cavazos?

13             MR. CAVAZOS:  Yes, Your Honor.  I would propose that

14    when and if the government intends to bring in, in particular,

15    extraneous acts, that being killings, kidnappings, murders of

16    individuals that are not specifically listed or specifically

17    identified in the indictment, then we approach the bench and

18    the government can then announce to all of us what intent it

19    seeks to use that evidence for, and then Your Honor can make

20    the appropriate instructions to the jury following language

21    similar to what I am proposing or what I am proposing in

22    particular.

23             That is my suggestion.  And if the information is

24    going to be presented to the jury that a simultaneous limiting

25    instruction be provided to the jury before it is introduced so
```

 1    that they can hear the evidence with that limiting instruction

 2    having been given.

 3            THE COURT:  Mr. Leachman.

 4            MR. LEACHMAN:  Two responses to that, Your Honor,

 5    the first being that the information of which the defendant

 6    speaks is admissible under more than one theory, and

 7    specifically --

 8            THE COURT:  And so let's -- and so I agree with

 9    that.  I mean, I didn't interrupt him, but -- I mean, so he

10    combined the murder with the conspiracy and the -- I mean,

11    with the kidnappings and the drug movement.  So let's just

12    focus on the murder of Count 1.  So respond to that.

13            MR. LEACHMAN:  So -- well, okay.  Just making sure

14    that you and I are on the same page, as to -- let's say that

15    there is a murder that is not alleged in Count 1 but that

16    occurred in the course of the conspiracy in furtherance of

17    Counts 2 through 9.  Our position is it is admissible for

18    those purposes anyway, so he wouldn't be entitled to the

19    limiting instruction.

20            I do think, I mean, at the close of evidence, that

21    it may be appropriate to look at -- I am not sure -- I haven't

22    been able to compare his instruction to other standard

23    instructions that have been given in cases like this, and I

24    want some opportunity to do that.

25            But there may be some -- it may be proper to put

1    something to that effect in the charge if the defense can

2    isolate some event, some murder that he feels was not in the

3    course of the conspiracy.  But as far as I can tell to this

4    point, there hasn't been any offer or specific objection to a

5    murder that wasn't in the course of the conspiracy, and we

6    think they all are.

7              THE COURT:  Yes.  This goes back to the comments I

8    made yesterday.  So the problem I am having with this is, all

9    of these references to all of these other murders are

10   relevant, and so the government is entitled to bring all that

11   into evidence before the jury.

12             This seems to focus, in my mind, still as to what I

13   am also struggling with, how does the jury get instructed on

14   Count 1 and how do they answer Count 1?  Because it is going

15   to have to go beyond guilty, not guilty.

16             I think it is going to have to specifically identify

17   which victims they unanimously agree were murdered as part of

18   this conspiracy that allegedly Mr. Millan Vasquez was a part

19   of.

20             So the proposed limiting instruction at this point

21   is denied.  Some version of this will be included in the final

22   jury charge, and I am still working on how the verdict form is

23   going to look.  So the ruling, though, on the proposed

24   limiting instruction is denied.

25             Now, with regard to the amended witness list, we

1    have one more new name, Yvonne Garcia-Gonzalez?

2           MR. CAVAZOS:  Yes, Your Honor.  She is a Mexican

3    national that lives in Piedras Negras.  I don't have any

4    reason to believe she has ever lived in San Antonio.

5           My suggestion would be that before she takes the

6    stand that her name be read to the jury, and if anyone,

7    obviously, identifies her as them knowing her and that would

8    influence them, then she won't be able to take the stand,

9    obviously.

10          THE COURT:  I was wondering how we are going to work

11   this, because I mean, at this point --

12          MR. CAVAZOS:  It is a character witness that came

13   forward.  I don't anticipate calling all of the witnesses on

14   my list.  As a matter of fact, a large majority of them are

15   not going to be available.  And so that was kind of a fill-in,

16   Judge.

17          MR. LEACHMAN:  Judge, if it is a character witness,

18   I don't think it is a problem.

19          THE COURT:  Okay.

20          MR. CAVAZOS:  She is not --

21          MR. LEACHMAN:  And I don't even think it

22   necessarily has to -- I am not sure that we can really address

23   it to the jury at that point.

24          I guess if after she testified some juror came

25   forward and said, "I know this person.  She is related to me,"

```
 1    or something, then we would have to consider about replacing
 2    with an alternate.
 3               THE COURT:  I sort of like Mr. Cavazos's idea
 4    better.  Identify the juror [sic] first, see if anybody
 5    recognizes the name, and then --
 6               MR. LEACHMAN:  If he is agreeable to it, we're fine
 7    with it.
 8               MR. CAVAZOS:  I suggest that.  That way, there are
 9    no problems later with anybody being influenced.
10               THE COURT:  Yes.  I agree with that approach, so
11    we'll do that, then.
12               MR. CAVAZOS:  Okay.
13               THE COURT:  Okay.  Are we ready for a jury?
14               MR. CAVAZOS:  Yes, Your Honor.
15               MR. LEACHMAN:  Could we approach real quick, Your
16    Honor, while they are coming in?
17               THE COURT:  Yes.
18               (Bench conference, as follows:)
19               MR. LEACHMAN:  You asked us yesterday at the end of
20    the day to get with you and kind of, how we are progressing
21    and all of that.  We forgot to do that.  I just wanted to tell
22    you, I think we will be at a point to close tomorrow.
23               THE COURT:  Oh.  Well, that is Thursday.  Okay.
24               MR. CAVAZOS:  That is going to cause problems for
25    me, Judge, because the port of entry is processing the dates
```

Jose Luis Rodriguez - Cross

1    of birth of the Mexican witnesses.

2            THE COURT:  Okay.  I am not going to mess with you.

3            So you close at the end of the day Thursday.  Then

4    Friday, we are going to have an informal jury --

5            COURTROOM DEPUTY:  All rise for the jury.

6            THE COURT:  One second, Ruben.

7            If you close at the end of the day on Thursday, then

8    we will just have a -- I will excuse the jury for Friday and a

9    three-day weekend, and we will have an informal jury charge

10   conference on Friday and then just work through some legal

11   issues that we all need to work through, and then you will

12   call your witnesses on Monday.

13           MR. CAVAZOS:  Because, as we speak, the port of

14   entry is really not communicating with me effectively on how

15   their process is going.

16           THE COURT:  But I will require that you have some

17   witnesses and you are ready on Monday.

18           MR. CAVAZOS:  Yes, sir.  I have some San Antonio

19   witnesses that definitely will be available.  I have a person

20   on the ground that is going to the port of entry, as we speak,

21   to try to get ahold of the individual that is my contact there

22   to see where we are at and where we are going.

23           MR. LEACHMAN:  Can we do the ones that are

24   available?

25           THE COURT:  On Friday?

Jose Luis Rodriguez – Cross

```
 1              MR. LEACHMAN:  On Friday?

 2              THE COURT:  Can you do the San Antonio people on

 3    Friday?

 4              MR. LEACHMAN:  I just --

 5              MR. CAVAZOS:  I hadn't even anticipated that, Judge,

 6    so I don't know that they are available on Friday, but I can

 7    find out this evening.

 8              THE COURT:  Why don't you check and --

 9              MR. CAVAZOS:  It will probably be two, maybe three.

10              THE COURT:  And if we just do them Friday morning

11    and then we break, that's fine too.

12              MR. CAVAZOS:  Fair enough.

13              MR. LEACHMAN:  Thank you, Your Honor.

14              (End of bench conference.)

15              (Jury enters courtroom.)

16              THE COURT:  Please be seated.

17              Good morning, ladies and gentlemen.

18              JURORS:  Good morning.

19              THE COURT:  And, Mr. Cavazos.

20              MR. CAVAZOS:  Yes, sir.

21                        *-*-*-*-*-*-*-*

22                      CROSS EXAMINATION

23    BY MR. CAVAZOS:

24    Q.  Good morning, sir.

25    A.  Good morning, sir.
```

Jose Luis Rodriguez - Cross

1    Q.  Let me ask you, just to make sure that we are all on the
2    same page.  Is this the first trial that you are testifying
3    in, or have you testified in a trial previously?
4    A.  This is the first trial I have testified in.
5    Q.  Okay.  But you have testified, being sworn and in front of
6    a grand jury, correct?
7    A.  Yes, sir.
8    Q.  Okay.  So other than those -- is it one or two grand
9    juries that you were involved in?
10   A.  One grand jury, and I had other cases, but in front of --
11   in front of a judge and a trial, only -- this is my first one.
12   Q.  When you say "other cases," what do you mean?
13   A.  Well, I had -- I have been participated -- I have been
14   cooperating in other cases with the U.S. government.
15   Q.  But you haven't given sworn testimony like you did in that
16   grand jury, correct?
17   A.  No.
18   Q.  Okay.  And when you testified before that grand jury, and
19   you were sworn, did you provide that grand jury with any
20   information that relates to Marciano Millan Vasquez?
21   A.  No, sir.
22   Q.  Okay.  Well, let me ask you, when did your cooperation
23   with the government begin?  Do you know what date that
24   happened?
25   A.  I cooperated in July of 2013, right after I got

Jose Luis Rodriguez – Cross

1    extradited, but then that's when we had a change of prosecutor

2    and then we couldn't get something settled, so we went to

3    trial.

4            And then after I got sentenced, my attorney

5    contacted the U.S. government and we were able to come back

6    and cooperate.  I don't -- I don't remember exactly the date,

7    but it has been on for two years.

8    Q.  Do you remember the date of your trial?

9    A.  It was in February of 2013.

10   Q.  Did you testify in that trial?

11   A.  No, sir.

12   Q.  And when were you arrested in Mexico?  What was the date?

13   A.  October 30th, 2011.

14   Q.  And how many times would you say you sat down with the

15   government and provided them information about individuals

16   that were involved in drug trafficking?

17   A.  It's been over 30 times.

18   Q.  Was it the first time that you sat with them that you

19   started mentioning or talking to them about Marciano Millan

20   Vasquez?

21   A.  No.  That first time, like I told you, it was a different

22   prosecutor, and I only answered what they asked me.  And at

23   that time, they were after other drug dealers in Mexico.  So

24   me myself, I only answer what they ask.

25   Q.  Okay.  So it wasn't until they began to ask you

Jose Luis Rodriguez - Cross

1   specifically about Marciano Millan Vasquez that you began to
2   give them information about him?
3   A.  Yes, sir.
4   Q.  Okay.  So it wasn't a process where they asked you, "Give
5   me your history of everything you have done," and you started
6   telling them what you did and what you -- and who you did it
7   with?
8   A.  Yes, sir.
9   Q.  So it didn't go down like your testimony has been here
10  today, kind of a chronology of what you have done and who you
11  have done it with?
12  A.  Well, I have mentioned a lot of names throughout my
13  cooperation, right, but I just -- I just come back and answer
14  always their questions.
15  Q.  But you recall specifically that you began to mention the
16  name of Marciano Millan Vasquez when you were specifically
17  asked about him --
18  A.  Yes.
19  Q.  -- correct?  Okay.  So when you were arrested October 30th
20  of 2011, you said you were taken to a state prison, unlike a
21  local prison?
22  A.  Yes.  I was taken to Mexico City prison, Reclusorio Norte.
23  I was there for 13 months.
24  Q.  Were you able to communicate -- did you have a cellphone?
25  Were you able to communicate with the outside world from

Jose Luis Rodriguez – Cross

1    there?

2    A.  No.  I didn't have a cellphone.  I had a pay phone.  You

3    put cards in.  I mean, there are cellphones in that cell, but

4    I didn't have the money to pay.

5    Q.  Were you able to communicate with those with whom you had

6    engaged in drug trafficking crimes while you were incarcerated

7    in Mexico?

8    A.  I stayed behind from everybody, except when they told me

9    to call Chano.

10   Q.  Who told you to call Chano?

11   A.  One of my friends, Hugo.

12   Q.  So you were in contact with Hugo, right?

13   A.  Yes.

14   Q.  And was he involved in drugs?

15   A.  Yeah.  Yeah, he was.

16   Q.  So you did have contact with the people that you were

17   involved in in the drug business while --

18   A.  Only with him, yes.

19   Q.  Only with him?

20   A.  Yeah.

21   Q.  So he was your conduit to get information and relay

22   information to others?

23   A.  I had to have contact with Hugo, because it was my family

24   out there and I feared for their lives, because I left a lot

25   of money out there.  You know, like I told you yesterday, I

Jose Luis Rodriguez – Cross

1    owed $3 million, and my wife and my kids were there in Mexico.

2    They are still there today.

3    Q.  So let me make sure I understand.  So were you making

4    contact with Hugo in an effort to collect money to pay your

5    debt?

6    A.  No.  Just to see how things were going, because once I

7    went to prison, I told them, "Here you are," and I left my

8    contacts to them.

9    Q.  But you didn't have time, at that point, to call all of

10   your contacts?

11   A.  No, no, no.  I didn't even have numbers.  They -- I even

12   handed my cellphone to Chano and to Daniel, when we had that

13   last meeting.

14   Q.  That cellphone, was it a Mexican cellphone --

15   A.  Yes, sir.

16   Q.  -- or was it a U.S. cellphone?

17   A.  No.  It was a Mexican cellphone.

18   Q.  Were you communicating with Hugo and giving him names of

19   individuals that owed you money for him to contact them and

20   let them know that they needed to pay up so your debt could be

21   resolved?

22   A.  No, sir.

23   Q.  Did you give Hugo any instructions that assisted your

24   process in paying your debt?

25   A.  No, sir.

Jose Luis Rodriguez – Cross

1   Q.  Let me move from there to the Abascals, your testimony

2   concerning the Abascals.

3   A.  Yes, sir.

4   Q.  Did you know Severino?

5   A.  Me myself, no, sir.

6   Q.  Did you know Vaneli?

7   A.  No, sir.

8   Q.  You never had any dealings with either one of them?

9   A.  No, sir.

10  Q.  Did you ever become aware that Severino was actually

11  involved in drug trafficking and weapons?

12  A.  Yes, sir.

13  Q.  Who did you find that out from?

14  A.  From the meeting we had, we all -- we used to gather to

15  settle in our accounts and talk about our business.  And I

16  heard about him, because they had dropped some guns in Eagle

17  Pass and --

18  Q.  Okay.  So, in fact, the testimony that you gave yesterday

19  basically was information that had come to you from others, in

20  particular --

21  A.  No.  I was present -- I was present when they were

22  talking, the group, our group.

23  Q.  Right.  But the information that you were getting was not

24  information that you yourself knew?  It was information they

25  were saying, correct?

Jose Luis Rodriguez - Cross

1    A.  Yeah, but it came from the correct source.  I mean, it
2    was -- it was Daniel, Chano and all of this group around.
3    Q.  Okay.  But, again, you didn't have any personal knowledge
4    of what Mr. Severino or Vaneli were doing?
5    A.  No, I wouldn't ask nothing that wouldn't belong to me.
6    Q.  Did Danny himself tell you that he killed them?
7    A.  Yes, sir.
8    Q.  Did Danny himself tell you that he cooked them?
9    A.  He said, "We just finished cooking him.  We just finished
10   cooking.  Don't ask no more."  So "we," it talks about more,
11   and Chano was part of it.
12   Q.  But you really don't know who he was referring to when he
13   said "we," do you?  You are making that conclusion, correct?
14   A.  Of course, yes, sir.
15   Q.  Okay.  His father, Jaime Abascal --
16   A.  Yes.
17   Q.  -- how long had it been since you had heard or spoken to
18   him when you got that call?
19   A.  Well, I worked with him when I was -- in like '96, '97,
20   but then I ran into him a couple of times when I was still in
21   the U.S., and I saw him one time when I was in Mexico, but I
22   hadn't spoke with him.
23   Q.  Well, let me ask it this way.  When did you receive that
24   phone call from him?  What date was that?
25   A.  September, I think, 11th of 2011.

Jose Luis Rodriguez - Cross

1  Q.  9/11?

2  A.  Yes.

3  Q.  And when had you seen him last or spoke to him last prior

4  to that; do you recall?

5  A.  No.  I don't remember, sir.

6  Q.  Was it years?  Was it weeks?  Months?

7  A.  No, it was probably a couple -- three, four years.

8  Q.  Three or four years.

9       Did you and he exchange phone numbers three or four

10  years before 9/11/2011?

11  A.  No, sir.

12  Q.  How was it that he made contact with you?  How did he know

13  how to get ahold of you?

14  A.  He -- we had a friend in common, and he contacted my

15  friend, and he went to go look at him.  And my friend called

16  me and said, "Hey, somebody that knows you wants to talk to

17  you."

18       And he passed the phone to Jaime, and Jaime started

19  speaking to me about that.

20  Q.  Only if you know --

21  A.  Yes, sir.

22  Q.  -- why would he think you could help him?

23  A.  Because he had heard I was part of -- part of the Zetas

24  cartel.

25  Q.  How would he know that?  Was he a Zeta?

Jose Luis Rodriguez - Cross

```
 1   A.  No, he wasn't a Zeta, but --
 2   Q.  Was he a drug runner of any kind?
 3   A.  No, sir.
 4   Q.  So are you telling us that common people would -- had
 5   knowledge of who the Zetas were and what they did?
 6   A.  Yes, sir.  And plus I'm -- actually, I'm a very well-known
 7   person in Piedras, so everybody knew what I was doing.
 8   Q.  When you say "well-known," what would you -- what were you
 9   well-known for?
10   A.  For -- I come from a good family, right?  And everybody
11   knows my family, right?  And also, I was always -- I was -- I
12   was always in -- in the look, you know, of everybody.
13   Q.  I don't understand what you mean.  I am sorry.
14   A.  Yeah.  I always represented what I was doing, you know.  I
15   was always -- I was always -- everybody knew, because I had a
16   lot of friends in common.
17   Q.  So are you saying that you dressed the part and you walked
18   the walk?  You were a Zeta?
19   A.  Yes, sir.
20   Q.  And so by the way you handled yourself in public, the
21   general public knew what you did and who you were associated
22   with?
23   A.  Yes, sir.
24   Q.  How many -- we talked about cellphones and you giving a
25   cellphone when the INTERPOL people took you.
```

Jose Luis Rodriguez – Cross

1    How many cellphones did you have when you were drug

2    trafficking?

3    A.  I had three.

4    Q.  And were they all Mexican phones?

5    A.  Yes, sir.

6    Q.  You testified earlier that you actually did business in

7    the United States even while you were wanted, correct?

8    A.  Yes, sir.

9    Q.  Did you use a U.S. phone when you were doing business in

10   the United States?

11   A.  A couple of times.  I would buy those prepaid phones, the

12   ones that they sell.  They sold them in the store in Piedras,

13   and we would just throw them away.

14   Q.  Did you ever keep track of the phone numbers that you used

15   throughout your history as a drug trafficker?

16   A.  No, sir.  It was a lot of cellphones I used, so I never

17   kept track.

18   Q.  Would you use your own name when you bought these phones,

19   or would you use false names?

20   A.  False names.

21   Q.  You also spoke of the killing of one Francisco Villarreal,

22   correct?

23   A.  Yes, sir.

24   Q.  Was he in the drug business?

25   A.  No, he was -- well, you could say yes, because he used to

1    count money for me, and he had connection with other drug

2    dealers.

3    Q.  Who were the other drug dealers that he had a connection

4    with?

5    A.  Well, Celso, Peluche, Metro, Loncho, Beto Casas.

6    Q.  Casas is one of the persons that you worked for, correct?

7    A.  Yes, sir.  A father and son.

8    Q.  And what exactly was it that Francisco Villarreal did for

9    them, other than count their money?

10   A.  Oh, he exchanged -- he had a money exchange house.  He

11   exchanged money for them, and he would hide jewelry for Metro.

12   And he had cars that belonged also to them.  He had -- if you

13   have seen the back of the money exchange house, they have like

14   a lot.  So he had cars.

15   Q.  And what?  He just held them there --

16   A.  No.

17   Q.  -- or would he sell them?

18   A.  For sale.  He would sell them.

19   Q.  Okay.  Did he invest any of their money?

20   A.  He invested his money and their money too.

21   Q.  What kind of investments was he into?

22   A.  Like how much amount?

23   Q.  No.  What kind of things was he investing in?

24   A.  Oh, no.  He wasn't investing.  He was just investing in

25   cars.

Jose Luis Rodriguez – Cross

1    Q.   Okay.  What, if anything, do you know as to why he was
2    killed?
3    A.   What I know is that they -- him and Miguel had been a
4    participant of stealing some money from one of the high
5    members of the Zetas.
6    Q.   And when you say "Miguel," who is Miguel?
7    A.   Miguel Uribe.
8    Q.   Uribe.  Does he have any brothers?
9    A.   Yes, sir.
10   Q.   Who are they?
11   A.   Mauricio Uribe and Rodrigo Uribe.  And he has -- he has
12   other stepbrothers that I don't know.
13   Q.   Do you know Mauricio and Rodrigo?
14   A.   Yes, sir.  Mauricio was part of that killing too.
15            THE REPORTER:  Was?
16            THE WITNESS:  Was part of it, yeah.  He got killed.
17   BY MR. CAVAZOS:
18   Q.   Repeat that.  I am sorry.  I didn't -- I missed that.
19   A.   Mauricio was killed in that -- in that -- in that same --
20   at that same day too.
21   Q.   The day that Francisco was killed?
22   A.   Yes, and Miguel too.
23   Q.   And Miguel was killed and Mauricio, so three of them?
24   A.   Yes, sir.
25   Q.   And all three of them were related to the theft of money?

Jose Luis Rodriguez - Cross

1    A.   Yes, sir.

2    Q.   Do you know what amount of money we're talking about?

3    A.   I think it was 800,000, what they were missing.

4    Q.   And who was that money owed to?

5    A.   42 or 40.

6    Q.   And this information that you're telling us, did you

7    witness it personally or is it what you heard?

8    A.   No.  What I heard.

9    Q.   Okay.  What kind of business were Francisco Villarreal and

10   Miguel Uribe involved in?

11            They were friends, but --

12   A.   Yeah, they were --

13   Q.   -- they also did business together, right?

14   A.   Yeah.  They were friends.  They had businesses with the

15   cars.

16   Q.   Other than -- Francisco, this is.  Other than helping you

17   count money with his machine, what else did he do for you?

18   A.   He held money sometimes for me too.

19   Q.   When you say "held money," what do you mean?  Did he have

20   like a vault or something?

21   A.   No.  I gave him like -- I gave him money to hold for me.

22   Q.   How much money are we talking about?

23   A.   Well, that day, when he got picked up, actually, I had

24   given him 320,000, but at the end of the day, when he told me

25   he was going to go hunting, I ended up picking up 300,000 from

Jose Luis Rodriguez – Cross

1    him, so I only left 20 that belonged to me, because those

2    300,000 I had to give to Daniel.

3    Q.   Okay.  Did you allow him to use the money while he was

4    holding it to make money?

5    A.   Yes, sir.

6    Q.   And is that some of the things that the other -- if you

7    know -- that the other Zetas would do as well?

8    A.   I don't know.  We wouldn't talk about --

9    Q.   Okay.  That's fair.

10           Let's talk about Rodrigo Uribe for a second.  You

11   said you knew him?

12   A.   Yes.

13   Q.   How did you know him?

14   A.   Oh, we -- we've been knowing each other for a long time,

15   because we -- we went to school -- we went to the same private

16   school, and my mom kind of knows his mom.

17   Q.   Okay.  So you go way back?

18   A.   Yes.

19   Q.   What involvement, if any, did he have with the Zetas?

20   A.   Oh, he was involved in the construction of the Black City

21   Mall, and he laundered money for them.

22   Q.   And who, in particular, was he laundering money for, or

23   was it the whole organization?

24   A.   That I know, for Cien.

25   Q.   Do you know --

Jose Luis Rodriguez - Cross

1   A.  Excuse me.  Sorry.  He also had -- he also was in charge

2   of those -- a couple of clubs with Miguel.

3   Q.  And when you say "Miguel," his brother?

4   A.  Yes, sir.

5   Q.  And so you said he was connected to Cien, correct?

6   A.  Yes, sir.

7   Q.  Did he have -- if you know, did he have any connection

8   with Lazcano?

9   A.  Well, those two clubs, the ones that I'm mentioning, those

10  belonged to Lazcano, which was Club Dubai, and I don't

11  remember the other one that was behind.

12  Q.  So the clubs that Miguel owned were actually owned by

13  Lazcano?

14  A.  They only -- they only -- Miguel didn't own.  He was

15  running them.

16  Q.  Oh.  I'm sorry.  So they were owned by Lazcano?

17  A.  Yes, sir.

18  Q.  Would you describe him as the Zetas' financial investor,

19  Rodrigo?

20  A.  Rodrigo, yes.

21  Q.  What work, if any, would he do for you?

22  A.  No.  Me and him didn't work.

23  Q.  Did you ever hear from other Zeta members of Rodrigo Uribe

24  being involved in stealing money or owing money to the Zetas?

25  A.  Yes, sir.

Jose Luis Rodriguez - Cross

1  Q.  And can you tell us what you heard and who you heard it

2  from?

3  A.  I was -- I played cards with Daniel, Chano, Cien, and I

4  heard that he had stolen a lot of money while he was -- while

5  he was building the Black City Mall.  And at the end, they did

6  a -- how do you call it when they do -- they go and check

7  for --

8  Q.  You can describe it.  You don't have to give us the term.

9  A.  Well, they did an audit on him.  Sorry.  An audit.  And he

10  ended up short a lot of money.

11  Q.  And whose money would that that have been?

12  A.  Cien.

13  Q.  And what did Cien do in response, if you know?

14  A.  I don't know.

15  Q.  Do you know how that issue got resolved, if it did?

16  A.  Well, that I know, it didn't get resolved, but they --

17  they did go after like his -- Rodrigo's mother-in-law

18  businesses, and they tore it down.  They burned it down.  And

19  I don't know exactly other -- other -- I don't even remember

20  where Rodrigo used to live.

21  Q.  And if you know, how did Rodrigo himself deal with that

22  allegation?  What was his response?

23  A.  Well, he flew to the United States.

24  Q.  Do you know -- if you know, how much money are we talking

25  about?

Jose Luis Rodriguez – Cross

1    A.  That he –– that he owed?

2    Q.  Yes.

3    A.  No, sir.  I don't know.

4    Q.  Do you have any personal knowledge of who, in fact, killed

5    Francisco Villarreal?

6    A.  No, sir.  I only know it was the Zetas Cartel.

7    Q.  And I believe you told us it was because $800,000 were

8    missing that were owed directly to 40 or 42, correct?

9    A.  Yes, sir.

10   Q.  You didn't hear from any other Zeta members that Marciano

11   Millan Vasquez was involved in that, in Francisco Villarreal's

12   disappearance, correct?

13   A.  Yes, sir.

14   Q.  Let me ask you this.  Who was in charge of the plaza when

15   Francisco Villarreal was killed?

16   A.  It was Peluche.

17   Q.  Peluche?

18   A.  Yes, sir.

19   Q.  Well, let me ask you this question, and just answer it if

20   you know.

21          Isn't it true that you had to get the nod or the

22   approval of the plaza boss before a hit or a disappearance was

23   approved of a fellow Zeta member?  Would that be true?

24   A.  I think sometimes they acted –– sometimes they acted

25   without approval.

Jose Luis Rodriguez – Cross

1   Q.  But was that the way it should have been done?

2   A.  No.  They have to have approval.

3   Q.  Right.  And when they didn't have approval, there could be

4   problems with the plaza boss as to their decision and what

5   they did, correct?

6   A.  Yes.  Unless they had -- how to -- how to prove what was

7   the --

8   Q.  Right.  So when we are talking about individuals that were

9   Zeta members themselves or working for the Zetas, like

10  Francisco and Mauricio and Miguel, is it more likely than not

11  that the plaza boss was aware that they were going to be taken

12  down and had his approval?

13  A.  Yes, sir.

14  Q.  And when those three individuals that I just mentioned

15  were disappeared, who was the plaza boss in command at the

16  time?

17  A.  Peluche.

18          MR. CAVAZOS:  One second, Your Honor.

19  BY MR. CAVAZOS:

20  Q.  Did you ever hear of an individual by the name of Rodolfo

21  Reyes, Jr.?

22  A.  No, sir.

23  Q.  Did you ever hear anything about him from other Zeta

24  members?

25  A.  No, sir.

Jose Luis Rodriguez – Cross

1    Q.  Who was the plaza boss when Severino and Vaneli were
2    disappeared?
3    A.  Daniel and Enano.
4    Q.  You said you knew Cesar Sanchez, right?
5    A.  No, sir.
6    Q.  No?  Do you know him?
7    A.  No, sir.
8    Q.  Have you ever heard of him from other Zeta members?
9    A.  No, sir.
10   Q.  How about Victor Cruz?
11   A.  Yes, sir.
12   Q.  How do you know him?
13   A.  He was -- he owned the gym.  I went a couple of times, and
14   I met with Poncho Cuellar there in that gym.
15   Q.  So he knew Poncho Cuellar?
16   A.  Victor Cruz?
17   Q.  Yes, sir.
18   A.  Yes, sir.
19   Q.  Were they close?
20   A.  Yes, sir.
21   Q.  Did they work together?
22   A.  Yes, sir.
23   Q.  Was he in the drug business?
24   A.  (Indicating.)  I don't know, but they worked together.
25   And, actually, I think even Poncho had part of that gym too.

Jose Luis Rodriguez – Cross

```
 1    Q.  Did you ever hear from other Zeta members that Victor Cruz

 2    was involved in the Zeta business?

 3    A.  Yes.  I heard, but I mean, me myself, I didn't exactly

 4    know what was he doing.

 5    Q.  Okay.  And do you know or have any knowledge about his

 6    disappearance?

 7    A.  Yes, sir.  He got --

 8    Q.  Do you know when that happened?

 9    A.  That happened in March in 2011.

10    Q.  And who was the plaza boss at the time?

11    A.  I don't remember.  2011 --

12    Q.  Take your time.

13    A.  It was -- because in February, it was still Peluche, and

14    this was March.  I think it was still Peluche.

15    Q.  Peluche.  And just to cover our bases, who followed

16    Peluche?

17    A.  Daniel and Enano.

18    Q.  Okay.  Do you know a person by the name of Jesus

19    Santillan?

20    A.  No, sir.

21    Q.  Have you ever, through other Zeta members, heard of Jesus

22    Santillan?

23    A.  No, sir.

24    Q.  And let's talk about Tavira for a second.

25    A.  Yes, sir.
```

Jose Luis Rodriguez - Cross

1    Q.  Tavira, according to your testimony, was very, very close
2    to Poncho Cuellar, correct?
3    A.  Yes, sir.
4    Q.  As a matter of fact, I think you said Poncho Cuellar
5    brought him in, or did you?
6    A.  No, sir.
7    Q.  That was somebody else?  Who was that somebody else that
8    Poncho Cuellar brought in or --
9    A.  I don't know.
10   Q.  You don't know?  Okay.  Maybe I misheard you.
11            But would you agree with me that Tavira and Poncho
12   Cuellar had a very close relationship?
13   A.  They had a business relationship.  I don't know if they
14   were very close.  Tavira would bring -- moved all of his coke
15   to the United States.
16   Q.  And the business that they were in was drugs, correct?
17   A.  Yes.
18   Q.  And Tavira was a Zeta member, correct?
19   A.  Yes, sir.
20   Q.  And as was Cuellar, correct?
21   A.  Yes, sir.
22   Q.  And then in March of 2011, Cuellar decided to come to the
23   United States, correct?
24   A.  Yes, sir.
25   Q.  And what happened to Tavira?

Jose Luis Rodriguez - Cross

```
 1   A.   Tavira got picked up and got taken in.  And that's when
 2   I -- I testified yesterday that they had him on the ground
 3   with a pistol to his head.
 4   Q.   And according to you, Cien saved him, correct?
 5   A.   Yes, sir.
 6   Q.   And Cien had that power to decide whether he lived or
 7   died, because at that time, Cien was a plaza boss, correct?
 8   A.   More than a plaza boss.
 9   Q.   What is more than a plaza boss?
10   A.   He was in charge of ten states in Mexico.
11   Q.   So he was above Peluche?
12   A.   Yes.  Above -- above --
13   Q.   Peluche, correct?
14   A.   Yes.
15   Q.   And he saved Tavira?
16   A.   Yes, sir.
17   Q.   So that reinforces what you and I had talked about before,
18   that if you are going to hit somebody that's a fellow Zeta
19   member, you need some authority from those higher up before
20   you do it, to do it right?
21   A.   Yes, sir.
22   Q.   Okay.  You testified about a conversation that was had
23   that related to the Cuellar thing, where people were picked
24   up, correct?
25   A.   Yes, sir.
```

Jose Luis Rodriguez – Cross

1    Q.  You personally -- and I am talking about you --

2    A.  Uh-huh.

3    Q.  -- you left that meeting and you went home, right?  You

4    didn't go out picking people up or anything like that, did

5    you?

6    A.  I never picked up people.

7    Q.  So you really don't have any personal knowledge of who got

8    picked up, by whom and what happened to them?  All you know is

9    what you heard, which is what everybody in Piedras Negras

10   knew, correct?

11   A.  Yes, sir.

12   Q.  Let's talk about that just for a second, about this -- I'm

13   going to call it the informal media, if you will, in Piedras

14   Negras, how word gets around.

15   A.  Yes.

16   Q.  Piedras is, population-wise, a pretty big town, a

17   good-sized town, right?

18   A.  250,000 people.

19   Q.  Right.  But in your business -- and it's kind of small.  I

20   mean, right?  I mean, everybody knows everybody?

21   A.  Yes, sir.

22   Q.  And because of that, a lot of information gets distributed

23   to the community at large, right?

24   A.  Yes, sir.

25   Q.  Would you agree with me that some of it is factual, right?

Jose Luis Rodriguez - Cross

1    A.  Yes.

2    Q.  And some of it is rumor, right?

3    A.  Yes, sir.

4    Q.  And some of it is just false, correct?  Some of the things

5    that go out there, that people pick up, aren't really true?

6    A.  Maybe.

7    Q.  Right.  And that's how a lot of the people in Piedras get

8    their knowledge, right, is from talking to other people and

9    interacting with other people, correct?

10          MR. LEACHMAN:  I object to the relevance of this,

11   Your Honor.

12          THE COURT:  That's overruled.

13   BY MR. CAVAZOS:

14   Q.  Go ahead.

15   A.  Well, me myself, I got it from facts.

16   Q.  Right.

17   A.  I don't know other people.  I cannot talk about others.  I

18   just can talk about what -- who I got it from.

19   Q.  Okay.  That's fine.  Let me ask you.  The word "sicario"

20   has been used a lot in this trial.  Would you consider

21   yourself one?

22   A.  No, sir.

23   Q.  What would you have to do in order to be classified or

24   called a sicario?

25   A.  Kill people.

Jose Luis Rodriguez – Cross

1   Q.  Let's talk about Poncho Cuellar just for a second.  How

2   deep into the organization was he?

3   A.  Very deep.

4   Q.  And had you done business with him?

5   A.  A couple of times.

6   Q.  And this information that you gave us yesterday about him

7   owing $10 million, where did you get that from?

8   A.  From Beto Casas.

9   Q.  And this is the same Beto Casas that you worked with in

10  the past, correct?

11  A.  Yes, sir.

12  Q.  And was that money that Cuellar owed Beto Casas?

13  A.  No, no, no.  He owed -- Poncho Cuellar didn't work for

14  Beto Casas.  He worked for 42.

15  Q.  So you're telling us that the $10 million that Cuellar

16  owed, he owed to 42, correct?

17  A.  Yes, sir.

18  Q.  And 42 would be higher up than a plaza boss, right?

19  A.  He was at the same as Cien, but on different branches.

20  Q.  A different branch.  Okay.

21           Now, when Cuellar left and came to the United

22  States, what happened to his debt?  Who took responsibility

23  for it?  Who was supposed to pay 42?

24  A.  Nobody.  That's why they went after everybody and killed

25  everybody, because of his cooperation and his debt -- and his

Jose Luis Rodriguez - Cross

1   debt.

2   Q.  And just to make sure, in March of 2011, Peluche was the

3   plaza boss?

4   A.  Yes.

5   Q.  Who was making all of the decisions, though?  Was it

6   Peluche or was it Cien or was it 42?  Who was making the

7   decisions about how to react to Cuellar's situation?

8   A.  When I saw the text message, when I was in the car with

9   Daniel and Chano, it was 40, the one texting.

10  Q.  Let me ask you this, Mr. Rodriguez.  What crossed your

11  mind when Cien made the decision to let INTERPOL take you?

12  What was going through your mind?

13  A.  Well, I was confused, because I thought -- I mean, I

14  was -- I was above everybody at that time.  I was doing all of

15  their business.  I was moving all of their coke and -- and I

16  thought they were going to protect me to the end, but things

17  happened and, thanks to God, I am alive.

18  Q.  Did you feel betrayed by the Zetas, the group that you

19  were working for and working with?

20  A.  Kind of.

21  Q.  You had to give up all of your contacts --

22  A.  Yes, sir.

23  Q.  -- right?  How did that make you feel?

24  A.  Well, I thought they were going to -- they told me that

25  they were going to continue helping me and my family while I

Jose Luis Rodriguez - Cross

```
1    was in prison.
2    Q.  And did they?
3    A.  No, sir.
4    Q.  So they lied to you?
5    A.  Yes, sir.
6    Q.  Did that confirm any feelings that you had about them?
7    And, if so, what feelings were they?
8    A.  No, no.  I didn't have -- I mean, it is just normal that
9    when you go down, everything cuts off.
10   Q.  Okay.  They took all of your money, correct?
11   A.  Yes, sir.
12   Q.  And then they took over all of your accounts receivable,
13   the people that owed you money?
14   A.  Yes.
15   Q.  How much money are we talking about that you were owed?
16   A.  I owed them or I was owed?
17   Q.  You were owed.
18   A.  $3 million.
19   Q.  And is that what you owed them?
20   A.  Yes.  I mean, there was a little bit of mine too, but I
21   still had my money, which they ended up taking too.
22   Q.  So you basically got zeroed out?
23   A.  Yes, sir.
24   Q.  How did that make you feel, having lost everything, being
25   betrayed by those that you worked with?  How did that make you
```

Jose Luis Rodriguez – Cross

1    feel with respects to Marciano Millan Vasquez, Daniel Menera,

2    Cien and the others?

3    A.  Well, I just felt like it was worthless, you know, all of

4    this two years of straight doing business with them for

5    nothing.

6    Q.  Were you angry at them?

7    A.  No.

8    Q.  Let me switch gears for just a second, and I want to talk

9    about this.

10          You said that when you were working for Beto Casas,

11   you were moving a lot of cocaine?

12   A.  Yes, sir.

13   Q.  When was this, more or less?

14   A.  From 2000, all the way to the end, because I still was

15   helping him a little bit.

16   Q.  And the end was when?

17   A.  2011.

18   Q.  At what point did Beto Casas say, "You know what,

19   Rodriguez?  No more for you.  You are too caught up in this

20   cocaine thing.  I don't want you handling my product"?  When

21   did that happen?

22   A.  In like around 2000 -- towards the end of 2005, I was --

23   my addictions were very strong, so they put me to the side.

24   Q.  When -- let's talk about your addiction, just for a

25   second.

Jose Luis Rodriguez - Cross

```
 1    A.  Yes, sir.
 2    Q.  How much cocaine were you doing a day?
 3    A.  Well, like -- like -- I don't know how much in grams, but
 4    I would do three or four days.
 5    Q.  Basically, you had enough cocaine where you could do as
 6    much as you wanted --
 7    A.  No.  At that time, I didn't have -- I wasn't running the
 8    show myself.  I was just working, so I had to buy it too.
 9    Q.  Okay.  Okay.  Well, how much cocaine were you using daily?
10    A.  You could say two, three grams.
11    Q.  And that's not all you were doing daily, right?  You were
12    drinking, right?
13    A.  Drinking, yes.
14    Q.  Smoking pot, marijuana?
15    A.  A little bit.
16    Q.  Any other drugs?
17    A.  No, sir.
18    Q.  Did you have to take drugs to come down, to sleep, or did
19    you stay awake for days at a time?
20    A.  No.  I would stay awake sometimes.
21    Q.  For days?
22    A.  No, not for days.  I would always go home.
23    Q.  Were you married then?
24    A.  Yes, sir.
25    Q.  Did you have kids then?
```

Jose Luis Rodriguez – Cross

```
 1    A.  I got married in 2004, and that's when my first kid was
 2    born.
 3    Q.  So you had this addiction while your family was very
 4    young?
 5    A.  Yes.
 6    Q.  And how long did this addiction last?
 7    A.  Until I went to rehab, to 2008.
 8    Q.  So for three years, you were consuming cocaine, alcohol
 9    and marijuana almost on a daily basis?
10    A.  No, sir.  Not on a daily basis.  I said from two to three
11    days a week.
12    Q.  But when you did it, you did it straight?
13    A.  Not straight.  I would go home every night, and then the
14    next night -- if it was possible; I didn't have no money.
15    Q.  No money.  Weren't you moving large quantities of cocaine
16    for Mr. Casas at that time?
17    A.  No, sir.  I had -- at that time, I had dropped out.  He
18    had put me to the side.
19    Q.  And when did you pick up and -- well, did you ever stop
20    being in the drug business during that time that you were
21    addicted?
22    A.  No, sir.  I was helping Chaparro Martin Mondragon at the
23    time.
24    Q.  So you were still working?
25    A.  Yes.
```

Jose Luis Rodriguez – Cross

```
 1    Q.  So you had some money coming in, right?
 2    A.  Yes, but it was just a little bit.  They will help me just
 3    for my bills.
 4    Q.  Okay.  So you went to rehab and you came out and you
 5    started working again for Mr. Casas or for --
 6    A.  I got out of rehab in 2000 -- in 2000 -- in 2009,
 7    February.  That's when INTERPOL started looking for me, and I
 8    left a little bit and then came back and started working on
 9    Casas' ranch.  And then that's when he saw me, I was too hot,
10    and he moved me to the side.
11    Q.  Who did you start working for when he moved you to the
12    side?
13    A.  Tommy Aleman.
14    Q.  Oh, that's right.
15         Did you -- were you sober after you got out of rehab
16    in 2009?
17    A.  Yes, sir.
18    Q.  Have you been sober since 2009?
19    A.  Yes, sir.
20    Q.  Let me talk to you about this.  You talked about the
21    relationship between Marciano and Danny, right?
22    A.  Yes, sir.
23    Q.  And it is your claim or your testimony that their
24    relationship was based on work for the Zetas, right?
25    A.  It was more than work.  They were very close.
```

Jose Luis Rodriguez – Cross

```
 1    Q.  If you had to rank them in terms of the hierarchy or the
 2    chart, who would be on top and who would be subordinate?
 3    A.  Daniel and then Chano.
 4    Q.  You testified that, other than handing over your phones,
 5    you provided Danny and Cien, at the time that INTERPOL took
 6    you and you knew that you were gone, you provided them with
 7    ledgers and notebooks of your accounts, correct?
 8    A.  No, sir.  Not Cien.  Cien wasn't present.
 9    Q.  Oh, I'm sorry.
10    A.  It was Chano and Danny.
11    Q.  Okay.  So you provided them with ledgers and notebooks,
12    right?
13    A.  Yes.  One ledger.
14    Q.  Okay.  And that ledger contained all of your contacts, all
15    of your accounts, quantities, amounts owed, et cetera?
16    A.  Yes.  Well, the reason was because I would be changing
17    notebooks.
18    Q.  Sure, sure.  But would you agree with me that it is common
19    in your business to keep track of loads of cocaine and loads
20    of marijuana with ledgers and books and notes, correct?
21    A.  Yes, sir.
22    Q.  I mean, you have got to do that in order to keep track of
23    all of that stuff, right?
24    A.  Yes, sir.
25    Q.  Well, let me ask you this.  You talked about people in
```

Jose Luis Rodriguez – Cross

```
 1    Piedras knowing you.
 2              What skill or talent did you bring to the Zeta
 3    organization?  What was your thing?
 4    A.  Honesty.
 5    Q.  Okay.  But what was your skill?  I mean, we are talking
 6    smuggling drugs.
 7    A.  Yes.
 8    Q.  Were you an expert in crossing the marijuana over the
 9    river?  Were you an expert in retrofitting vehicles?  Were you
10    a communications expert?  Were you a logistics expert?  Did
11    you have buyers?  What was your skill set?  What did you bring
12    to the table?
13    A.  Okay.  Me myself, I had drivers.  I had clients.  And they
14    would give me all of the material to me, because they were
15    getting a lot of money through me.
16    Q.  So you had the source, you had drivers to transport it --
17    A.  Yes, sir.
18    Q.  -- and then you had the clients that would ultimately buy
19    it?
20    A.  Yes.
21    Q.  And were you good at it?
22    A.  Yes, sir.
23    Q.  Would you consider yourself very good at it?
24    A.  Very good.
25    Q.  How much money would you say you made for the Zetas during
```

Jose Luis Rodriguez - Cross

1   the period from -- you said 2000 to 2011?

2   A.  Yes, sir.

3   Q.  How much money would you say you made for them?

4   A.  Well, the Zetas, from 2000, they were not at Piedras.  In

5   2000, I was working for Beto Casas and --

6   Q.  Well, let me rephrase it.

7           How much money would you say that you generated for

8   those that you were working with and for during that 11-year

9   period that you were drug trafficking?

10  A.  Millions and millions of dollars.

11  Q.  Give me a guesstimate or an estimate.

12  A.  Over 15 million, 20 million.

13          THE REPORTER:  Fifteen to 20?

14          THE WITNESS:  Yes.

15  BY MR. CAVAZOS:

16  Q.  And how many weapons would you say you were directly or

17  indirectly responsible for providing for those that you worked

18  with and worked for during that 11-year period?

19  A.  Like 200.

20  Q.  How many kilos of cocaine would you estimate you were

21  responsible for and importing into the United States during

22  that 11-year period?

23  A.  Over 10,000.

24  Q.  What about marijuana?  How many kilos would you estimate?

25  A.  Close to 3,000, 4,000.

1    Q.  Would you agree with me that what you provided us and this

2    jury is testimony that can only be backed up with your word,

3    correct?

4    A.  Yes, sir.

5    Q.  The ledgers and your phones and all of that, they don't

6    exist anymore?  You don't have control over that?

7    A.  No, sir.

8    Q.  Let me switch gears for a second, and let's talk about

9    this deal that you made with the government after you were

10   found guilty.

11   A.  Yes, sir.

12   Q.  Okay.  You were found guilty?

13   A.  Yes, sir.

14   Q.  And you received a sentence, right?

15   A.  Yes, sir.

16   Q.  I believe you said that you got a life sentence, correct?

17   A.  Yes, sir.

18   Q.  Didn't you, in fact, get five life sentences?

19   A.  One for each count, running concurrent, that is equivalent

20   to one.

21   Q.  Okay.  Well, let's talk about that one.

22        In the federal -- you know how the federal system

23   works, and the BOP calculates good credit and all of that,

24   right?

25   A.  Yes, sir.

Jose Luis Rodriguez – Cross

1   Q.  When you get a life sentence in the federal system, what

2   does that mean?

3   A.  That you are going to die in prison.

4   Q.  Right.  And that's the sentence that you got, right?

5   A.  Yes, sir.

6   Q.  And then you got your lawyer to reach out to the

7   government and try to work out a deal, right?

8   A.  Yes, sir.

9   Q.  Okay.  And one of the things that you had to give up at

10  the very beginning was you had to give up your right of

11  appeal?

12  A.  Yes, sir.

13  Q.  Which means what?

14  A.  That I am not going to appeal no more, that I am not going

15  to have a right to fight my case.

16  Q.  Right.  That your life sentence is what it is?

17  A.  Yes.

18  Q.  Okay.  So now, in reality, all you really had to work on

19  was getting that sentence reduced, right?

20  A.  Yes.

21  Q.  And your children -- you still have your children --

22  A.  Yes.

23  Q.  -- and you still have your wife, right?

24  A.  Yes, sir.

25  Q.  And -- well, let me ask:  How hard is it to be separated

Jose Luis Rodriguez - Cross

1    from them?

2    A.  Well, very hard, sir.  Until today, I haven't seen them.

3    It has been four years since I haven't seen them, since I got

4    extradited.  And it is hard for me to have them in Mexico,

5    having to do with this cartel.

6    Q.  Well, let me ask you:  As you sit here today, what are

7    your plans?  What are your goals?  What is it that you want to

8    do with your life?

9    A.  Well, today -- I don't focus on the tomorrow, because

10   there is no promise.  I focus on today.  And today, I am there

11   in my cell and -- well, I got sent to lockdown right now

12   because of this case.  But I study the word of God, I do

13   exercise, I share the word of God with the rest of the

14   inmates, and I changed my life.

15   Q.  Is part of your plan to get out of prison?  Is that part

16   of your plan?

17   A.  Well, if it is possible.

18   Q.  Well, isn't it true that that's what you are doing here

19   today?  You are working on reducing your time so you can be

20   returned to your family, right?

21   A.  Yes, sir.

22   Q.  Let me ask you this.  You talked about that you were

23   negotiating with the government prior to your trial.

24          How many years were you willing to do before you

25   went to trial?

Jose Luis Rodriguez – Cross

```
 1   A.  I don't know.  I just sat down with them one time.  It was
 2   a different prosecutor, and we didn't talk about time at that
 3   time.
 4   Q.  Well, based on what you have done so far, your sentence
 5   has changed from life to what?
 6   A.  To 25 years.
 7   Q.  That changes everything, doesn't it?
 8   A.  Yes, sir.
 9   Q.  Because you are getting credit for the time that you have
10   served off those 25 years, right?
11   A.  Yes, sir.
12   Q.  And you are getting good time credit --
13   A.  Yes, sir.
14   Q.  -- which is, what, 54 days a year --
15   A.  Yes, sir.
16   Q.  -- right now?
17        And now you are eligible to apply to do drug rehab
18   programs and get credit for that, right?
19   A.  I am not able to apply for a drug rehab program because I
20   have a kidnapping case.
21   Q.  Oh, that's right.  I forgot about that.  So you are
22   ineligible for that program?
23   A.  Yes.
24   Q.  But you are doing everything you can to get as much good
25   time credit and apply for any programs that will reduce your
```

Jose Luis Rodriguez - Cross

1  sentence?

2  A.  Not everything.  Just speak the truth.

3  Q.  As we sit here today, do you know when your release date

4  is, based on that reduction of sentence?

5  A.  No, sir, because in the computers, it still says life.

6  Q.  Okay.  Well, let's be honest --

7  A.  Uh-huh.

8  Q.  -- as you say.

9          You are expecting a sentence reduction for having

10  given testimony in this case, are you not?

11  A.  Yes.

12  Q.  And you talked about telling the truth.  In fact, the

13  government expects you to tell the truth.  That's part of the

14  deal, right?

15          You have got to say the truth, right?

16  A.  That's why I swear --

17  Q.  Right.

18  A.  -- before.

19  Q.  And when you signed that agreement with the government,

20  you told them that you would tell the truth, right?

21  A.  Yes.

22  Q.  So that's what is expected of you, correct?

23  A.  Yes, sir.

24  Q.  But isn't it true that it is the very people that you cut

25  that deal with that are going to judge your credibility as to

Jose Luis Rodriguez – Redirect

 1   whether you are telling the truth or not?  Is that not true?

 2   A.  I don't understand that question.

 3   Q.  Well, let me ask it this way.  There was a Rule 35 filed

 4   by the government --

 5   A.  Yes, sir.

 6   Q.  -- that was given to the judge that sentenced you to those

 7   five life sentences?

 8   A.  Yes.

 9   Q.  And he's the one that signed off and gave you the sentence

10   reduction, correct?

11   A.  Yes, sir.

12   Q.  That judge wasn't at the grand juries that you testified

13   to, right?

14   A.  No, sir.

15   Q.  He wasn't present in those 30-plus meetings that you had

16   with the government, wherein you gave information, right?

17   A.  No, sir.

18   Q.  So he was relying on the government to present to him that

19   you had been truthful in your cooperation, correct?

20   A.  Yes, sir.

21   Q.  So, again, isn't it true that the very people that you cut

22   your deal with are the ones that are making that judgment

23   call?

24   A.  Yes, sir.

25   Q.  And here you are again with another situation where you

Jose Luis Rodriguez – Redirect

1   are going to be asking the government, when you are done with

2   this, to ask that judge to reduce your sentence even further,

3   correct?

4   A.  Yes.

5           MR. CAVAZOS:  Pass the witness, Judge.

6           THE COURT:  Anything further?

7           MR. LEACHMAN:  Yes, Your Honor.  I anticipate this

8   will be a while, Your Honor.  I don't know if you want to

9   break or not.

10          THE COURT:  Break now?  Keep going?

11          No?  No break.  Okay.  Let's push.

12                    *-*-*-*-*-*-*-*

13                  REDIRECT EXAMINATION

14  BY MR. LEACHMAN:

15  Q.  Mr. Rodriguez, I want to go back and talk to you about

16  some of the matters that you have recently addressed with the

17  opposing attorney.

18          And the first thing he asked you about was, the

19  testimony you gave in connection with the grand jury testimony

20  related to Betillo Casas.

21          Do you remember those questions?

22  A.  Yes, sir.

23  Q.  And you were asked also if you have met with the

24  prosecutor a number of times in connection with this case; is

25  that correct?

Jose Luis Rodriguez – Redirect

1    A.  Yes, sir.

2    Q.  And you said that was a lot of times; is that correct?

3    A.  Yes.

4    Q.  And each time that you met with me, you were also meeting

5    with at least two agents, who were also present for those

6    conversations; is that correct?

7    A.  Yes, sir.

8    Q.  And we have talked about -- and I will put it back up on

9    the screen, Government's Exhibit No. 158.

10              And over those many times that we have talked, we

11   have talked at some length about all of the persons that you

12   identified on this organization chart that is in evidence,

13   correct?

14   A.  Yes, sir.

15   Q.  And in that regard, some of those folks are more -- strike

16   that.

17              Did we focus, at different times, more on some

18   persons than others?

19   A.  Yes, sir.

20   Q.  Were there occasions when you were -- when we came to talk

21   to you that we were focused only on a single person?

22   A.  Yes, sir.

23   Q.  And let me talk to you about the way that that would

24   happen.

25              The defense attorney asked you some questions about

Jose Luis Rodriguez – Redirect

1    how it was that it comes around that you talk about these

2    individuals that are like depicted on Government's Exhibit

3    158.  Do you remember that?

4    A.  Yes, sir.

5    Q.  And when you sat down with agents, do they bring you what

6    is a photo array or, in other words, a lineup of people for

7    you to look at to see if you know anyone?

8    A.  Yes, sir.

9    Q.  And if you know someone, do you identify that person by

10   name or nickname, or if you don't know their name or nickname,

11   say, "I don't know their name, but I have seen this person

12   somewhere before," if you do?

13   A.  Yes, sir.

14   Q.  And as a part of that, you don't know if there is going to

15   be a person in that photo array that you would know or not, do

16   you?

17   A.  Yes, sir.

18   Q.  And you have been through this a number of times with the

19   agents, where we met with you regarding these individuals; is

20   that correct?

21   A.  Yes, sir.

22   Q.  And do they have a notebook that is about five inches

23   thick of photos -- of six packs of photos with various

24   individuals related to the cartel that they have shown you

25   over time and asked you if you know the person?

Jose Luis Rodriguez – Redirect

```
 1   A.  Yes, sir.

 2   Q.  And did they show you such a photo that related to the

 3   defendant, Chano, in this case?

 4   A.  Yes, sir.

 5   Q.  And before -- or strike that.

 6          When they did that, did you identify a person in

 7   that photo?

 8   A.  Yes, sir.

 9   Q.  And did you tell them, "I do know someone in that lineup"?

10   A.  Yes, sir.

11   Q.  And did you tell them what the name was of that person?

12   A.  Yes.

13   Q.  And what name did you tell them for that person?

14   A.  Chano.

15   Q.  Okay.  And is this a pattern that is played out over and

16   over, in looking at Beto Casas and Cien and Danny Menera and

17   some of Danny Menera's relatives and Tavo and all of the

18   people that we have talked about over time?

19   A.  Yes, sir.

20   Q.  And on some occasions, do you tell people -- do you tell

21   the agents -- did you tell the agents about persons that they

22   didn't have a photo of?

23   A.  Yes, sir.

24   Q.  And on some of those occasions, did they come back later

25   with another photo lineup and say, "Is the person -- do you
```

Jose Luis Rodriguez – Redirect

1   recognize anyone there?"

2   A.  Yes, sir.

3   Q.  And were there occasions when you did that, but then you

4   identified further persons that were a part of this Zeta

5   conspiracy?

6   A.  Yes, sir.

7   Q.  And, for example, was Tavo one of those persons?

8   A.  Yes.

9   Q.  Okay.  And so back to the question that this all started

10  with, about the grand jury proceeding, at the time you went to

11  the grand jury, were we focused on one particular person?

12          Well, actually, strike that.

13  A.  It was three -- Beto Casas, Sr., Jr., and Sergio Heredia.

14  Q.  Okay.  So Sergio Heredia, Buddha Casas -- or Beto Casas,

15  Sr., and Betillo Casas -- or Betillo Casas, Jr., correct?

16  A.  Yes.

17  Q.  Okay.  And was that the focus of the testimony that you

18  gave at the grand jury?

19  A.  Yes, sir.

20  Q.  And did we talk about Tavo in the grand jury?

21  A.  No, sir.

22  Q.  Does that mean he's not involved?

23  A.  No.

24  Q.  It just wasn't the focus of the grand jury proceeding,

25  correct?

Jose Luis Rodriguez - Redirect

```
1    A.  Yes, sir.
2    Q.  And Chano wasn't the focus of that grand jury proceeding
3    either, was he?
4    A.  No, sir.
5    Q.  Nor was it even, really, Danny Menera, although I think he
6    might have been mentioned.
7    A.  Yeah.  I mentioned him, but he wasn't the focus.
8    Q.  Okay.  Now, one of the things that you were asked was
9    whether or not you've given information -- you said something
10   to the effect that you answered just the questions that were
11   posed to you.  Do you remember that?
12   A.  Yes, sir.
13   Q.  In the course of this process, have we asked you or
14   attempted to get all of the information that you have out of
15   the -- about the Zetas from you?
16   A.  Yes, sir.
17   Q.  But no matter how hard we tried or how freely you give the
18   information, is there additional things that you know that we
19   don't know yet, because we just haven't got to the right topic
20   yet?
21   A.  Yes, sir.
22   Q.  Okay.  And we have talked to you more about specific
23   people as we've got ready and prepared either cases for the
24   grand jury or cases like this that have gone to trial; is that
25   correct?
```

Jose Luis Rodriguez – Redirect

1    A.  Yes, sir.

2    Q.  Okay.  Now, you were asked a question about the

3    information that you received about what happened to Severino

4    Abascal and Vaneli Luna.  Do you remember that question?

5    A.  Yes, sir.

6    Q.  And in that question -- first question, when you -- at the

7    request of Mr. Abascal, called, who answered the phone?

8    A.  When he called me or when I called --

9    Q.  No.  After he -- strike it.  It was a poorly worded

10   question.  Sorry.

11        When he asked you to make a call on his behalf to

12   the Zetas, who did you call?

13   A.  Danny.

14   Q.  Okay.  And when you made that call, who answered the

15   phone?

16   A.  Chano.

17   Q.  And what happened after Chano answered the phone?

18   A.  He told me that the boss is busy, but then again, he ended

19   up handing the phone to the boss.

20   Q.  Okay.  And after he said the boss is busy and gave the

21   phone to -- to who?

22   A.  To Danny.

23   Q.  Okay.  And then you had the conversation with Danny

24   immediately after he handed the phone; is that correct?

25   A.  Yes, sir.

Jose Luis Rodriguez – Redirect

1    Q.  Okay.  And he told you -- what did he tell you?

2    A.  "We just finished cooking him."

3    Q.  Okay.

4    A.  "Cooking them."

5    Q.  And so we know, because of the context of the phone call,

6    that there is more than one person that's part of this "we"

7    that he's talking about, correct?

8    A.  Yes, sir.

9    Q.  And who is the other people that we know for sure are part

10   of that "we"?

11   A.  Whoever is right next to him.

12   Q.  And who is that?

13   A.  Chano.

14   Q.  Okay.  You were also asked a number of questions about, I

15   guess, the rumor mill in Piedras Negras.  Do you remember

16   those questions?

17   A.  Yes, sir.

18   Q.  Okay.  And the Zetas control a lot of life in Piedras

19   Negras; is that true?

20   A.  Yes, sir.

21   Q.  And so certainly, people that live there are aware of it

22   and have some general understanding of what they do and what

23   to try to stay clear of?

24   A.  Yes, sir.

25   Q.  Is it also correct that the general public doesn't have

Jose Luis Rodriguez – Redirect

```
 1    the kind of information you've been sharing with us for the
 2    past two days?
 3              MR. CAVAZOS:  That's leading, Your Honor.
 4              THE COURT:  That's sustained.
 5    BY MR. LEACHMAN:
 6    Q.  Okay.  Strike that question.
 7              Does -- was the general public invited to the -- was
 8    the general public part of the conversation that you had with
 9    Danny Menara and Vecino and Chano about the problem with
10    Severino Abascal and having him killed?
11    A.  No, sir.
12    Q.  Was there any reporter as a part of that meeting?
13    A.  No.
14    Q.  So would a person that's just a citizen in Piedras Negras
15    have any knowledge of an event like that?
16              MR. CAVAZOS:  Calls for speculation, Your Honor.
17              THE COURT:  That's overruled.
18    BY MR. LEACHMAN:
19    Q.  Would the public at large know about something like that?
20    A.  No.
21    Q.  It has to be someone in the inner circle; is that true?
22    A.  Yes, sir.
23              THE COURT:  Karl, is he going too fast for you?
24              THE REPORTER:  He's fine.  Thank you, Judge.
25
```

Jose Luis Rodriguez – Redirect

```
 1   BY MR. LEACHMAN:
 2   Q.  You were asked a number of questions about other people
 3   that we have talked about.
 4   A.  Yes, sir.
 5   Q.  And so one of those -- one of those folks was, for
 6   example, Ezekiel Rodriguez, also nobody as Cheque; is that
 7   correct?
 8   A.  Yes.
 9   Q.  And also Keko, or also known as Sergio Heredia; is that
10   correct?
11   A.  Yes, sir.
12   Q.  And have I talked to you more about those individuals than
13   I have some of the other people on this chart?
14   A.  Yes, sir.
15   Q.  Do you know whether or not people like Danny Menera or
16   Cien or 40 or 42 are people that are pending extradition from
17   the government of Mexico?
18   A.  A lot of them are pending extradition.
19   Q.  Okay.  And that's because charges have been brought
20   against those folks in the United States, like your charges
21   were brought for the kidnapping charge; is that correct?
22   A.  Yes, sir.
23   Q.  Okay.  And do you expect that if those folks were to ever
24   be sent that we would have some more significant conversations
25   about their specific involvement?
```

Jose Luis Rodriguez – Redirect

1   A.  Yes, sir.

2   Q.  Okay.  One question that he -- that you were asked, that I

3   don't -- I didn't -- I'm not sure I understood, was, you were

4   asked some questions about Poncho Villarreal, and he counted

5   money for you, correct?

6   A.  Uh-huh.

7   Q.  And he also held money for you, correct?

8   A.  (Witness nods head.)

9   Q.  Is that right?

10  A.  Yes, sir.

11  Q.  You've got to answer verbally.

12  A.  Yes, sir.

13  Q.  Thank you, sir.  But one of the things you were asked was:

14  Was he allowed to use that money while he held it for you?  Do

15  you remember that question?

16  A.  Yes, sir.

17  Q.  Was he, and what does that mean?

18  A.  Oh, no.  Like me, I will always leave him a little bit so

19  he could use in the money exchange, so he could change pesos

20  for dollars, but not for other --

21  Q.  Okay.  So he couldn't take it and go invest it --

22  A.  No, no.

23  Q.  -- in something else for himself?

24  A.  No, no, no.

25  Q.  He could use it as currency in his casa de cambio?

Jose Luis Rodriguez – Redirect

```
 1   A.  Yeah.  I would tell him how much, because I would have to
 2   give most of the money up.
 3   Q.  And so if I understand what you are saying, he could use
 4   your portion of the money --
 5   A.  Yeah.
 6   Q.  -- but not the amount of money that he was holding that
 7   you had to turn over back to the company?
 8   A.  Yes.
 9   Q.  Okay.  One of the things that you were asked questions
10   about was what happened with Rodrigo Uribe.  Do you recall
11   those questions?
12   A.  Yes, sir.
13   Q.  And one of the things that you testified to was, is that
14   you learned something about this from playing cards with Danny
15   and Chano.  Do you remember that testimony?
16   A.  Yes, sir.
17   Q.  Now, have you and I ever talked about that before?
18   A.  No, sir.
19   Q.  So even here in the trial, I'm learning things from you
20   that I've never heard before about things that happened with
21   the Zetas; is that correct?
22   A.  Yes, sir.
23   Q.  Okay.  And in that particular meeting, Danny told you that
24   there was an audit, basically, of Rodrigo, and that's why he
25   was in trouble with the cartel?
```

Jose Luis Rodriguez – Redirect

1    A.  Yes, sir.

2    Q.  You were asked a question related to the plaza boss and

3    who was a plaza boss at a particular time and whether or not

4    you had to have the permission of the plaza boss in order to

5    kill a person.  Do you remember those questions?

6    A.  Yes, sir.

7    Q.  Okay.  The first question is, any of these people that are

8    killed, is it just one person that's involved in the killing

9    of the person?

10   A.  No, no.

11   Q.  Okay.  And when these things happen, are all of the other

12   leaders of the cartel assisting and encouraging this activity?

13   A.  Yes, sir.

14   Q.  Okay.  And you talked about, specifically, the meeting

15   that you were at with Chano and with Vecino and with Danny

16   Menera, and they are talking about the problem with this kid

17   who's lost the guns in Eagle Pass.  Do you remember that

18   conversation?

19   A.  Yes, sir.

20   Q.  And in that conversation, are they discussing whether or

21   not they need to kill this kid or not?

22           MR. CAVAZOS:  Leading, Your Honor.  Objection.

23           THE COURT:  Sustained.

24           THE WITNESS:  No, they were discussing --

25           THE COURT:  You need to rephrase.

Jose Luis Rodriguez – Redirect

```
 1    BY MR. LEACHMAN:
 2    Q.  What are they discussing?
 3    A.  They were discussing on what they are going to do with
 4    him, to pick him up.
 5    Q.  Okay.  And in that discussion, is the defendant, Chano,
 6    talking to Danny about what he thinks should be done?
 7    A.  Yes, sir.
 8    Q.  And is he encouraging him to pick him up?
 9    A.  Yes, sir.
10    Q.  And is he encouraging him to kill him?
11    A.  Yes, sir.  He was -- he was right there in the circle and
12    they were -- they were talking to him.
13    Q.  And really, this is -- is this a meeting, basically, of
14    the leadership, where they are deciding the fate of this
15    person and whether or not they are going to be killed?
16    A.  Yes, sir.
17    Q.  Okay.  And are they counseling with one another and,
18    basically, having a session to talk about what they're going
19    to do, how they're going to do it, when they're going to do it
20    and the like?
21            MR. CAVAZOS:  Objection.  Leading, Your Honor.
22            THE COURT:  That's sustained.
23    BY MR. LEACHMAN:
24    Q.  Did they discuss how they're going to do it?
25    A.  Yes, sir.
```

Jose Luis Rodriguez – Redirect

```
 1    Q.  Did they discuss when they're going to do it?
 2    A.  No, sir.
 3    Q.  They didn't discuss when they were going to do it?
 4    A.  No, they didn't.
 5    Q.  Did they discuss whether it needed to be done?
 6    A.  Well, no, no.  I left after -- after they were talking
 7    about that.
 8    Q.  Okay.  But I'm talking about while you're there, okay,
 9    they are discussing -- is this something that they are saying
10    needs to be done?
11    A.  Yes, sir.
12         MR. CAVAZOS:  Objection, Your Honor.  He's already
13    said he has no basis in personal knowledge.
14         THE COURT:  That's overruled.
15         THE WITNESS:  Yes, sir.
16    BY MR. LEACHMAN:
17    Q.  Okay.  And --
18         THE COURT:  That's where you get in trouble with the
19    leading.  You start with "and" all the time, so rephrase your
20    question.
21    BY MR. LEACHMAN:
22    Q.  Was the agreement, what caused the death of Severino
23    Abascal, to be effected?
24    A.  Yes, sir.
25    Q.  You said you were asked questions about who was the plaza
```

Jose Luis Rodriguez – Redirect

1    boss when Severino disappeared.  Do you remember that?

2    A.  Yes, sir.

3    Q.  And who was the plaza boss?

4    A.  Daniel and Chaparro -- and Enano.

5    Q.  Okay.  And who was Danny's right hand at that time?

6    A.  Chano.

7    Q.  And who was the person that counseled with him at that

8    time?

9    A.  Chano.

10   Q.  And who was the person that helped procure this person for

11   him at that time?

12           MR. CAVAZOS:  Leading, Your Honor.

13           THE COURT:  Sustained.

14   BY MR. LEACHMAN

15   Q.  Who helped procure Severino for Danny to effect the

16   murder?

17   A.  Chano.

18   Q.  You were also asked a number of questions about Victor

19   Cruz.  Do you remember those questions?

20   A.  Yes, sir.

21   Q.  And you were asked who was the plaza boss at the time of

22   that -- at the time of those disappearances.  Do you recall

23   that?

24   A.  Yes, sir.

25   Q.  And you said it had been, I think, Peluche?

Jose Luis Rodriguez – Redirect

1   A.  Yes, sir.

2   Q.  And then who was after Peluche?

3   A.  Enano and Danny.

4   Q.  And who was after Enano and Danny?

5   A.  Well, the people right after Chano.

6   Q.  You were asked some questions about -- and I think this

7   was confusing, but that there was a person that Poncho Cuellar

8   had brought in that was very close to him.  Do you remember

9   that question?

10  A.  Yes.

11  Q.  Do you remember who the person was that Poncho brought in

12  that was close to him?

13  A.  Tavira.

14  Q.  Okay.  Did he also have somebody who was a neighbor that

15  was close to him?

16  A.  Yes.

17  Q.  And who was that?

18  A.  Vecino.

19  Q.  And did he bring him into the Zetas also?

20  A.  Yes, sir.

21  Q.  Okay.  I want to talk to you about the conversation you

22  had regarding -- and I'm going to call it the Poncho Cuellar

23  roundup, after he and Hector Moreno were thought to be in the

24  United States.  Okay?

25  A.  Yes, sir.

Jose Luis Rodriguez – Redirect

1    Q.  And Mr. -- or the defense counsel asked you some questions

2    about whether lots of people in Piedras Negras knew about some

3    of those events.  Do you remember that?

4    A.  Yes, sir.

5    Q.  Did you have a personal conversation with Danny Menera

6    about those events?

7    A.  Yes, sir.

8    Q.  And did the general public know about that?

9    A.  No, sir.

10   Q.  Did you attend a meeting in Piedras Negras with the

11   leadership of the Zetas in anticipation of that roundup?

12   A.  Yes, sir.

13   Q.  Was the general public privy to that?

14   A.  No, sir.

15   Q.  Does the general public normally have access to the plaza

16   bosses?

17   A.  No, sir.

18   Q.  Are the plaza -- are plaza bosses actually protected from

19   the public?

20   A.  Yes, sir.

21   Q.  And so the facts about this meeting that you testified

22   about, with the leadership before the Poncho Cuellar roundup,

23   was that out in the general news, before yesterday's news,

24   when you testified to it, that you know of?

25   A.  I can't -- I don't think so.

Jose Luis Rodriguez – Redirect

1    Q.   Okay.  Was that public knowledge in Piedras?

2    A.   No, sir.

3    Q.   Okay.  You were asked a number of questions -- strike

4    that.

5              Before I get to that, the meeting at the roundup

6    that we talked about, before the Poncho Cuellar roundup, was

7    Chano at that meeting?

8    A.   Yes, sir.

9    Q.   You were asked some questions about, you know, when you

10   got arrested, you had to produce your accounts and your

11   ledgers and stuff like that.  Do you remember that?

12   A.   Yes, sir.

13   Q.   And did you obtain those to turn over to Chano and Danny

14   Menera?

15   A.   Yes, sir.

16   Q.   Is that something that you kept secret from law

17   enforcement?  Do you understand what I am asking?

18   A.   No.

19   Q.   Okay.  Well, if I understood what you testified to, you

20   had like a document that said, "This person owes me this much

21   money, and this person owes me this much money."

22   A.   Yes, sir.

23   Q.   And these are all about illegal drug deals --

24   A.   Yes, sir.

25   Q.   -- is that right?

Jose Luis Rodriguez – Redirect

1    A.  Yes, sir.

2    Q.  Is that something that you would leave in a place that it

3    would be made available to law enforcement?

4    A.  No, sir.

5    Q.  Did law enforcement ever get those documents?

6    A.  No, sir.

7    Q.  And does every drug dealer know that?

8    A.  Yes, sir.

9    Q.  You were asked a question about your skill or talent for

10   the Zetas.  Do you recall that?

11   A.  Yes, sir.

12   Q.  And you gave a response that you said honesty was one of

13   them.

14   A.  Yes, sir.

15   Q.  Why did you say that?

16   A.  Because I'm an honest person.  I wouldn't like steal from

17   them.

18   Q.  Okay.  So was that -- is that how you built trust with

19   them and got the work that you've described?

20   A.  Yes, sir.

21   Q.  You also talked about that you had clients and drivers.

22   Do you remember that testimony?

23   A.  Yes, sir.

24   Q.  And for an international organization like the Zetas, is a

25   very important aspect persons that have contacts in the United

Jose Luis Rodriguez - Redirect

1    States, the ability to speak English and to get the product,

2    basically, to market?

3    A.  Yes, sir.

4    Q.  And is that one of the functions that you had for them?

5    A.  Yes, sir.

6    Q.  You were asked questions about the amount of cocaine that

7    you had moved over that whole period of time.  Do you remember

8    that?

9    A.  Yes, sir.

10   Q.  And I think you said it was somewhere around 10,000 kilos?

11   A.  Yes, sir.  Probably.

12   Q.  And at the time that you got arrested for coming into the

13   United States and what you went to trial on and was proved up

14   at trial, that was -- how many kilos was that?

15   A.  Well, I got indicted, but a lot more kilos came up.

16   Q.  Okay.  But how many kilos were you indicted for?

17   A.  112 or 118.  I'm not sure.

18   Q.  Okay.  So somewhere around 120 kilos?

19   A.  Yes.

20   Q.  And how many kilos came up besides that?

21   A.  Thousands.

22   Q.  Okay.  And that's what we've learned from you, from you

23   telling us about these activities; is that --

24   A.  Yes, sir.

25   Q.  You were asked a question about whether or not your

Jose Luis Rodriguez – Redirect

1   testimony that you have given is only backed up by your own

2   words.  Do you remember that?

3   A.  Yes, sir.

4   Q.  Okay.  And so, for example, you testified that Victor Cruz

5   and his wife were killed, right?

6   A.  Yes, sir.

7   Q.  If somebody else testifies about that, then it's not just

8   your word; would you agree?

9   A.  Yes, sir.

10  Q.  If there are other accounts of that person's

11  disappearance, that would be evidence that's not just your

12  word; would you agree?

13  A.  Yes, sir.

14  Q.  If the person has never been seen since and the persons

15  close to them and that know them say that no one's ever seen

16  them again, that's something else that tends to show that's

17  true.  That's not just your word; is that true?

18  A.  Yes, sir.

19  Q.  You were asked a number of questions about your case and

20  having had a life sentence and that the only way you can

21  reduce it now is by doing what you're doing.  Do you remember

22  those questions?

23  A.  Yes, sir.

24  Q.  And it's true, you hope to reduce your sentence and get

25  out of jail some day, correct?

Jose Luis Rodriguez – Redirect

```
 1   A.  Yes, sir.
 2   Q.  Okay.  It's also true that learning about the people that
 3   are on Government's Exhibit 158 only comes from people like
 4   you --
 5   A.  Yes, sir.
 6   Q.  -- is that true?
 7   A.  Yes, sir.
 8   Q.  So we could let the likes of Danny and Cien and Metro and
 9   all of those folks go, or we can talk to folks like you to
10   find out about it; is that true?
11   A.  Yes, sir.
12   Q.  And so we've done that in your case; is that correct?
13   A.  Yes, sir.
14   Q.  And so -- and we've done that with a number of various
15   people that are on this chart; is that true?
16   A.  Yes, sir.
17   Q.  So one of the folks that you talked to us about was this
18   Keko, or Sergio Heredia, right?
19   A.  Yes, sir.
20   Q.  And he was charged with a ten-to-life case, looking at the
21   same stuff you were, right?
22   A.  Yes, sir.
23   Q.  And because of that, he is guilty now and in jail, right?
24   A.  Yes, sir.
25   Q.  And you also talked about this guy, Ezekiel Rodriguez?
```

Jose Luis Rodriguez – Recross

```
1    A.  Right there, to the right.

2    Q.  Okay.  This guy, Cheque, right?

3    A.  Yes, sir.

4    Q.  And you gave information about him?

5    A.  Yes, sir.

6    Q.  And just so the jury knows, is this a guy that moved

7    thousands and thousands of kilos of coke also?

8    A.  Yes, sir.

9    Q.  And is this a guy that was found in San Antonio?

10   A.  Yes.  He was caught here in San Antonio.

11   Q.  And is he in prison for 35 years now because of your

12   assistance?

13   A.  Yes, sir.

14   Q.  And there are a number of other people that aren't even --

15   that are in indictments that you have assisted on that aren't

16   even on this chart?

17   A.  Yes, sir.

18   Q.  And finally, you were asked questions about who makes the

19   decision of whether or not you are going to get a reduction in

20   your sentence or not.  Do you remember that?

21   A.  Yes, sir.

22   Q.  And I can make recommendations to the Court.  You

23   understand that?

24   A.  Yes, sir.

25   Q.  And in the Rule 35 that we have talked about before, I
```

Jose Luis Rodriguez - Recross

1  told them about -- I told the judge about the very things that
2  you and I just discussed with Keko and Cheque and others,
3  correct?
4  A.  Yes.
5  Q.  But, ultimately, who makes the decision of whether or not
6  that is sufficient to warrant -- or substantial to warrant a
7  departure in your case?
8  A.  The judge.
9          MR. LEACHMAN:  Pass the witness.
10         THE COURT:  Anything else?
11         MR. CAVAZOS:  Yes, Your Honor.
12                   *-*-*-*-*-*-*-*
13               RECROSS EXAMINATION
14  BY MR. CAVAZOS:
15  Q.  I want to go back to that conversation where you called
16  Danny and you asked specifically about Abascal, and the word,
17  the term "we."
18         You don't know who was in that room or that place
19  where Danny was when he was having that conversation with you,
20  correct?
21  A.  Correct.
22  Q.  So when he used that word "we," you are assuming and
23  concluding that he was talking about Marciano, right?
24  A.  Well, of course, because he had participation in
25  everything Danny did.

Jose Luis Rodriguez – Recross

```
 1   Q.  Well, that is an assumption on your part.
 2   A.  No.  I was a witness in a lot of things they acted
 3   together.
 4   Q.  Were you with them all the time?
 5   A.  No, sir.
 6   Q.  Okay.  So you don't know what they did independent of each
 7   other, do you?
 8   A.  No, sir.
 9   Q.  So, again, isn't it your own conclusion that you have
10   drawn, when you use the word "we," to include Marciano in that
11   event --
12   A.  Well --
13   Q.  -- correct?
14   A.  -- when I say "we," it is the circle, because Abascal was
15   working for our circle, for our circle and --
16   Q.  So did "we" include you?
17   A.  No, no, no.  He said "we."  I wasn't -- I was over here,
18   on the other side of the phone.
19   Q.  I mean, it wasn't just you three, right?  There were other
20   people, correct?
21   A.  Yes.
22   Q.  So how could "we" be limited just to him, just to
23   Marciano?
24   A.  It is more --
25   Q.  That is your definition, isn't it?
```

Jose Luis Rodriguez – Recross

```
 1   A.  Yes, sir.
 2   Q.  Thank you.  Now, when you talked about Villarreal and his
 3   money and he using your money, his business was what?
 4   Exchanging money, right?
 5   A.  Yes, sir.
 6   Q.  So what did he need to exchange for pesos?
 7   A.  Dollars.
 8   Q.  And what did you give him?
 9   A.  Dollars.
10   Q.  And he made a profit off of that transaction with the
11   customers that came to his store, right?
12   A.  Yes, sir.
13   Q.  So he was making money with your money, wasn't he?
14   A.  Yes, sir.
15   Q.  Now, let's talk about the plaza bosses and giving
16   permission to kill.  You testified, on direct and on cross,
17   that you had nothing to do with any killings or picking up
18   people.  You always went home or you got scared and you left,
19   right?
20   A.  Yes, sir.
21   Q.  So how do you know about the details --
22   A.  Because --
23   Q.  -- other than having heard from others?
24   A.  Because I was with them.  I was part -- I was part of that
25   organization.
```

Jose Luis Rodriguez – Recross

1   Q.  Yes.  But you weren't with them.  You were at home with

2   your family or you were elsewhere when supposedly these things

3   were taking place.

4           So how can you sit there today and say that you have

5   personal knowledge of the details associated with individual

6   killings?

7   A.  Because they wanted me to give up names.  They wanted me

8   to give up houses, sir.

9   Q.  Were you present when anyone was killed, yes or no?

10  A.  No, sir.

11  Q.  Were you present when anyone was kidnapped?

12  A.  No, sir.

13  Q.  Yes or no?

14  A.  No, sir.

15  Q.  You were asked if Marciano procured the killing of

16  Severino.  What does that term mean to you?

17  A.  What does the word "procure" mean?

18  Q.  Well, that was the question that was asked of you, and you

19  agreed with it.  What does it mean to you?

20  A.  Assisted?

21  Q.  I don't know.  What does it mean to you?

22  A.  Can you repeat the question again?

23  Q.  What does the word "procure" mean to you --

24  A.  That was --

25  Q.  -- as it was said in the question --

Jose Luis Rodriguez - Recross

1    A.   That wasn't the question you asked me.  You asked me

2    another that had the word "procure."  You asked me a question.

3    Q.   Okay.  The question that was asked of you, not by me, but

4    was asked of you was, "Did Marciano procure the killing of

5    Severino?"

6    A.   Yes, sir.

7    Q.   And you said, "Yes."  What does the word "procure" mean to

8    you?

9    A.   Assisted.

10   Q.   You were arrested in 2011, correct?

11   A.   Yes, sir.

12   Q.   And in 2011, who was the plaza boss?

13   A.   Daniel and Enano.

14   Q.   Okay.  So how is it that you were able to testify that

15   Marciano became the plaza boss after Danny if you were no

16   longer in Piedras or associated with the Zetas?

17   A.   Because I have -- my mother-in-law has a relationship with

18   one of -- with Beto Casas, Sr., and I have contact with my

19   mother-in-law.

20   Q.   So is your mother-in-law a Zeta?

21   A.   No, sir.

22   Q.   Is she involved in the drug dealings?

23   A.   No, sir.

24   Q.   Is she present at the meetings where people are going to

25   be killed and the plan is being made?

Jose Luis Rodriguez - Recross

1   A.  No, sir.

2   Q.  So she is not privy to any of the inner circle involving

3   the Zetas, right?

4   A.  Yes, sir.

5   Q.  But yet she knows who the plaza boss is?

6   A.  Yes, sir, because Beto Casas is a high-ranked drug dealer.

7   Q.  And he goes to -- who is it that he goes and tells all of

8   this to?

9   A.  To my mother-in-law.

10  Q.  To your mother-in-law?

11  A.  They have 30 years of relationship.  They talk about

12  everything.

13  Q.  All right.  Is that smart for a criminal to be telling a

14  common person, a woman, the inner workings of a major drug

15  organization?  Does that make any sense to you?

16  A.  Well, their relationship is very close, so, yes.

17  Q.  We have got to rely on your word, right?

18  A.  Yes, sir.

19  Q.  Okay.  You said your special skill was being an honest

20  person?

21  A.  Yes, sir.

22  Q.  Does that make a good drug dealer, being an honest person?

23  A.  Yes, sir.

24  Q.  So is Cien an honest person?

25  A.  They left me behind, so I don't know if that is honest.

Jose Luis Rodriguez – Redirect

1    Q.  Is Lazcano an honest person?

2    A.  I never met Lazcano, so I wouldn't -- I wouldn't tell you

3    if he's honest or not.

4    Q.  Is Danny an honest person?

5    A.  No.  He left me behind too.

6    Q.  So he is dishonest because he left you behind?

7    A.  Yes, sir.

8    Q.  Well, what does "being honest" mean to you?

9    A.  From -- that you are going to be always there.  You are

10   always going to speak the truth, and the words that come out

11   of your mouth, you are going to -- you are going to follow

12   what you speak.  You are going to act on what you speak.

13   Obedient.

14   Q.  You are teaching and you are educating the government

15   about the roles and the responsibilities and the actions of

16   the people on this chart, correct?

17   A.  I am just giving them information.  I cannot be a teacher

18   for them, because they -- they have other people also

19   cooperating, so --

20   Q.  Well, wasn't it just said that they are learning a lot of

21   things from you?

22   A.  Yeah.  Yeah.  I am giving cooperation.

23   Q.  Right.  You are giving them information, and they are

24   learning things from you --

25   A.  Yes.

Jose Luis Rodriguez – Redirect

1   Q.  -- right?

2   A.  Yes.

3   Q.  And what is it that you are giving them?  Your word,

4   right?

5   A.  Yes.  Yes.

6   Q.  And that's all you are giving them, right?

7   A.  Yes.

8   Q.  And that's all you have given this jury, correct?

9   A.  Yes, sir.

10              MR. CAVAZOS:  Thank you, Judge.

11              THE COURT:  Anything else?

12              MR. LEACHMAN:  Yes, Your Honor.

13                    *-*-*-*-*-*-*-*

14                 REDIRECT EXAMINATION

15  BY MR. LEACHMAN:

16  Q.  A few short follow-up questions, Mr. Rodriguez.  The

17  conversation on the phone with Chano and Danny Menera, do you

18  know for a fact that there were two people present when you

19  made that phone call?

20  A.  Yes.

21  Q.  And who are those two people?

22  A.  Chano and Danny.

23  Q.  So when Mr. Menera tells you "we," you know it could be

24  more than two people, but are you sure that at least two

25  people are a part of that "we"?

Jose Luis Rodriguez – Redirect

```
 1                MR. CAVAZOS:  Objection.  Leading, Your Honor.
 2                THE COURT:  That is overruled.
 3                THE WITNESS:  Yes, sir.
 4   BY MR. LEACHMAN:
 5   Q.  You were asked some question about what it means to
 6   procure.  Do you remember those questions?
 7   A.  Yes.
 8   Q.  And you said "assisted."
 9   A.  Yes.
10   Q.  Did the meeting that Danny Menera, Chano, Vecino had that
11   you were at, did that meeting cause the murder of Severino
12   Abascal to happen?
13   A.  Yes, sir.
14   Q.  Is that what brought forth the murder of Severino Abascal?
15   A.  Yes.
16                MR. CAVAZOS:  Objection.  Speculation, Judge.
17                THE COURT:  Overruled.
18   BY MR. LEACHMAN
19   Q.  Your answer?
20   A.  Yes, sir.
21   Q.  You were asked questions about Chano being the plaza boss
22   after the fact, and you talked about your mother-in-law.  Do
23   you remember that?
24   A.  Yes, sir.
25   Q.  Did you also have personal conversations with Chano after
```

Jose Luis Rodriguez – Recross

```
 1   the fact from the jail?
 2   A.  Yes.  From the Mexican prison, yes.
 3   Q.  Okay.  And at that point in time, who was the plaza boss?
 4   A.  Danny.
 5   Q.  Okay.  So Chano wasn't yet the plaza boss then?
 6   A.  No, sir.
 7   Q.  Okay.  And you talked about, earlier about your -- about
 8   what made you a good member of the organization.  Do you
 9   remember that?
10   A.  Yes, sir.
11   Q.  And when you are talking about especially the drug portion
12   of drug trafficking -- and I am talking about the movement of
13   drugs, fronting of drugs, things like that -- is honesty an
14   important attribute in that?
15   A.  Yes.
16   Q.  When you are talking about people that are sicarios or
17   plaza boss, is it a different skill set that is important for
18   those folks?
19   A.  Yes, sir.
20   Q.  Is how vicious you are actually a valuable attribute when
21   you are looking at those positions?
22           MR. CAVAZOS:  Leading, Your Honor.
23           THE COURT:  That is sustained.  And now we are
24   exceeding the scope of the last cross.  We didn't talk about
25   sicarios last time.
```

Jose Luis Rodriguez – Recross

1          MR. LEACHMAN:  I will pass the witness.

2          THE COURT:  Anything based on those?

3          MR. CAVAZOS:  Just a few questions.

4          THE COURT:  It has got to be based on this last set.

5          MR. CAVAZOS:  Yes, Your Honor.

6                    *-*-*-*-*-*-*-*

7                    RECROSS EXAMINATION

8    BY MR. CAVAZOS:

9    Q.  You just testified that you had personal contact with

10   Marciano while you were in the Mexican jail, correct?

11   A.  Yes, sir.

12   Q.  Didn't you just tell me earlier that the only person that

13   you were having contact with was Hugo?

14   A.  Hugo?  Hugo con -- I contact Hugo, and he told me to call

15   Chano, because there was a problem with our provider in the

16   United States.

17   Q.  Why didn't you tell us that earlier?  Are you being honest

18   with us today?

19          MR. LEACHMAN:  I object to that.  He is

20   mischaracterizing his testimony.

21          THE COURT:  Sustained.  Ask a question.

22   BY MR. CAVAZOS:

23   Q.  Do you know for a fact that there was only two people,

24   Danny and Marciano, when you were talking to Danny on the

25   phone and the subject of Severino was discussed?  Do you know

```
 1    that for a fact?
 2    A.  The fact that there was them two?
 3    Q.  No.  Do you know that there were only them two?  Do you
 4    know that for a fact?
 5    A.  No.
 6    Q.  I am sorry?
 7    A.  No.  It's only he answered, and then he passed the phone.
 8    Q.  But do you know for a fact that they were the only two
 9    present when you were having that conversation?
10    A.  No, sir.
11              MR. CAVAZOS:  Thank you.  Nothing further.
12              MR. LEACHMAN:  Nothing further of this witness, Your
13    Honor.
14              THE COURT:  And you may -- is there any further need
15    for this witness?
16              MR. LEACHMAN:  No.  We would ask he be excused.
17              MR. CAVAZOS:  No objection, Your Honor.
18              THE COURT:  Then he can be excused, and the witness
19    may step down.
20              Ladies and gentlemen, we will take our morning
21    break.
22              (Brief recess.)
23              MR. CAVAZOS:  If we could approach for a second.
24              THE COURT:  Yes.
25              (Bench conference, as follows:)
```

1            MR. CAVAZOS:  I have just been informed by the

2     marshals that Lucero Vasquez is now here in San Antonio.

3     Obviously, I haven't had a chance to talk to her since she's

4     been in Del Rio.

5            She's on my witness list, and I wanted to bring

6     certain evidence in through her.  But because of the testimony

7     that Lilia Martinez gave and the implication of a phone number

8     that's related to her coming out, I don't want to be

9     responsible for bringing a witness on the stand that is going

10    to take the Fifth, because she's got a revocation hearing that

11    she's being held on.

12           I don't know if she needs a lawyer.  I don't know --

13    I don't know if I am in a position to talk to her, because she

14    has that revocation.  We are trying to find out if she has an

15    attorney appointed.

16           THE COURT:  Well, let's take it one step at a time.

17    She's also on the government's witness list.  So are you going

18    to call her?

19           MR. LEACHMAN:  Probably not.

20           THE COURT:  So --

21           MR. CAVAZOS:  And right now, I am talking to my

22    client to try to figure how else can I get what I wanted to

23    get in through Lucero without Lucero, because we may not have

24    an issue, and that's going to require me revisiting with some

25    of my witnesses to see if they have any personal knowledge of

1    some of the things that I was going to be using Lucero for.

2            If I am able to do that, then she's a nonissue.  We

3    can just scratch her off my list, and I am assuming the

4    government isn't going to call her.  I don't know.

5            MR. LEACHMAN:  Well, I want her available.  I don't

6    know if I will call her or not.

7            THE COURT:  I mean, so what are you asking?

8            MR. CAVAZOS:  I am just giving you a heads-up that

9    that issue may come up.  And right now, I am trying to

10   determine if an attorney is appointed to her.  I am hoping

11   it's a San Antonio attorney that travels to Del Rio, because

12   she's here, but we are finding that out right now.

13           THE COURT:  I didn't appoint a lawyer for her.

14           MR. CAVAZOS:  Right.

15           THE COURT:  So I am assuming she had some lawyer

16   yesterday on whatever Del Rio proceeding she had.

17           MR. CAVAZOS:  Exactly.

18           COURTROOM DEPUTY:  I am trying to find out.

19           THE COURT:  Who that lawyer is, I have no idea.

20           MR. CAVAZOS:  Right.  Again, I didn't want you to be

21   surprised with it.  I wanted us to start thinking about that.

22   It may be a nonissue after this evening, when I get a chance

23   to talk to these other witnesses.

24           COURTROOM DEPUTY:  Excuse me.  She says she was not

25   initialed, so nobody has been appointed.

```
1              MR. CAVAZOS:  Is that a problem?

2              MR. LEACHMAN:  Can they employ a San Antonio lawyer?

3    Could we just --

4              THE COURT:  I mean -- well, I can't be appointing

5    any lawyers in her Del Rio case.  I mean, that's not my case.

6    I mean, I could appoint her a lawyer for the limited purposes

7    of this proceeding.  I can do that.

8              MR. CAVAZOS:  Well --

9              THE COURT:  But, I mean, I'm not sure how helpful

10   that's going to be to her or her lawyer, understanding

11   everything that's implicated around her.

12             Who was her lawyer before?

13             MR. CAVAZOS:  Reginald van Wade out of Del Rio.

14             THE COURT:  Well, you know, I guess, first of all,

15   you need to figure out -- I mean, I don't know what questions

16   you intend to ask her.

17             MR. CAVAZOS:  Right.

18             THE COURT:  But if she intends to take the Fifth, I

19   mean, I can't see how that's going to be in the best interests

20   of your client, for her just to come up here and take the

21   Fifth.

22             MR. CAVAZOS:  Exactly.  And I think it would be

23   improper for her to do that, when the government gets up and

24   does its cross, that she just shuts down.  That wouldn't be

25   fair to either them or me.
```

1           THE COURT:  So what?  Are you going to try to talk
2   to her sometime or what?
3           MR. CAVAZOS:  Well, I would like to talk to her this
4   evening, but I think, better yet, I would like to talk to the
5   other witnesses to see if I can get what I can through them.
6   And if I can, then it's a nonissue.
7           THE COURT:  Okay.
8           MR. CAVAZOS:  We can just release her and send her
9   back to Del Rio.
10          THE COURT:  Okay.
11          MR. CAVAZOS:  So I have got very limited time, so I
12  am going to use it effectively.  I think my time would be best
13  served focusing on those witnesses first.
14          THE COURT:  Okay.
15          MR. CAVAZOS:  And then that -- because GEO is -- a
16  visit is two hours.  It's an hour wait, usually, for somebody
17  to come down.  It's crazy.  And then, you know, whatever -- I
18  am going to do it that way, with your permission, Judge.
19          THE COURT:  Okay.
20          MR. CAVAZOS:  And I will report back to you in the
21  morning.
22          THE COURT:  Okay.
23          MR. CAVAZOS:  And if I find out tonight, I will send
24  Russ an e-mail, and then I will send your clerk an e-mail as
25  well.

Jaime Abascal Reyna - Direct

```
 1              THE COURT:  Okay.
 2              MR. LEACHMAN:  Just for the record, we want her
 3    held, whether he does that or not.
 4              THE COURT:  I am not releasing her yet, yeah.
 5              MR. CAVAZOS:  Okay.  Fair enough.
 6              THE COURT:  Bring in the jury.
 7              MR. CAVAZOS:  A question, then.  If the
 8    government --
 9              THE COURT:  You can start lining them up.
10              MR. CAVAZOS:  If the government is going to hold
11    her, then do we need an attorney appointed for her, if that
12    situation arises?
13              MR. GALDO:  She's coming from Del Rio, right?
14              THE COURT:  Not yet.  I am not going to appoint a
15    lawyer until I figure out whether one or both of you -- one or
16    the other or both of you are going to call her.  So I am just
17    going to wait for that.
18              MR. CAVAZOS:  Okay.
19              (End of bench conference.)
20              (Jury enters courtroom.)
21              THE COURT:  Please be seated.
22              Your next witness.
23              MR. LEACHMAN:  Your Honor, the United States' next
24    witness is Jaime Abascal.
25              THE COURT:  Where is that person?
```

```
 1              MR. LEACHMAN:  He does need the interpreter, Your
 2   Honor.
 3              THE COURT:  You need to swear the witness in,
 4   please.
 5              COURTROOM DEPUTY:  Would you raise your right hand,
 6   please.
 7              (Oath administered to the witness through the
 8              interpreter.)
 9              THE INTERPRETER:  May the interpreter instruct the
10   witness, Your Honor?
11              THE COURT:  Yes.
12                        *-*-*-*-*-*-*-*
13                      DIRECT EXAMINATION
14   BY MR. LEACHMAN:
15   Q.  Please state your full name for the record.
16   A.  Jaime Abascal Reyna.
17              MR. LEACHMAN:  May I approach the witness, Your
18   Honor?
19              THE COURT:  Yes.
20   BY MR. LEACHMAN:
21   Q.  I am going to show you what is already in evidence,
22   Mr. Abascal, as Government's Exhibit 162, 163 and 164.
23              Do you recognize some of the people depicted in
24   those photographs?
25   A.  Yes.
```

Jaime Abascal Reyna – Direct

1   Q.  Okay.  And Government's Exhibit No. 162, can you tell us

2   who is in that photograph?

3   A.  My son and my son's girlfriend.

4   Q.  Okay.  And how about in Picture No. 163?  Do you recognize

5   any of the persons in that photograph?

6   A.  Yes.

7   Q.  You have got to wait and let the interpreter finish the

8   question before you answer.  Okay?

9   A.  Uh-huh.  Yes.

10  Q.  Okay.  And then also, in 164, do you know those folks?

11  A.  Yes.

12  Q.  And is that your son?

13  A.  My son.

14  Q.  And Cesar Sanchez, you just talked about?

15  A.  Also.

16  Q.  And some other friends of his?

17  A.  Yes.

18  Q.  Okay.  Would you tell us, when was the last time you saw

19  your son?

20  A.  The 11th of September of 2011.

21  Q.  And were you close to your son?

22  A.  Yes.

23  Q.  How –– but prior to September 11th of 2011, how frequently

24  would you see your son?

25  A.  Two or three times a day, but we could call every day.

Jaime Abascal Reyna – Direct

1    Q.  And since September 11th of 2011, have you had any contact
2    whatsoever with your son?
3    A.  No.  None.
4    Q.  Did you also know his girlfriend, Vaneli Luna also?
5    A.  Yes.
6    Q.  And were they -- were they boyfriend and girlfriend, or
7    were they married?
8    A.  She had been living with him for three months.
9    Q.  Okay.  And did you see her frequently also before
10   September 11th, 2011?
11   A.  Yes.
12   Q.  Would she come to cookouts or other events at your house
13   with your son?
14   A.  Yes.
15   Q.  And have you seen Vaneli Luna since September 11th of
16   2011?
17   A.  No.
18   Q.  The person that you identified earlier as Cesar Sanchez,
19   was he a friend of your son?
20   A.  Yes.
21   Q.  And was he also a person that you would see sometimes with
22   your son?
23   A.  Yes.  They worked together.
24   Q.  Okay.  And have you seen Cesar Sanchez since September
25   11th of 2011?

Jaime Abascal Reyna – Direct

1    A.  No.

2    Q.  When your son disappeared, did you make efforts to find

3    his whereabouts?

4    A.  Yes.

5    Q.  Did that include reaching out through a person to --

6    persons associated with the Zeta drug cartel?

7    A.  Yes.

8    Q.  And who was the person that contacted -- that you

9    contacted in order to do that?

10   A.  It was an architect who would fix up houses there in

11   Mexico, who sometimes did some jobs for them.

12   Q.  Okay.  And do you know who he reached out to to try to

13   make contact with the Zetas for you?

14   A.  No.

15   Q.  Do you know a person that goes by the nickname Pollo?

16   A.  Yes.

17   Q.  Is that someone that you worked with in the past?

18   A.  Yes.

19   Q.  And did you know whether or not he had a connection to the

20   Zetas?

21   A.  Well, no.  Well, more or less.  I am not so sure.

22   Q.  Okay.  In any event, did you ever hear anything back from

23   your inquiry that you have just described?

24   A.  Can you repeat the question?

25   Q.  Yes.  Did you ever hear back from this person you asked to

Monserrato Sanchez – Direct

```
 1    look into this, as far as whether they knew where your son

 2    was?

 3    A.  No.

 4    Q.  Mr. Abascal, did you also make attempts to get information

 5    about your son's disappearance from the government in Mexico?

 6    A.  Yes.

 7    Q.  And when did you initially reach out to government

 8    officials there?

 9    A.  After about ten or 15 days after he disappeared.

10    Q.  Okay.  And what did they do?

11    A.  They told me not to go around asking questions about my

12    son, for me to stop doing that.

13              MR. LEACHMAN:  Pass the witness.

14              THE COURT:  Any questions?

15              MR. CAVAZOS:  No, Your Honor.

16              THE COURT:  Mr. Abascal, you may step down.  Thank

17    you, sir.

18              Call your next witness.

19              MR. GALDO:  Monserrato Sanchez.

20              THE INTERPRETER:  Does he need an interpreter?

21              THE COURT:  Does he need an interpreter?

22              MR. GALDO:  No.  These are a series of agents, Your

23    Honor.

24              COURTROOM DEPUTY:  Could you raise your right hand.

25              (Oath administered to the witness.)
```

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Monserrato Sanchez - Direct

1            COURTROOM DEPUTY:  Thank you.  Have a seat.

2                    *-*-*-*-*-*-*-*-*

3                    DIRECT EXAMINATION

4    BY MR. GALDO:

5    Q.  Good morning, sir.

6    A.  Good morning.

7    Q.  Can you please state your name and then spell your first

8    and last name for the record?

9    A.  My name is Monserrato Sanchez, M-o-n-s-e-r-r-a-t-o,

10   S-a-n-c-h-e-z.

11   Q.  And who is your employer?

12   A.  The United States Border Patrol.

13   Q.  How long have you been with the Border Patrol?

14   A.  A little over 13 years.

15   Q.  And are you an agent with the Border Patrol?

16   A.  I am a supervisor Border Patrol agent.

17   Q.  And where are you currently assigned?

18   A.  I am assigned to the Comstock Border Patrol Station in the

19   Del Rio sector.

20   Q.  And how long have you been at the Comstock station?

21   A.  A little over 13 years.

22   Q.  I am going to put up on the screen here -- this is

23   Government's Exhibit 228.  This is a map that's already in

24   evidence.

25            Can you see that, or do I need to bring it up to

Monserrato Sanchez – Direct

1    you?

2    A.  I can make it out, sir.

3    Q.  Okay.  I am going to zoom in --

4          MR. GALDO:  Pardon me, Your Honor.

5    BY MR. GALDO:

6    Q.  So if we are looking at the map, this is Del Rio right

7    here, correct?

8    A.  Yes, sir.

9    Q.  And is that Lake Amistad, just north of Del Rio?

10   A.  That is correct.

11   Q.  And I see Langtry on the map.  Where is the Comstock area?

12   Is it on there?

13   A.  It's -- that would be located right there, where your pen

14   was, where the road comes down south.

15   Q.  For the record, I am --

16   A.  It's going to be at the intersection of those two roads.

17   Q.  For the record, on Government's Exhibit 228, just

18   southeast on the map of -- where it's marked Langtry.

19          Were you working on January 28th, 2013?

20   A.  Yes, sir.

21   Q.  And were you involved in a seizure of about 230 pounds of

22   marijuana that day?

23   A.  Yes, sir, I was.

24   Q.  And can you tell the ladies and gentlemen of the jury how

25   you came to seize that marijuana?

Monserrato Sanchez – Direct

1    A.  On that particular day, a lone individual was apprehended

2    in our area of responsibility.  After he was apprehended, he

3    was being interviewed by our intelligence agents at our

4    station.  During the course of the interview, it became

5    apparent that he was part of a larger group.

6            So I and another agent from our station -- actually,

7    my supervisor -- we went out to an area that we thought he was

8    in or had been in and we started looking.  While we were out

9    there looking, we were later informed that -- in fact, the

10   person being interviewed had made comments that there was

11   possibly narcotics involved, and so we continued looking in

12   the areas where we thought he had been.

13           And my supervisor found foot sign in an area called

14   Cal Creek.  And when he observed the foot sign, I went over

15   there and helped him do sign-cutting activities.

16   Q.  And if I could, what -- first, what is "foot sign"?

17   A.  Foot sign is tracks left by people walking, their tracks

18   left by their shoes.  And sign cutting is what we do.  We

19   track the foot tracks sometimes.  Sometimes they don't leave

20   foot tracks.

21           Sometimes the people walking through an area will

22   crush plants or they will kick over rocks and things of that

23   nature.  And it's a skill that we acquire through practice,

24   where we will -- we are able to locate individuals in terrain

25   by pursuing that kind of a sign.

Monserrato Sanchez – Direct

1    Q.  This area that we are talking about -- basically, am I

2    circling the area that we are talking about?

3    A.  Yes, sir.

4    Q.  What is the terrain like out there?

5    A.  It's extremely rugged, hilly, with a lot of what we call

6    draws, which are like dry creek beds that run off when it

7    rains.  When it does rain, runoff travels through those.

8    It's, as I said, very rocky.  The vegetation varies,

9    everything from cactus, that is low to the ground, to some

10   bushes that are taller than an average man.

11   Q.  A lot of people hanging around out there?

12   A.  Very few people.  It is sparsely populated.  There is a

13   community there named Comstock.  The population is 300.  And

14   the areas where we were looking, it's private property.  There

15   are fences for livestock that -- very little livestock out

16   there, but there's fences.

17        And typically, the only signs or indications that

18   people are out there are either hunters, which, you know,

19   occasionally happens, or people who are attempting to come

20   into the United States illegally.

21   Q.  And not just people, but people bringing things with them,

22   correct?

23   A.  Correct.

24   Q.  And so there's multiple ranches out in that area, correct?

25   A.  There are a few, yes, sir.

Monserrato Sanchez – Direct

1    Q.  Private property?

2    A.  Yes, sir.

3         MR. GALDO:  May I approach the witness, Your Honor?

4         THE COURT:  Yes.

5    BY MR. GALDO:

6    Q.  I am showing you what has been marked for identification

7    purposes as Government's Exhibits 121 and 122.

8         Do you recognize those photographs?

9    A.  Yes, sir, I do.

10   Q.  Are these photographs of the marijuana that was seized

11   that day?

12   A.  That is correct.  Yes, sir, it is.

13   Q.  And do these fairly and accurately depict what was seized?

14   A.  Yes, sir, it does.

15        MR. GALDO:  Your Honor, at this time, the government

16   moves into evidence Government's Exhibit 121 and 122.

17        MR. CAVAZOS:  No objections, Judge.

18        THE COURT:  121 and 122 are admitted.

19   BY MR. GALDO:

20   Q.  So this is Government's Exhibit 121.  This is Government's

21   Exhibit 121, and then this is 122, another shot.

22        Agent Sanchez, is there anything -- and I am

23   pointing at Government's Exhibit 122.  These are shoes

24   strapped to the bags.

25        What can you tell us about shoes on bags?  What's

Monserrato Sanchez - Cross

1    the purpose for those; do you know?

2    A.   The purpose can be anything from trying to throw us off,

3    as far as when we are sign cutting, so that -- we are

4    looking -- for example, we may be tracking a particular type

5    of pattern that's being left by a shoe, and they change out to

6    basically throw us off.  Or it could just be anything, maybe

7    to replace shoes that get worn out on their trek.  It could be

8    any of those things.

9    Q.   And these sacks, these bundles, we will call them, did you

10   put them in a vehicle for -- to have someone else take them

11   back to the station?  Is that what happened to them?

12   A.   They were loaded up -- they were carried -- I carried

13   three of those myself, and another -- my supervisor carried

14   two of them from the Cal Creek area.  We carried them, loaded

15   them into the back of the truck and transported them to the

16   station for processing.

17   Q.   And it was someone else who actually opened up those

18   satchels to see what was inside, correct?

19   A.   Yes, sir.  Someone else actually tested them for the

20   contents.

21   Q.   These are consistent with what you have seen used to

22   traffic marijuana, correct?

23   A.   Yes, sir.  They are.

24         MR. GALDO:  I have no further questions for this

25   witness, Your Honor.

Alejandro Mascorro – Direct

```
 1              THE COURT:  Any cross?
 2              MR. CAVAZOS:  Just one question -- or a few
 3    questions.
 4                      *-*-*-*-*-*-*-*
 5                    CROSS EXAMINATION
 6    BY MR. CAVAZOS:
 7    Q.  Agent Sanchez, did you interview that person that was
 8    arrested?
 9    A.  I did not, sir.
10    Q.  Okay.  Did you search his person?
11    A.  I did not, sir.
12    Q.  Okay.  Did you examine the sacks or the -- that contained
13    the marijuana?
14    A.  Only a cursory examination.
15              MR. CAVAZOS:  Okay.  Nothing further, Judge.
16              THE COURT:  Anything based on that?
17              MR. GALDO:  No, Your Honor.
18              THE COURT:  You may step down.  Thank you, sir.
19              Your next witness.
20              MR. GALDO:  The government calls Alejandro Mascorro.
21              COURTROOM DEPUTY:  Could you raise your right hand,
22    please.
23              (Oath administered to the witness.)
24              COURTROOM DEPUTY:  Thank you.  Have a seat.
25                      *-*-*-*-*-*-*-*
```

Jason Tims – Direct

```
 1                      DIRECT EXAMINATION
 2    BY MR. GALDO:
 3    Q.  Sir, can you please state your name and then spell your
 4    last name for the record.
 5    A.  Alejandro Mascorro, last name is M-a-s-c-o-r-r-o.
 6    Q.  And who is your employer?
 7    A.  United States Border Patrol.
 8    Q.  And are you a Border Patrol agent?
 9    A.  Yes, sir.
10    Q.  How long have you been with the Border Patrol?
11    A.  A little over seven years.
12    Q.  And where are you stationed currently?
13    A.  In the Comstock station, Del Rio sector.
14    Q.  And how long have you been in Comstock?
15    A.  Seven years.
16    Q.  And I want to talk about January 28th, 2013, specifically
17    about a seizure of about 230 pounds of marijuana.  And I want
18    to show you Government's Exhibit 121 that's already been
19    admitted.
20             Are those the bundles that made their way back to
21    the station that day that you saw?
22    A.  Yes, sir.
23    Q.  And did you participate in peeling off these layers of
24    binding to see what was inside these sacks?
25    A.  Yes, sir.  We weighed and processed them.
```

Jason Tims – Direct

```
 1    Q.  And was marijuana inside of those sacks?
 2    A.  Yes, sir.
 3             MR. GALDO:  I have no further questions of this
 4    witness, Your Honor.
 5             THE COURT:  Anything?
 6             MR. CAVAZOS:  No, Your Honor.
 7             THE COURT:  You may step down.
 8             Your next witness.
 9             MR. GALDO:  The government calls Jason Tims.
10             COURTROOM DEPUTY:  Could you raise your right hand,
11    please.
12             (Oath administered to the witness.)
13             COURTROOM DEPUTY:  Thank you.  Have a seat.
14                      *-*-*-*-*-*-*-*
15                      DIRECT EXAMINATION
16    BY MR. GALDO:
17    Q.  Sir, can you please state your name and then spell your
18    last name for the record.
19    A.  Jason Tims, T-i-m-s.
20    Q.  And who is your employer?
21    A.  The United States Border Patrol.
22    Q.  How long have you been with the Border Patrol?
23    A.  Now, 12 and a half years.
24    Q.  And where are you currently stationed?
25    A.  In the Comstock station.
```

Jason Tims – Cross

1  Q.  And how long have you been in Comstock?

2  A.  My whole career.

3  Q.  I am showing you Government's Exhibit 228, which is a map

4  of the area.  I am going to try to zoom in some here.

5          Agent Tims, can you see that map?

6  A.  Yes, sir.

7  Q.  Is that, generally speaking, the area that we are talking

8  about, southeast of Langtry, in this area?  Is that Comstock?

9  A.  Yes, sir.

10  Q.  I am going to direct you to March 13th, 2013.  Did you

11  participate in the apprehension of Jorge De Leon and his

12  father?

13  A.  Yes, sir.  I did.

14  Q.  Can you tell the jury how you came to apprehend those

15  individuals?

16  A.  Yes, sir.  The prior shift had come across some foot sign

17  near the highway.  They were able to track it a little ways,

18  until the oncoming shift, my shift took over.  And me and a

19  few other agents were able to track them, I don't know,

20  approximately another mile or so, until we found them hiding

21  in the brush.

22  Q.  And about how far from the U.S.-Mexico border was that

23  location, approximately?

24  A.  Three or four miles, I would say.

25  Q.  Is that an easy three or four miles walk?

Jason Tims - Cross

```
 1    A.  No, sir.  Not at all.
 2    Q.  What is that terrain like between the border and that
 3    area?
 4    A.  There is a lot of elevation change, a lot of -- lots of
 5    sticky stuff, lots of rocks.
 6    Q.  What do you mean by "sticky stuff"?
 7    A.  Mesquite, cactus, thorns, anything that will poke you or
 8    stick you.  There's a lot of it.
 9    Q.  That's what grows out there, right?
10    A.  Yes, sir.
11    Q.  Was there anything -- whenever you apprehended them,
12    anything that stood out to you in any way?
13    A.  No, sir.  Not at the time.
14    Q.  Did you take him and everything he had on his person or on
15    his back and load him into a car?
16    A.  Yes, sir.  When we caught him, we walked him out to a
17    transport vehicle.  They were then transported to the station.
18              MR. GALDO:  Pass the witness, Your Honor.
19              THE COURT:  Any questions?
20              MR. CAVAZOS:  Yes, Your Honor.
21                        *-*-*-*-*-*-*-*
22                     CROSS EXAMINATION
23    BY MR. CAVAZOS:
24    Q.  Did you identify the individual with some identification
25    when you first apprehended him?
```

Orlando Vara – Direct

```
 1    A.  Did I identify myself or him?

 2    Q.  No.  Him.

 3    A.  No, sir.

 4    Q.  You didn't know who he was?

 5    A.  No, sir.

 6    Q.  He didn't say who he was?

 7    A.  No, sir.

 8    Q.  He didn't say why he was there?

 9    A.  No, sir.

10    Q.  Did he speak to you at all?

11    A.  No, sir.

12              MR. CAVAZOS:  Nothing further, Judge.

13              THE COURT:  Anything?

14              MR. GALDO:  No, Your Honor.

15              THE COURT:  You may step down.

16              Call your next witness.

17              MR. GALDO:  The government calls Orlando Vara.

18              Your Honor, may those three witnesses be excused?

19              THE COURT:  Any need for them?

20              MR. CAVAZOS:  No, Your Honor.

21              THE COURT:  They are excused.

22              COURTROOM DEPUTY:  Could you raise your right hand,

23    please.

24              (Oath administered to the witness.)

25              COURTROOM DEPUTY:  Thank you.  Have a seat.
```

Orlando Vara – Direct

```
1                    *–*–*–*–*–*–*–*

2                 DIRECT EXAMINATION

3    BY MR. GALDO:

4    Q.  Sir, can you please state your name and then spell your

5    last name.

6    A.  Orlando Vara.  Vara is going to be V–a–r–a.

7    Q.  And who is your employer?

8    A.  United States Border Patrol.

9    Q.  And where are you –– or where have you been stationed with

10   the Border Patrol?

11   A.  I have been stationed at the Comstock, Texas station and

12   currently in the Brackettville station.  Also been a part of

13   the HSI Task Force in Del Rio, Texas, Homeland Security

14   Investigations.

15   Q.  As part of your work out in Comstock –– and for the

16   record, I am looking at –– if you'll look at the screen, this

17   is Government's Exhibit 228.  It's the area pictured ––

18   A.  Yes, sir.

19   Q.  –– on that map.  Did you ever come across something called

20   "fake bundles"?

21   A.  Yes, sir.

22   Q.  What are fake bundles?

23   A.  Bundles that we use to, as Border Patrol, put them on the

24   trails of known narcotic routes and just leave them there with

25   cameras or sensors to see if anyone will go pick them up on a
```

Orlando Vara – Direct

```
 1   later date.
 2   Q.  So if a bundle was seized, it may be replaced with a fake
 3   bundle?
 4   A.  Yes, sir.
 5   Q.  And there will be a camera set up?
 6   A.  Yes.
 7   Q.  And did you participate in the arrest of an individual
 8   with the last name of Vara-Martinez?
 9   A.  Yes, sir.
10         MR. GALDO:  May I approach the witness, Your Honor?
11         THE COURT:  Yes.
12   BY MR. GALDO:
13   Q.  I am showing you what has been marked for identification
14   purposes as Government's Exhibit 118, 119 and then 120.
15         On these photographs, is a fake bundle depicted?
16   A.  Yes, sir.
17   Q.  And is Jose Vara-Martinez depicted as well?
18   A.  Yes, sir.
19   Q.  And were these photographs from a trail cam set up taken
20   on January 31st, 2013?
21   A.  Yes, sir.
22   Q.  Do they fairly and accurately depict that, what the trail
23   cam looks like?
24   A.  Yes.
25         MR. GALDO:  At this time, the government moves for
```

Orlando Vara – Direct

```
1    admission of 118, 119 and 120.
2              MR. CAVAZOS:  No objections, Judge.
3              THE COURT:  118, 119 and 120 are admitted.
4              MR. GALDO:  I wish to publish them to the jury.
5    BY MR. GALDO:
6    Q.  This is 119.  And that is Vara-Martinez -- oh, let me zoom
7    out.  Is that Vara-Martinez walking past a fake bundle on the
8    trail cam?
9    A.  Yes, sir.
10   Q.  And this is 118.  Same thing as well, correct, a fake
11   bundle and Vara-Martinez?
12   A.  Yes, sir.
13   Q.  All right.  Now, when you were a -- I believe you said you
14   were a Task Force officer?
15   A.  Yes, sir.
16   Q.  And who is that with again?
17   A.  Homeland Security Investigations.
18   Q.  And what were your responsibilities as an HSI Task Force
19   officer?
20   A.  I conducted -- worked on cases, human smuggling, narcotics
21   smuggling, assisted in helping whatever was needed there,
22   translations.
23   Q.  You said "translations."  Are you a native Spanish
24   speaker?
25   A.  Yes, sir.
```

Orlando Vara – Cross

1  Q.  And you are fluent in both written and verbal Spanish,

2  correct?

3  A.  Yes, sir.

4  Q.  Did you assist Agent Anthony, Tony Livingstone in an

5  investigation into an individual named Calderia and also Jorge

6  De Leon?

7  A.  Yes, sir.

8  Q.  Were you present on March 13th, 2013 when Jorge De Leon

9  was captured and first interviewed?

10  A.  Yes.

11  Q.  Were you, in fact, present for most of -- or all of the

12  early interviews of Jorge De Leon because of your Spanish-

13  speaking ability?

14  A.  Yes, I was.

15  Q.  Was a Blackberry seized from Jorge De Leon on the date of

16  his arrest?

17  A.  Yes, sir.

18        MR. GALDO:  Your Honor, permission to approach the

19  witness.

20        THE COURT:  Yes.

21  BY MR. GALDO:

22  Q.  I am showing you what has been marked for identification

23  purposes as Government's Exhibit 110, which is a large stack

24  of paper with a binder clip, as well as Government's Exhibits

25  125, which contains multiple sheets of paper, and 126, which

Orlando Vara – Cross

```
 1    also contains multiple sheets of paper.
 2              Have you reviewed all three of these documents,
 3    previous to coming to court today, to look at the translation
 4    from Spanish to English in there?
 5    A.  Yes, sir.
 6    Q.  And you -- based on your experience and your knowledge of
 7    Spanish, are these translations accurate translations?
 8    A.  Yes, they are.
 9    Q.  And these are, based on your understanding, data derived
10    from the Blackberry seized from Jorge De Leon, correct?
11    A.  Yes.
12              MR. GALDO:  Your Honor, that's all I have for this
13    witness at this time.
14              THE COURT:  Any cross?
15              MR. CAVAZOS:  Yes, Your Honor.
16                        *-*-*-*-*-*-*-*
17                        CROSS EXAMINATION
18    BY MR. CAVAZOS:
19    Q.  Are you certified as a translator?
20    A.  No, sir.
21    Q.  Did you receive any specialized training as a translator?
22    A.  No, sir.
23              MR. CAVAZOS:  That's all I have, Your Honor.
24              THE COURT:  Anything else?
25                        *-*-*-*-*-*-*-*
```

Orlando Vara – Redirect

```
 1                      REDIRECT EXAMINATION
 2    BY MR. GALDO:
 3    Q.  How long have you been speaking Spanish?
 4    A.  Since when I was two years old, since I was -- first
 5    language.
 6              MR. GALDO:  No further questions, Your Honor.
 7              THE COURT:  Anything based on that?
 8              MR. CAVAZOS:  No, Your Honor.
 9              THE COURT:  You can step down.
10              Your next witness.
11              MR. GALDO:  Government calls Erick Tarango.
12              COURTROOM DEPUTY:  Could you raise your right hand.
13              (Oath administered to the witness.)
14              COURTROOM DEPUTY:  Thank you.
15                      *-*-*-*-*-*-*-*
16                      DIRECT EXAMINATION
17    BY MR. GALDO:
18    Q.  Sir, can you please state your name and then spell your
19    last name for the record.
20    A.  First name is Erick, last name is Tarango, T-a-r-a-n-g-o.
21    Q.  And who is your employer?
22    A.  Homeland Security Investigations, originally Customs
23    Enforcement.
24    Q.  And how long have you been with HSI?
25    A.  Going on ten years now, sir.
```

Erick Tarango – Direct

1    Q.  And where are you currently stationed?

2    A.  I am stationed in Colorado Springs, Colorado.

3    Q.  And where did you -- did you have any prior stations, duty

4    stations?

5    A.  Yes.  I transferred out of Alpine, Texas back in 2011.

6    Q.  Is Alpine, Texas in the Western District of Texas?

7    A.  Yes, it is.

8    Q.  What was your role in a 2012 -- or did you participate in

9    a 2012 time period gun smuggling investigation?

10   A.  Yes, sir, I did.

11   Q.  And were you in Colorado at that point?

12   A.  I was in Colorado.

13   Q.  What was your particular role in that investigation?

14   A.  I was acting as an undercover agent at that time in that

15   investigation.

16   Q.  And why were you an undercover agent?  Any particular

17   skills that you brought?

18   A.  I started my undercover as an agent back in Alpine.  I was

19   certified in 2009.  I continued to work on criminal

20   investigations dealing with narcotics, munitions, alien

21   smuggling and so forth.

22   Q.  Are you a native -- can you speak Spanish fluently?

23   A.  Yes, sir.  I am fluent.

24   Q.  So how did -- this particular investigation involving a

25   load of guns, how did it start?

Erick Tarango - Direct

```
1    A.  I used to have a confidential informant from the west --
2    western -- from West Texas.  He put us in contact with a
3    subject by the name of Enrico Ochoa out of the Acuna area.
4    Q.  And looking at Government's Exhibit 228, this is Del Rio
5    depicted.  Is Acuna right across the river, on the Mexican
6    side?
7    A.  Yes, sir.
8    Q.  So was Ochoa the person that the deal was concluded with?
9    A.  No, sir.  He first put me in contact with the subject
10   Antonio Calderia.  That deal fell apart.  That was early June
11   of 2012.  Continued to negotiate until about October of 2012.
12   Right -- early October, I was introduced to another subject by
13   the first name of Jorge.
14   Q.  And this introduction, is this in person or --
15   A.  No.  This is all telephonic, sir.
16   Q.  Did you personally, as an HSI agent, ever, in this
17   investigation, travel to Mexico to meet with these people?
18   A.  No, I did not.
19   Q.  And why would you not do that?
20   A.  Safety issues, sir.
21   Q.  So you were introduced to Jorge on the phone.  Did you
22   have multiple phone calls with Jorge?
23   A.  Yes.  I had a couple of phone calls with him.  We were
24   negotiating a transaction of him buying AK-47 machine guns
25   from us.
```

Erick Tarango - Voir Dire

```
 1                MR. GALDO:  Your Honor, may I approach the witness?
 2                THE COURT:  Yes.
 3    BY MR. GALDO:
 4    Q.  Agent Tarango, I am first going to hand you what has been
 5    marked for identification as Government's Exhibit 106, which
 6    is a CD in a white sleeve.
 7                Can you take a look at that and see if you recognize
 8    it?
 9    A.  I do, sir.
10    Q.  And how are you able to recognize just any old CD?
11    A.  My initials are on it, sir.
12    Q.  And did you -- were you able to view the contents of that
13    CD?
14    A.  I was.
15    Q.  And what is on that CD?
16    A.  There are two telephonic conversations between myself and
17    a subject by the name of -- first name of Jorge.
18    Q.  And then I also have got Government's Exhibit 107 and 109.
19    Have you seen those exhibits before?
20    A.  Yes, I have, sir.
21    Q.  And what are those?
22    A.  The first transcript is a conversation between myself and
23    the subject Jorge, where we are talking about the type of
24    AK-47s that I am going to sell him.  We are talking whether
25    these AK-47s are capable of taking any type of magazine.  And
```

1    he's asking, mainly asking about the type of extractor that
2    the AK-47 has.  He agrees to send, the subject -- well, the
3    following days to Colorado.  I try to tell him where we are
4    located.  I told him we are in Pueblo, Colorado.
5    Q.  And just briefly -- we can go into detail later, but just
6    briefly, what is in -- what is Government's Exhibit 109?
7    A.  109 is a follow-up call between myself and the subject
8    Jorge.  This was after the arrest of the subjects that were
9    sent up to Colorado to purchase the machine guns.
10   Q.  And are these -- and you have reviewed these yourself,
11   correct?
12   A.  I have, sir.
13   Q.  And are these accurate English versions of the Spanish
14   conversation that took place in Government's Exhibit 106?
15   A.  Yes, they are.
16        MR. GALDO:  Your Honor, at this time, the government
17   moves for admission of 106, 107 and 109.
18        MR. CAVAZOS:  May I ask a question first, Judge?
19        THE COURT:  Yes.
20            *-*-*-*-*-*-*-*
21            VOIR DIRE EXAMINATION
22   BY MR. CAVAZOS:
23   Q.  Officer, did you translate that CD yourself?
24   A.  I did not, sir.
25   Q.  Do you know who did?

Erick Tarango – Direct

```
 1    A.  No.  It is listed, I believe, on the transcript there.

 2    Q.  Okay.  But it is your testimony today that you were

 3    listening to and reading the translation, and they are

 4    accurate?

 5    A.  I do believe they are accurate, sir.

 6    Q.  Are you certified as a translator?

 7    A.  No, I am not certified.

 8            MR. CAVAZOS:  Nothing further, Judge.

 9            THE COURT:  Any objections on 106, 107, 109?

10            MR. CAVAZOS:  No, sir.

11            THE COURT:  106, 107 and 109 are admitted.

12                    *-*-*-*-*-*-*-*

13                CONTINUED DIRECT EXAMINATION

14    BY MR. GALDO:

15    Q.  Agent Tarango, you talked a little bit about this.  Can

16    you explain how the -- you said the deal in Colorado -- how

17    that kind of went down with the purchase of the AK-47s; what

18    happened?

19    A.  Yes, sir.  Prior to the deal, early October, I received a

20    phone call from Jorge.  He said he was going to send some

21    subjects up to Colorado -- to Pueblo, Colorado, to meet us to

22    buy 11 AK-47s.  The set price was $1,000 apiece, so we were

23    going to get $11,000 from these AK-47s.

24            Through phone -- through that time, he puts me in

25    contact with a female that he is sending.  Last name is
```

Erick Tarango – Direct

1    Moncivais.  This female travels along with three -- she is

2    accompanied by three other people.

3            I believe it was her sister, her boyfriend and the

4    sister's husband.  They meet us in Pueblo, Colorado, at which

5    time we meet them at a storage container, where they take

6    possession of the AK-47s.

7    Q.  You said "we," "we meet them."  Who is meeting them?

8    A.  Myself and a second undercover agent, sir.

9    Q.  And was it your intent to sell these people these guns and

10   let them go on their way?

11   A.  They were not going to go away, sir.

12   Q.  All right.  So what happened when they showed up?

13   A.  After they showed -- once they showed up, we had some

14   crates there with the AK-47s.  We opened up the crates.  They

15   were allowed to handle the guns.  At that time, there was some

16   doubt whether they were full automatic machine guns.

17           The female gets on the phone, and she calls -- I had

18   told her, "Well, call Jorge."  She gets on the phone, and she

19   calls the subject Jorge.  I didn't have the last name of the

20   subject.  Finally, she nods her head, "Yeah, they're" -- she

21   says, "They are the right ones."

22           At that point in time, I said, "Okay.  Where is my

23   money?"  She hands me the money.  Myself and the other

24   undercover agent walk out of the storage unit.  At that time,

25   the arrest team goes in and they are placed into custody.

Karl H. Myers, CSR, RMR, CRR - (210) 244-5037

Erick Tarango – Direct

1           MR. GALDO:  May I approach the witness, Your Honor?

2           THE COURT:  Yes.

3   BY MR. GALDO:

4   Q.  This is Government's Exhibit 101, 103 and 104 and 105.  Is

5   101 a photograph of the individual who I believe you said was

6   Moncivais?

7   A.  I believe that is Valia Moncivais, correct.

8   Q.  And then is 103, 104 and 105, are those photographs of the

9   firearms that you all had to do this undercover operation?

10  A.  That is correct.

11  Q.  And are all of these pictures fair and accurate

12  representations of these things we are discussing?

13  A.  Yes, they are, sir.

14          MR. GALDO:  Your Honor, at this time, the government

15  would move into evidence 101, 103, 104 and 105.

16          MR. CAVAZOS:  No objections, Judge.

17          THE COURT:  101, 103, 104 and 105 are admitted.

18          MR. GALDO:  So publish it to the jury.

19  BY MR. GALDO:

20  Q.  This is a picture of the female subject we are talking

21  about, who came up -- Moncivais, I believe?

22  A.  That is correct, sir.

23  Q.  And then this is 103, and that is 104.  And those are

24  photographs of the AK-47 fully automatic weapons that you all

25  had in your possession as part of this undercover operation,

Erick Tarango – Direct

1   correct?

2   A.   Correct.

3   Q.   So in these calls -- the jury will have the disk and the

4   full transcript with them.  But the first call -- if this will

5   focus for me -- we've got -- you are the undercover agent in

6   this transcript, correct?

7   A.   Yes, sir.

8   Q.   And the unidentified male is the person you know as Jorge,

9   correct?

10  A.   That is correct.

11  Q.   And so this is the discussion you were talking about here

12  about what type of firearm this would be, what type of

13  ammunition --

14  A.   That is correct.

15  Q.   -- is that correct?  And then on the bottom here, Jorge

16  says, "All right.  That's all I want, man, because -- then

17  afterwards, here -- no way, man.  They won't count them, and

18  they'll take them away from me.  Understand?"

19          Is that something that he said?

20  A.   Yes, that is.

21  Q.   Did you place another call to Jorge after the arrest

22  occurred?

23  A.   Yes.  A second call was placed, sir.

24  Q.   And what was the purpose, sir?  Why did you place another

25  call?

Erick Tarango – Cross

1   A.  The purpose of this call was to continue communications

2   with Jorge.  We were planning on doing a controlled delivery

3   to Del Rio, but the cooperator at the time, Ms. Moncivais, due

4   to her health, wasn't able to continue forth.

5   Q.  So your plan or hope was to try to continue to move up the

6   chain, correct?

7   A.  That is correct, sir.

8   Q.  But in this -- in your part of the investigation, you were

9   unable to do so, correct?

10  A.  That is correct.

11  Q.  Was there another HSI agent out of another sector that you

12  passed this information on to at another time?

13  A.  Yes.  All of the information was passed on to Special

14  Agent Tony Livingstone.

15  Q.  And why did you give him all of this information?

16  A.  All the information -- after the conflicting -- it came

17  out that we were working the same target, which I later

18  learned that it was Jorge De Leon.

19          MR. GALDO:  Pass the witness, Your Honor.

20          THE COURT:  Anything?

21          MR. CAVAZOS:  Yes, Your Honor.

22                    *-*-*-*-*-*-*-*

23                  CROSS EXAMINATION

24  BY MR. CAVAZOS:

25  Q.  Correct me if I am wrong, but did Moncivais become a

Erick Tarango – Cross

```
1   cooperator after the arrest, or was she cooperating with you
2   from the beginning?
3   A.  That was after the arrest, sir.  That's when she was
4   cooperating.
5   Q.  Did she ever mention the name of Marciano Millan Vasquez?
6   A.  No, sir.
7   Q.  Did Jorge, in any conversation that he had with you,
8   mention the name of Marciano Millan Vasquez?
9   A.  No, sir.
10  Q.  And so through your contact with Agent Livingstone, you
11  were able to confirm that the person that you were speaking to
12  was Jorge De Leon, correct?
13  A.  Yes, sir.  Jorge.
14  Q.  There was no confusion about who you were talking to,
15  correct?
16  A.  No, sir.  Correct.
17  Q.  And was he the only person that you talked to about this
18  load?
19  A.  As far as --
20  Q.  Negotiating the terms of this transaction.
21  A.  As far as agency, you mean, sir, or other people as far as
22  during the negotiations?
23  Q.  Is Jorge De Leon the only person from Mexico that you
24  communicated with in negotiating this deal that turned out to
25  be a seizure?
```

Erick Tarango – Redirect

```
 1   A.  No, sir.  There was -- as I mentioned earlier, Antonio
 2   Calderia as well.
 3   Q.  You spoke with him as well?
 4   A.  Yes, sir.
 5   Q.  And you -- were you able -- did he identify himself by
 6   name?
 7   A.  No.  That was through the subject that introduced us,
 8   Ochoa.
 9   Q.  Ochoa.  And the subject that introduced you was working
10   with you, correct?
11   A.  No, he wasn't.
12   Q.  He wasn't?
13   A.  No.
14   Q.  Were you able to identify that those persons actually
15   exist, were real?
16   A.  Never met with them in person.  It was just through phone
17   analyses that were done and through other offices.
18   Q.  And the phone analysis that was done was -- did any of
19   that information connect Marciano Millan Vasquez to this
20   transaction?
21   A.  Not that I know of, sir.
22          MR. CAVAZOS:  Thank you.  Pass the witness.
23          THE COURT:  Anything based on that?
24                   *-*-*-*-*-*-*-*
25                 REDIRECT EXAMINATION
```

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Anthony Livingstone – Direct

```
 1   BY MR. GALDO:

 2   Q.  Is Calderia C-a-l-d-e-r-i-l-l-a?  Is that correct, for

 3   that spelling of the last name?

 4   A.  Calderia would be C-a-l-d-e-r-i-a, Calderia.

 5            MR. GALDO:  Thank you.

 6            No further questions, Your Honor.

 7            MR. CAVAZOS:  Nothing further, Judge.

 8            THE COURT:  You may step down.  Thank you.

 9            THE WITNESS:  Thank you, sir.

10            THE COURT:  Call your next witness.

11            MR. GALDO:  The government calls Anthony

12   Livingstone.

13            COURTROOM DEPUTY:  Could you raise your right hand.

14            (Oath administered to the witness.)

15            COURTROOM DEPUTY:  Thank you.

16                    *-*-*-*-*-*-*-*

17                    DIRECT EXAMINATION

18   BY MR. GALDO:

19   Q.  Good morning, sir.

20   A.  Good morning.

21   Q.  Can you please state your name and spell your last name

22   for the record.

23   A.  Anthony Livingstone, L-i-v-i-n-g-s-t-o-n-e.

24   Q.  And who is your employer?

25   A.  Homeland Security Investigations.
```

Anthony Livingstone – Direct

1    Q.  And how long have you been with Homeland Security

2    Investigations?

3    A.  I started in 2008.  I originally started in Del Rio,

4    Texas, and recently got transferred up here to San Antonio

5    this year.

6    Q.  Do you have any prior law enforcement experience to that

7    in 2008?

8    A.  Yes.  I was a deputy sheriff in Louisiana, and prior to

9    that, I was military.

10   Q.  Let's -- how about July 12th, 2012?  Did you arrive at a

11   seizure at the Del Rio port of entry on that day?

12   A.  Yes.

13   Q.  And for the jury, can you describe what the Del Rio port

14   of entry is, what that phrase means, "port of entry"?

15   A.  Yes.  That is a bridge, an international bridge between

16   the United States and Mexico, where vehicles and pedestrians

17   come in and they get checked to come into the United States.

18   Q.  And is Del Rio just -- for Del Rio, does it just have one

19   bridge connecting?

20   A.  In Del Rio, yes, and there is another one on the outskirts

21   of town.

22          MR. GALDO:  May I approach the witness?

23          THE COURT:  Yes.

24   BY MR. GALDO:

25   Q.  If you could, these government exhibits, or what's been

Anthony Livingstone – Direct

1    marked for identification as Exhibits 112 through 116, can you

2    just take a second and look through all of those photographs?

3          And do all of those photographs, pictures of what

4    you saw that day, fairly and accurately depict the seizure

5    that you participated in?

6    A.  Yes.

7          MR. GALDO:  Your Honor, at this time, the government

8    would move for the admission of 112 through 116, inclusive.

9          MR. CAVAZOS:  No objection, Judge.

10         THE COURT:  112 through 116 are admitted.

11   BY MR. GALDO:

12   Q.  Who is this in Government's Exhibit 112?

13   A.  It's Griselda Cedillo.  She was encountered at the Del Rio

14   port of entry on that date, driving that vehicle --

15   Q.  Real briefly, which -- when you say "that vehicle," are

16   you talking --

17   A.  Yes.  Let me show it to you.  It's the Dodge pickup.

18   Q.  Government's Exhibit 116, this is the car you are talking

19   about?

20   A.  Yes.  That vehicle was encountered at the Del Rio port of

21   entry and was found to be carrying narcotics hidden within the

22   wheels and inside the vehicle.

23   Q.  This is Government's Exhibit 115.  Can you just -- what is

24   this a picture of?

25   A.  That's the bundles that were hidden inside the backseat.

Anthony Livingstone – Direct

1    That's the back seat of the vehicle that's actually folded up.

2    You can see the bundles inside.  So they try to take a picture

3    before they remove all the bundles.

4    Q.  And how many port-of-entry vehicle seizures have you

5    participated in, witnessed, seen in your time?

6    A.  Probably about 50.

7    Q.  What are some of the places that narcotics were hidden in

8    vehicles at the Del Rio port of entry that you saw?

9    A.  Quarter panels, engine, inside the engine -- the vehicle

10   frame, inside wheels, tires.  Anywhere you can stick

11   something, basically, in the vehicle.

12   Q.  If there's a space, they will -- they will put something

13   inside?

14   A.  Yes.

15   Q.  And then we talked about wheels.  This is Government's

16   Exhibit 114.  Are those the tire that's filled with narcotics

17   as well?

18   A.  Yes.

19   Q.  And this is Government's Exhibit 113.  Are those the

20   packages after they have been taken out?

21   A.  Yes.  And we stack those up, and that's a picture of us

22   taking the samples.  We take ten samples and send those off to

23   the DEA lab.

24   Q.  And so this was just under 50 kilograms of marijuana,

25   correct?

Anthony Livingstone – Direct

1   A.   Yes.   It was the –– the gross weight was over, a little

2   over 50 kilograms, but the net was 46.

3   Q.   And was this particular seizure part of a larger

4   investigation?

5   A.   Yes, it was.

6   Q.   And who was the investigation that –– who were you

7   investigating that the seizure was a part of?

8   A.   Late 2011, we started investigating a subject in Mexico

9   known as Antonio Calderia.

10  Q.   And then was there another person who came on your radar

11  connected to Calderia?

12  A.   Yes.   Another subject named Jorge De Leon was closely

13  associated.   We weren't sure how, but he was on the radar.   We

14  were apprehending people who were walking backpacks of

15  marijuana across into the U.S. that was giving us that name.

16          THE REPORTER:   What was Griselda's last name?

17          THE WITNESS:   Cedillo.

18          THE REPORTER:   Cedillo.

19          THE WITNESS:   C-e-d-i-l-l-o.

20          THE REPORTER:   Thank you, sir.

21  BY MR. GALDO:

22  Q.   Agent Livingstone, this is Government Exhibit 228, and I

23  will zoom in a little bit.   Actually, let me take it out of

24  the plastic.

25          If you could, look at 228, this map.   Do you see Del

Anthony Livingstone – Direct

```
 1    Rio down here?  And is this Lake Amistad?
 2    A.  Yes.
 3    Q.  And is this the area north of Lake Amistad on the border?
 4    A.  Yes.
 5    Q.  Out kind of by the Comstock area?
 6    A.  Uh-huh.
 7    Q.  So you said people were backpacking across.  Is this the
 8    area you are talking about where they were backpacking?
 9    A.  Yes.  That area that we were apprehending some of the
10    people that were giving us that name Jorge De Leon.  And that
11    area was commonly known as the Comstock area.
12    Q.  And you talked about backpacking, and we have this vehicle
13    that we are discussing.
14           Can you talk about the two different methods of
15    getting drugs across in the Del Rio area?
16    A.  Yes.  One of them is, obviously, the vehicle that we just
17    showed.  Another one is the backpacks filled with the same
18    bundles, and they would strap them on their back.  They would
19    either wade through the river, if it's low enough.  If not,
20    they will take a boat through the lake and get dropped off
21    onto this side.
22    Q.  And when we talk about the -- let's talk about both of
23    those things, river and lake.  For those people who haven't
24    been down to the Rio Grande River, that's the river you are
25    talking about, correct?
```

Anthony Livingstone – Direct

1   A.  Yes.

2   Q.  In this area, how big is the Rio Grande River?  How large

3   are we talking about?

4   A.  In some places, maybe only 30 yards wide.  Some places, a

5   little bit larger.  And some places, it's not very deep, maybe

6   just a couple of feet.  You could walk through it.

7   Q.  All right.  And let's talk about Lake Amistad.  Correct me

8   if I am wrong.  If I am looking at this map correctly, it

9   looks like the lake is on both sides of the international

10  border; is that correct?

11  A.  Yes.

12  Q.  Is there a giant metal wall down the middle of the lake

13  separating the U.S. and Mexico side?

14  A.  No.

15  Q.  So how easy is it to go in a boat from Mexico to the

16  United States?

17  A.  Very easy.  You just jump in a boat.  And we -- they don't

18  have enough agents to patrol that whole lake, so as soon as

19  you are in a boat, nobody sees you, you can come to this side

20  very easy.

21  Q.  Let's fast forward to March 13th, 2013.  Can you tell me

22  how you came to be into contact with Jorge De Leon on that

23  date?

24  A.  Yes.  I was contacted by our duty agent, that they had a

25  subject named Jorge De Leon in custody in Comstock.

Anthony Livingstone – Direct

1  Q.  Did you think it was the same Jorge De Leon you were
2  looking into?
3  A.  We weren't sure.  That's one of the reasons why I wanted
4  to go out.  So we went out and initially spoke with Jorge De
5  Leon that evening.
6  Q.  You said "we."  Who went with you?
7  A.  It was me and the person I was working the case with, Task
8  Force Agent Orlando Vara.
9  Q.  And through the interview of -- or was it -- Jorge De Leon
10  was captured as well as his father, correct?
11  A.  Yes.
12  Q.  And through the interview of his father, was the fact that
13  you had the correct Jorge De Leon confirmed?
14  A.  Yes.
15  Q.  On the day of his arrest, did Jorge De Leon admit he was
16  also known as Coco?
17  A.  Yes.
18  Q.  And on that date, did you actually do a thorough, detailed
19  debrief of Jorge De Leon, also known as Coco?
20  A.  We attempted to.
21  Q.  And was there a detailed conversation about everything
22  Jorge De Leon had been involved in on that date?
23  A.  We tried to get into everything that he was involved in,
24  but we got a little bit more out of the father.  There was --
25  he held back quite a bit, but he was adamant about being

Anthony Livingstone – Direct

 1    kidnapped previously.

 2    Q.  Let me show you --

 3              MR. GALDO:  Permission to approach, Your Honor.

 4              THE COURT:  Yes.

 5    BY MR. GALDO:

 6    Q.  Let me show you what has been marked for identification

 7    purposes as Government's Exhibit 123, which is an evidence bag

 8    with a phone inside it, and then Government's Exhibit 123-A,

 9    which is a picture.

10              Can you tell me what 123 and 123-A are?

11    A.  Yes.  123 is -- appears to be the phone that the Border

12    Patrol took off of Jorge De Leon on March 13th, 2013.

13    Q.  And can you do me a favor and look at some markings on the

14    bag to see if you can confirm that it is, in fact, the same

15    Blackberry?

16    A.  Yes.  That's my seal and my signature.

17    Q.  And is this a photograph of that Blackberry?

18    A.  Yes, it is.

19              MR. GALDO:  Your Honor, at this time, the government

20    would move into evidence Government's Exhibits 123 and 123-A.

21              MR. CAVAZOS:  No objection.

22              THE COURT:  123 and 123-A are admitted.

23    BY MR. GALDO:

24    Q.  In regards to the Blackberry, did you attempt to extract

25    the digital information that was found on that phone?

Anthony Livingstone – Direct

1   A.  We did.  We received consent to search the phone, and we

2   attempted to extract data locally at our office using a

3   machine.  We were not very successful in getting all of the

4   information from that phone.

5   Q.  So Jorge De Leon gave you consent to search the phone --

6   A.  Yes.

7   Q.  -- correct?  Was there a follow-up forensic examination

8   done of that Blackberry?

9   A.  Yes.

10  Q.  And who did you send the phone to for that exam to be

11  done?

12  A.  We have a computer forensics agent here in San Antonio

13  that I took it to, and his name is James Beard, with Homeland

14  Security.

15  Q.  Was the amount of information that he was able to recover,

16  did it greatly exceed what your local efforts were able to

17  glean from the phone?

18  A.  Yes.  He was able to recover deleted items, which

19  75 percent, I would say, roughly, of what he recovered was

20  previously deleted.

21  Q.  And did you then have the information that was in the form

22  of text messages and Blackberry messages translated by people

23  in your office?

24  A.  Yes, we did.

25          MR. GALDO:  Permission to approach.

Anthony Livingstone – Direct

1          THE COURT:  Yes.

2    BY MR. GALDO:

3    Q.  I will show you what has been marked for identification

4    purposes as Government's Exhibits 110, and then 125 and 126.

5          Are these, I will call it, a more readable format

6    version of the digital information found, that was recovered

7    by Agent Beard from the phone?

8    A.  Yes.

9    Q.  As well as an English translation of the Spanish?

10   A.  Yes.

11   Q.  Was there particular information -- strike that.

12         After the information was retrieved from the phone

13   and recovered, the deleted information, were the Blackberry

14   messages and text messages shown to Jorge De Leon in an effort

15   to understand some of the messages?

16   A.  Yes, they were.

17   Q.  And was some of the information related -- was some of the

18   information you found on the phone related to other known

19   targets that you were looking at?

20   A.  Yes.

21   Q.  Who do those targets include?

22   A.  Some of the known targets were Alfredo Andrade, which -- a

23   known smuggler in Mexico, had several investigations that were

24   on him.  Another person named Kellogg.  There was one

25   person -- we related some phone content from Jorge De Leon's

Anthony Livingstone – Direct

1    phone that was linked to a gun seizure in Eagle Pass.  Another

2    one, he had a phone number for, Vara-Martinez, who was in

3    Comstock, caught on camera looking for abandoned marijuana.

4    Q.  Okay.  Were there also conversations about an individual

5    called Calderia on the phone?

6    A.  Yes.  Several.

7    Q.  And what about someone named Raulito or discussions about

8    someone you found out to be Raulito?

9    A.  Yes.

10   Q.  Was there anything on that phone that you saw that led you

11   to take further steps to try to investigate a potential

12   kidnapping?

13   A.  Yes.

14   Q.  Were there discussions with Jorge De Leon about multiple

15   murders that he witnessed?

16   A.  Yes.  And that was at the beginning, whenever we first

17   started talking to him.  He was very adamant about being

18   kidnapped, and he witnessed several murders while he was

19   kidnapped.  And there were several names that he mentioned,

20   back in 2013, was Chano and several others.

21   Q.  Were there attempts made to -- even though he had been

22   kidnapped -- to try to locate some of those areas where the

23   murders occurred?

24   A.  Yes.  We sat down with him with a laptop and tried to

25   geo-locate the lat and longs for each location, and sent that

Anthony Livingstone – Cross

1    to the HSI attache in Mexico to see if they could identify the

2    locations.

3    Q.  And was that information passed on -- was the intent of

4    that step to pass that information on to the government of

5    Mexico?

6    A.  Yes.

7    Q.  Has there been any response to HSI, as far as you know?

8    A.  No.  The only response we got was, some of the places

9    couldn't be located.  And some of the places that they could

10   locate, the police were not willing to go in that area.

11   Q.  Did you receive information from Eric Tarango and other

12   agents from Colorado HSI about a gun seizure in Colorado?

13   A.  Yes.

14   Q.  Not a gun seizure; an undercover operation involving

15   firearms?

16   A.  Yes.

17   Q.  And that connected to Jorge De Leon, correct?

18   A.  It did.

19   Q.  Was the moniker -- or the nickname in the Blackberry

20   "Chicken 2" identified by Jorge De Leon early in the

21   investigation?

22   A.  Yes, he identified that person as being a person named

23   Chano and later picked him out of a photograph lineup.

24           MR. GALDO:  I will pass the witness, Your Honor.

25           THE COURT:  Any questions?

Anthony Livingstone - Cross

```
 1              MR. CAVAZOS:  Yes, Your Honor.
 2                    *-*-*-*-*-*-*-*
 3                  CROSS EXAMINATION
 4   BY MR. CAVAZOS:
 5   Q.  You just spoke about an HSI attache in Mexico.
 6   A.  Yes, sir.
 7   Q.  Does HSI have agents throughout Mexico?
 8   A.  We have attaches and assistant attaches, not throughout
 9   Mexico, in certain locations, that help out with our
10   investigations.
11   Q.  Is there one assigned to the Piedras Negras area?
12   A.  No, I don't believe so.
13   Q.  What would be the nearest assignment to Piedras Negras?
14   A.  I think we went through Monterrey.
15   Q.  Monterrey.  And did you have direct contact with this
16   attache in Monterrey --
17   A.  I did.
18   Q.  -- concerning this case?
19   A.  Yes.
20   Q.  And what information did you relay to him?
21   A.  We tried to give him the locations as we could best
22   describe them, the lat and longs, what they looked like, and
23   we sent that information to him.
24   Q.  Lat and longs?
25   A.  Yes.  Latitude and longitude on -- like on a map.
```

Anthony Livingstone – Cross

1    Q.  Okay.  So you gave him specific locations, correct?

2    A.  We attempted to, yes.

3    Q.  And do you know what he did with that information?  If you

4    know.

5    A.  No, I don't.

6    Q.  Did you later learn that he himself went personally to

7    those locations to determine if they were -- if they actually

8    existed, these longitude and latitude locations, if they

9    related to a building or a location that was described with

10   some detail by Jorge De Leon?

11   A.  No.  He himself didn't go.

12   Q.  Do you know whether he assigned someone that task?

13   A.  I believe he -- I am not real sure exactly, but I believe

14   it was passed to maybe the Mexican government, but I can't say

15   for sure.

16   Q.  Okay.  And you just talked about Jorge De Leon identifying

17   Marciano from a photo lineup?

18   A.  Yes, sir.

19   Q.  Okay.  But with respects to the contact -- I believe it

20   was called "Chicken 2"?

21   A.  Yes.

22   Q.  What information corroborated the linkage between

23   Chicken 2 and Marciano, as told to you by Jorge De Leon?

24   A.  I believe there was a text message found with Chano --

25   Chano's name in it.

Anthony Livingstone – Cross

```
 1    Q.  And how Chano's name ends up in that text message, can you
 2    share that with us?
 3    A.  I would have to review the text messages.
 4    Q.  But other than that, was there any phone record
 5    verification or any other type of corroboration that would
 6    confirm that Chicken 2, as identified by Jorge De Leon, was
 7    connected to Marciano Millan Vasquez?
 8    A.  No.  It was very difficult to get phone records from a
 9    Mexico phone.
10    Q.  So is your answer no?
11    A.  Yes.
12    Q.  So up to this point, you are relying on Jorge De Leon's
13    information to you, correct?
14    A.  Him and his father.  His father said the same thing.
15    Q.  Okay.  But up to this point, that's what you are relying
16    on, is what they are telling you, correct?
17    A.  Yes.
18    Q.  And now that you have completed your investigation, is
19    that still the basis of your connection between this Chicken 2
20    and Marciano Millan Vasquez?
21    A.  Yes.
22    Q.  You testified that, when you first encountered Jorge De
23    Leon, he wasn't very cooperative, right?
24    A.  Correct.
25    Q.  Was he, in fact, deceitful in some of the responses that
```

Anthony Livingstone – Cross

1  he was giving you, when you compared what he was saying to

2  that of what his father was saying?

3  A.  Yeah.  He was trying to hold back his involvement in what

4  he's been doing.

5  Q.  So he wasn't being truthful, correct?

6  A.  Correct.

7  Q.  Okay.  The only one that seemed to be cooperative was his

8  father?

9  A.  Yes.

10  Q.  And -- but there was one thing that you said that he

11  wanted to make sure that he got across to you, and that was

12  that he had been kidnapped?

13  A.  Correct.

14  Q.  Why was that so important to him?

15  A.  He didn't want to go back to Mexico.  He feared for his

16  life.

17  Q.  Okay.  So was he making what is called a credible fear

18  claim --

19  A.  Yes.

20  Q.  -- with immigration officials, which you are?

21  A.  Yes.

22  Q.  And what procedures does that trigger on your part?

23  A.  It didn't really trigger -- I mean, normally, it would be

24  a different case.  But in his case, we were looking at him for

25  narcotics smuggling, so he was placed under arrest for that.

Anthony Livingstone – Cross

1  Q.  What would normally happen?

2  A.  He would be placed with a notice to appear in front of an

3  immigration judge, and he would either be returned to custody

4  of his family members, if he had any in the United States; if

5  not, he would be placed in holding until he could see that

6  judge.

7  Q.  And the purpose of that is to give him an opportunity to

8  explain the basis for his fear and whether it's legitimate or

9  not, right?

10  A.  Yes.

11  Q.  And that process takes sometimes months or years to occur,

12  correct?

13  A.  Yes.

14  Q.  And a lot of the times, the people that are being held

15  under that status are given either a personal recognizance

16  bond or some form of monetary bond and placed with a family

17  member, right?

18  A.  Correct.

19  Q.  And that's what -- exactly what Jorge De Leon was trying

20  to seek from you when he was making sure that you understood

21  that he was claiming he had been kidnapped, correct?

22  A.  I don't believe he was trying to seek for that.

23  Q.  But, in fact, that's what normally would have happened,

24  right?

25  A.  Normally, yes, if he wasn't the subject of another

Anthony Livingstone - Cross

```
 1   investigation.
 2   Q.  So all that you and I can do is guess as to why he may
 3   have focused on that and been deceitful about everything else?
 4   A.  Yes.
 5   Q.  The names in the phone, you mentioned Alfredo Andrade, a
 6   guy named Kellogg, Vara-Martinez -- Calderaria?  I may be
 7   mispronouncing that.
 8   A.  Calderia.
 9   Q.  -- Calderia and Raulito?
10   A.  Yes, sir.
11   Q.  All right.  Up until Jorge De Leon started talking about
12   Chano, was he on your radar, as these other people were?
13   A.  Yes.  We had heard of him.
14   Q.  You had heard of him?
15   A.  Yes, sir.
16   Q.  But you didn't know who he was?
17   A.  Yes.  I believe we had the full name back then.  Jorge De
18   Leon didn't know his full name.  He only knew him as Chano.
19   Q.  Okay.  So does that -- as an investigator, does that
20   indicate to you that he may not be as close to this person or
21   as familiar with this person, because he doesn't know him by
22   full name, right?
23   A.  Not necessarily.  I've worked several investigations.  A
24   lot of people just know them by nicknames.
25   Q.  You said that you had difficulty understanding the
```

1   messages.  What was the basis of that difficulty?  Was it a

2   translation issue?  Word usage?  What was it that was

3   confusing?

4   A.  At what point did I say that?

5   Q.  When you were asked if you had reviewed the text

6   translations and if you had had difficulty understanding some

7   of the messages.

8   A.  Yeah.  All of the messages were in another language, so I

9   would have somebody else translate it.

10  Q.  Oh.  Okay.  That's what you meant.  Okay.  I thought maybe

11  after the --

12  A.  No.  I just wanted to verify when I said it --

13  Q.  So after they were translated, you had no difficulty

14  understanding what was being communicated?

15  A.  Still, even whenever they are translated, it's a little

16  broken, because they are using slang, so it's hard to

17  translate.  So some of them are a little difficult to read.

18  Q.  Okay.  And obvious, by your response, you are not fluent

19  in Spanish, right?

20  A.  Correct.

21  Q.  So you had the messages in Spanish translated into

22  English, correct?

23  A.  Yes, sir.

24  Q.  Do you know who did that?

25  A.  Yes.  We had several people from my office that are native

1    Spanish speakers and translated those for us.

2    Q.  Do you know whether any of those persons are certified

3    translators?

4    A.  No, I don't know.

5    Q.  Does HSI have certified translators available to them?

6    A.  Yes.

7    Q.  They weren't used in this case?

8    A.  No.

9    Q.  Okay.  You talked about your office doing an extraction,

10   and you really weren't able to get much info, correct?

11   A.  Correct.

12   Q.  And that was because of the deletions that Jorge had done,

13   correct?

14   A.  Correct.

15   Q.  So Jorge De Leon crosses the border, right?

16   A.  Yes.

17   Q.  He is carrying his cellphone with all of this data and

18   information, right?

19   A.  Yes.

20   Q.  And he is arrested by Border Patrol, right?

21   A.  Correct.

22   Q.  Which is connected with immigration, right?

23   A.  Yes.

24   Q.  And then he makes the credible fear allegation statement,

25   right?

Anthony Livingstone – Cross

1   A.  Correct.

2   Q.  But yet there are a lot of deletions prior -- to his phone

3   prior to he coming to U.S. soil, correct?

4   A.  Yes.

5   Q.  As an investigator, does that raise some concerns to you,

6   about him having information that he wanted you to know about

7   but other information that he did not want you to know about?

8   A.  No.  I am not sure -- I don't think we ever asked him the

9   question if he was the one that deleted the stuff.  I am not

10  sure how our CFA was able to get that deleted information, but

11  there was quite a bit.

12        Some of the information that was deleted was --

13  wasn't really important to an investigation or important to

14  anything, and then some of it was, so I am not sure what the

15  meaning was for deleting some of the items.

16  Q.  Was there -- was the information about this alleged

17  kidnapping deleted?

18  A.  No.

19  Q.  Okay.  So it was something he wasn't concerned about

20  anybody finding out if he was arrested and coming across the

21  border, right?

22  A.  Correct.

23  Q.  Was there information -- well, you were targeting him or

24  you knew about him because he is a drug dealer, right?

25  A.  Correct.

Anthony Livingstone - Cross

```
 1   Q.  And a weapons smuggler, right?
 2   A.  Yes.
 3   Q.  Now, the information that was deleted that Mr. Beard was
 4   able to extract later, was it related to drugs and/or weapons?
 5   A.  Yes.
 6   Q.  So that information he didn't want you guys to know about,
 7   right?
 8   A.  Again, I don't know exactly what was deleted and what
 9   wasn't.  I would have to go back through the phone records to
10   see exactly what we had on hand and what was able to be
11   recovered.
12   Q.  Okay.  How many months passed before Jorge De Leon decided
13   to sit down and talk to you guys?
14   A.  We had talked to him as soon as possible.  Both went
15   over -- it was several times.  I believe we talked to him
16   approximately seven times, and it was the second or third
17   debrief that he decided to tell us everything.
18   Q.  Prior to that, he hadn't?
19   A.  No.
20   Q.  He was being -- he was holding stuff back and he wasn't
21   being forthright about everything, right?
22   A.  Correct.
23   Q.  At the point that he started giving the information up,
24   did he have a lawyer?
25   A.  Yes.
```

Anthony Livingstone - Redirect

1    Q.  And did he have a proffer letter signed?

2    A.  Yes.

3    Q.  And you understand what a proffer letter does, right?

4    A.  Yes, sir.

5    Q.  What does it do?

6    A.  Whatever information is gained from his statements, he

7    might be benefited in the future for less time or --

8    Q.  And he can't be prosecuted for whatever he tells you --

9    A.  Correct.

10   Q.  -- that you might not be aware of, right?

11   A.  Yes.

12   Q.  So until he had that blanket of comfort, that protection,

13   he wasn't being honest with you, he wasn't being forthright

14   with you, and he wasn't cooperating fully with you, correct?

15   A.  No.  He had that letter in the first two debriefs where we

16   didn't get much out of him.

17   Q.  So even with that, he still wasn't --

18   A.  Correct.

19   Q.  -- being straight up with you?

20   A.  Yes.

21            MR. CAVAZOS:  Pass the witness.

22            THE COURT:  Anything?

23            MR. GALDO:  Yes, Your Honor.

24            THE COURT:  How long is this going to be?

25            MR. GALDO:  Fifteen minutes.

Anthony Livingstone – Redirect

1           THE COURT:  Let's go ahead and stop.

2           Ladies and gentlemen, I've got another criminal

3      matter I've got to attend to during the lunch hour.  So please

4      follow the directions of the courtroom security officer.

5           Again, same instructions to you.  Do not deliberate.

6      Don't discuss this case with each other.  Don't call up

7      anybody.  Don't get on that smart phone.  Don't do any

8      research.

9           Have a good lunch.  We will be back at 12:45.

10          (Lunch recess.)

11          COURTROOM SECURITY OFFICER:  All rise for the judge

12     and jury.

13          (Jury enters courtroom.)

14          THE COURT:  Please be seated.

15          MR. GALDO:  Could we excuse Agent Tarango, who has

16     given his testimony?

17          MR. CAVAZOS:  No objection, Your Honor.

18          THE COURT:  He is excused.

19                    *-*-*-*-*-*-*-*

20                  REDIRECT EXAMINATION

21     BY MR. GALDO:

22     Q.  Agent Livingstone, I believe you were asked some questions

23     about when Blackberry messages or text messages were deleted

24     and questions along that nature, and you said you couldn't

25     quite recall?

Anthony Livingstone – Redirect

1    A.  Yes, sir.

2    Q.  What was -- would reviewing Government's Exhibits 110,

3    124, 125 and 126, which is -- or what's been marked for

4    identification, would that refresh your recollection, the

5    report you got, the forensic report you received?

6    A.  Yes.

7            MR. GALDO:  May I approach the witness, Your Honor?

8            THE COURT:  Yes.

9    BY MR. GALDO:

10   Q.  Agent Livingstone, if you could take some time and look on

11   the computer, which has that forensic report.  Look at that

12   for some time and look at the printout of the text messages,

13   and when you have kind of looked over everything, take a

14   couple of minutes, and then look up when you are done, if you

15   could.

16   A.  Okay.

17   Q.  Okay.

18           MR. GALDO:  Approach again, Your Honor?

19           THE COURT:  Yes.

20   BY MR. GALDO:

21   Q.  Now, Agent Livingstone, I know that's a lot of material,

22   so if you need to refresh again, let me know.  I will just

23   leave that computer there.  Thank you.

24           Would it be an accurate characterization of the

25   information that was deleted that the only things that were

Anthony Livingstone – Redirect

1  deleted from Jorge De Leon's phone were things that implicated

2  him in some way?

3  A.  No.

4  Q.  Was information -- and let's go back to the sequence --

5  was -- did Jorge De Leon tell you about multiple murders in

6  Mexico?

7  A.  Yes.

8  Q.  And did he tell you about cooking dead bodies?

9  A.  Yes.

10  Q.  And were there actually deleted messages on that phone

11  that discussed people being killed and bodies being cooked?

12  A.  Yes.

13  Q.  So it would not be an accurate representation to say that

14  he deleted all of the information except for what supported

15  his kidnapping, correct?

16  A.  Correct.

17  Q.  When you first spoke to Mr. De Leon, I believe your

18  testimony was that you had already spoken -- you spoke to the

19  father at the same time, or the same night, correct?

20  A.  Yes.

21  Q.  And the father had implicated his son in tens of thousands

22  of kilograms of marijuana, correct?

23  A.  Yes.

24  Q.  And that information was told to Jorge De Leon, correct?

25  A.  Yes.

Anthony Livingstone – Redirect

1   Q.  And this proffer agreement you were asked questions about,

2   that didn't protect Mr. De Leon from the statements of his

3   father, did it?

4   A.  No.

5   Q.  And he was held accountable for all of those loads that

6   were described by his father, wasn't he?

7   A.  Yes, he was.

8   Q.  There were also questions about what steps, if any, the

9   HSI attache took in Mexico.  That's a specific word,

10  "attache," correct?

11         The HSI agent in Mexico, he is not acting with all

12  of the authority of a law enforcement agent when he is in

13  Mexico, is he?

14  A.  No, he is not.

15  Q.  Can he take active investigatory steps?

16  A.  No.  I can't even go there, being so close to the border,

17  that my job won't allow me to go to Mexico to do an active

18  investigation.

19  Q.  And did you or any other HSI agent, even one stationed in

20  Mexico, pick up a shovel and a camera and head over to these

21  death sites and dig them up?

22  A.  No.  You have to clear it through the government.

23  Q.  And does the Mexican -- and I believe your testimony was

24  that the Mexican authorities said some of those areas were too

25  dangerous, correct?

Anthony Livingstone – Redirect

1    A.  Correct.

2    Q.  Were there Blackberry messages from Chicken 2 that were

3    actually deleted on the phone as well?

4    A.  Yes.

5    Q.  And do those messages include threats from Chicken 2?

6    A.  Yes, they do.

7    Q.  So would it make sense, if Jorge De Leon was scrubbing his

8    phone for information, just deleting things that had to deal

9    with his drug dealing, for him to delete those messages?

10   A.  No.

11            MR. CAVAZOS:  Objection.  Speculation.

12            THE COURT:  Overruled.

13   BY MR. GALDO:

14   Q.  Sorry, Agent.  What did you say?

15   A.  I said no.

16   Q.  Did much of the information that was deleted on the phone

17   actually confirm what Jorge De Leon was telling you?

18   A.  Yes.

19   Q.  There were also questions about how many debriefs it took

20   for Jorge De Leon to talk about everything that he knew.  Do

21   you remember those questions?

22   A.  Yes.

23   Q.  Did that surprise you?

24   A.  No.

25   Q.  Have you -- how many debriefs do you think you have

Anthony Livingstone – Redirect

 1    conducted in your time as an HSI agent?

 2    A.  Well, in the hundreds, at least.

 3    Q.  Is it common for someone, on the first time they sit down

 4    with you, to tell you everything that they know?

 5    A.  No.

 6    Q.  Was Jorge De Leon consistent in what he had to say about

 7    the death and the murders that he witnessed?

 8    A.  Yes.  Very consistent.

 9    Q.  When Jorge De Leon was first interviewed by you, you

10    informed him that you knew who he was, correct?

11    A.  Yes, I did.

12    Q.  And that he was going to be arrested and prosecuted,

13    right?

14    A.  Yes.

15    Q.  So in terms of a credible fear claim -- there were

16    questions about that -- was that even on the table in any way?

17    A.  No.

18    Q.  In terms of the latitude and longitude, you testified

19    about that, the latitude and longitude for the death sites --

20    A.  Yes, sir.

21    Q.  -- was that -- explain again how that was done.  There

22    were some questions about how specific that information was.

23    A.  We tried to be as specific as possible.  To get those, we

24    took a laptop and a debrief with us and had Jorge De Leon walk

25    us through the areas that he had witnessed these murders.  And

Anthony Livingstone – Recross

1   through the laptop, we were able to get the latitude and
2   longitude.
3   Q.  Were there areas, that at least on their physical
4   description, based on the maps, matched what he was
5   discussing?
6   A.  Yes.  Physical description was another area that we were
7   looking into.  Houses, colors, you know, the area, terrain,
8   everything.
9   Q.  Highways and roads and things like that?
10  A.  Yes.
11  Q.  Were there people that Jorge De Leon discussed as being
12  involved in drug trafficking, like Alfredo Andrade and Kellogg
13  and Calderia that he told you about, that that information was
14  corroborated by his telephone?
15  A.  Yes.
16  Q.  And were there photo lineups of multiple individuals,
17  besides just the defendant, that were shown to Jorge De Leon?
18  A.  Yes.
19  Q.  And was he able to identify those individuals?
20  A.  Yes.
21  Q.  Is it true that from the very beginning, Jorge De Leon
22  said that Chano was responsible for murders?
23  A.  Yes.
24          MR. GALDO:  I will pass the witness.
25          THE COURT:  Anything else?

James Beard – Direct

```
1                 MR. CAVAZOS:  Yes, Your Honor.  Thank you.

2                      *-*-*-*-*-*-*-*

3                    RECROSS EXAMINATION

4    BY MR. CAVAZOS:

5    Q.  Did your attache in Monterrey, Mexico confirm that the

6    locations that were being identified by Jorge De Leon were

7    consistent with reports or investigations that Mexican law

8    enforcement was involved in?

9    A.  I can't even speculate on what he provided.  The only

10   thing he provided to me was, some of the locations couldn't be

11   identified, and some of the locations we had asked him to go

12   look at were too dangerous for locals to go into.

13   Q.  But if he had received that information, that would have

14   been something important to your investigation, correct?

15   A.  Correct.  He probably would have passed it on.

16   Q.  And did he pass any type of information like that on to

17   you?

18   A.  No.

19   Q.  Okay.

20                 MR. CAVAZOS:  Pass the witness, Judge.

21                 THE COURT:  Anything else?

22                 MR. GALDO:  Nothing, Your Honor.

23                 THE COURT:  You may step down.  Thank you.

24            Your next witness.

25                 MR. GALDO:  The government calls James Beard.
```

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

James Beard – Direct

```
 1                  May I retrieve an exhibit, Your Honor?
 2                  THE COURT:  Yes.
 3                  COURTROOM DEPUTY:  Could you raise your right hand.
 4                  (Oath administered to the witness.)
 5                  THE CLERK:  Thank you.  Have a seat.
 6                  MR. GALDO:  May I proceed, Your Honor?
 7                  THE COURT:  Yes.
 8                       *–*–*–*–*–*–*–*
 9                       DIRECT EXAMINATION
10       BY MR. GALDO:
11       Q.  Sir, can you please state your name and spell your last
12       name for the record.
13       A.  James Beard, B-e-a-r-d.
14       Q.  And who is your employer?
15       A.  I am employed by U.S. Immigration and Customs Enforcement.
16       Q.  And do you work for HSI?
17       A.  Yes.
18       Q.  And how long have you worked with HSI?
19       A.  I have been a federal agent for 21 years.  I have been
20       with HSI since it was created after 9/11.
21       Q.  So how many years is that?  Do the math.
22       A.  Three –– 12 years, 13 years.
23       Q.  Do you have a particular specialty that you focus on right
24       now?
25       A.  Computer forensics.
```

James Beard – Direct

1    Q.  And have you received -- or what kind of training and
2    education have you received in the area of computer forensics?
3    A.  In computer forensics, I have had basic computer evidence
4    recovery training in 2005.  Since then, I have had advanced
5    computer evidence recovery training.  I have had basic,
6    intermediate and advanced cellphone forensic training.  I have
7    an undergraduate certificate in computer forensics from
8    Champlain College.
9    Q.  And have you testified as an expert in the area of
10   computer forensics in federal court before?
11   A.  Yes, sir.
12   Q.  Approximately how many times?
13   A.  Approximately six times, Southern District, here in the
14   Western District of Texas and in the Eastern District of
15   Virginia.
16           MR. GALDO:  And before we get to that, Your Honor, I
17   would request that this witness be acknowledged as an expert
18   in the area of computer forensics and cellphone data recovery.
19           THE COURT:  Any objection?
20           MR. CAVAZOS:  No.  No objection.
21           THE COURT:  He is recognized as an expert in those
22   fields.
23   BY MR. GALDO:
24   Q.  Agent Beard, let me show you --
25           MR. GALDO:  May I approach the witness, Your Honor?

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

James Beard – Direct

```
 1              THE COURT:  Yes.
 2    BY MR. GALDO:
 3    Q.  -- a series of items.  First is Government's Exhibit 123,
 4    which has already been admitted.
 5              Did you receive a Blackberry, red Blackberry
 6    cellphone from Agent Anthony Livingstone to examine?
 7    A.  Yes, sir.
 8    Q.  And is Government Exhibit 123 that Blackberry?
 9    A.  Yes, sir.
10    Q.  And then can you tell the jury, before we get to these,
11    what do you do when you get a Blackberry?  What did you do
12    with that Blackberry?
13    A.  When I got the phone, I did some research into what tools
14    I needed to use to extract the data.  Cellebrite, one of our
15    tools, did the best job, so I used Cellebrite to extract a
16    physical image, and it just pulled all of the information it
17    could off of the phone and put it in a binary string file,
18    which is just a bit for bit of every piece of information that
19    it could pull off the phone.  Then I used a physical analyzer
20    parser to turn that data into human readable format.
21    Q.  And did you compile one kind of electronic file that
22    contained all of the information that you could extract from
23    that phone?
24    A.  Yes, sir.  I created a report and gave it to the case
25    agent.
```

James Beard – Direct

1   Q.  Tony Livingstone?

2   A.  Yes, sir.

3   Q.  Can you look at what has been marked for identification as

4   Government's Exhibit 124, and can you tell us what that is?

5   A.  This is a CD that has an electronic copy of my report on

6   it.

7   Q.  And did you previously view that CD and initial it --

8   A.  Yes, sir.

9   Q.  -- so you could identify it?

10   A.  Those are my initials on the CD, on the exterior case.

11           MR. GALDO:  At this time, I move for admission of

12   Government's Exhibit 124.

13           MR. CAVAZOS:  No objection, Judge.

14           THE COURT:  124 is admitted.

15   BY MR. GALDO:

16   Q.  And could you now look at -- I believe they are on the

17   table.  We have got 110, 125 and 126.  We previously sent

18   those files and have given you time to review them?

19   A.  Yes, sir.

20   Q.  And are those three items, which are paper copies,

21   printouts, kind of in a spreadsheet form, correct?

22   A.  Yes, sir.

23   Q.  And are those exact replications in what we will call a

24   more readable format than what is on Government's Exhibit

25   124 --

James Beard – Direct

```
1    A.  Yes, sir.

2    Q.  -- with the addition of translation, correct?

3    A.  With the exception of the translation, yes, sir.

4              MR. GALDO:  Your Honor, at this time, based on Agent

5    Beard and Agent Beard's previous testimony, the government

6    would move into evidence Government's Exhibits 110, 125 and

7    126.

8              MR. CAVAZOS:  110, no objection.

9              THE COURT:  110 is admitted.

10             MR. CAVAZOS:  125, no objection.  And the other is

11   126?

12             MR. GALDO:  126.

13             MR. CAVAZOS:  126, no objection.

14             THE COURT:  125 and 126 are admitted.

15             MR. GALDO:  And perhaps we could do this.  I have

16   previously given these to defense counsel.  Government's

17   Exhibits 111, 117, 128, 129 and 130 are simply portions of

18   Government Exhibit 110, just specific date ranges.  They are

19   identical.

20             I move for their admission as well.

21             MR. CAVAZOS:  No objection, Judge.

22             THE COURT:  111 is admitted.

23             MR. GALDO:  117.

24             THE COURT:  128 --

25             MR. GALDO:  117.
```

James Beard – Direct

```
 1              THE COURT:  117, I missed that one.  117 is
 2   admitted.  128, 129 and 130 are admitted.
 3              MR. GALDO:  Yes, Your Honor.
 4   BY MR. GALDO:
 5   Q.  Now, Agent Beard, one of the phrases on those printouts
 6   there is "UTC," around the time and date stamp.  Can you
 7   explain what UTC is?
 8   A.  Yes, sir.  That's Universal Coordinated Time.  It
 9   basically replaced Greenwich Mean Time for use in scientific
10   fields.  It is still based with the zero time zone in
11   Greenwich, England.
12              Headed west, it's -- you minus one hour each time
13   zone.  East, you add one hour each time zone.  So it is
14   basically the same as Greenwich Mean Time, but they do some
15   minor changes for the slowdown of the Earth's rotation every
16   couple of years.
17   Q.  You are not talking ten minutes or an hour?
18   A.  No.
19   Q.  We are talking --
20   A.  Microseconds.
21   Q.  And -- so to put that in common English, we have got UTC
22   on the phone, we would either add five or six hours, depending
23   on daylight savings, for Central Time; is that correct?
24   A.  Subtract, minus five.
25   Q.  We are going west from Greenwich Mean Time?
```

James Beard - Cross

1   A.  Yes.  Minus five, yeah.  Plus two is over in the Middle

2   East.

3   Q.  And then, in addition to text messages, there was also

4   Blackberry messages extracted in your report, correct?

5   A.  Yes, sir.

6   Q.  And how many phones from the border area and in drug cases

7   have you examined, approximately?

8   A.  Probably close to 1,000.

9   Q.  In the time period when you received a phone, 2012, 2013,

10  was Blackberry Messenger a common form of communication?

11  A.  Yes, sir.

12  Q.  By -- and especially by whom?  Is there a group that used

13  it a lot?

14  A.  Drug cartels in the area, South Texas.

15  Q.  And in Blackberry Messenger, there is a pin that is

16  associated with an individual, correct?

17  A.  Yes, sir.

18  Q.  And Blackberry Messenger also had the ability to have

19  things like group chats, where multiple people could chat,

20  correct?

21  A.  Yes, sir.

22  Q.  In one text stream, correct?

23  A.  Yes.

24          MR. GALDO:  I will pass the witness, Your Honor.

25          THE COURT:  Anything?

James Beard - Cross

```
 1              MR. CAVAZOS:  Just one question.

 2                     *-*-*-*-*-*-*-*

 3                    CROSS EXAMINATION

 4   BY MR. CAVAZOS:

 5   Q.  As a follow-up to the UCT time, on the -- on your

 6   extraction, there is a date associated and then a time,

 7   correct?

 8   A.  Yes, sir.

 9   Q.  Are those dates accurate?

10   A.  Those dates are updated by the cellphone towers, so that

11   date and time would be as accurate as the signal it was

12   getting from the cellphone network.  I can't say if it was

13   exactly that time at that time.  It could be within a few

14   seconds, but it is updated off the networks.

15   Q.  Let's assume, for argument's sake, that the system is

16   working properly and the towers are working properly and the

17   signals are getting through properly.

18              Do the notations of the date and the time of the

19   text message or the phone call, would those be accurate dates

20   and times of the place where the person that was placing or

21   receiving the message --

22   A.  It is not set for time zone, so it wouldn't be at a

23   certain place.  If it was here in Texas, say, in February, we

24   would have to subtract five hours from the time here to show

25   the exact local time, because this isn't in local time.  This
```

1    is in Coordinated Universal Time.

2    Q.   Okay.  So if I am looking at a message, and it says

3    2/27/2013, 9:27 p.m., what would the actual date and time --

4    the correct actual date and time be when that message was

5    either being sent or received?

6    A.   9:27 p.m. -- it would be the same date and either five or

7    six hours, depending on the time zone shift and daylight

8    savings time.

9    Q.   So it would be 4:27, perhaps, p.m.?

10   A.   Yes, sir.  Yes.

11   Q.   In Piedras Negras, Mexico?

12   A.   Yes.  Yes.  If -- yes.

13   Q.   Let's assume -- or we don't have to assume.  Piedras

14   Negras, being right across the border from Eagle Pass, Texas,

15   which is in the Central Time zone, given that notation of

16   2/27/2013 at 9:27 p.m., what would the accurate local time and

17   date be for that location, if it was being sent from Piedras

18   Negras?

19   A.   Either 3:27 or 4:27.

20   Q.   And that would account for daylight savings time?

21   A.   Yes, sir.

22   Q.   That the date, given the time that it's being sent, would

23   be accurate?

24   A.   Yes, sir.

25            MR. CAVAZOS:  Okay.  Thank you.

```
 1                THE COURT:  Anything else?
 2                MR. GALDO:  No, Your Honor.
 3                THE COURT:  You may step down.
 4                Your next witness.
 5                MR. GALDO:  May we approach, Your Honor?
 6                THE COURT:  Come on up.
 7                (Bench conference, as follows:)
 8                MR. GALDO:  I want to discuss how to handle this
 9      before he takes the stand.  Jorge De Leon is the next witness.
10                THE REPORTER:  Counsel, speak clearly into the
11      microphone.
12                MR. GALDO:  Jorge De Leon is the next witness, and
13      his brother was shot at by police and in the subsequent
14      case -- chase died two weeks ago.  I had to inform him of
15      that.  Our investigation is still ongoing as to what happened.
16      He is confident that Chano caused that death to occur.  I do
17      not --
18                THE COURT:  When you say "police," are you talking
19      about Mexican police?
20                MR. GALDO:  Local Mexican police in Acuna.
21                MR. LEACHMAN:  He believes that.
22                MR. GALDO:  And he believes that.  We have not told
23      him that.  We have no idea.  But I have told him -- and I said
24      to him, I am not asking questions on it, but it may be
25      something where we call him in, and maybe Your Honor could
```

Jorge De Leon-Navarro - Direct

```
 1    inform him of that or just to let you know --
 2                THE COURT:  Inform him of what?
 3                MR. LEACHMAN:  To not get into that matter.
 4                MR. GALDO:  To not discuss it, because we don't want
 5    to raise issues --
 6                THE COURT:  I will just cut it off as soon as I hear
 7    something like that.
 8                MR. GALDO:  Okay.
 9                THE COURT:  While you all are up here, so Claudia
10    Reyna was arraigned by Judge Mathy.  Judge Mathy was going to
11    appoint Schaefer as his counsel for these proceedings, but
12    Schaefer, of course, was counsel to one of the other
13    witnesses.
14                MR. CAVAZOS:  Claudia --
15                THE COURT:  Claudia.  I mean, is that a conflict
16    or --
17                MR. CAVAZOS:  You mean Lucero?
18                THE COURT:  Yes.  For Lucero.  I am sorry.  Let me
19    backtrack.  This is Lucero, right?  One second.  Yes.  So
20    Lucero -- let me backtrack.  Lucero or Lucera?
21                MR. CAVAZOS:  Lucero.
22                THE COURT:  Even though she is a woman?
23                MR. CAVAZOS:  Yes.
24                THE COURT:  I have never heard that name.  So Lucero
25    was arraigned by Mathy.  Mathy wants to appoint Schaefer.
```

Jorge De Leon-Navarro - Direct

```
1              MR. LEACHMAN:  That's a conflict.
2              THE COURT:  That's what I am asking you guys, so --
3              MR. CAVAZOS:  Because, actually, I think Claudia
4    testified about that jailhouse conversation --
5              THE COURT:  Okay.  So --
6              MR. CAVAZOS:  -- and --
7              THE COURT:  -- we can get somebody else.  Okay.
8    Thanks.
9              (End of bench conference.)
10             THE COURT:  Bring down the next witness.
11             MR. GALDO:  Jorge De Leon.
12             THE COURT:  Will he need a translator?
13             MR. GALDO:  Yes, Your Honor.
14             COURTROOM DEPUTY:  Would you raise your right hand.
15             (Oath administered to the witness.)
16             COURTROOM DEPUTY:  Thank you.
17             THE COURT:  Please take a seat, sir.
18             MR. GALDO:  May I proceed, Your Honor?
19             THE COURT:  Yes.
20                         *-*-*-*-*-*-*-*
21                      DIRECT EXAMINATION
22   BY MR. GALDO:
23   Q.  Good afternoon.  Sir, we are going to have a translator
24   for you.  Just if you can speak into the microphone and she
25   will translate everything that you say.
```

Jorge De Leon-Navarro – Direct

1   A.  Okay.

2   Q.  Now, can you please state your name?

3   A.  Jorge De Leon-Navarro.

4   Q.  That is D-e L-e-o-n for De Leon?

5   A.  Yes.

6   Q.  And you were arrested outside of Del Rio in March of 2013,

7   correct?

8   A.  Yes.

9   Q.  And when you were arrested --

10         MR. GALDO:  May I approach the witness, Your Honor?

11         THE COURT:  Yes.

12  BY MR. GALDO:

13  Q.  I am showing you what has been marked as Government's

14  Exhibit 123.  You had a red Blackberry on you, correct?

15  A.  Yes.

16  Q.  You were arrested and eventually you decided to cooperate

17  with the government, correct?

18  A.  Yes.

19  Q.  And you eventually entered into a plea agreement to plead

20  to a marijuana charge that carries with it a sentence of ten

21  years to life, correct?

22  A.  Yes.

23  Q.  And that was the most serious charge on your indictment?

24  A.  Yes.

25  Q.  And prior to then -- you have not yet been sentenced on

Jorge De Leon-Navarro - Direct

1  that case, correct?

2  A.  Yes.

3  Q.  And prior to that, you had been convicted by the State of

4  Texas in 1994 for a marijuana charge, correct?

5  A.  Yes.

6  Q.  How old were you in 1994 when you were convicted of that

7  offense?

8  A.  Seventeen years old.

9  Q.  I want to -- what city in Mexico are you from?

10  A.  Ciudad Acuna, Coahuila, Mexico.

11  Q.  And that's right across the Rio Grande River from Del Rio,

12  Texas, right?

13  A.  Yes, that is correct.

14        THE INTERPRETER:  I am sorry.  The interpreter

15  corrects herself.

16        THE WITNESS:  Del Rio, yes.

17  BY MR. GALDO:

18  Q.  What was your role in marijuana trafficking in Acuna when

19  you first began getting involved, before you started working

20  directly for Calderia?

21  A.  Take care of marijuana.

22  Q.  And what do you mean by "take care of"?

23  A.  At a house, take care of it.

24  Q.  So what is commonly called a stash house?

25  A.  Exactly.

Jorge De Leon-Navarro – Direct

1    Q.  And how long have you lived in Acuna?

2    A.  My entire life.

3    Q.  I want to talk about the first time you were ever

4    kidnapped and Commandante Pecos.

5    A.  Yes.

6    Q.  Can you tell us about that?  What happened when you were

7    kidnapped?

8    A.  The first time, they took me with a group of about seven

9    people.  They picked us up.  They told us that we had to work

10   for someone or work with them, the Zetas.  The first one that

11   they asked, he said he didn't want to work and they said okay.

12   That was fine.  He turned around and they put a gunshot in

13   him.  And from there on, the rest of us accepted.

14   Q.  And so who did you begin to work for after that incident?

15   A.  For Antonio Calderia.

16   Q.  And when you began working for Antonio Calderia, what was

17   your initial job?

18   A.  Take care of him, drive around with him in his vehicle,

19   his truck and answer phones.  On several occasions, dropping

20   off persons with backpacks, with marijuana to the river's

21   edge.

22   Q.  I believe you said the word "mochilas."  Is that correct?

23   A.  Mochilas of marijuana.

24   Q.  Could you describe what a mochila is?

25   A.  In a sack, they put in there several packages or packs,

Jorge De Leon-Navarro - Direct

1    and it is like a backpack type or a bag.

2    Q.  Did you -- through driving Calderia around and assisting

3    him in his business, did you end up becoming a trusted member

4    of his organization?

5    A.  With Calderia and several people, I was there in a trust

6    situation with the Zetas.

7    Q.  How important or how big was Antonio Calderia in Acuna in

8    terms of drug trafficking?  Was he a small-time trafficker, a

9    big-time trafficker?  How would you describe him?  And excuse

10   me.  I meant to say Acuna, not Piedras Negras.

11   A.  He was important.

12   Q.  Based on what you saw and the people you interacted with,

13   how many people worked for Antonio Calderia in Acuna?

14   A.  Approximately 50.

15   Q.  And what kind of jobs -- when you say "worked," can you

16   describe the type of different jobs people had who worked for

17   Antonio Caldaria?

18   A.  Some people would transport the drugs over here to the

19   United States side.  Others would press the drugs.

20   Q.  What do you mean by "press the drugs"?

21   A.  To reduce the large packages to a smaller package.

22   Q.  And what other types of jobs besides transportation and

23   pressing?

24   A.  Take care of the drugs.

25   Q.  You said "transport the drugs."  Are there -- what are the

Jorge De Leon-Navarro – Direct

```
 1    two ways, two different ways that drugs go from Acuna to the
 2    United States?
 3    A.   In secret compartments through the bridge or in sacks or,
 4    like they call them over there, mules in the brush.
 5    Q.   And are mules people?  Is that what you are talking about?
 6    A.   Yes.
 7    Q.   And the area north of Del Rio on the U.S. side, the towns
 8    of Sanderson, Comstock, out that way, are you familiar with
 9    that terrain?  Do you know that area?
10            THE INTERPRETER:  Can the interpreter hear those
11    towns again?
12            MR. GALDO:  Comstock, Sanderson.
13            THE WITNESS:  Yes.
14    BY MR. GALDO:
15    Q.   And what kind of terrain is out there?
16    A.   It is mountainous.  It is like country.
17    Q.   Not a lot of people live out there?
18    A.   No.
19    Q.   At the time you worked for him, was Caldaria working
20    directly with the Zetas?
21    A.   Yes.
22    Q.   What do you know about Caldaria's relationship and the
23    Zetas' relationship with the local police in Ciudad Acuna?
24    A.   Most of them were bought by them.
25    Q.   What do you mean by "bought by them"?
```

Jorge De Leon-Navarro - Direct

1    A.   Bribed.   They worked for them too.

2    Q.   Did you ever hear or did you ever know anything about

3    Caldaria and the Zetas' relationship with the local military

4    that was stationed or that would come around Acuna?

5    A.   Some of them, yes.

6    Q.   Some of them what?

7    A.   Military and police and the road police, most of the

8    police in the town.

9    Q.   Were bribed?

10   A.   Yes.

11   Q.   So the Caldaria organization and the Zetas had -- didn't

12   have an adversarial relationship with law enforcement -- did

13   not have an adversarial relationship with law enforcement?

14   A.   No.

15   Q.   Because of your position and relationship with Caldaria,

16   were you introduced to the source of supply for Caldaria's

17   marijuana?

18            THE INTERPRETER:  I am sorry.  The interpreter needs

19   to hear that -- the source of marijuana?

20            MR. GALDO:  The source of supply of the marijuana.

21            THE WITNESS:  Yes.

22   BY MR. GALDO:

23   Q.   And who were Caldaria's source of supply for marijuana?

24   A.   Commandante Raulito from Piedras Negras, Chano, Enano.

25   Zeta 40, Zeta 42, Commandante Comillo.

Jorge De Leon-Navarro - Direct

1   Q.  And just to clarify, is Raulito -- where is he the
2   commandante of?
3   A.  He was the commandante of Ciudad Acuna, Coahuila.
4   Q.  And Chano and Enano, what city were they in?
5   A.  Piedras Negras, Coahuila.
6   Q.  And were 40 and 42, Z 40 and Z 42, were they higher up the
7   Zeta hierarchy?
8   A.  They were the bosses of the Zetas.
9   Q.  Do you remember the first time that you met Commandante
10  Chano?
11  A.  Yes.
12  Q.  What was the circumstances when you met Chano for the
13  first time?
14  A.  It was marijuana delivery to Antonio Caldaria.
15  Q.  And the first time you met him, do you remember
16  approximately how much marijuana we are talking about?
17  A.  It was approximately three tons.
18  Q.  What vehicles did you and Caldaria take to pick up the
19  marijuana?
20  A.  A van, a truck, and a closed truck.
21          THE INTERPRETER:  May the interpreter seek a
22  clarification?  The small truck -- interpreter correction --
23  is a pickup truck with like a closed bed.
24  BY MR. GALDO:
25  Q.  And is that the only time you saw Chano or did you see him

Jorge De Leon-Navarro – Direct

1    multiple times after that?

2    A.  Many more times.

3    Q.  Is the person you know as Chano in the courtroom today?

4    You can look around at every single person this side of the

5    courtroom and the other side of the courtroom as well.  Stand

6    up, if you need to.  Look at every table, at all the desks and

7    the pews.

8             (Eighty-second pause in proceedings.)

9    Q.  Can you sit down whenever you are done looking?  Take your

10   time.

11            (One-minute-and-49-second pause in proceedings.)

12   Q.  Have you had time to look around the courtroom, sir?

13            (One-minute pause in proceedings.)

14   A.  (Pointing.)

15   Q.  You pointed in the direction -- in this direction over

16   here.  There are two people at the table.  The person closest

17   to me or furthest away from me at the table?

18   A.  (Indicating.)  Farther.

19            MR. GALDO:  Your Honor, may the record reflect an

20   in-court identification of the defendant?

21            THE COURT:  So noted.

22   BY MR. GALDO:

23   Q.  You can have a seat.  We talked about that initial time

24   you met Chano and picked up three tons of marijuana.  Before

25   we talk about any other marijuana, were there ever any

Jorge De Leon-Navarro – Direct

1    interactions involving either guns or money with Chano?

2    A.  Yes.

3    Q.  Let's talk about money first.  Who is the money from?

4    A.  From Caldaria.

5    Q.  And how many times did you take money from Caldaria?

6    A.  Approximately ten times.

7    Q.  And approximately -- or how many times was the money taken

8    to Chano?

9    A.  Most of them.  All of them.

10   Q.  And we are talking about money.  How much money are we

11   talking about?

12   A.  Different amounts.  60,000.

13   Q.  What is the largest amount of money you ever took to Chano

14   from Caldaria?

15   A.  130,000.

16   Q.  And what city or what location did you take the money to

17   Chano in?  Where did you take it to?

18   A.  To the outskirts of Piedras Negras.

19   Q.  You were coming from Acuna, correct?

20   A.  Yes.

21   Q.  If you will look at the screen in front of you.  If you

22   have trouble seeing it, let me know and I can bring it up to

23   you.  Are you able to see that, sir?

24   A.  Yes.

25   Q.  This is Government's Exhibit 228.  So Del Rio is on the

Jorge De Leon-Navarro – Direct

1    map, but Acuna is right across the river from Del Rio,

2    correct?

3    A.  Yes.

4    Q.  And this is a highway that goes all the way down from

5    Acuna to Piedras, correct?

6    A.  Yes.

7    Q.  When you were driving around with -- or driving -- strike

8    that.  About how long does that take in a car to go from Acuna

9    to Piedras Negras?

10   A.  Approximately 40 minutes.

11   Q.  And when you are driving 40 minutes in a car with $130,000

12   in cash, did you have any fear of being stopped by the police?

13   A.  No, because they were bought by them.

14   Q.  Did you have any interactions with police when you were

15   driving money to Piedras from Acuna?

16   A.  On two occasions, yes.

17   Q.  Let's talk about each of those.  What happened the first

18   time you were stopped?

19   A.  Antonio Caldaria just told me that if I got stopped to let

20   them know that it was -- I was running an errand for

21   Commandante Chano.

22   Q.  So what did you do the first time you were stopped?  What

23   did you tell them?

24   A.  That it was an errand for Commandante Chano.

25   Q.  What did the police do when you told them that?

Jorge De Leon-Navarro – Direct

```
 1              THE INTERPRETER:  The interpreter needs to clarify.
 2              THE WITNESS:  He escorted me until I got -- until I
 3    arrived to Chano.
 4    BY MR. GALDO:
 5    Q.  So the police escorted you to Chano; is that what your
 6    answer is?
 7    A.  Yes.
 8    Q.  What about the second time you were stopped by police with
 9    money?
10    A.  The same.
11    Q.  Let's talk about guns now, if we could.  What is the
12    connection between the Zetas and firearms?
13    A.  Most of them are for them.
14    Q.  And why do they need firearms?
15    A.  To fight, to kill, to pick up people.
16    Q.  What obligation did Caldaria have as a drug trafficker
17    working for the Zetas to get firearms for them?  What did he
18    have to do?
19    A.  Buy the weapons for them and send them to them.
20    Q.  Did you assist him in making arrangements to get weapons
21    from the United States?
22    A.  Yes.
23    Q.  Did you also assist him in transporting weapons from Acuna
24    to Chano in Piedras Negras?
25    A.  Yes.
```

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro - Direct

1   Q.  Let's first talk about getting weapons from the United

2   States.  Now, as part of discussions we have had, you have

3   been shown --

4              MR. GALDO:  May I approach the witness, Your Honor?

5              THE COURT:  Yes.

6   BY MR. GALDO:

7   Q.  You have been shown what has been entered into evidence as

8   Government Exhibit 110.  Do you recognize this as the original

9   Spanish and then an English translation of the text messages

10  recovered from your Blackberry, correct?

11  A.  Yes.

12  Q.  I will put on the screen some conversations that took

13  place.  For the record, for the jury, these are numbered on

14  the left 104, 105, 106, et cetera, conversations that took

15  place on June 11, 2012.  These are messages from your -- sent

16  messages, messages you typed on your phone, correct?

17  A.  Yes.

18  Q.  And you can look on in Spanish and I will read it in

19  English.  Bro, in a while I get the ten long ones.  What do

20  you think?  Can you get them to edge so that I can send you

21  money?

22  A.  Bro, in a while I get the ten long ones.  What do you

23  think?  Can you get them to the edge so that I can send you

24  money?

25  Q.  What does "long ones," "ten long ones" mean?

Karl H. Myers, CSR, RMR, CRR - (210) 244-5037

Jorge De Leon-Navarro - Direct

1    A.   Ten AK-47s.

2    Q.   And that's a type of rifle, a type of firearm?

3    A.   Yes.

4    Q.   And who were you sending these messages to?

5    A.   To the guy who was going to pick them up, to get them

6    close to the river.

7    Q.   So walk me through how an operation like this works.   When

8    you have got the guns in the United States, how do you

9    actually get them into Mexico, when we are talking about

10   getting them across the river?   What happens?

11   A.   One person takes them to Del Rio.   Another one crosses

12   them through the bridge or takes them to the edge of the

13   river, and others that -- people that Caldaria had working

14   would go to jump them over, to cross them in the river.   And

15   then he would send -- then he would send me to pick them up,

16   the persons with the weapons, on the Mexican side.

17   Q.   And where would you take the firearms once they --

18   immediately after they crossed into Mexico, where would they

19   go?

20   A.   To Piedras Negras, Coahuila.

21   Q.   Were there ever any firearms stashed for a period of time

22   in Acuna before they could be taken to Piedras Negras?

23   A.   Yes.

24   Q.   So with these ten long ones that we are looking at here,

25   these firearms, were these ten firearms successfully smuggled

Jorge De Leon-Navarro – Direct

1    into Mexico?

2    A.  Yes.

3    Q.  And what happened to those firearms?  What did you do with

4    those firearms once you got them in Mexico?

5    A.  Antonio Caldaria sent me to deliver them to Commandante

6    Chano.

7    Q.  And did you do that?

8    A.  Yes.

9    Q.  Can you describe how that delivery took place?

10   A.  Another person and I went in a pickup truck, and the same.

11   We went to Piedras Negras, and outside of the city, we

12   delivered them to Chano out in the brush.

13   Q.  Was he there by himself?

14   A.  No.  More people were with him.

15   Q.  What kind of people?

16   A.  Armed sicarios guarding him.

17   Q.  Did Chano actually look at any of the guns whenever you

18   delivered them?

19   A.  Yes.  He inspected them all.

20   Q.  So that was in June of 2012.  Earlier, in October of 2012,

21   did you attempt to purchase 11 AK-47s from someone in

22   Colorado?

23          THE INTERPRETER:  May the interpreter please hear

24   that question again, sir?

25

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro - Direct

```
 1    BY MR. GALDO:
 2    Q.  So that was in June of 2012.  Earlier, in October of 2012,
 3    did you attempt to purchase 11 AK-47s from someone in
 4    Colorado?  That would be later.  My apologies.
 5    A.  Yes.
 6    Q.  And did you later find out that the person you had been
 7    talking to about buying those firearms was actually an
 8    undercover agent?
 9    A.  Yes.
10    Q.  And were you actually played some of your conversations
11    with that undercover agent in preparation for your trial
12    today?
13    A.  Yes.
14    Q.  I am showing you Government's Exhibit 107, and this is in
15    English.  I will state it out loud so you can have it
16    interpreted for you.  It is a conversation between you and the
17    undercover agent posing as the supplier of firearms.  And you
18    asked him about what has been translated here as an extractor.
19    Or you asked him if it will fit the regular one, and the
20    undercover agent talks about not having an extractor on the
21    firearm.  And I think the actual word is "unya" that is used.
22    A.  Yes.
23    Q.  And what -- can you tell us, what was wrong with the unya?
24    What was the problem with the unya?
25    A.  The unya is because they don't want to have any problems
```

Jorge De Leon-Navarro - Direct

1   when they try to -- the interpreter needs to clarify -- to

2   load it, because it is harder to remove it.

3   Q.  So you are talking about when they change magazines in the

4   firearm, correct?

5   A.  Yes.

6   Q.  And then later your response to that, you tell them:

7   That's all I want, man, because then afterwards, here, no way,

8   man.  They won't count them and they will take them away from

9   me.  Understand?

10  A.  Yes.

11  Q.  Who wouldn't count them?  What did you mean when you say

12  they wouldn't be counted if you got guns with unyas?

13  A.  The Zetas don't consider them valid.

14  Q.  So if you showed up with firearms that had unyas, you

15  would be on the hook for wasted money, right?

16  A.  Yes.

17  Q.  I am showing you what has been admitted as Government's

18  Exhibit 112, and I will take it out of the sleeve.  Do you

19  recognize that person?

20  A.  Griselda Cedillo.

21  Q.  And did Griselda Cedillo also work for Antonio Caldaria?

22  A.  Yes.

23  Q.  Did she also -- did you also ever give her directions

24  about places to pick up marijuana?

25  A.  Yes.

Jorge De Leon-Navarro – Direct

1   Q.  This is Government's Exhibit 116.  Do you recognize that
2   vehicle?
3   A.  Yes.  That's Jose Antonio Cedillo's truck.
4   Q.  Let's talk about an individual named, the last name of
5   Vara-Martinez, Augustine Vara-Martinez.
6   A.  Yes.
7   Q.  Did you hire him or communicate with him in relation to
8   guiding a load of marijuana in January of 2013?
9   A.  Yes.  Yes.
10  Q.  Can you tell us the story of exactly where that marijuana
11  came from?  How did that marijuana get from the beginning,
12  that you ever heard of that marijuana, to how it ended up
13  being guided by Vara-Martinez?
14  A.  I went with Antonio Caldaria to Piedras Negras, Coahuila.
15  And he received another shipment of marijuana of approximately
16  three tons also.  We brought them over to Ciudad Acuna.  And
17  Caldaria, he told me to hide part of it in a house.  He hid
18  another part of it.  And there, he called this man, Vara
19  Martinez, to make arrangements so that he could take a load,
20  bring a load of marijuana.
21  Q.  Earlier, you talked about pressing marijuana.  Did this
22  marijuana have to be pressed before it was sent across the
23  river?
24  A.  Yes.
25  Q.  And who was there -- where did the marijuana come from in

Jorge De Leon-Navarro - Direct

1    Piedras Negras that was picked up?

2    A.   Commandante Chano delivered it or gave it.

3    Q.   Was that -- the marijuana that was guided across by

4    Vara-Martinez, did that successfully reach its destination?

5    A.   No.

6    Q.   When the marijuana didn't meet -- reach its destination,

7    who was responsible for that lost load?

8    A.   Me.

9    Q.   In the following days, this is Government's Exhibit 110,

10   is Agustiamer, is that Vara-Martinez in your phone?

11   A.   Yes.

12   Q.   And you used some rather harsh language with him in these

13   text messages about finding that marijuana, don't you?

14   A.   Yes.

15   Q.   And why the harsh language?  What was going to happen if

16   this marijuana wasn't found or recovered?

17   A.   I was being threatened that my family would get killed.

18   Q.   You said Raulito was the commandante of Acuna, correct?

19   A.   Yes.

20   Q.   I am showing you another page from Government's Exhibit

21   110, message 604, and this message says:  Raulito wants 35,000

22   tomorrow because I am  looking for guides.  I was going to do

23   something today and then I didn't.

24              THE INTERPRETER:  I am sorry.  The interpreter can't

25   see.  Okay.

Jorge De Leon-Navarro - Direct

```
 1    BY MR. GALDO:
 2    Q.  This is on February 9th, 2013.  What was -- Raulito, what
 3    is the story behind that?  Why did he want 35,000?
 4    A.  Of the drugs that were -- that were picked up and that he
 5    said was my fault.
 6    Q.  Back to that in a minute.  I will show you Government's
 7    Exhibit 125.  There is a name there, Chicken 2.  And then
 8    there is Leon.  First, who is Leon?
 9    A.  Me.
10    Q.  Who is Chicken 2?
11    A.  Chano.
12    Q.  The person here in the courtroom today?
13    A.  Yes.
14    Q.  This message was on February 13th, 2013.  And he said to
15    you:  Look, Jorge.  I don't want to be a dick but if you don't
16    give me anything by Friday I will tie you up and I will not
17    let you go until you pay me, fucker, so think about how you
18    are going to do this.  I don't know.
19              Do you remember getting that message?
20    A.  Yes.
21    Q.  I want to talk about this.  This name Leon for Blackberry.
22    This is your Blackberry pin, correct?
23    A.  Yes.
24    Q.  For the record, I am gesturing to a series of numbers and
25    letters above the name Leon on Government's Exhibit 125.
```

Jorge De Leon-Navarro – Direct

1          You, under the name Leon, you created a Blackberry

2    account with that pin, correct?

3    A.  Yes.

4    Q.  And so any time you sent a Blackberry message to someone,

5    the name Leon would show up, because you put that in on your

6    phone?

7    A.  Yes.

8    Q.  And the name Chicken 2, Chano, who had this pin, is the

9    one who had to put that nickname in, correct?

10   A.  Yes.

11   Q.  Let's talk about one other thing on Blackberries.  This is

12   Government's Exhibit 126.  These are more Blackberry messages

13   from your phone that were recovered.  Who is Acuario Z?

14   A.  That is Commandante Raulito.

15   Q.  And what is Central Acuna?  What is that?

16   A.  They are the ones who look out for the soldiers, the Gates

17   and the Marines.

18   Q.  So were these messages pushed out to a large group of

19   people who were connected with the Zetas from Central Acuna?

20   A.  Yes.

21   Q.  All right.  Let's look at this up close, see if you could

22   explain this.  So there is a translation over here, but I

23   would like you to explain it, not just translate it, if you

24   could.  What is this?  It says:  2 RAP in Bienvenida.

25          In fact, perhaps it is easier if you could walk

Jorge De Leon-Navarro - Direct

1  through all of these and explain what these mean, line by

2  line.

3  A.  Pedestrians at Papa Indio means soldiers at the

4  International Bridge, by foot.

5  Q.  And what is the next line?

6  A.  2 RAP in Bienvenida, that is two soldier trucks.  One

7  lento Sierra 4 is -- it is a small Jeep on Sierra 4 towards

8  Amistad, the Amistad dam.

9  Q.  How about the next line?

10  A.  It is towards the mountains, toward the fields, a Jeep, a

11  small Jeep.

12  Q.  And what was the other part he said about the Gates?

13  A.  Four gates trucks, with one -- one Jeep towards the

14  mountains.

15  Q.  And what about the next line?

16  A.  There is a rhino, a Lincoln, an Avalanche at the Public

17  Ministry.  And then two fast ones in the Vista Hermosa colonia

18  or subdivision.

19  Q.  What are "fast ones"?

20  A.  Two soldier trucks, military.

21  Q.  You mentioned the Gates.  This is 2013.  What was going on

22  between the Gates and the Zetas at this time?

23  A.  They were adversaries.  They were not bought out.

24  Q.  And so we have got -- you talked about mountain range or

25  mountains 4, mountains 3.  Was that prearranged terms for

Jorge De Leon-Navarro - Direct

1  certain geographic areas?

2  A.  Yes.  So that they -- to know where each patrol was.

3  Q.  And you had someone who was arranging marijuana loads.

4  What -- how useful was this information?  Was this useful for

5  you?

6  A.  Yes.

7  Q.  And did Antonio Caldaria also get this information?

8  A.  Yes.

9  Q.  And I think the person down here -- who is Aguila Acuna?

10 Who is that?

11 A.  Andrade, Alfredo Andrade.

12 Q.  And without going into a full -- a lot of detail, who,

13 generally speaking, is Alfredo Andrade?

14 A.  Another drug trafficker who also bought drugs from the

15 Zetas.

16 Q.  So would Alfredo Andrade also get those messages from

17 Central?

18 A.  Yes.

19 Q.  So if you were moving drugs at Acuna and you were

20 affiliated with the Zetas, you would get those messages?

21 A.  Yes.

22 Q.  All right.  This -- the money that you talked about

23 earlier that Raulito said you needed to pay, were you able to

24 pay it?  Initially, were you able to pay it?

25 A.  Yes.  Part of it.

Jorge De Leon-Navarro - Direct

1    Q.   And did that satisfy Chano?

2    A.   No.

3    Q.   Were you, in fact, picked up?

4    A.   Yes.

5    Q.   Was anyone else picked up at the same time that you were?

6    A.   Alfredo Andrade and Antonio Caldaria.

7    Q.   So it was you, Andrade and Caldaria?

8    A.   Yes.

9    Q.   And how much or what did the Zetas want from Andrade and

10   Caldaria and from you?

11   A.   I had to pay, along with Caldaria and Andrade owed money

12   too.

13   Q.   Were Andrade or -- where were you taken when you were

14   picked up at first?

15   A.   To Piedras Negras, Coahuila.

16   Q.   Were you all taken together?

17   A.   Separately.

18   Q.   Did Andrade and Caldaria, did they remain picked up with

19   you?

20   A.   We were separate.

21            THE INTERPRETER:  Your Honor --

22            THE COURT:  Let's go ahead and take an afternoon

23   break.

24            (Brief recess.)

25            THE COURT:  Please be seated.

Jorge De Leon-Navarro – Direct

1          MR. GALDO:  May I continue?

2    BY MR. GALDO:

3    Q.  Mr. De Leon, I think where we left off is, you, Alfredo

4    Andrade and Caldaria have all been kidnapped.  Andrade and

5    Caldaria had been let go, correct?

6    A.  Yes.

7    Q.  Do you know how much money Andrade and Caldaria paid to be

8    let go?

9    A.  No.  No.  I don't know.

10   Q.  What did the Zetas want from you in order to be released?

11   A.  $100,000 more.

12   Q.  Did you have $100,000 when they initially kidnapped you?

13   A.  No.

14   Q.  So you said you were taken to Piedras Negras?

15   A.  Yes.

16   Q.  Where -- I don't need a street address, but what type of

17   structure or building were you taken to at first?

18   A.  It was on the outskirts of Piedras Negras.  They never

19   took me to a structure or to a house.  They always had me in a

20   car or a truck.

21   Q.  And did they take your phone away?

22   A.  Yes, but they had it there with them, so that I would

23   continue sending messages, so my family could obtain the

24   money.

25   Q.  So they wanted you to be able to reach out to get money,

Jorge De Leon-Navarro - Direct

1    correct?

2    A.  Yes.

3    Q.  You don't think they were afraid of you calling the

4    police?

5    A.  No, because a threat from them is not any -- just

6    anything.

7    Q.  While you were -- or how many days were you held for?

8    A.  Thirteen days.

9    Q.  You were released on March 1st of 2013, correct?  Around

10   that time?

11   A.  Pardon me.  Could you repeat that again?

12   Q.  Were you released by the Zetas around March 1st, 2013?

13            MR. CAVAZOS:  The question is leading, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  Yes.

16   BY MR. GALDO:

17   Q.  While you were held, did you witness any acts of violence?

18   A.  Yes.

19   Q.  And before we talk about those in detail, were you told by

20   the people holding you why you were being shown these acts of

21   violence?

22   A.  Yes.  So that I would tell my family that if they did not

23   obtain the money that was going to happen to me and to them.

24   Q.  Was Chano one of the people who was holding you?

25   A.  Yes.

Jorge De Leon-Navarro - Direct

 1   Q.  Earlier when I asked you if Chano was in the courtroom,
 2   why did you take so long to point him out?  Did you have
 3   trouble recognizing him?
 4   A.  I am afraid for my family.
 5   Q.  All right.  Let's take some time and talk about the acts
 6   of violence that you saw.  I want to do it by location.  Let's
 7   first talk about an orange or a pink house.
 8   A.  Yes.
 9   Q.  Tell us about how you were taken to that house and what
10   you saw there.
11   A.  The first time, the persons who had me with them in the
12   truck took me there.  They got me off the truck and they made
13   me kneel.  They had a person there who was blindfolded and
14   handcuffed.  They had a steel drum that had a lit fire in it.
15   Q.  And so there is a person blindfolded.  Do you have a
16   blindfold on?
17   A.  They took it off me when they made me kneel in front of
18   him.
19   Q.  And what, if anything, happened to the other person who
20   was there?
21   A.  They cut him up alive.
22   Q.  And who was there besides you and that man?
23   A.  Sicarios, several sicarios and Chano.  Chano gave the
24   order for them to cut him.
25   Q.  And what were they using to cut him?

Jorge De Leon-Navarro – Direct

1   A.  An axe.

2   Q.  And how did they cut him?

3   A.  First the knee, then this part here, then an arm and then

4   the other side, likewise; the knee, the same, the arm.  And at

5   the end, they beheaded him.

6   Q.  And what happened to the remains of the body?

7   A.  They threw them into the tank to burn them.

8   Q.  Were you brought back to that orange or pink house another

9   time?

10  A.  Yes.  Another occasion.

11  Q.  And the first person that we talked about, did you know

12  that person?

13  A.  No.

14  Q.  What about -- so I apologize for interrupting.  You were

15  brought back to that orange and pink house another time,

16  correct?

17  A.  Yes.

18  Q.  And what -- now, what did you witness that second time?

19  What were you made to see?

20  A.  Again, they got me off the car.  They made me kneel.  They

21  took the blindfold off of me and they cut up those three

22  people likewise.

23  Q.  You said it was three people?

24  A.  Yes.

25  Q.  Were they all males?

Jorge De Leon-Navarro – Direct

1   A.  One woman.

2   Q.  Did you know those people?

3   A.  None.

4   Q.  What happened to their bodies?

5   A.  They began to cut them up.  Likewise, they would always

6   cut them from the knee and then here and then the arm.  All of

7   them, the majority of them, they cut them the same way.

8   Q.  Was there yet a third incident at that orange and pink

9   house?

10  A.  It was in another house.

11  Q.  Let's talk about something you saw out by El Centinela.

12  Is that by the Cereso prison?

13  A.  Yes.

14  Q.  Were you taken there?

15  A.  Yes.

16  Q.  And how were you taken there?

17  A.  The same way.  The ones who were with me, the ones who had

18  me took me there.  They got me off the car.  They made me

19  kneel.  They took the blindfold also and they already had a

20  person down, laying down there.

21  Q.  Did you know that person?

22  A.  No.

23  Q.  Was Chano there?

24  A.  Yes.

25  Q.  What happened to that person who was laying down?

Jorge De Leon-Navarro – Direct

1    A.  The same.  They cut him up and they burned him also.

2    Q.  And that was a male?

3    A.  Yes.

4    Q.  Did you later go back to a location out by the Centinela?

5    A.  No.

6    Q.  Let's talk about, did you witness an act of violence at

7    another house in Piedras Negras?

8    A.  Yes.

9    Q.  Let's go through that story step by step.  How did you

10   arrive at this home?

11   A.  Likewise.  The sicarios who had me got there; they took me

12   there.

13   Q.  And you arrived at the home.  Who else was at the home?

14   A.  Chano, Enano and several of their sicarios.

15   Q.  Was there anyone else there besides Chano, Enano, several

16   sicarios and you?

17   A.  The three persons they killed.

18   Q.  And did you know those three people by name?

19   A.  No.

20   Q.  Can you describe each of those people?

21   A.  A girl, a little girl, a woman and a man.

22   Q.  When you say a girl, how old, approximately?

23   A.  Six years old.

24   Q.  Do you know why those three people were there?

25   A.  No.

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro - Direct

1   Q.  What was the first act of violence that you saw that day?

2   A.  Cutting up the little girl.

3   Q.  And who was the one cutting up the little girl?

4   A.  Chano began.

5   Q.  What do you mean by "began"?  What did you see?

6   A.  He began taking the axe and he cut a knee and an arm off

7   of her.

8   Q.  Was there a fire and a barrel like before?

9           MR. CAVAZOS:  Leading, Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  Yes.

12  BY MR. GALDO:

13  Q.  What happened to the parts of her body that Chano cut off

14  first?

15  A.  They were thrown into the barrel.

16  Q.  You said there was a little girl, a woman and a man.  What

17  were the relationships between the little girl and the woman

18  and the man?

19  A.  She was their daughter.

20  Q.  Was she alive when Chano began to chop her?

21  A.  Yes.

22  Q.  Did she say anything?

23  A.  She would cry.  She would scream.

24  Q.  Was Chano saying anything?

25  A.  He would laugh.  He would say to her father so that he

Jorge De Leon-Navarro - Direct

```
 1   could see so that he would remember.
 2   Q.  What happened to the rest of the little girl?
 3   A.  They cut her all up in pieces and burned her.
 4   Q.  While her parents were in the room?
 5   A.  No.  It was outside on the patio.
 6   Q.  Were her parents also outside on the patio?
 7   A.  Yes.
 8   Q.  What were -- let's take it one at a time.  What was her
 9   mother doing?
10   A.  Crying.
11   Q.  What was the father doing?
12   A.  Also crying.
13   Q.  Was he allowed to look away?
14   A.  No.  They would grab him by the hair so that he would see,
15   so that he would look.
16   Q.  And who was grabbing him by the hair?
17   A.  Chano and Enano.
18   Q.  After the little girl was killed, what happened to the
19   mother?
20   A.  They also cut her up.
21   Q.  Who cut her up?
22   A.  The sicarios.
23   Q.  While this was happening, where were you?  How far away
24   were you?
25   A.  One meter and a half, two meters, approximately.
```

Jorge De Leon-Navarro - Direct

```
 1   Two meters, approximately.
 2   Q.  Were you standing, sitting, kneeling?  What were you
 3   doing?
 4   A.  Kneeling.
 5   Q.  Were you looking away?
 6   A.  Yes, but they wanted me to look, to see.
 7   Q.  Who wanted you to look?
 8   A.  Chano, Enano.
 9   Q.  What happened to the mother?
10   A.  They also cut her up.
11   Q.  After the little girl was murdered, after the mother was
12   murdered, what happened to the father?
13   A.  They also killed him and cut him up.  They cut all three
14   of them up alive.
15   Q.  Did the mother and father -- or did the father have to sit
16   and watch the death of his little girl and his wife?
17   A.  Kneeling.
18   Q.  How far away was the barrel where their bodies were
19   burned?
20   A.  Approximately three meters.
21   Q.  Could you smell it as it was burning?
22   A.  Yes.
23   Q.  Did Chano say anything to the father?
24   A.  No.  Only so that he would remember him, because in the
25   end, he was going to kill him.
```

Jorge De Leon-Navarro - Direct

```
 1            THE COURT:  You have covered this enough.  Move on
 2   to another subject.
 3   BY MR. GALDO:
 4   Q.  Were there also killings you witnessed at a junk yard?
 5   A.  Yes.
 6   Q.  What was the first killing you witnessed at the junk yard?
 7   A.  Some children, some adolescents who sold -- oh, who sold
 8   newspapers at traffic lights, traffic stoplights.
 9   Q.  Did you use the word "Zocalo"?
10   A.  Yes.
11   Q.  And what happened to the -- what happened at the first
12   time that you saw people killed at the junk yard?  What did
13   you see?
14   A.  They picked up the guys, the fellows, the young fellows
15   and they also cut them up.
16   Q.  Was Chano there?
17   A.  He gave the order.
18   Q.  Do you remember what he said?
19   A.  That they might be able -- that they could be an
20   adversary, antagonistic group.
21   Q.  What happened to their bodies?  Did you witness that?
22   A.  Four, yes, they burned them.
23   Q.  So it was four newspaper boys?
24   A.  Yes.
25   Q.  Did you know the names of any of those four?
```

Karl H. Myers, CSR, RMR, CRR - (210) 244-5037

Jorge De Leon-Navarro - Direct

1    A.   No.

2    Q.   You said a word that was translated as they could be

3    adversaries, I think.  What did you mean by that?

4    A.   That they thought it was another cartel.

5    Q.   Were you taken back to the junk yard another time?

6    A.   Yes.

7    Q.   Who else was at the junk yard on that occasion?

8    A.   Sicarios, Chano and Enano.

9    Q.   And what happened the second time you went to the junk

10   yard?  What did you see?

11   A.   Other fellows, young fellows, likewise, the same.

12   Q.   And how many?

13   A.   There were two, but I didn't see if they burned those or

14   not.

15   Q.   Did you see them -- did you see how they died, if not how

16   they were disposed of?

17   A.   Yes.

18   Q.   And how did they die?

19   A.   The same way, all of them, cut up.

20   Q.   Did they have -- as on the other occasions, was there a

21   barrel with a fire lit, that you saw?

22   A.   On the first time, yes.

23   Q.   So the second time, you didn't see if there was a barrel

24   of fire?

25   A.   No.  Not for those kids, not the second time.  I did not

Jorge De Leon-Navarro - Direct

1    see barrels.

2    Q.  Was there also an incident that happened by a river

3    outside of -- or a small river outside of Piedras Negras?

4    A.  Yes.

5    Q.  How did you get to that location?

6    A.  Also, the sicarios that had me, they took me there.

7    Q.  And what did you see?

8    A.  There were three persons, and they would say that they

9    were military.  They got them off a truck.  I was able to see

10   when they made them kneel, and some bullet sounds were heard,

11   but I -- some shots were heard, but I did not see if they

12   killed them, because the sicarios who had me took me from

13   there.

14   Q.  And who was -- besides the sicarios who had you and you,

15   who else was there on that occasion?

16   A.  Chano, Enano, Zeta 40 and Zeta 42.  And the sicarios.

17   Q.  Did you hear, while you were there, who ordered those

18   killings to happen?  Who was in charge?

19   A.  Zeta 40, Chano and Enano.

20   Q.  When you say "ordered," what did you actually hear?

21   A.  That they had to be given the floor, kill them.

22   Q.  And who said that?

23   A.  Chano.

24   Q.  I am putting up on the screen Government Exhibit 126.

25   Specifically, pointing to the bottom.  And this is you, Leon.

Jorge De Leon-Navarro - Direct

1   It is 126.  On the bottom of 126 is a message from Leon, which
2   is you, correct?
3   A.  (No answer.)
4   Q.  And you sent a message to Aguila Acuna, who you said is
5   Alfredo Andrade, correct?
6   A.  Well, Alfredo Andrade, that if he had some money that he
7   could lend me, because they were going to kill me.
8   Q.  Did Alfredo Andrade give you money?
9   A.  No.
10  Q.  Did you use primarily Blackberry Messenger to talk with
11  the higher ranking people in the cartel, as opposed to text
12  messages?
13  A.  Did I -- would I call on the telephone?
14  Q.  We have got -- from your phone, we have Blackberry
15  Messenger, which these are Blackberry messages.  And then
16  Government Exhibit 110, for example, are text, regular text
17  messages from your phone.
18         Was Blackberry Messenger what you primarily used to
19  talk to higher ranking people in the cartel, as opposed to
20  text?
21  A.  Yes.
22  Q.  Your text messages on June 21st -- I am sorry.  Pardon
23  me -- February 21st, which is Exhibit 110 -- I don't know if
24  that is up there.  That is in the other book.
25         MR. GALDO:  If I may approach.

Jorge De Leon-Navarro – Direct

1          THE COURT:  Yes.

2    BY MR. GALDO:

3    Q.  If you can see, these are numbered on the side.  There is

4    a number as well as a date.  Message 735, you sent a message

5    to someone.  You have a number and then M-a at the side.  Who

6    is that person?  735, M-a.

7    A.  My mother.

8    Q.  And in this message, you say:  Here, it's not going to be

9    like in Acuna.  That man let me go.  Here, I give the cash or

10   they'll break me.  I already told you what I am  taking.

11   Understand?

12   A.  When they had me kidnapped, my mother, my wife, my sisters

13   were together, and my mother, my wife, my sisters would answer

14   that telephone.

15   Q.  So this phone number, this contact, Ma, this 8771159599

16   MA, that was going to your wife and your mother; they would

17   both use that phone?

18   A.  Yes.

19   Q.  And then if you flip forward a message, 819, that is also

20   February 23rd, the same contact?  Give my son a big hug please

21   and lots of kisses and tell him how much I love him if I don't

22   come back.  Take him far away from this shit.

23          Who were you talking to and who were you talking

24   about?

25   A.  With my wife.

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro – Direct

1    Q.  And who were you talking about?

2    A.  My son.

3    Q.  Let's go forward to 861 and 863.  And this is also on

4    February 23rd, 2013.  861.  Find it.  Right now they are

5    killing the poor that sell Zocalo.  Think they won't kill me?

6    Keep looking, please.

7            And later you say:  They already have four of the

8    Zocalos.

9            What is the relationship between that text and what

10   you talked about earlier with the people who were killed at

11   the junk yard?

12   A.  Those are the ones.

13   Q.  And then on February 23rd, to the same contact later that

14   day.  Right now they are going to cook some of the dead.  They

15   are telling me to find the cash so that they don't break me.

16   Please find it.  That's 880.  8-8-0.

17           Is that message also about the Zocalos who were

18   killed in the junk yard?

19   A.  I don't remember exactly if it was that, but it was one of

20   the ones they burned.

21   Q.  You said you were in a truck with sicarios.  Is there a

22   word for a truck of sicarios?

23   A.  Estacas.

24   Q.  And did the estaca that you were riding around with, did

25   they have instructions for you about who you could talk to and

Jorge De Leon-Navarro – Direct

1    how you could use your phone, et cetera?

2    A.  Yes, yes.  They had the telephone.

3    Q.  They would allow you to type things about people being

4    dead and people being burned?

5    A.  Yes.

6    Q.  Did they have any fear of the police stopping them?

7    A.  No.

8    Q.  Forward to 910.  This is two days later.  This is

9    February 25th.  This time, you are talking to a contact that

10   has a series of numbers that ends with P-a-p.  Is that your

11   father?

12              THE INTERPRETER:  920?

13              MR. GALDO:  910.

14              THE WITNESS:  Yes.

15   BY MR. GALDO:

16   Q.  And here you said:  Dad, find em because if I don't give

17   that money today, they are going to kill me.  Find em please.

18   A.  Yes.

19   Q.  And what were -- what was your family trying to do during

20   that time?

21   A.  Obtain the money.

22   Q.  And how were they trying to do that?

23   A.  Selling the house.  All our properties.

24   Q.  Around that same time, you are telling your mother -- this

25   is 916 -- 915 to 916, actually.  It seems like you don't want

Jorge De Leon-Navarro – Direct

1    to pressure.  Then let them kill me so that you don't feel

2    pressured.  Then ask her tell her that, that they are going to

3    kill me.  That's why it's urgent.

4           Were there issues trying to come up with the money?

5    Was your family having trouble?

6    A.  Yes.

7    Q.  Later on, 1043.  This is February 26 to Guer 3.  And,

8    actually, it is 1041 and 1043 kind of together.  Who is Guer

9    3?

10   A.  It was a person that I wanted to sell some land to, an

11   acquaintance.

12   Q.  And here you say -- it's translated as:  It's cuz over

13   here they have me on the rock and I need to give some money

14   today by 12.  In Spanish, it says "la roca."  This is in 1043.

15   Is that slang for any particular town or city?

16   A.  Piedras Negras.

17   Q.  You also have a series of messages, someone who has -- in

18   your phone is a phone number with D-i-a-b-l, Diablo.  It would

19   be 1075, 1076, 1077.  Who is Diablo?

20   A.  It was a woman, friend of mine.

21   Q.  Is it more than a friend?  Did you have a sexual

22   relationship with her?

23   A.  Yes.

24   Q.  And you start out here asking her for money?

25   A.  Yes.

Jorge De Leon-Navarro – Direct

```
 1    Q.  Was she able to get you money?

 2    A.  No.

 3    Q.  And you identify yourself as Jorge from Acuna?

 4    A.  Yes.

 5    Q.  And why did you think you could get money from her?

 6    A.  I would ask anybody I knew, anyone I knew.  I wanted to

 7    obtain the money.

 8    Q.  Now, in this conversation, later you talk about requesting

 9    food, and then later on you actually talk about some things

10    that are sexual in nature via text with her.

11            Can you tell the jury why, while you were kidnapped,

12    you were having these types of text message chats with Diablo?

13            THE INTERPRETER:  I am  sorry.  I can't hear you,

14    sir.

15    BY MR. GALDO:

16    Q.  In this series of text messages, which starts around 1071,

17    you ask her for money.  You continue to talk with her about

18    asking for food, and then later some text messages that are

19    discussing about things that are sexual in nature.

20            What is the story behind those text messages while

21    you are kidnapped?  Why were use sending those text messages

22    to Diablo?

23    A.  The intention was for her to lend me money and to forget

24    for a while what was happening.

25    Q.  Did she actually -- were you able to get food from her?
```

Jorge De Leon-Navarro - Direct

1    A.  Yes.

2    Q.  And how did food get from her to you while you were with

3    the estacas, the sicarios?

4    A.  It was one time.  They told her -- they told me to tell

5    her to send it in a taxi to an Oxxo.  And there, they picked

6    it up.

7    Q.  Were they feeding you for the 13 days you were held?

8    A.  A taco and a mouthful of water.

9    Q.  And later, you tell Diablo on February 27 -- and this is

10   1282.  Did you tell her on that date:  If I don't give them

11   $100,000 I will not escape.  I have 20?  How would you come up

12   with the $20,000 by that point?

13   A.  Selling my mother's house.

14   Q.  Now fast forward to 1382.  This is March 1st, 2013, a

15   conversation with Ma again, your wife or your mother, about

16   having a taxi waiting for you.

17            Why were you released at the end of 13 days?  How

18   does that play in with the taxi?

19   A.  Well, because I was able to put together that amount and

20   they released me, but in one more week, I would have to give

21   them $100,000 more.

22   Q.  Were you able to put together $100,000 or $20,000?

23   A.  Only 20,000.  Not the 100,000, no.

24   Q.  And who told you that you needed to pay $100,000 more?

25   A.  Chano and Enano.

Jorge De Leon-Navarro - Direct

```
 1    Q.   Where were you when they released you?
 2    A.   They let me go in Piedras Negras at an Oxxo.
 3    Q.   How did you get home to Acuna?
 4    A.   In a taxi.
 5    Q.   Did Chano communicate with your family ever to confirm
 6    that you had the money, that $20,000?
 7    A.   Yes.
 8    Q.   Who was the money actually handed to?
 9    A.   To Commandante Raulito.
10    Q.   On March 1st, 2013, the date you were released -- this is
11    Government's Exhibit 126.
12              MR. GALDO:  May I approach, Your Honor?
13              THE COURT:  Yes.
14    BY MR. GALDO:
15    Q.   On March 1st, 2013, there is a message from you, someone
16    that comes up as unknown on your Blackberry, and it says:
17    Bro, tell Chano that El Mando has not answered me from here.
18    Right now when he answers I will deliver that to him.
19              And under that you say:  The 20,000.
20    A.   Yes.
21    Q.   So is the person you are referring to as Chano in here the
22    same Chano that is here in the courtroom?
23    A.   Yes.
24    Q.   And El Mando, what does that mean?
25    A.   The commandante.
```

Jorge De Leon-Navarro – Direct

1   Q.   So "mando" is slang for "commandante"?

2   A.   Commandante and mando is the same thing.

3   Q.   So who were you sending this -- if you remember.  It says

4   "unknown" here, but do you remember who you were sending that

5   message to?

6   A.   Yes.

7   Q.   Who is that?

8   A.   Kitty, a sicario from Piedras Negras.

9   Q.   And why were you sending a message to Kitty?

10  A.   So that they would tell Chano that the commandante from

11  Acuna had not answered me.

12  Q.   And why were you trying to get in touch with -- I believe

13  you said it was Raulito that was the commandante in Acuna?

14  Why were you trying to get in touch with him?

15  A.   Yes.

16  Q.   Why were you trying to get in touch with him?

17  A.   Because Chano told me that the money should be delivered

18  or turned over to him.

19  Q.   And why to Raulito instead of to Chano?

20  A.   Because the commandante who -- who controlled in Acuna,

21  who controlled Raul was Chano.

22  Q.   On -- this is Government's Exhibit 125.  This has been

23  already talked about.  This is the second page of Government's

24  Exhibit 125.

25          MR. GALDO:  May I approach, Your Honor?

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro – Direct

```
 1              THE COURT:  Yes.
 2   BY MR. GALDO:
 3   Q.  You talked about Chicken 2 is Chano, and he sends a
 4   message to you on March 3rd, 2013.  You have already been
 5   released.  It says:  Get money.  Try to get it right now that
 6   you are free man.  Because you are going to need it.  Don't be
 7   confident.
 8              And you replied:  I am here on top of it.  Yes.
 9   Listen.  No, I am  already on it.
10              And what was the purpose of that message?  What was
11   the purpose of that exchange you had with Chano?
12   A.  To obtain the money, and that if I didn't obtain it, he
13   was going to tie me up.  He was going to take me.
14   Q.  On -- a few days later, on March 6 -- this is Government's
15   Exhibit 126.  If you could turn to 126.
16              MR. GALDO:  May I approach, Your Honor?
17              THE COURT:  Yes.
18              Can you read the screen from there, from where you
19   are at?
20              THE INTERPRETER:  Barely, Judge.
21              THE COURT:  Okay.  That's fine.
22              MR. GALDO:  Government's Exhibit 126, on the fifth
23   page --
24              THE COURT:  One second, Counsel.
25              (Change of interpreters.)
```

Jorge De Leon-Navarro – Direct

1    BY MR. GALDO:

2    Q.  On the fifth page, these are messages on March 6th, 2013.

3    This is five pages over.  Messages with someone who has the

4    Blackberry name -- it looks like a series of symbols and then

5    Poemas 04?

6    A.  Yes.

7    Q.  Who is Poemas 04?

8    A.  A sicario from Piedras Negras.

9    Q.  And you are having a conversation with him on March 6th,

10   where you tell him -- you describe yourself, and he says:  Who

11   are you?

12           The detained one from Acuna, bro.  How's it going?

13   A.  Yes.

14   Q.  And did you -- who did Poemas work for?

15   A.  For Chano.

16   Q.  And then you tell him, in the same conversation, that you

17   are here right now.  Just came back from walking some people.

18   I am on it.

19           What did you mean by "walking some people"?

20   A.  That was just a lie.  He asked me for a favor, that I get

21   him an address, and that's why I told him that I was busy.

22   Q.  This next part of the conversation, "That if Che has the

23   address of the guy."  What does "walking some people" mean?

24   Does that have anything to do with drug trafficking,

25   smuggling?

Jorge De Leon-Navarro - Direct

1    A.  That's how you would name it, when you would take some

2    people who had some sacks to the edge of the river.

3    Q.  So did you have any obligations after you were released to

4    move any drugs?

5    A.  To continue working for Caldaria.

6    Q.  And why were you supposed to continue working for

7    Caldaria?

8    A.  For the money that I still owed him.

9    Q.  On that same page, at the bottom, there is a Acuario Z.

10   Who is Acuario Z?

11   A.  Commandante Raulito.

12   Q.  So he says to you, "What's up?" on March 7th.  And you

13   respond to him --

14   A.  He had some boxes, nine millimeters and 35 magazines.

15   Q.  What do you mean, "some boxes"?  What are you talking

16   about?

17   A.  These are with bullets, boxes.

18   Q.  And so what -- what do you -- what are you talking about

19   here?  Are you talking about ammunition?

20   A.  Yes.

21   Q.  What -- tell me about that ammunition.  How is it getting

22   across?

23   A.  Through compartments in the vehicles, by the -- over the

24   bridge.

25   Q.  So you sent Raulito this message, and he sends you a

Jorge De Leon-Navarro – Direct

1    message shortly thereafter that just said "E."  And then he

2    says, "Answer, whore."

3              Do you know why he was speaking to you that way?

4    A.  He was mad.

5    Q.  Why was he mad?

6    A.  Because I was not answering him.

7    Q.  So what would happen if Raulito, Chano, Enano, any of the

8    Zetas called you and you didn't answer the phone?

9    A.  They would get mad and they would start threatening that

10   they were going to kill the family.

11   Q.  Going back to Government's Exhibit 125.  Turn to the

12   second page of 125, towards the bottom.  There is a message

13   from you.  It is the series that starts on March 11, 2013,

14   from you to Chicken 2, Chano.  You say:  Listen, like around

15   eight or nine at night I should get the paper so I can give it

16   to you.  I will let you know shortly when I get there so you

17   can tell me what to do.

18              And then Chano replies:  How much is it?

19              When you said "paper," what did you mean?

20   A.  Money.

21   Q.  And he asks you how much it was.  You said:  It is 95.

22   What do you think?

23              And you are talking about the guy has it and he is

24   getting ready to come over.  What were you talking about

25   there?

Jorge De Leon-Navarro - Direct

1    A.  I was trying -- buying time, because that was the day that

2    I came over here.  I wanted to make him believe -- I made him

3    believe that in the afternoon I was going to get some money,

4    and that was only to buy time to get out of Acuna.

5    Q.  And then he replies to you and says:  Well, you already

6    know who your plaza commander is there.  You can give them to

7    him.

8            And so tell us about, what does he mean by "plaza

9    commander"?

10   A.  To deliver it to the Commandante Raulito.

11   Q.  And what is a plaza?

12   A.  The control of Acuna.

13   Q.  And then on the next page, Chano sends you a message,

14   Chicken 2.  This is on March 12.  "Did you give the payment,

15   Leon?"  What is he talking about there?

16   A.  That if I had already given the 95,000.

17   Q.  And at that point, on March 12, 2013, where were you?

18   A.  At the Serenia, on the edge of the Rio Bravo.

19   Q.  Is that the Rio Grande?

20   A.  Yes.

21   Q.  And where is that in relation to Acuna?

22   A.  About four hours from Acuna.

23   Q.  North?

24   A.  Yes.

25   Q.  And what were you doing there?

Jorge De Leon-Navarro – Direct

1   A.  I was on my way already to the United States.

2   Q.  On Government's Exhibit 126 -- and I can put it on the

3   screen, if that works.  This is the last messages on

4   Government's Exhibit 126.

5          You have someone on your phone as Caldo, C-a-l-d-o.

6   Who is Caldo?

7   A.  Caldaria.

8   Q.  And he send you a message -- this is March 12th.  "Listen,

9   El Coma left me an order to deliver to you."

10          And then he sends a second message right after.  "He

11  gave me one too and Andrade.  It's 50 kilos that he gave each

12  one of us.

13          What can you tell me about that message?

14          THE INTERPRETER:  The interpreter is looking for the

15  March 12th date.

16          MR. GALDO:  It is the very last page of 126, the

17  last message.

18          THE INTERPRETER:  What was the final question in

19  reference to that?

20  BY MR. GALDO:

21  Q.  You said this was Caldaria sending you two messages.  What

22  was the point of those two messages?  What was that about?

23  A.  I believe that he was talking about 50 pounds of

24  marijuana -- 50 kilos of marijuana, but I didn't answer the

25  message anymore, because I was no longer in Acuna.

Karl H. Myers, CSR, RMR, CRR – (210) 244-5037

Jorge De Leon-Navarro - Cross

```
1    Q.  Where were you going?

2    A.  To the United States.

3    Q.  And why were you going to the United States?

4    A.  I was coming away, escaping, because I didn't have the

5    $100,000 and he was going to kill me and my whole family.

6    Q.  Who is "he"?

7    A.  Los Zetas, Chano, Raul, Enano.

8            MR. GALDO:  One moment, Your Honor.

9    BY MR. GALDO:

10   Q.  Did any of the Zetas, Chano, Enano, anyone say why you

11   owed $100,000?

12   A.  Just it was a fine.

13   Q.  A fine for what?

14   A.  Because I didn't have the $20,000 in time.

15           MR. GALDO:  I will pass the witness, Your Honor.

16           THE COURT:  Any questions?

17           MR. CAVAZOS:  I do have questions, Your Honor.

18   Could we take a break, though, before I start?

19           THE COURT:  Yes.  Let's take 15 minutes.

20           (Jury leaves courtroom.)

21           THE COURT:  Please be seated.

22           If we are going to continue using the books for

23   examination -- I mean, we are losing a lot of time just

24   finding pages.  All you have to do is blow up the screen and

25   enhance the text and everybody would be able to read it from
```

Jorge De Leon-Navarro – Cross

1   the screen.  It is an easy solution, guys.

2         MR. GALDO:  I only did that because the interpreters

3   asked not to.  That's why I was --

4         THE COURT:  Well, and so the interpreter's job is

5   just to interpret, and so it is not -- you guys keep on

6   looking for the text.

7         All you have to do is translate the words that are

8   said.

9         Let's take a break.

10        (Brief recess.)

11        THE COURT:  Please be seated.

12        Mr. Cavazos.

13        MR. CAVAZOS:  Thank you, Your Honor.

14                    *-*-*-*-*-*-*-*

15                  CROSS EXAMINATION

16  BY MR. CAVAZOS:

17  Q.  Mr. De Leon, I want to kind of do a little chronology, so

18  I am going need your help with dates.  Okay?

19  A.  Yes.

20  Q.  And I want to start with this.  There was a transaction

21  that you described wherein you and Calderia went to Piedras

22  and you picked up three tons of marijuana, correct?

23  A.  Yes.

24  Q.  When did that happen?

25  A.  The first time, it was at the beginning of the year 2011.

Jorge De Leon-Navarro - Cross

1    Q.  Okay.  But I want to get to the three-ton load that you

2    testified to that occurred prior to that load that was lost

3    that caused all of these problems.  When did that happen?

4    A.  In December.

5    Q.  Of what year?

6    A.  2012.

7    Q.  And you picked up three tons, right?

8    A.  Yes.

9    Q.  And it was my understanding that you hid a ton, right?

10   A.  No.  I never said a ton.  I hid some of it, a part of it.

11   Q.  Okay.  So you took some of the marijuana and Calderia took

12   some of the marijuana.  And did anybody else take any of that

13   marijuana?

14   A.  No.  Just the two.  They were hidden in two homes only.

15   Q.  And the marijuana that you hid, do you remember how much

16   that was?

17   A.  No.

18   Q.  Was it half of the load, a third of the load, a fourth of

19   the load?

20   A.  Approximately half.

21   Q.  So it would have been at least over one ton, correct?

22   A.  Yes.

23   Q.  And because you were the one that hid that load or you put

24   it in a house, would you now be responsible for that?

25   A.  To have looked after the drug?  I was responsible.

Jorge De Leon-Navarro – Cross

1    Q.  But you all went and bought it, according to you, from

2    Marciano and the others in Piedras, right?

3    A.  I worked for Calderia and Calderia would buy it.

4    Q.  Okay.  So Calderia went over and bought it, and you helped

5    him bring it back, right?

6    A.  Yes.

7    Q.  So now it's Calderia's marijuana, right?

8    A.  Calderia is the owner of the marijuana.

9    Q.  Okay.  And so he is responsible now for it, right?  Or he

10   owned it; you already paid for it, right?

11   A.  Can you repeat?

12   Q.  Yes.  At the point that Calderia leaves Piedras Negras and

13   you and he bring the marijuana to Acuna, he's paid for it.

14   It's now his marijuana, correct?

15           MR. GALDO:  Objection, Your Honor.  Compound

16   question.  It's two issues there.

17           THE COURT:  That's overruled.  I believe the

18   answer -- the witness gave an answer and it needs to be

19   translated.

20           THE WITNESS:  Yes.

21   BY MR. CAVAZOS:

22   Q.  Okay.  So that being the case, the people in Piedras

23   Negras, they don't have any interest in that marijuana, do

24   they?

25   A.  Well, it was theirs when they sold it to Calderia.

Jorge De Leon-Navarro - Cross

1    Q.  Okay.  But Calderia bought it.  It's his now, right?

2    A.  Yes.

3    Q.  Okay.  All right.  And that happened around December 2012,

4    correct?

5    A.  Yes.

6    Q.  Okay.  When was the load of Vara-Martinez seized, if you

7    know?

8    A.  I don't remember exactly.  It was in February -- or in

9    January or the 1st of February.  I don't remember the date

10   exactly.

11   Q.  But that would have been in 2012, correct?

12   A.  No.  Starting the year 2013.

13   Q.  All right.  Okay.  And were you responsible for packing

14   that marijuana and making sure that it got across the river?

15   A.  No.  Calderia had someone to pack the marijuana.  I was

16   only to take it to the edge of the river.

17   Q.  Okay.  And you did that, right?

18   A.  Yes.

19   Q.  Okay.  Let me back up just for a second so I can

20   understand the relationship that you and Mr. Calderia had.

21   Did he pay you for the things that you did for him, or did you

22   get like a salary, or you were paid no matter what you did?

23   A.  I would receive a salary.

24   Q.  Okay.  And how much were you receiving?

25   A.  From $200 a week.

Jorge De Leon–Navarro – Cross

1    Q.  Did you yourself distribute marijuana or sell marijuana,

2    aside from the things that you were doing for Mr. Calderia?

3    A.  No.  I would not sell.

4    Q.  Never?

5    A.  My job was to use the phone, but they were all his

6    clients.  When he was busy and could not answer the phone or

7    he would tell me to call, but he was the one who had the

8    direct contact.

9    Q.  So you never sold marijuana independent of Mr. Calderia,

10   correct?

11   A.  No.

12   Q.  And you didn't have a source of supply that you utilized

13   to receive marijuana for resale, correct?

14   A.  No.  They were all Calderia's clients.

15   Q.  Okay.  All right.  So when were you physically picked up

16   because of that lost load?  What date?

17   A.  The middle of February, more or less.  I don't remember

18   the date exactly.

19   Q.  Well, you were released on March 1st, right?

20   A.  I recall about that, yes.

21   Q.  And you said you were held for 13 days?

22   A.  Thirteen days.

23   Q.  And did you text somebody or were you allowed to text

24   somebody the day that you were picked up?

25   A.  Yes.

Jorge De Leon-Navarro – Cross

1    Q.   Okay.  Do you remember who you texted?

2    A.   I recall that I did send messages to my family.

3    Q.   And what exactly did you tell them?

4    A.   To get money.

5    Q.   But you don't know exactly what date that would have been?

6    A.   I don't remember.

7    Q.   Okay.  And you said you were driven around at first, that

8    you weren't taken to a location, correct?

9    A.   They didn't drive me around.  They just had me there tied

10   up.

11   Q.   Where is "there"?

12   A.   In the truck, in the vehicle, in the car.  And they would

13   change me from place to place, a vehicle, car, truck.

14   Q.   And did that situation continue for days or hours?

15   A.   For the 13 days, that's how they had me.

16   Q.   So you were never at a physical location at any time?

17   A.   No.

18   Q.   So you were allowed to keep your cellphone, right?

19   A.   No.  The ones who had me, they had them.  They would just

20   loan them to me or they would just give them to me, just so

21   that I could send messages to my family.

22   Q.   Okay.  And would you ask for permission for the phone, or

23   they would direct you to send those texts?

24   A.   They would tell me that I had to send the messages to get

25   the money.  If not, they would kill me.

Jorge De Leon-Navarro – Cross

1    Q.  And you said -- you described, when you were taken to

2    places, that you were blindfolded.  Is it your testimony here

3    that while you were in the vehicle you were always

4    blindfolded?

5    A.  Yes.  When they wanted me to send the text messages, they

6    would take it off.

7    Q.  Okay.  And when they would allow you to send text

8    messages, were you still driving around or were you at a

9    location, or where were you?

10   A.  They had me in the vehicle.

11   Q.  How long was it before they allowed you to use your phone

12   after they picked you up?

13   A.  I don't recall, but it was quickly.

14   Q.  Okay.  And --

15            MR. CAVAZOS:  I am sorry, Judge.

16   BY MR. CAVAZOS:

17   Q.  Let me ask it this way.  How quickly after you and

18   Calderia and Alfredo, that you were picked up, did they get

19   released?

20   A.  I don't recall, because they did not have us together.

21   Q.  But were you made aware that they had been released?

22   A.  No.

23   Q.  You testified earlier that they were released because they

24   paid money.  Do you recall that?

25   A.  Yes, but I didn't know that until later.  I don't know how

Jorge De Leon-Navarro – Cross

1    many days later, but I didn't learn of it until later.  As to
2    when they let them go, I don't know.
3    Q.  Okay.  But did you learn they had been released while you
4    were still captive?
5    A.  Yes.  And I even asked money from Alfredo Andrade, but he
6    did not loan me any.
7    Q.  But you worked for Calderia.  Why didn't you ask him for
8    money?
9    A.  Because Calderia also owed, and I knew that he did not
10   have any money at that time.
11   Q.  Okay.  And did you find out that they had been released
12   before you were taken to that pink house that you testified
13   about?
14   A.  I don't remember.
15   Q.  Okay.  Well, let me ask it this way.  How many days had
16   passed before you were taken to that orange-pinkish house for
17   the first time?
18   A.  Two or three days.
19   Q.  I have read the texts that you sent.  You didn't send any
20   texts to your family describing what you had seen at that
21   orange and pink house, did you?
22   A.  At some time -- I don't know if I put down that if they
23   knew what I had seen or something like that.
24   Q.  Okay.  But I've read them, and they are available to you,
25   if you want to go back to them.  But did you describe what you

Jorge De Leon-Navarro - Cross

1   described to this jury to your family or anything close to

2   that in your texts?

3   A.  Can you repeat the question again?

4   Q.  Did you text your family and provide a description of what

5   you saw that you testified to here today?

6   A.  That if I would --

7   Q.  Yes.

8   A.  -- tell my family how they were cutting them up?  No.  I

9   didn't send any message to my family about that.

10  Q.  But you said that the reason that the people that had you

11  wanted you to see that was so you could get money for them,

12  right?

13  A.  Yes.

14  Q.  Okay.  You said a lot of things to your family, right?

15  A.  Some.  Some things.

16  Q.  I believe -- and it was shown that you described -- or you

17  didn't describe.  You just said something about the boys, the

18  Zocalo boys, right?

19  A.  Yes.

20  Q.  And, obviously, the same phone that you had when you were

21  kidnapped was the same phone that law enforcement took from

22  you when they found you in the United States, correct?

23  A.  Yes.  Yes.

24  Q.  What features did that phone have?  Was it like a

25  smartphone?

Jorge De Leon-Navarro - Cross

1  A.  I don't know about features on the phone.  I just used the
2  Internet and it would call.
3  Q.  Okay.  There was a second incident that you described
4  where you say you saw violent acts.  Where did that happen?
5  A.  Specifically, the little girl or the other people or the
6  others?
7  Q.  Okay.  Well, I want to go in order -- all we've talked
8  about so far is the first time you went to a pinkish house,
9  right?
10  A.  Yes.
11  Q.  And you said that that happened between two or three days
12  after you were kidnapped, right?
13  A.  Yes.
14  Q.  Okay.  Now, there was -- what happened -- what other
15  violent act happened after that?
16  A.  That same house, there was another one, three people --
17  Q.  Okay.  Three people.
18  A.  -- two men and a woman.
19  Q.  And, I mean, you had your cellphone with you.  It would
20  tell you what date, because you were texting, right?
21  A.  When I was watching the deaths, at that moment, I did not
22  have them -- have it.
23  Q.  But you were allowed to use your phone after you witnessed
24  what you say you witnessed, right?
25  A.  Later.  I don't remember how many hours later.

Jorge De Leon-Navarro - Cross

1    Q.  So it was that same day, just hours later that you were
2    allowed use of your phone, right?
3    A.  I don't remember if it was the same day.  I don't remember
4    exactly what exact hour or when.
5    Q.  Okay.  So how many days from the pinkish house did that
6    second incident involving the three people happen?
7    A.  I don't remember.  I wouldn't be telling the truth if I
8    told you how many days it was.  It's several occasions, so
9    it's difficult to remember exact occasions, exact times.
10   Q.  Okay.
11   A.  All I -- all those deaths that I saw, all I know is, it
12   was during the time that I was there, during those 13 days.
13   The first one was at the orange house, then it was at the
14   Centinela, then in the house with two floors, then at the junk
15   yard, and then at the edge of the river.  The exact days, I do
16   not know.
17   Q.  Okay.  Let me make sure.  Centenilla?  Or what did you --
18   A.  Centinela.
19   Q.  Centinela.  And that's near the prison?
20   A.  Yes.
21   Q.  And then after that was a two-story house?
22   A.  Yes.
23   Q.  And then next to the river after that?
24   A.  The junk yard.
25   Q.  Oh.  The junk yard.  Okay.  And then after the junk yard?

1    A.  The river.

2    Q.  Okay.  So the first time, the pinkish house, right?

3    A.  Yes.

4    Q.  The second incident was where?

5    A.  Centinela.

6    Q.  Not at the pinkish house?

7    A.  There were two events at that house, but the first event

8    was at the house, then the second event was at the Centinela,

9    and then it was back at that house for another one.

10   Q.  So the two-story house is the pinkish house?

11   A.  No.

12   Q.  Okay.  All right.  So you don't know how many days had

13   passed from the pinkish house to the second incident, and the

14   second incident occurred in that place near the prison, the

15   Centinela, correct?

16   A.  Yes.

17   Q.  You didn't text your family any of the details or even

18   close to the details that you described here on the first

19   time?

20   A.  That they were cutting up the people?  Not as far as I can

21   remember.

22   Q.  And --

23   A.  In a message, I said that they were smoking them, they

24   were cooking them.

25   Q.  Okay.  And on the incident near the prison, Centinela, you

Jorge De Leon-Navarro - Cross

1  didn't text your family about details concerning that either,

2  did you?

3  A.  I don't remember.

4  Q.  Okay.  Then you said the third incident was at a two-story

5  house, which was different from the pinkish house, right?

6  A.  It was not the third one.  It was about the fourth one.

7  There were two incidents -- there were two incidents in the

8  orange house, the first one, then the Centinela, then again

9  the orange house.

10 Q.  Okay.  So this was the fourth incident?

11 A.  I remember something like that.

12 Q.  How many days into your captivity were you at this point?

13 A.  The truth is, I don't remember.

14 Q.  Do you remember how many days it was before you were

15 released?

16 A.  I was kidnapped for 13 days.

17 Q.  Okay.  And we talked about that and we talked about the

18 text messages that you were sending.  When did you start

19 texting people other than your family for money?

20 A.  I don't remember.  It was during the lapse of those days

21 to different people.

22 Q.  Okay.  And by -- at that point, had you already witnessed

23 the incident at the pink house?

24 A.  At the orange one?

25 Q.  Yes.  You had already seen -- witnessed that, right?

Karl H. Myers, CSR, RMR, CRR - (210) 244-5037

Jorge De Leon-Navarro – Cross

1    A.  Yes.

2    Q.  And had you witnessed the incident at Centinela, near the

3    prison?

4    A.  I don't remember.

5    Q.  So then after -- and the Centinela is when you said that

6    there was already a body there, right?

7    A.  Yes.  They had a person.

8    Q.  Okay.  Did you text any information about that to your

9    family?

10   A.  I don't remember.

11   Q.  Okay.  And after that, the next incident was where?

12   A.  The two-story house, the little girl and her parents.

13   Q.  You didn't text your family about that either, did you?

14   A.  Not as far as I can remember.

15   Q.  You didn't text that to any of your friends that you were

16   asking money from, right?

17   A.  Not that I remember.

18   Q.  And what incident happened the next time?

19   A.  After that house, it was at the junk yard.

20   Q.  Now, at this point, do you know, more or less, what date

21   it is?

22   A.  I don't remember.

23   Q.  And there, what did you witness?

24   A.  The death of four young guys.

25   Q.  That, you did text to your family, right?

Jorge De Leon-Navarro – Cross

1    A.  Yes.

2    Q.  Do you remember what date that was?

3    A.  No.

4    Q.  I am going to put up a document from Exhibit 110 that's

5    already been introduced into evidence.  Can you see it?

6    A.  I can't make it out from here.

7    Q.  Can you see it now?  Do you see this message?  Are you

8    having difficulty reading it; is that it?

9    A.  They have got four already of the Zocalos.

10   Q.  Is that the message you sent to your family?

11   A.  Yes.

12   Q.  What's the date on that message?

13   A.  I can't make it out.  Can't distinguish it.  Is it 2/23?

14   Q.  Right.  February 23rd.  Okay.  Now we are at incident

15   number -- which one?  Three?

16   A.  The one about the Zocalos?

17   Q.  Yes.  That happened, according to you, at the junk yard,

18   right?

19   A.  Yes.

20   Q.  Okay.  So far, you have described the incident at the

21   two-story house, the second incident at the pink house or

22   orange house?

23   A.  Yes.

24   Q.  The incident near the prison?

25   A.  Yes.

Jorge De Leon-Navarro – Cross

```
1    Q.  And then there was another incident where?  At the pink

2    house again, or there was another one before that?

3    A.  At the pink house, where they killed the little girl and

4    their parents, it was only that one.  And at the orange-color

5    house, there were two incidents, yes.  And there were also two

6    incidents at the junk yard.

7    Q.  Okay.  So I guess I am trying to orient dates.  At the

8    junk yard, you texted about the boys, the newspaper boys, and

9    we are talking February 23rd of 2013?

10   A.  Uh-huh.  Yes.

11   Q.  So let's get grounded on February 23rd of 2013 at the junk

12   yard.

13   A.  Yes.

14   Q.  How many days before that did the incident at the junk

15   yard occur?

16   A.  I would be lying to you if I told you exactly what.  I

17   don't remember.

18   Q.  Can you give me an idea?  Was it one or two or three?

19   A.  They were not very far, very distant, one from the other.

20   They were fairly close together.

21   Q.  Okay.

22   A.  I don't remember.

23   Q.  Then after the junk yard, which was on February 23rd of

24   2013, you said that there was an incident that occurred at the

25   river, correct?
```

Jorge De Leon-Navarro - Cross

1   A.   Yes.

2   Q.   How many days had passed from the junkyard incident to the

3   river incident?

4   A.   That was the last day, when they let me go at the river.

5   Q.   And what date did they let you go?

6   A.   It seems that it was on the 1st of March.

7   Q.   Okay.  This is out of Exhibit 110, which is already into

8   evidence.  These are the texts between you and Diabla, or the

9   person you call Diabla.

10  A.   Yes.

11  Q.   And these are the texts that you testified before that

12  were talking about sex and you wanting money from her, right?

13  A.   Yes.

14  Q.   And according to these text messages, that occurred around

15  February 26th of 2013, right?

16  A.   I don't remember, but the date's there.

17  Q.   Okay.  Well, I mean, did other people bring you food while

18  you were kidnapped?

19  A.   No.

20  Q.   She was the only one that did, right?

21  A.   She was the only one, and she sent it to me only once, one

22  time.

23  Q.   So now, that incident, put it into the context of the four

24  incidents that you have described where violent acts occurred.

25          In relationship to the incident, when did that text

Jorge De Leon-Navarro - Cross

1    get sent?  After the first one, the second one, the third, the

2    fourth?  Whereabouts?

3    A.  I don't remember.  Several incidents had already taken

4    place.

5    Q.  Okay.  And you didn't describe anything in your text to

6    Diabla about what you had seen and what you were being

7    subjected to, correct?

8    A.  No.  Yes.  Correct.

9    Q.  The extent of your conversation was about lust and getting

10   chicken delivered to you, correct?

11   A.  Yes.

12   Q.  Now, let me ask you this, because I want to make sure that

13   I am clear.  This is out of 110 as well.  Here is Diabla,

14   D-i-a-b-l-a.  And I am assuming that that's her phone number

15   where you are sending that text to, correct?

16   A.  Yes.

17   Q.  Did you give her this abbreviation for her number in your

18   phone?

19   A.  Yes.  I gave it to her.

20   Q.  And you did the same thing for everybody that shows up

21   that you sent text messages to, correct?

22   A.  In the text messages, through the Internet, they put there

23   what comes out.

24   Q.  No.  It was a poorly worded question.  So here you have

25   Cal 3, right?

Jorge De Leon-Navarro - Cross

1    A.  Yes.

2    Q.  And you gave -- this is -- in your phone, the contact Cal

3    3, you put it in there, and it relates to this phone number,

4    right?

5    A.  Yes.

6    Q.  And the same thing for Ma, your mother, correct?

7    A.  Yes.

8    Q.  And it's the same for Chicken 2, right?  You put that in

9    as a contact in your phone, and it relates to a number, right?

10   A.  No, it's not the same.

11   Q.  Okay.  Did you, at any point, know where you were at while

12   you were being kidnapped?

13   A.  I don't know Piedras very well or a lot about it.

14   Q.  Okay.  Did you ever think about sending a text to your

15   family or your friends to try to get help to get you out of

16   the situation you were in, call law enforcement, anything?

17   A.  No, because it would be like turning myself over to them.

18   Q.  But would you agree with me that the Marinos are not

19   bought and paid for, right?

20   A.  Yes.  But if you are with them, and if you say so, they

21   may leave.  They may wait for a day or two, but they will kill

22   you and your family, if they say they are going to kill you

23   and your family.

24   Q.  Okay.  I asked you earlier if you yourself dealt marijuana

25   on your own outside of your relationship with Calderia.

Jorge De Leon-Navarro - Cross

1    A.   No.  It was all under his orders.

2    Q.   Well, let me show you some text messages out of

3    Exhibit 110.  The contact is P-a-p, Pap.

4    A.   Uh-huh.

5    Q.   Yes?

6    A.   Yes.

7    Q.   And you said earlier that that was your dad, correct?

8    A.   Yes.

9    Q.   Okay.  And you are sending him a text on the 20th day of

10   February while you are still being held, right?

11   A.   Yes.

12   Q.   And you are asking him to get a scale -- it says, "Get a

13   scale to see how much it is in total weight.  Mark it with

14   everything and paper."

15   A.   Yes.

16   Q.   What are you talking about weighing?

17   A.   It was to bring some drugs that I had brought from the

18   Serenilla Acunense and -- which they wanted to be returned to

19   Calderia.  And they wanted to know if the amount -- if the

20   quantity that I had was the quantity that Calderia had written

21   down.  And because of that reason, that I would ask him or

22   tell him to weigh it and tell how much it was.

23   Q.   Was this marijuana different marijuana than the three tons

24   that you all had picked up?

25   A.   No.  It wasn't -- out of the same.

Karl H. Myers, CSR, RMR, CRR - (210) 244-5037

Jorge De Leon-Navarro - Cross

1   Q.  So your father had access to the marijuana that you and

2   Calderia had bought from the Zetas?

3   A.  No.  I sent him because I didn't -- I needed someone

4   trustworthy, and they wanted me to send someone trustworthy,

5   and that's why I asked my father to do that.  And if that

6   marijuana did not return from the Serenilla, from the hill

7   country, they would also -- they were going to kill me.

8   Q.  So your father knew where it was?

9   A.  I -- I notified him.

10  Q.  Okay.

11  A.  I told him at which ranch, farm it was.

12  Q.  Okay.  Well, this is the page from the previous text, and

13  there is another message to your dad.

14  A.  Uh-huh.  Yes.

15  Q.  And all you are telling him is, "Okay.  In the morning,

16  weigh everything with a scale."

17  A.  Yes.

18  Q.  I don't see any direction for him on where to go, correct?

19  A.  It's there in some messages in which I tell him that it

20  was at El Coyote Ranch.

21  Q.  The next message is to Cal 3, where you are asking him to

22  lend you a scale --

23  A.  Yes.

24  Q.  -- right?  And that number is 1331, correct?

25  A.  Yes.

Jorge De Leon-Navarro - Cross

1   Q.  Okay.  And now we are at 1332, so that's the next message.
2   And still, I don't see you telling your father where the ranch
3   is.
4   A.  When he goes to weigh, he had already come back.  Those
5   messages are further back.
6   Q.  Okay.  And here, in this message, you are saying, "Go for
7   it.  Start weighing that, Dad."
8   A.  Yes.
9   Q.  And that's on the 28th day of February, the same day that
10  these other messages are, correct?
11  A.  Uh-huh.  Yes.
12  Q.  Okay.  And then the next message is, "There were some
13  scales at the house, wasn't there?  Or go find a good one."
14  A.  Yes.
15  Q.  No directions to wherever it is that the marijuana is that
16  your dad is supposed to go weigh, correct?
17  A.  He had already come back.  As I tell you, if you look for
18  those messages, you will find them there.
19  Q.  So on these incidents, the river incident occurs, and did
20  the $20,000 actually get handed over or was it promised to be
21  handed over that day that you were released?
22  A.  I turned them over the next day.
23  Q.  Okay.  And how many days after March 1st did you cross?
24  What date did you cross into the U.S.?
25  A.  I don't remember, but I believe it was on the 12th.

Jorge De Leon-Navarro - Cross

1   Q.  On the 12th.  I am going to show you what's out of 110.

2   This is your message to your mom on the 1st of March, right?

3   This is the date you were released?

4   A.  Yes.

5   Q.  Okay.  Where you ask her to fix you some breakfast and you

6   are on your way home, right?

7   A.  Yes.

8   Q.  So from March 1st to the day that you were arrested --

9   which was March 12th, you said?

10  A.  They arrested me March 13 at 3:00 o'clock in the

11  afternoon.

12  Q.  So from March 1st, when you got out, what was your plan?

13  A.  Obtain the money, sell some land, sell some land that was

14  my grandfather's.

15  Q.  What else?

16  A.  And Calderia told me that he would lend me some money if

17  I -- and if I continued shipping drugs for him, and that if

18  everything turned out all right that he would loan me some

19  money.

20  Q.  And did you do that?  Were you moving drugs and stuff

21  after March 1st and before March 13th?

22  A.  Yes.  Yes.  I took some people with bags to the Rio Grande

23  riverside.

24  Q.  Okay.  And did you make money off of that?

25  A.  No.  No.  Because the drug was lost.  We learned -- we

Jorge De Leon-Navarro - Cross

1    knew nothing about it.

2    Q.  So everything was going bad?

3    A.  Everything turned out bad.

4    Q.  What date was it, if you remember, or how many days had

5    passed, if you don't remember the date, from March 1st when

6    that load got caught?

7    A.  It was after March 1st.  Five or six days.  I don't

8    recall.

9    Q.  And that's when the load got caught?

10   A.  I don't know if it got caught or if we lost it.  We did

11   not know.  Even to this date, I don't know.

12   Q.  And what was the only thing going through your head at

13   that time?

14   A.  How was I going to pay that money?  What was I going to

15   do?

16   Q.  That was it?

17   A.  Get the money.

18   Q.  Okay.  Let me show you something out of 110.  Who is this

19   person, Tek, T-e-k, Tek?

20          THE INTERPRETER:  T-e-k?

21   BY MR. CAVAZOS:

22   Q.  Who is that?

23   A.  It is one other person.

24   Q.  Is it a female person?

25   A.  Yes.

Jorge De Leon-Navarro – Cross

```
 1   Q.  So on March 7th, 2013, around the time that this load that
 2   you are claiming fell and things were going horrible, what are
 3   you trying to negotiate with her?
 4   A.  What is it?  What does it say?
 5   Q.  "Yes, come, but very sexy."
 6   A.  Nothing to do with drugs or anything.
 7   Q.  Okay.  Was that another thing to distract yourself from
 8   what was going wrong?
 9   A.  Yes.  Nothing to do with drugs.
10   Q.  This is another text between you and that same person on
11   that same day.  Same thing, later on, just trying to get your
12   mind off of what is going wrong?
13   A.  Nothing to do with drugs.
14   Q.  Right.  It had to do with her fulfilling some sexual
15   fantasy for you, right?
16   A.  Something like that, I remember.
17   Q.  Okay.  Okay.  So you make the decision to cross the river?
18   A.  Yes.
19   Q.  And you are doing this in order to protect your family?
20   A.  Yes.
21   Q.  Your wife?
22   A.  Yes.
23   Q.  Your children?
24   A.  Yes.
25   Q.  Okay.  Who crosses the river with you?
```

Jorge De Leon-Navarro - Cross

1    A.  My father.

2    Q.  Your wife, where is she?

3    A.  She had a visa.  She crossed on the bridge.

4    Q.  Your children, I hope, too?

5    A.  My son was born here.

6    Q.  Okay.  And when you were arrested, you were now in the

7    hands of the United States law enforcement, right?

8    A.  Yes.

9    Q.  You didn't have any fear of them being bought by the

10   Zetas, right?

11   A.  No.

12   Q.  You didn't tell them any of this, did you?

13   A.  That I was coming, fleeing?

14   Q.  No.  That you had seen a little girl hacked to death,

15   multiple people hacked to death; you didn't tell them any of

16   that, did you?

17   A.  Yes.  I started talking about drugs.  I wanted them to

18   investigate me.  I wanted to be taken to prison.  I was afraid

19   that if they did not investigate me, then they were going to

20   return me, and my father and I would be dead.

21   Q.  The officer that was involved in your arrest and your

22   investigation sat in the same chair you are sitting and said

23   that you were being deceptive, that you were avoiding the

24   truth.  Is he wrong?

25            MR. GALDO:  Objection, Your Honor.  That is

Jorge De Leon-Navarro - Cross

1    comparing testimony to a witness.

2              THE COURT:  That is overruled.

3              THE WITNESS:  Can you ask the question again?

4    BY MR. CAVAZOS:

5    Q.  The officer that was involved in your detention or arrest,

6    that investigated you and talked to you when you were first

7    arrested, sat in that same chair that you are sitting in and

8    testified in this court that you were being deceptive and you

9    were avoiding the truth.

10             Did he get it wrong?

11   A.  No.  At first, I did start saying something.  Then I saw

12   that he was pulling up a lot of things that were mine, and so

13   that's -- about me, so I did not want to continue.

14   Q.  So what you are saying is that you were telling him things

15   that were not true, and he was providing you with things that

16   he knew about you that you knew to be true, and you shut down,

17   right?

18   A.  I asked for an attorney.

19   Q.  You didn't talk about the fear that was in your mind from

20   witnessing these horrific things that you claim you saw with

21   your eyes?

22   A.  That was the first I said to him, that I was kidnapped,

23   that I was fleeing, that I didn't want to -- my family to be

24   killed.

25   Q.  You didn't give him any details, did you?

Jorge De Leon-Navarro – Cross

1    A.  At that time, no.  Not until later.

2    Q.  It took months before you sat down and told him something

3    close to what you are telling them here today?

4    A.  Yes, because I was afraid because of my family, because of

5    what has happened.

6    Q.  Wasn't your family already in the United States?

7    A.  Some.

8    Q.  Well, did you tell the other family members that you were

9    worried about that you were coming to the United States and

10   why and that maybe they should think about crossing?

11              MR. GALDO:  Objection.  Your Honor, may we approach?

12              THE COURT:  Come on up.

13              (Bench conference, as follows:)

14              MR. CAVAZOS:  You don't need to say it.  I just

15   remembered what they were trying to caution me from -- I will

16   withdraw the question.

17              THE COURT:  Step back.

18              (End of bench conference.)

19   BY MR. CAVAZOS:

20   Q.  Disregard that last question, sir.

21              MR. GALDO:  Your Honor, may it be stricken from the

22   record?

23              MR. CAVAZOS:  I have no objection to it being

24   stricken, Your Honor.

25              THE COURT:  The question is stricken.

Jorge De Leon-Navarro – Cross

```
 1              Ladies and gentlemen, you should disregard the
 2    question was even asked.
 3    BY MR. CAVAZOS:
 4    Q.  It took months for you to agree to tell them the truth,
 5    correct?
 6    A.  Yes.
 7    Q.  It took a proffer agreement, which is an agreement between
 8    you, your lawyer and the government, that protects you from
 9    your own words, correct?
10    A.  Yes.
11    Q.  And even then, it took several times of you sitting down
12    with them before you began to talk about the details that you
13    testified to here today, correct?
14              MR. GALDO:  Your Honor, could we approach on the
15    earlier issue?
16              THE COURT:  Come on up.
17              (Bench conference, as follows:)
18              MR. GALDO:  Whether it was intentional or not, he
19    has essentially raised the entire issue of his death and --
20              THE COURT:  Of whose death?
21              MR. GALDO:  Of his brother's death.  And he talked
22    about his family, which is clearly what he is distraught about
23    right now, and the jury has no idea what is going on, and it
24    basically has impacted the rest of his cross-examination right
25    now.
```

Jorge De Leon-Navarro – Cross

1           MR. CAVAZOS:  I have no control over his emotions,
2    Judge.  I am basically --
3           THE COURT:  There was a question about -- several
4    times, and so that's all I want is an answer to that, and then
5    I will wait for the next question.  So the question is, "It
6    took several times of you sitting down before you began to
7    talk and give details, correct?"
8           MR. GALDO:  That's not what I am saying that
9    triggered him, Your Honor.
10          THE COURT:  I know what is triggering it, but it is
11   a satisfactory question, and so I can't control what triggers
12   anybody's emotions.  The question is proper.  He can answer
13   and answer just that question, and I have to wait for the next
14   question.
15          So the next question is going to be -- he is going
16   to start saying something about his brother, and then I will
17   shut it down at that point.
18          MR. GALDO:  But, Your Honor, my concern is not about
19   this specific question.  My concern is confusion on the jury's
20   part as to why he is reacting this way to this question.  They
21   don't understand the background of his improper question.
22          THE COURT:  The jury can figure all of this out for
23   themselves.  They don't need more details of anything else.
24          (End of bench conference.)
25

```
1    BY MR. CAVAZOS:
2    Q.  You can answer that question whenever you are ready, sir.
3              THE INTERPRETER:  Can the interpreter have the
4    question one more time?
5              THE COURT:  The question is, "It took several times
6    of you sitting down with them before you began to talk about
7    the details that you testified to here today, correct?"
8              And please answer yes or no and nothing further.
9              THE WITNESS:  Yes.
10             THE COURT:  Next question.
11   BY MR. CAVAZOS:
12   Q.  Then after that, you entered into a plea agreement with
13   the government, correct?
14   A.  Yes.
15   Q.  And contained within that plea agreement is a section that
16   provides that if you give the government information that they
17   can use, they will use their discretion and consider
18   requesting a judge to give you a lesser sentence, correct?
19   A.  Yes.
20   Q.  And after that is when you began to sit down with the
21   government and describe what you have testified to here today?
22   A.  Yes.
23             MR. CAVAZOS:  Pass the witness.
24             THE COURT:  How much do you anticipate?
25             MR. GALDO:  A fair amount, Your Honor.
```

```
1              THE COURT:  Okay.  Ladies and gentlemen, we are
2    going to call it a day.  Again, same instructions to you as
3    always.  No independent research.  Do not discuss this case
4    with each other.  Do not discuss this case with your loved
5    ones.  Do not read about this case.  If there is any coverage
6    on the TV, please avoid that.  No outside sources.
7              We will resume tomorrow at 8:30.  Be careful riding
8    home.
9              (Jury leaves courtroom.)
10             THE COURT:  Do you want to take up anything further?
11             Please be seated.
12             Do we need to take up anything else or not?
13             MR. LEACHMAN:  No, I don't think so.
14             MR. GALDO:  No, Your Honor.
15             MR. CAVAZOS:  No, Your Honor.  I am just going to
16   follow up with what we discussed earlier, and I will report to
17   you first thing in the morning.
18             THE COURT:  Okay.  So as we go forward here, do we
19   know who is going to be on the witness stand tomorrow?
20             MR. LEACHMAN:  Yes.  I have already basically told
21   Mr. Cavazos all of the remaining witnesses.  There will be a
22   few law enforcement witnesses to follow this witness and then
23   the last, you know, substantive witness.
24             THE COURT:  Okay.  So the expectation is that you
25   still might rest by tomorrow?
```

1          MR. LEACHMAN:  I think that is a possibility.

2          THE COURT:  Okay.  In the event that takes place,

3    then you need to be prepared to have some witness -- I am not

4    saying all of your witnesses, but at least some witnesses to

5    testify on Friday.  Yes, you.

6          MR. CAVAZOS:  Yes.

7          THE COURT:  And then -- and then any of your

8    witnesses coming from Mexico, if they are going to come here,

9    then we can wait upon them on Monday.

10          MR. CAVAZOS:  Thank you, sir.

11          THE COURT:  Okay.  See you tomorrow.

12          *-*-*-*-*-*-*-*

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      *-*-*-*-*-*-*-*

2    UNITED STATES DISTRICT COURT )

3    WESTERN DISTRICT OF TEXAS    )

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that the transcript fees and format comply

7    with those prescribed by the Court and the Judicial Conference

8    of the United States.

9    Date signed:  September 27, 2017.

10

11                          /s/ Karl H. Myers

12                          _____
                            **KARL H. MYERS, CSR, RMR, CRR**
                            Official Court Reporter
13                          655 East Durango Blvd., Suite 315
                            San Antonio, Texas 78206
14                          (210) 244-5037

15

16

17

18

19

20

21

22

23

24

25